B VOL 3 of 3

COURT OF CRIMINAL APPEALS NO. CR-02-2104

# APPEAL TO ALABAMA COURT OF CRIMINAL APPEALS

### FROM

## CIRCUIT COURT OF  MONTGOMERY  COUNTY, ALABAMA

CIRCUIT COURT NO.  CC 2002-1417

CIRCUIT JUDGE  HOBBS

Type of Conviction / Order Appealed From:  INTENTIONAL MURDER

Sentence Imposed:  LIFE WITHOUT PAROLE

Defendant Indigent: ■ YES ☐ NO

DARRYL JEVON JOYCE
NAME OF APPELLANT

AIMEE C. SMITH                    (334)  264-6466
(Appellant's Attorney)                              (Telephone No.)
640 S. MCDOUNOUGH STREET
(Address)
MONTGOMERY         AL            36104
(City)              (State)        (Zip Code)

V.

## STATE OF ALABAMA

NAME OF APPELLEE

(State represented by Attorney General)
NOTE: If municipal appeal, indicate above, and enter
name and address of municipal attorney below.

(For Court of Criminal Appeals Use Only)

Part 4 of 5


EXHIBIT
A

1    saying.  So I spoke back to them.

2    Q.  Now you actually saw Eric and

3    Boo.  They came up to you?

4    A.  Yes.

5    Q.  Before y'all got out of the

6    truck, did you see them in the area?

7    A.  They was in the alley, I mean,

8    the little -- like where the building

9    is.  They standing in the yard between

10   the two buildings.

11   Q.  Referring to State's 6, the

12   picture up on the screen?

13   A.  Yeah.

14   Q.  Is that the two buildings you

15   are talking to?

16   A.  Yes.

17   Q.  Is that what they are talking

18   about when they say the cut between the

19   two buildings?

20   A.  At the cut.

21   Q.  Where were they standing?

22   A.  Well, they were standing -- you

23   see like that Cadillac right there?  They

24   standing about right there, in between

25   that building right there.

1      Q.    Closer to the Cadillac?

2      A.    You know what I'm saying,

3   that's about where Boo was standing at.

4      Q.    Okay.

5      A.    Boo standing right there.  And

6   see, the Jeep was parked about a little

7   over towards the right by the driver's

8   side of the Cadillac.

9      Q.    Okay.

10     A.    The Jeep was over a little that

11  way.

12     Q.    But basically y'all were parked

13  in between those two buildings?

14     A.    Yeah.

15     Q.    And Boo came up and spoke to

16  you?

17     A.    Yes.

18     Q.    And then did you ever get out

19  of the car?

20     A.    I got out because my brother

21  had got out.  I got out and asked my

22  brother to let me go to the service

23  station.  So I went to the service

24  station and came back.

25     Q.    Now this is when you very first

1    got there?

2          A.    Yeah.

3          Q.    You saw them over by the

4    Cadillac and then you got in the car and

5    left?

6          A.    I got in the truck and went to

7    the service station.

8          Q.    How long did it take you to go

9    to the service station?

10         A.    It took me about ten or fifteen

11   minutes.  I just went to the Racetrak

12   right up the street.

13         Q.    And what did you get up there

14   at the Racetrak?

15         A.    A six pack of Coronas and a

16   cigar.

17         Q.    For the party?

18         A.    Yeah, but the party was over.

19   I was going to drink that just outside,

20   you know what I'm saying.

21         Q.    Just you and your brother?

22         A.    Yeah, me and my brother.

23         Q.    Was anything kind of -- how

24   would you describe the party once y'all

25   got there?

1      A.    I ain't heard no music.  There

2    were a couple folks outside, you know

3    what I'm saying.  It was dead.  It

4    supposed to have been my cousin, Chris

5    McQueen's, party.  We asked where he

6    was.  They said he was in the house

7    asleep, you know what I'm saying.  So the

8    party was over with when we got there.

9      Q.    Now what was going on when you

10   came back from the store with the cigars

11   and the beer?

12     A.    Well, they was out there

13   arguing.  So I called -- told Rabbit to

14   tell my brother to come on.  Told him to

15   tell Johnny to come on.

16     Q.    Who did you tell that to?

17     A.    Rabbit.

18     Q.    Rabbit?

19     A.    Yeah.

20     Q.    Now where were you in the truck

21   at this point, the Jeep?

22     A.    When I told Rabbit that?

23     Q.    Yeah.

24     A.    On the driver's side.

25     Q.    Where was the Jeep itself?

1     A.    Still backed in.

2     Q.    You backed in?

3     A.    I backed in when I came from

4  the service station.

5     Q.    And then what happened?

6     A.    I got out and my brother got

7  in, and I went around and got on the

8  passenger side.

9     Q.    So correct me if I am wrong,

10  but at this point the Jeep is backed in

11  there and you are on the passenger side?

12     A.    I pulled in.  I was driving.  I

13  backed back in so I told Eric to tell my

14  brother to come on.

15     Q.    Okay.

16     A.    Because, you know what I was

17  saying, his girlfriend had the truck.  So

18  I let him get back in the driver's seat

19  and I got out and went and got back in

20  the passenger's side.

21     Q.    I'm going to show you real

22  quick State's 5.  Do you recognize that?

23     A.    That's the truck.

24     Q.    Now, your brother is back in

25  the driver's seat and y'all are both in

1       the Jeep.  What happens now?

2           A.  Well, they -- they were still

3       arguing.

4           Q.  Now, when you say they, who

5       were you --

6           A.  James and Darryl.

7           Q.  And when you say Darryl, who

8       are you talking about?

9           A.  Joyce.

10          Q.  Darryl Joyce?

11          A.  Yes.

12          Q.  What else does he go by?

13          A.  Poncho.

14          Q.  How did you know it was James

15      and Darryl Joyce out there arguing?

16          A.  Because -- I met Darryl through

17      Rabbit.

18          Q.  Through Rabbit?

19          A.  Yeah.  I met him through

20      Rabbit.  Rabbit said this his home boy

21      out of prison, from prison.  So that's

22      how I knew Darryl.  I seen his face

23      once.  I remember his face.  I ain't

24      never forget it, you know what I'm

25      saying, but I grew up with Boo, you know

1    what I'm saying. So that's how I knew

2    Boo.

3        Q.   So you knew all the folks there

4    that night?

5        A.   Yeah.

6        Q.   And you specifically remember

7    seeing Darryl Joyce and Boo were the ones

8    in the argument?

9        A.   Yes.

10        Q.   Did you hear what they were

11    arguing about?

12        A.   No, I really didn't know what

13    they were arguing about. All I know it

14    was gang stuff, you know, you know what

15    I'm saying, gang related.

16        Q.   Back and forth?

17        A.   Gang related stuff back and

18    forth.

19        Q.   What is the next thing you

20    remember happening?

21        A.   Then -- I know I heard Boo say,

22    man, I ain't no proud person. If I

23    wanted to do something to you, I could

24    have got you that night you were asleep

25    on the porch, you know what I'm saying.

1     Q.    You heard Boo say that?

2     A.    Yeah.  Boo said that.

3     Q.    What happened next?

4     A.    Then that's what I seen the gun

5  up.  I seen him shoot him one time in the

6  leg.  So by that time he shot him one

7  time in the leg.  I'm looking back on the

8  passenger side.  He shot towards our

9  truck.  He hit our truck three times.

10  Shot the windows out on my side.

11     Q.    Now pretend for me and the jury

12  that you were sitting in the truck on the

13  passenger side.  Okay.  Pretend like the

14  jury box there is the truck.

15     A.    All right.

16     Q.    How are you looking behind you

17  to see what is going on?

18     A.    Just like this.

19     Q.    Okay.

20     A.    I could see the whole thing.

21     Q.    How could you see the whole

22  thing?

23     A.    Because you see where the

24  corner of the house right there on the

25  other side where it says 406?

1          Q.    Uh-huh (indicating yes).

2          A.    That was about where they were

3     at, you know what I'm saying.  Boo had

4     made it to about right there when he shot

5     him one time in the leg, you know what

6     I'm saying.

7          Q.    Is your window up or is your

8     window down?

9          A.    My window was down.  My head

10    was hanging out.  So I guess that's why

11    they shot at the truck because he seen my

12    head hanging out.

13         Q.    Now be a little more clear.

14    Now if this is your window right here,

15    are you just looking back over your

16    shoulder?

17         A.    I'm looking like this.

18         Q.    Looking out the window?

19         A.    Looking just like that.

20         Q.    What do you see?

21         A.    I see him shoot Boo in the leg

22    one time.

23         Q.    Who did you see shoot who?

24         A.    Poncho.  I seen Poncho shoot

25    Boo.

1    Q.    Do you see the person that shot

2    Boo in the courtroom here today?

3    A.    Yes.

4    Q.    Point him out to the jury.

5    A.    That man right there, sir.

6    Q.    Did you see that man there that

7    night?

8    A.    Yes, sir.

9    Q.    How far were you from where you

10   were in the truck back in that cut where

11   you saw him?

12   A.    From about -- from the -- the

13   truck was backed all the way to the curb,

14   and he was at the end of the building

15   just standing at the back end of the

16   building about the second window.

17   Q.    Put me about where he would

18   have been standing if you are sitting in

19   the truck.

20   A.    I'd say about --

21   Q.    From me to you?

22   A.    Something about thirty feet

23   back.

24   Q.    Did he come forward or back

25   up?

1      A.    Huh?

2      Q.    If I am standing --

3      A.    You need to come up some.

4      Q.    Come up?

5      A.    Yeah.  About like that.

6      Q.    About right there?

7      A.    Yeah.

8      Q.    When you looked back in the
9   truck, the guy you saw doing the shooting
10  was standing from me to you?

11     A.    Yeah, about that much.  That's
12  how he got a chance to shoot at our
13  truck.

14     Q.    Now what did you see the
15  defendant do once you turned and were
16  looking out the window of that truck?

17     A.    He shot at us three times.
18  Then I was telling my brother pull off.
19  While I'm telling my brother to pull out,
20  I'm still looking, you know what I'm
21  saying, to see if he shoot him again.  He
22  already shot him about two or three more
23  times, I guess.

24     Q.    And you saw that?

25     A.    I saw that.  I saw Boo fell.

1        Q.    From the truck?

2        A.    From the truck.

3        Q.    Now once the shooting was over

4    with, what did Darryl Joyce do?

5        A.    Take off through the back

6    field.

7        Q.    When you say the back field --

8        A.    Yeah.  Through that way.

9    Through the back.

10       Q.    Like toward that tree?

11       A.    No.  He turned the corner.  The

12    building right there, he turned back that

13    way.

14       Q.    The other way from the tree?

15       A.    Yeah, toward the left side.

16       Q.    What did you and your brother

17    do?

18       A.    We had pulled -- we had pulled

19    off, you know what I'm saying.  Then we

20    backed back.  We had went to the corner.

21    I said back on back.  We backed on back.

22    That's when we came back and Rabbit was

23    over Boo just like that.

24       Q.    Mr. Osborne, is there any doubt

25    in your mind that you saw this person

1    sitting in the courtroom today shoot

2    James Friendly?

3        A.    No, I ain't telling no -- I'm

4    telling you the whole truth.

5        Q.    Did you know another person at

6    the party named Bryant Thomas?

7        A.    No, sir.

8        Q.    You didn't know Bryant Thomas

9    or known as B.T.?

10        A.    I don't know him.

11        Q.    What about a dude named Darryl

12    Foggy?

13        A.    No.

14        Q.    So all you know is what you saw

15    out there that night?

16        A.    Yes.

17            MR. POWELL:    Nothing further,

18    Judge.

19            CROSS-EXAMINATION

20    BY MR. HARTLEY:

21        Q.    Mr. Osborne, y'all got out

22    there about what time that night?

23        A.    It was -- it was late.    I can't

24    recall.    The party was over with.    I

25    ain't --

1          Q.    I want to find out had you been
2     drinking before you arrived at the scene
3     there that night?
4          A.    No.  We just had left my mama's
5     house.  I just had put on clothes.
6          Q.    So you are going to a birthday
7     party that takes place over there in that
8     neighborhood and you don't go until 11:30
9     at night?
10          A.    Well, we had to take his
11     girlfriend to work and then we had to go
12     to the party.  But see we -- when they
13     throw parties out there, they throw
14     parties till in the morning time, you
15     know what I'm saying.
16          Q.    Things get kind of wild out
17     there, don't they?
18          A.    Yeah.
19          Q.    Let me show you some of these
20     exhibits.  You looked at that picture
21     over there and tried to refer to things
22     that happened out there that night.  It
23     wasn't lit up like that that night, was
24     it?
25          A.    No.

1      Q.     These are some photographs that
2  were taken by police officers -- by the
3  officer that came out there and
4  photographed the scene.  His pictures
5  portray it to be fairly dark out there.
6           Is there any lighting that
7  lights up that area behind the cars and
8  between the buildings?  Was there any
9  lighting out there that night?
10      A.     No.
11      Q.     So whatever you saw was in the
12  dark shadows of those buildings, wasn't
13  it?
14      A.     Yeah.  But you could still see
15  the person's face good though.
16      Q.     Well, if your brother testified
17  that the persons that he saw back in
18  there, standing back there near the
19  buildings were in the shadow from the
20  street light, it made it even darker.
21  Would you agree with that or disagree
22  with that?
23      A.     I can't say because my brother
24  couldn't really see from the driver's
25  side.

1        Q.    Excuse me?

2        A.    My brother couldn't see from

3    the driver's side so I couldn't really

4    say.

5        Q.    If he said he saw the people

6    that were back there but said he couldn't

7    identify them, then it would be up to him

8    to say whether or not he could see or

9    not, right?

10        A.    Yeah.

11        Q.    How many people did you see

12    back there at that time?

13        A.    Three.

14        Q.    Three?

15        A.    Yeah.

16        Q.    Well, what if your brother said

17    he saw five?

18        A.    I didn't see but three.  I seen

19    three guys I know.

20        Q.    So your brother and you who

21    were almost in exactly the same spot at

22    exactly the time observed totally

23    different numbers of people back there,

24    right?

25        A.    Yeah.

1       Q.   Wait.  You said the lighting

2  was good back there, right?

3       A.   When I got back, there were

4  three folks.  There were three folks out

5  there.

6       Q.   And at the moment that the

7  shooting went on --

8       A.   There was three folks.

9       Q.   You said there were three folks

10 and your brother says there were five?

11      A.   I didn't see but three.

12      Q.   Okay.  Is that because the

13 lighting was not as good as you are

14 trying to portray it to be to this jury

15 today?

16      A.   Well, from where I can see, I

17 know I can see what I can see, you know

18 what I'm saying?  It really wasn't that

19 dark back there.

20      Q.   Well, why do you think the

21 officer had such a hard time

22 photographing your vehicle when it comes

23 out that dark?

24      A.   Well, I don't know.

25      Q.   Do you see any lighting that

1    illuminates that area?  That's supposed

2    to be the area in State's Exhibit Number

3    1 between the buildings.  Do you see that

4    number 406 up there?

5         A.    That's not in the parking lot

6    though.

7         Q.    That's not?

8         A.    I'm saying, he ain't at the

9    parking lot.  He's taking pictures close

10   up.

11        Q.    This is the same area where the

12   shooting took place, right?

13        A.    Yeah.  That's a closeup

14   picture.

15        Q.    It wasn't lit up like that, was

16   it?

17        A.    No.

18        Q.    And that bad lighting and the

19   inability to see is why you and your

20   brother have totally different versions

21   of how many people were out there, right?

22        A.    Yeah.

23        Q.    Did you see Darryl Foggy out

24   there?

25        A.    I don't even know Darryl Foggy.

1      Q.    Is your brother acquainted with

2   Darryl Foggy?

3      A.    I don't even know.

4      Q.    Did you see Bryant Thomas out

5   there?

6      A.    I don't even know him.

7      Q.    Who did you know that was at

8   this party?

9      A.    All I know is Boo and Eric and

10   I know my cousin Chris McQueen.  I know

11   they were having the party.

12      Q.    Well, now, I'm not clear.  When

13   you first got there, did you say that

14   they came over and spoke to you at your

15   vehicle when you first got there or when

16   you returned from the store?

17      A.    When I first got there.

18      Q.    And they came over and spoke to

19   you?

20      A.    Rabbit --

21      Q.    How many people came over then?

22      A.    Two.

23      Q.    Just two people?

24      A.    Two, Rabbit and Boo.

25      Q.    And were they arguing?

1          A.    Uh-huh (indicating no).    They
2    were home boys.
3          Q.    Wait a minute.   But you don't
4    know Darryl Foggy, do you?
5          A.    No, sir.
6          Q.    Nicknamed D?   You don't know
7    him?
8          A.    (Witness nodding head
9    negatively.)
10          MR. HARTLEY:   No further
11    questions.
12          REDIRECT EXAMINATION
13    BY MR. POWELL:
14          Q.    Mr. Osborne, after you heard
15    those gunshots out there that night, did
16    anybody take off running?
17          A.    Well, ain't nobody -- I ain't
18    seen nobody run but Poncho.
19          Q.    Were there other people
20    standing around like on the porch and
21    that kind of thing that you were able to
22    see?
23          A.    No.   No, sir.
24          Q.    You didn't see it or there
25    wasn't anybody standing there?

1    A.    I didn't see it.  I didn't pay

2    no attention to it.  Because when he

3    started shooting at the truck, I was

4    telling my brother pull off.

5        Q.    You were focused on where the

6    shots were coming from?

7        A.    Where the bullets coming from,

8    you know what I'm saying.

9        Q.    So if there were other people

10   standing around or took off running --

11       A.    I don't even know about it.

12       Q.    -- you wouldn't know that?

13       A.    Uh-huh (indicating no).

14       Q.    Now when the gun shot, did any

15   fire come out of it?

16       A.    Well, you -- a little.

17       Q.    A little?

18       A.    You can't say much.  Just a

19   little fire came out.

20       Q.    But you were able to see that?

21       A.    Yeah.

22           MR. POWELL:  Nothing further,

23   Judge.

24           MR. HARTLEY:  Nothing further.

25           THE COURT:  Okay.

1                  MR. HARTLEY:  One more.

2     BY MR. HARTLEY:

3         Q.   Let me refer to your

4     statement.  This is page eleven.  You

5     gave a statement to the police, Detective

6     Townsend, on the day after the event.

7         A.   Yes.

8         Q.   It starts off, is your name

9     Brian Osborne?

10         A.   Yes.

11         Q.   Does that appear to be a

12     transcript of your statement?  Did you

13     say that?

14         A.   Yes.

15         Q.   On page eleven, you said so

16     -- you are describing -- after the

17     officer asked you questions about what

18     happened, then you said -- you heard

19     about five shots.

20                MR. HARTLEY:  This is the --

21     the fourth question down, Counsel.

22         Q.   So, you know -- I'm going to

23     read this for him if counsel does not

24     object.  You know what I'm saying, we

25     looked up and when I seen the dude Poncho

1    running behind the building, my brother

2    pulled off.

3              Why would you have to say you

4    looked up if you'd been looking out the

5    window and had your head turned around

6    and looking back the whole time?

7         A.    I ain't say that.

8         Q.    You didn't say that?

9         A.    They probably had it wrote

10   because we were talking too fast, you see

11   what I'm saying.

12        Q.    You are saying that the police

13   typed --

14        A.    I'm saying they typed up my

15   date of birth wrong, you see what I'm

16   saying.

17        Q.    So you are saying in the

18   original statement you did not say I

19   looked up and then saw Poncho running

20   off?

21        A.    I know I was paying attention.

22   I was looking all the time.

23        Q.    I am asking, if they say in

24   that typed statement, so you know what

25   I'm saying, I looked up -- I mean, I

1    looked up when I seen the dude Poncho

2    running behind the building.  You are

3    saying that that is not something you

4    said?

5        A.    Well, it's on paper.  It's got

6    to be.

7        Q.    So now you are saying you did

8    look up at some point.  That implies that

9    you ducked down and then looked back up,

10   right?

11       A.    I did not -- the whole time he

12   was shooting, I seen it from my own

13   eyes.  From my own eyes, I seen this.

14       Q.    Well, what does that mean when

15   you say we looked up?  We looked up.

16   What does that mean?

17       A.    Like I say, my brother, you

18   know what I'm saying.  Because it was me

19   and my brother in the truck.

20       Q.    Next question down.  It says,

21   between the third and fourth shot, did

22   you duck down?  And what did you answer?

23       A.    Yes, sir.

24       Q.    Okay.  So they asked you if you

25   ducked and you said yes, sir.  Correct?

1    A.   Yes.   Wouldn't you duck if you

2    shot at three or four times.

3    Q.   I'm just asking, were you

4    looking the whole time or were you not

5    looking the whole time?

6    A.   I ducked after he shot at our

7    truck.   But when he shooting Boo, I seen

8    that from my own eyes.

9    Q.   Now you have changed your

10   testimony from where you were looking

11   back the whole time now to where you did

12   duck down at some point along the way,

13   right?

14        Because when you answered that

15   question, okay, all right.   Did you duck

16   down, your answer was affirmative.   What

17   does it say?

18   A.   Yes, sir.

19   Q.   Okay.   Now do you admit that

20   you said that to the police officer?

21   A.   It's on paper.   It got to be.

22   Q.   So you in fact did duck down

23   during part of that event, didn't you?

24   Did you?

25   A.   After he shot at our truck.

1    Q.   Okay.  So you weren't looking

2    back the whole time?

3    A.   Because glass and stuff was

4    still flying.

5    Q.   You were looking back at that

6    area that was dark behind your vehicle?

7    A.   Yeah.

8    MR. HARTLEY:  Okay.  No further

9    questions.

10    REDIRECT EXAMINATION

11    BY MR. POWELL:

12    Q.   I think Mr. Hartley may have

13    skipped over one question, Mr. Osborne.

14    Now the part he was referring to where he

15    was talking about, I'm saying we looked

16    up.  That's right here, is it not?

17    A.   Yes.

18    Q.   The very next question, what is

19    that?

20    A.   Yes, sir.

21    Q.   Does it say, did you actually

22    see Poncho pull the trigger?  Is that the

23    question?

24    A.   Yes, sir.

25    Q.   And the answer is yes, sir, I

1    saw the fire?

2        A.    Yes, sir.

3        Q.    That's what it says?

4        A.    Yes.

5        Q.    That was actually the next

6    question?

7        A.    Yeah, before that.

8        Q.    And then he asked you, so where

9    was Boo?  And your answer was Boo had --

10   Boo was right there.  He had fell on the

11   ground by then.  By that time he had

12   fell; is that right?

13       A.    Yes, sir.

14       Q.    And then he starts asking you

15   that's when the vehicle got shot and

16   that's when you ducked?

17       A.    Yes.

18       Q.    Okay.

19           MR. POWELL:  Nothing further,

20   judge.

21           THE COURT:  You want to ask one

22   more question again, Mr. Hartley?

23           MR. HARTLEY:  No.

24           (Off-the-Record Discussion.)

25           THE COURT:  You can step down.

1    Thank you, sir.  Ladies and gentlemen, we

2    are going to break for the day.  I

3    appreciate your patience.  We are going

4    to start back at 9:00 in the morning

5    unless somebody tells me -- if that

6    creates a problem for you.  Is that okay

7    for everybody?

8         I think -- hopefully we can

9    finish the evidence before lunch anyway.

10   Maybe even get the law to you and all

11   that.  We can -- y'all can start

12   deliberating tomorrow afternoon.

13        In the meantime, remember don't

14   let anybody discuss the case with you.

15   Don't discuss the case with each other.

16   Don't try to do an independent

17   investigation of the facts in this case.

18   Don't get on the internet.  I can promise

19   you the first thing that is going to

20   happen when you go home tonight is your

21   wife or your husband or your children,

22   somebody is going to say tell me about

23   the case.  Don't start talking about it

24   with them.  Don't tell them anything

25   because they are going -- as soon as you

1    start telling them about the case, they
2    are going to throw their two cents in.
3    They are going to throw two cents in and
4    they don't know anything about case.
5    They hadn't heard word one. It just
6    takes us in an area where we don't want
7    to go.
8            I hadn't seen anybody from the
9    newspaper or anything in here today but
10   you never know. Something could be
11   reported on the news or something about
12   it. Just don't read anything about the
13   case. Don't listen to anything on the
14   news. I have yet to read a news account
15   of a case where they got it right. There
16   is always something in there that they
17   don't quite get. And since they are not
18   even here, anything they write is going
19   to be what somebody told them. It just
20   gets all messed up. So if you see an
21   article in the newspaper or you watch the
22   news and they start talking about
23   something that went on at the courthouse
24   just cover your ears. Just please don't
25   listen to them. It just causes more

1    problems than it is worth.

2              Good night.  Thank y'all

3    again.  If y'all would be back at the

4    jury assembly room at 9:00 in the jury

5    assembly room, we'll come get you.  We

6    will start first thing in the morning.

7              (The jury exits the courtroom.)

8              (COURT ADJOURNED.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    **June 22, 2003**

2        THE COURT:  Good morning.  Glad

3    to have you back.  The reason we started

4    at nine is in case you didn't know, we

5    had some other matters to attend to this

6    morning.  We have gotten those out of the

7    way and we are ready to get started.  Mr.

8    Powell.

9        MR. POWELL:  The State calls

10   Detective Gino Howton.

11       E.E. HOWTON,

12   having been first duly sworn, was

13   examined and testified as follows:

14       DIRECT EXAMINATION

15   BY MR. POWELL:

16       Q.   Detective, could you state your

17   name for the members of the jury?

18       A.   Corporal E.E. Howton.

19       Q.   And how are you employed?

20       A.   I'm a homicide detective for the

21   Montgomery Police Department.

22       Q.   How long have you been a homicide

23   detective?

24       A.   About six-and-a-half years.

25       Q.   How long have you been a

1     Q.    And what about specifically any

2     training or specialized class work you have

3     done as a robbery homicide detective?

4     A.    Been through investigation

5     classes.   I have been to interrogation

6     classes.   You know, interview classes,

7     stuff like that.

8     Q.    Now, Detective, you are what is

9     referred to as a case agent in this case;

10    is that right?

11    A.    Yes, sir.

12    Q.    Describe for the jurors what that

13    means.

14    A.    I am responsible for basically

15    putting the case together in whatever the

16    situation is and I am responsible for

17    collecting, gathering evidence from not

18    only information that I have obtained but

19    from other sources and end up putting it in

20    a case file such as this.

21    Q.    So basically you are the primary

22    or lead detective on this case?

23    A.    Yes.

24    Q.    Are you the main detective

25    involved in investigating the circumstances

1   of this case?

2       A.   After I was called in, yes, I

3   was.

4       Q.   So basically all the documents

5   and everything related to this case come to

6   you?

7       A.   Yes.

8       Q.   Now, Detective, when were you

9   first called in on this case?

10       A.   Saturday morning about 3:30 in

11   the morning.

12       Q.   What happened?

13       A.   I was contacted at my house by my

14   lieutenant.  He told me that there had been

15   a shooting out at Smiley Court and one of

16   the subjects -- the subject that had been

17   shot died and he needed me to respond to

18   headquarters at that time.

19       Q.   At that point did this become

20   your case?

21       A.   After I got to headquarters it

22   was, yes.

23       Q.   What did you do to follow up and

24   begin investigating this incident?

25       A.   Well, I started getting

information from the late car detectives as
to basically what the situation was out in
Smiley Court when they got there.  The
individuals that were involved and
potential witnesses that had already been
interviewed, getting their names,
addresses, so forth.

Q.   Did you ever go back and
reinterview any of those witnesses?

A.   Yes, I did.

Q.   Now from your initial processing
of this information, talking to these
witnesses, did you develop any suspects?

A.   I was initially given the name of
a subject at headquarters by the name of
Darryl Joyce or Darryl Joiner.  That's what
was originally given to me.

Q.   Okay.  Now, did you talk to any
other witnesses -- did you talk to any
other witnesses as you continued following
up on this information?

A.   Yes.  I spoke to a black female
that was out there.  I spoke to Eric
Stewart.

Q.   That would be Rabbit who we have

1       already heard from?

2              A.    Yes.

3              Q.    Do you know the name of the black

4       female you spoke with?

5              A.    Ms. Judkins.

6              Q.    Whose residence was the party at?

7              A.    Ms. Judkins.

8              Q.    So you spoke to the lady that was

9       having the party?

10             A.    Right.

11             Q.    From that conversation, did you

12      develop any other possible names or

13      possible suspects?

14             A.    Well, there was another subject

15      that was named Darryl as well.

16             Q.    So we got two Darryls at the

17      party?

18             A.    We had two Darryls at the party.

19      One was the original suspect that was given

20      to me, the other subject was known as D.,

21      Darryl Foggy.

22             Q.    Darryl Foggy?

23             A.    Yes.

24             Q.    So let me make sure I'm clear.

25      We got one Darryl which is Darryl Joyce?

1        A.   Right.

2        Q.   Is this that Darryl Joyce?

3        A.   Yes.

4        Q.   The one in the courtroom today?

5        A.   Yes.

6        Q.   And the other Darryl is Darryl

7  Foggy?

8        A.   Yes.

9        Q.   And those were basically the two

10  Darryls you had at that party?

11       A.   Yes.

12       Q.   How did you follow up with those

13  two names to determine which one was your

14  suspect?

15       A.   Well, like I said, I

16  reinterviewed Eric Stewart, Rabbit.  Of

17  course, he was adamant that Darryl Foggy

18  was not involved in the shooting.  He was

19  at the party but he was not involved in the

20  actual shooting of Mr. Friendly.

21       Q.   Okay.

22       A.   He later gave me the location of

23  where a handgun which belonged to Darryl

24  Foggy could be located where I eventually,

25  myself and another detective, went to a

1    residence across the street from Ms.

2    Judkins where we collected a nine

3    millimeter.

4          Q.    I'm going to show you State's

5    21.  Do you recognize this?

6          A.    Yes, sir.  This is the firearm

7    handgun which we recovered from Amy

8    Albright's apartment.

9          Q.    And Amy Albright lived where in

10    relation to this incident?

11          A.    Just right across the street.

12          Q.    And the information you had that

13    led you to this handgun in Amy Albright's

14    apartment came from who?

15          A.    Eric Stewart.

16          Q.    And you were able to collect this

17    gun?

18          A.    Yes.

19          Q.    Once you had it in your custody,

20    what did you do with it?

21          A.    It was sent to DFS.

22          Q.    What does that mean?

23          A.    It was sent to the Department of

24    Forensic Sciences to have it examined to

25    see if the round came -- that was recovered

1    from the victim came from that gun.

2        Q.    Were you aware of any projectiles

3    that were recovered from the victim?

4        A.    We were aware that three shell

5    casings were recovered from the area.

6        Q.    From the crime scene?

7        A.    Yes.

8        Q.    And what about an actual bullet

9    that came out of the victim from an

10   autopsy?

11       A.    We recovered one round from the

12   victim.

13       Q.    I'm going to show you what we

14   have marked collectively as State's 15, 16

15   and 17, and ask you if you recognize these?

16       A.    These are the shell casings which

17   were recovered from the crime scene.

18       Q.    Do those appear to be in the same

19   -- do those casings appear to be in the

20   same or substantially the same condition as

21   the last time you saw them or had them in

22   your custody?

23       A.    Yes.

24            MR. POWELL:   We offer State's 15,

25   16 and 17.

1          MR. HARTLEY:  Judge, I don't

2    think the chain of custody has been fully

3    established.

4          MR. POWELL:  We'll wait on

5    admissability, Judge.

6          THE COURT:  I will let them in.

7          (State's Exhibit Numbers 15, 16

8    and 17 admitted into evidence.)

9     Q.    Now, Detective Howton, do you

10   know who collected these shell casings from

11   the scene?

12    A.    Detective Grandison.

13    Q.    And do you know what Detective

14   Grandison did with these shell casings?

15    A.    Impounded them.

16    Q.    And then once they -- when you

17   say they were impounded, explain to the

18   jurors what that means.

19    A.    He took them and eventually

20   placed them into the supply and evidence

21   room down at headquarters, which eventually

22   the casings were submitted to DFS through

23   the crime scene bureau tech.

24    Q.    How does that work?  How did the

25   crime scene bureau tech get the shell

1    casings from y'all's evidence room over to

2    the DFS?

3        A.    We fill out a request form, and

4    once that request form is filled out we

5    give them a copy of it and they receive

6    that copy.   Then in turn they go back to

7    the supply and evidence room and retrieve

8    the shell casings at which time then they

9    transport it out to DFS and we release it

10   to them.

11       Q.    To your knowledge, was anybody

12   else in your chain of custody besides

13   Detective Grandison, the evidence tech in

14   this case that transported the bullets, the

15   DFS person that tested the bullets or

16   yourself who received them back from DFS?

17       A.    I'm not aware of anybody else,

18   no.

19       Q.    Now, Detective, so basically what

20   you had from physical evidence of the scene

21   was a bullet from the victim's body, these

22   three shell casings, and State's 21, which

23   is a handgun purported to be from Darryl

24   Foggy; is that correct?

25       A.    That's correct.

1    Q.    Did you ever find Darryl Foggy?

2    A.    Yes.

3    Q.    Were you able to take a statement

4    from Darryl Foggy?

5    A.    Yes.

6    Q.    And after you had got the results

7    back from that handgun and talked to Darryl

8    Foggy, who did you sign warrants on?

9    A.    Mr. Joyce.

10    Q.    Was there any other evidence

11    implicating Darryl Joyce in this incident

12    other than Eric Stewart's testimony?

13    A.    Well, the fact -- I couldn't find

14    him.

15    Q.    You couldn't find him?

16    A.    I couldn't find him, no.

17    Q.    Were you ever able to recover a

18    gun or any type of firearm from Mr. Joyce

19    or his residence or anything associated

20    with him?

21    A.    No.

22    Q.    Were there any other witnesses

23    that identified Mr. Joyce as being the

24    shooter?

25    A.    You had Eric Stewart.  You had

1    Brian Osborne.

2        Q.    Now, Detective --

3        A.    And I believe you had Mr. Foggy.

4        Q.    Do you know when you arrested

5    Darryl Joyce?

6        A.    It was approximately -- it was on

7    February the 11th when he was actually

8    arrested out in California.

9        Q.    What do you mean he was arrested

10   in California?

11       A.    He was stopped in a traffic stop

12   by some officers out in Los Angeles or in

13   that area where he used a fake name and had

14   a fake ID, and they charged him with that.

15       Q.    How were you able to identify the

16   person in California as your suspect Darryl

17   Joyce?

18       A.    He used the name of Willie Faulk,

19   and that is his mother's maiden name.  We

20   had a lookout on him at that time, which

21   was NCI.  We had a nationwide lookout on

22   him.  We ended up sending a certified copy

23   of some fingerprints of Mr. Joyce out to

24   LA, and in turn they sent a photograph back

25   to us.  They were able to verify the

1    fingerprints that belonged to Darryl Joyce

2    at that time.

3        Q.    Did you take a look at the

4    photographs?

5        A.    Yes.

6        Q.    Were you able to verify the

7    photographs?

8        A.    I just -- just that one

9    photograph they sent to me.    I told them

10    that he had a habit of bending his lip

11    whenever a photograph was taken of him to

12    kind of distort the photograph.    When I got

13    the photograph back from LA, that's what I

14    had was a photograph of him, which I

15    identified, and him biting his upper lip.

16        Q.    When did this incident occur,

17    Detective Howton, the shooting?

18        A.    Actually, on the 1st of February

19    of 2002.

20        Q.    And when was the next time any

21    law enforcement had contact with this

22    defendant?

23        A.    When he was arrested out in Los

24    Angeles.    That was on the 11th.

25        Q.    The 11th, ten days later?

1        A.    Yes.

2        Q.    He was all the way in Los

3   Angeles, California?

4        A.    Yes.

5        Q.    Now, Detective, I want to show

6   you what I have marked for identification

7   purposes only as State's 28.  Explain to

8   the jurors what State's 28 is.

9        A.    This is a mug book that we have.

10        Q.    What does that mean?

11        A.    Well, it has got -- it contains

12   photographs of --

13            THE COURT:  Can you speak up,

14   Detective.  I don't think everyone can hear

15   you.

16        A.    This is a mug book.  It has a --

17   or has photographs of several individuals

18   which have been arrested over a period of

19   time, and they are collected in this book.

20            MR. HARTLEY:  Judge, I object and

21   move for a mistrial.  The evidence

22   -- whatever the history of all these

23   people in this book should not be

24   introduced in this trial, Judge.

25            (An off-the-record discussion was

1    held outside the presence and hearing of

2    the jury and the court reporter.)

3             THE COURT:  You have your

4    objection.  Ladies and gentlemen of the

5    jury, the fact that the police department

6    has a photograph of Mr. Joyce is not to be

7    considered by you any implication that he

8    is guilty or innocent in this case.  It is

9    not evidence of guilt, the fact that they

10   had a photograph of Mr. Joyce.

11            They have got lots of photographs

12   and that's not to be considered by you.

13   Does everybody understand that?  Does

14   anybody have a problem with treating that

15   as not being an indication of his guilt?

16   Okay.

17       Q.   You were talking about the book

18   with a bunch of photographs in it?

19       A.   Yes.

20       Q.   Now, is the defendant's picture

21   in that book?

22       A.   Yes.

23       Q.   Could you open the book to the

24   page with the defendant's picture on it?

25       A.   (Witness complies.)

1          Q.    Is this the page with the

2    defendant's picture on it?

3          A.    Yes.

4          Q.    Did you use this book at any

5    point during the course of your

6    investigation?

7          A.    Yes.

8          Q.    Explain to the jurors how you

9    used this book.

10         A.    Just presented the book to some

11   of the witnesses and let them see if they

12   could identify Mr. Joyce.

13         Q.    Was Eric Stewart one of those

14   witnesses?

15         A.    Yes.

16         Q.    Was he able to identify the

17   defendant?

18         A.    Yes.

19         Q.    Did you show this book to either

20   one of the Osbornes?

21         A.    Not me, but I believe one of the

22   other detectives did.

23         Q.    And could you point out to the

24   jurors which one of the pictures on these

25   two pages is Mr. Joyce?

1      A.    The top one right here.

2      Q.    And is that the same picture or

3  different picture from the one Eric Stewart

4  identified?

5      A.    I believe that's the same picture

6  it came from out of the book.

7      Q.    The same picture.  And Eric

8  Stewart used this book to positively

9  identify the defendant Darryl Joyce?

10      A.    Yes.

11      Q.    Now, Detective, did you ever go

12  out to this crime scene?

13      A.    Yes.

14      Q.    So you are familiar with the

15  layout and the evidence where it was

16  collected?

17      A.    I know the general area, yes,

18  sir.

19      Q.    The general area?

20      A.    Yes, sir.

21      Q.    I'm going to show you a series of

22  photographs and ask you to take a look at

23  these real quick.  First, let's start with

24  -- here it is right here.  Let's start

25  with State's 27 and 27-A.  I believe

1    State's 27 and 27-A have been combined

2    together, put on the board there. Do you

3    recognize that?

4              A.    Yes, sir.

5              Q.    What is it?

6              A.    It is a drawing that I did,

7    completed in reference to the crime scene

8    and the general area of the crime scene.

9              Q.    To your knowledge, this is not to

10    scale?

11              A.    No, it's not to scale.

12              Q.    With that exception, does this

13    fairly and accurately represent the way the

14    crime scene looked on the night of the

15    shooting?

16              A.    Yes.

17              MR. POWELL: We offer 27 and

18    27-A, Judge.

19              THE COURT: It is admitted.

20              (State's Exhibit Numbers 27 and

21    27-A admitted into evidence.)

22              Q.    Detective Howton, I have got a

23    series of photographs here, State's 1, and

24    some of these other ones have already been

25    admitted. State's 1 through 6. Do you

1    recognize those?

2         A.    It is photos of the crime scene.

3         Q.    Are you familiar with those?

4         A.    Yes.

5         Q.    I want you to go ahead and take a

6    look for me at State's 7 through 14.

7         A.    (Witness complies.)

8         Q.    Just look through real quick and

9    tell me if you recognize those.

10        A.    It is a photograph of the crime

11   scene of that area.  This is during

12   daylight hours though.

13        Q.    It is a different photograph of

14   the crime scene?

15        A.    Yes.

16        Q.    Do these appear to be fair and

17   accurate representations --

18             MR. HARTLEY:  Your Honor, I

19   object.  I don't believe Mr. Howton was out

20   there.  No testimony has been brought forth

21   as to when he was out there or what

22   occasions he was out there and what time he

23   was out there.  So I'm not sure how Mr.

24   Powell can ask him if they fairly and

25   accurately depict the scene if he wasn't

1       out there the night that the scene was

2       investigated.

3                   THE COURT:   When was he out

4       there?

5           Q.   Detective, when did you actually

6       go to the crime scene to look at these two

7       apartment buildings?

8           A.   I was out there that Saturday

9       morning around 5:30 in the morning.

10          Q.   Did you ever go back out there

11      subsequently?

12          A.   Well, that was the first time I

13      went out there was that Saturday morning

14      around 5:30.

15          Q.   And have you ever been over to

16      the area of Marlyn Street in Smiley Court

17      before?

18          A.   Oh, yes, many times.

19          Q.   How many times have you been out

20      there to that area in general?

21          A.   Several.

22          Q.   Are you familiar with the basic

23      setup of the apartment buildings and the

24      areas that are located on Smiley Court?

25          A.   Yes, sir.

1      Q.   And from your knowledge, based

2   both specifically on this case and from

3   your knowledge of the neighborhood in

4   general, do these pictures appear to be

5   fair and accurate representations of the

6   areas surrounding the 4000 block of Marlyn

7   Street?

8      A.   Yes, sir.

9           MR. POWELL:  We offer these

10  photographs.

11          THE COURT:  Admitted.

12          (State's Exhibit Numbers 7

13  through 14 admitted into evidence.)

14     Q.   Now, Detective, we prepared a

15  Powerpoint demonstration, a monitoring aid

16  to assist you in your testimony.

17          Would that assist you in

18  explaining the locations of several items

19  of physical evidence to the jury?

20     A.   Yes, sir.

21     Q.   What are we looking at on the

22  screen?

23     A.   That's the drawing that I

24  completed and the legend that went with it.

25     Q.   Does the photograph that just

1    appeared on the screen, I believe it is

2    marked State's 1, what is that a photograph

3    of?

4         A.    That's going to be a photograph

5    of the area in between the two buildings

6    where the shooting occurred.

7         Q.    And the arrow, what does that

8    indicate?

9         A.    That's the general area where the

10   shooting occurred.

11        Q.    Now the next photograph that came

12   up, I believe it is State's 6.  What is

13   that a photograph of?

14        A.    That's the same area except it's

15   a photograph in daylight.

16        Q.    Now that's a closeup.  To the

17   best of your knowledge, is this where the

18   shooting occurred?

19        A.    Yes, sir.

20        Q.    And this is a different

21   photograph?

22        A.    Yes, sir.

23        Q.    What does that circle indicate?

24        A.    That's where the victim and the

25   shell casings were located.

1           Q.    Now, the three photographs that

2      just appeared, what are those?

3           A.    Those are the shell casings which

4      were located at the scene.

5           Q.    And the circles that just

6      appeared, what do they indicate?

7           A.    The shell casings.

8           Q.    And those casings that are

9      circled in those photographs, are those the

10     same casings that we have admitted into

11     evidence as State's 15, 16 and 17?

12          A.    Yes, sir.

13          Q.    What is this a photograph of?

14          A.    That is going to be the vehicle

15     that the Osbornes were in.

16          Q.    And, again, what is this a

17     photograph of?

18          A.    That's an overall of the crime

19     scene area.

20          Q.    Do you know which apartment

21     building the party was being held in?

22          A.    It's going to be on the lower

23     right --

24          Q.    You can press that button and

25     indicate it there.

1          A.    Okay.   All  right.   The  party  was

2     held  right  there.

3          Q.    Now,  what  is  this  a  photograph

4     of?

5          A.    That's  the  overall  view  of  the

6     crime  scene.

7          Q.    And  that  one?

8          A.    Same  thing.

9          Q.    Now  this,  what  are  we  looking  at

10     here?

11          A.    That's  the  building  where  the

12     party  was  being  held  at.

13          Q.    And  what  is  this?

14          A.    That's  the  actual  apartment  right

15     here.

16          Q.    And  what  --  that  area  there,  does

17     that  indicate  the  porch  some  people  have

18     been  referring  to?

19          A.    Yes,  sir.

20          Q.    And  another  photograph?

21          A.    Yes,  sir.

22          Q.    What  is  this  a  photograph  from?

23          A.    That's  going  to  be  the  back  side

24     of  the  buildings.

25          Q.    The  reverse  angle?

1          A.    Right.

2                MR. POWELL:  I don't think I have

3     anything further of this witness, Judge.

4                THE COURT:  Mr. Hartley.

5                CROSS-EXAMINATION

6     BY MR. HARTLEY:

7          Q.    Detective Howton, do you have any

8     of the supplemental offense reports that

9     you prepared as case agent of this case, do

10    you have any of those with you?

11         A.    I've got several right here in

12    the case file.

13         Q.    You do have them so you can refer

14    to them if I ask you to refer to them,

15    right?

16         A.    Yes.

17         Q.    When you began your testimony,

18    Mr. Powell asked you about some of the

19    steps you took in conducting your

20    investigation and you did say that you

21    talked to a Nicole Judkins; is that right?

22         A.    Yes, sir.

23         Q.    And you talked to Darryl Foggy, I

24    believe?

25         A.    Yes, sir.

1        Q.    But you talked to several other

2    people beyond that, didn't you?

3        A.    Yes, sir.

4        Q.    Did you speak to a Bryant Thomas?

5        A.    Yes, sir.

6        Q.    All right.  And, of course, you

7    took -- did you take statements from Eric

8    Stewart?

9        A.    Yes, sir.

10        Q.    One of them or both of them?

11        A.    I took one of them, yes.

12        Q.    And was it -- were you the person

13    that Eric Stewart divulged the information

14    about the location of Darryl Foggy's gun?

15        A.    Yes, sir, he was.

16        Q.    Now, could you refer to your

17    supplemental offense report that was

18    prepared on February the 5th, '02.  I know

19    there are more than one in the file.  So I

20    will try to give you a reference point

21    here.  It is called a follow-up

22    investigation.  The first line of this --

23    I'm sorry.  Let me give you -- it is a

24    fourteen page long report.  So you notice

25    it is one of the more lengthy ones.  It

1      starts off on Saturday, February 2nd, '02.

2      Can you find that one?

3              A.    Can you tell me what date the

4      supplement was done?

5              Q.    On February the 5th, '02, at 840

6      hours.  It is a fourteen page report.

7              A.    Fourteen page?

8              Q.    Let me show you the first page of

9      it.

10             A.    I've got it right here.

11             Q.    That's the one.

12             A.    Okay.

13             Q.    And this is something that you

14     prepared in the course of our

15     investigation; is that right?

16             A.    Yes, sir.

17             Q.    And it memorializes a lot of

18     things that happened, right?

19             A.    Yes.

20             Q.    I want you to refer, if you will

21     -- let me be sure I get to the right

22     place.

23             MR. HARTLEY:  I'm sorry, Judge.

24     I've got so many pages.

25             Q.    Yes.  On page nine, if you will.

1    In the first paragraph of that part of the

2    report -- well, on the previous page and

3    the top paragraph on page nine, I think

4    that's where you are writing your notes

5    that you made that recorded Eric Stewart's

6    disclosing where the gun was that was

7    Darryl Foggy's gun; is that right?

8         A.   Yes, sir.

9         Q.   And at the end of that paragraph

10   you wrote the following, and I want you to

11   explain it to the Court.  The sentence is

12   written:  At this time it is unknown as to

13   reason why Eric Stewart took Foggy's gun

14   and hid the gun.  I think there is a typo

15   there.  It is A-N but it is probably and

16   hid the gun, end of sentence.

17        At that time, did you have some

18   information that would have led you to

19   write in this report that Eric Stewart had

20   hidden Foggy's gun, Darryl Foggy's gun?

21        A.   No, but at that time I was having

22   some doubt as to which Darryl was actually

23   involved.

24        Q.   But that's not the same

25   question.  The question is:  Your report

1   says, at this time it is unknown as the

2   reason why Eric Stewart took Foggy's gun

3   and hid the gun.  I mean, you didn't just

4   write that as a casual matter of no

5   importance, did you?

6       A.    I didn't know.  I don't know why

7   he took the gun.  That's why I --

8       Q.    But something made you put it in

9   your report that there was an open question

10   as to why Eric Stewart hid Darryl Foggy's

11   gun, right?

12       A.    Correct.

13       Q.    And did you in fact get some

14   information from a lady named Ms. Works?

15       A.    Yes.

16       Q.    It is down at the bottom of that

17   same page, isn't it?

18       A.    Yes.

19       Q.    And what did she tell you about

20   Darryl Foggy's gun?

21       MR. POWELL:  Your Honor, we are

22   going to object to hearsay.

23       MR. HARTLEY:  Your Honor, it is

24   written in his report.

25       MR. POWELL:  It is still hearsay.

1          THE COURT:  It is still hearsay.

2          Q.   Well, I won't ask you what she

3     said.  Did you record in your report

4     information from Ms. Works that also

5     referenced the fact that Eric Stewart had

6     hid Darryl Foggy's gun?

7          MR. POWELL:  Your Honor, we are

8     going to object to the double hearsay.

9          MR. HARTLEY:   That's not

10    hearsay.  That's what he wrote in his

11    report, Judge.

12         MR. POWELL:  It makes it hearsay.

13         THE COURT:  It is still hearsay.

14         Q.   So you can't tell us why you

15    wrote in the report after having talked

16    with all these people something about Eric

17    Stewart having hidden Darryl Foggy's gun?

18         A.   Repeat that one more time.

19         Q.   I'm going back to my question a

20    moment ago.  Did you write in the report

21    that you had an -- an open question or --

22    it was unknown to you why Eric Stewart had

23    taken and hidden Darryl Foggy's gun?

24         A.   That's right.  I didn't know why.

25         Q.   But you wrote that in there for

1   some reason, right?

2       A.   I was questioning it, yes.

3       Q.   Let me ask you about your

4   interview or your statement or your -- I

5   don't think you took a statement from

6   Bryant Thomas.  Who was Bryant Thomas?

7       A.   Bryant Thomas is the subject that

8   walked over there with James Friendly, over

9   to the party that night.

10      Q.   And I guess on the next day, on

11  Saturday, were you interviewing him about

12  the -- his knowledge of this case?

13      A.   Did I speak to him on Saturday?

14      Q.   Let me refer you to page eight of

15  the report.

16      A.   Page eight.

17      Q.   The same report.

18      A.   I did speak to him on Saturday.

19      Q.   Did you ask him if he knew who

20  had committed the offense?

21      MR. POWELL:  Your Honor, at this

22  point it may be a little premature but we

23  are going to object to the substance of

24  anything that Bryant Thomas told the

25  detective as that would be hearsay if it

1    doesn't come from Bryant Thomas himself.

2         MR. HARTLEY:  We've got Bryan

3    Thomas to testify if we need to, Judge.  I

4    will just ask him about this exhibit.

5    We've got an exhibit that came from his

6    file.  We can ask him about that.

7         MR. POWELL:  True.

8         MR. HARTLEY:  Okay.

9         Q.   Without telling me, you know,

10   words that Bryan Thomas said, did you go

11   through a process with Bryan Thomas to

12   possibly narrow down or specifically

13   identify a suspect who committed this

14   offense?

15        A.   Yes.

16        Q.   Did you show him one of these

17   photo arrays that we have heard testimony

18   about in this case earlier?

19        A.   Yes.

20        Q.   Now this photo array -- you can

21   see what I have in my hand here, can't you,

22   from a distance?  What kind of photo array

23   is this?  It is not the same as this book

24   over here, is it?

25        A.   That's more or less a photo

1    lineup.

2         Q.    Right.   Is this designed so that

3    a person might be able to pick somebody out

4    of a group and say this is a person who

5    committed the offense?

6         A.    Yes.

7         Q.    All right.   And did you go

8    through that process with Mr. Bryan Thomas?

9         A.    Yes.

10             MR. HARTLEY:   Now, this has not

11   been admitted or offered yet, I don't

12   believe.

13             MR. POWELL:   Not yet.

14        Q.    It bears a sticker called State's

15   Exhibit 26.   I'm going to show it to you

16   now.   See if you can identify that for the

17   Record and for the jury and tell us what

18   you know about that lineup?

19        A.    This is a lineup that is signed

20   by Bryant Thomas and he is identifying

21   photograph number three in this lineup.

22        Q.    All right.   Now, he -- I want you

23   to be specific because when you asked him

24   to identify this, you identify someone from

25   that photo, were you asking him to identify

1    persons who were present or the person who

2    committed the offense against James

3    Friendly?

4         A.   Usually when I show a lineup like

5    this, it is to see who he knows that pulled

6    the trigger, if we can identify the

7    suspect.

8         Q.   And did you record in your report

9    that Bryan Thomas had positively identified

10   number three, the photograph of number

11   three, as being the person who he claimed

12   was the subject that was involved in the

13   shooting of James Friendly?

14        A.   Yes, sir.

15        Q.   Who is the subject -- who is the

16   picture in number three?

17        A.   Darryl Foggy.

18        Q.   Would you hold that up and just

19   show it to the jury and point to Darryl

20   Foggy's picture?

21        A.   Number three right here.

22        Q.   So this is a person who was

23   identified by an eye witness as being the

24   shooter on the morning of --

25             MR. POWELL:   Judge, we object to

1    the fact that it is not in evidence as

2    Bryan Thomas being an eye witness.

3              THE COURT:   Overruled.

4         Q.   Did he tell you that he saw what

5    happened out there?

6              MR. POWELL:   Objection, Your

7    Honor.   Hearsay.

8              MR. HARTLEY:   Okay.   Strike

9    that.   We are not going into any possible

10   hearsay.

11        Q.   But you went through this process

12   and he said -- that is the result of --

13   that identification is the result of your

14   interview with Mr. Bryan Thomas, right?

15        A.   Yes, sir.

16        Q.   Okay.   And you reported in your

17   report that he positively identified him as

18   the shooter?

19        A.   Yes.

20        Q.   Thank you.   Further on in your

21   report, if I can find it.   Let me go back.

22   Did you talk to Nicole Judkins?   I believe

23   you identified her as one of the people you

24   interviewed?

25        A.   Yes.

1          Q.    In your interview with her, did

2    she identify Darryl Foggy as being one of

3    the people that was at the party?

4          A.    Yes.

5          Q.    Did she say that she knew he had

6    a gun?

7                MR. POWELL:    Objection, Your

8    Honor.   The question calls for hearsay.

9          Q.    Have you recorded in your report

10   that she knew about a gun being at the

11   party?

12               MR. POWELL:    Objection, Your

13   Honor.   That question calls for double

14   hearsay, what someone said and whether it

15   was put in a written document.

16               MR. HARTLEY:    Your Honor, she is

17   a witness in the case and will testify

18   later.   If we have to recall this witness,

19   we will do it.

20               MR. POWELL:    She can testify to

21   it but as to --

22               THE COURT:    I will sustain the

23   objection.

24         Q.    Did Nicole Judkins have

25   information about this case?

1          A.    Yes.

2          Q.    Did she have knowledge of the gun

3     that is sitting on that counter right

4     there, on the table?

5          A.    She had knowledge of a gun, yes.

6          Q.    Who did -- okay.  And whose gun

7     is this supposed to be?

8          A.    Mr. Foggy's.

9          Q.    Now let's go back.

10          MR. HARTLEY:  And if counsel

11     would assist me, I would like to ask you to

12     put up the screen that shows the schematic

13     of the property.

14          MR. POWELL:  The whole thing?

15          MR. HARTLEY:  The aerial, that's

16     it.

17          Q.    You testified about the State's

18     Exhibits 15, 16 and 17 being shell casings

19     recovered?

20          A.    Is that the numbers for the shell

21     casings?

22          MS. PERKINS:  Yes.

23          MR. POWELL:  The shell casings.

24          A.    Okay.  Yes, sir.

25          Q.    In all of your statements -- in

1    all the statements that were taken from

2    various witnesses, did anybody say that

3    there were just three shots fired?

4         A.   I have had information -- well, I

5    got information, it was supposed to be

6    several other shots fired in this case.

7         Q.   Did witnesses tell you that there

8    were as many as six shots fired or numbers

9    in that range?

10        A.   I have had five and six shots.  I

11   had eight or nine shots.

12        Q.   But only three shell casings were

13   found out there, right?

14        A.   Correct.

15        Q.   And if this scene all happened

16   right here in this area and if it all

17   happened in a matter of seconds, is it --

18   by the way, do you have some familiarity

19   with guns?

20        A.   Sir?

21        Q.   You have some familiarity with

22   handguns?

23        A.   Some, yes.

24        Q.   I'm not trying to qualify you as

25   an expert but could you distinguish between

1     an automatic pistol and a revolver?

2         A.    Yes.

3         Q.    Does a revolver have a round --

4     I'm going to call it a cylinder, where it

5     holds all of the shells in there and as it

6     is fired does it kick out the empty shells?

7         A.    No.

8         Q.    Is that a revolver laying on that

9     table?

10        A.    No.

11        Q.    It is considered an automatic?

12        A.    Semiautomatic, yes, sir.

13        Q.    Semiautomatic.  If the weapon

14    fired out there that night was kicking

15    shell casings out or throwing them on the

16    ground, what kind of gun would it most

17    likely be?

18        A.    Semiautomatic or an automatic.

19        Q.    Does the semiautomatic, when it

20    is being fired, does it stop kicking the

21    shells out, you know, along the way or does

22    it eject every single spent cartridge?

23        A.    It ejects each casing as it is

24    fired.

25        Q.    So wouldn't it be a logical

1    inference that if someone had shot out

2    there five or six times that there should

3    have been more shell casings on the ground?

4         A.   Yes.

5         Q.   And your officers are supposed to

6    be out there conducting a thorough search

7    to find all the evidence that they can find

8    out there, right?

9         A.   Yes.

10        Q.   And y'all have got plenty of

11   manpower to go out there and scour the

12   ground and find all the shell casings,

13   right?

14        A.   Yes.

15        Q.   Would it be a reasonable

16   inference that someone probably picked up

17   some shell casings and made off with them

18   from that scene?

19        A.   I think there would have been

20   some difficulty in doing that because of

21   the grass because we went back out there

22   and looked around.  Of course, Grandison

23   was able to find those three casings but we

24   looked all over that area but we were

25   unable to find anymore shell casings.

1    Q.    So something could have happened

2    to those casings, right?

3    A.    Yes, but I think it would be a

4    great difficulty.

5    Q.    But it's not impossible?

6    A.    No.  It is possible that they may

7    have found some, but I would question

8    whether they would have been able to find

9    all of them.

10    Q.    My only point about this is, the

11    number of shell casings and the number of

12    shots fired don't match up, do they?

13    A.    No, they don't.

14    Q.    In the course of your

15    investigation, did you find out that there

16    may have been two people out there who had

17    the nickname Poncho?

18    A.    No.  Just one.  I know the second

19    Poncho came up later on.

20    Q.    So someone came to the scene

21    later?

22    A.    No.  I was -- I had to interview

23    or I spoke to a subject on Dellwood Court

24    that also went by the name of Poncho.

25    Q.    Who was that person?

1    A.    He has got a long name.  I can't

2    think of his name.  It is in the file.

3    Q.    Did that person have a connection

4    to this matter?

5    A.    No, did not.

6    Q.    How did his name get into your

7    file?

8    A.    Because his name -- his nickname

9    is also Poncho.

10    Q.    Tell us who it is.  I don't know

11    where that is in the file right now.  I

12    have been trying to keep up with some of

13    these names, but if you could help me, I

14    sure would like to know who that is.

15    Mr. Powell has found it.  He

16    tells me it is in your February 13 report,

17    page five.

18    A.    Yeah.  Here it is.  Alwin

19    Darius.  I will spell the middle name,

20    A-Q-U-A-N-T-I-S-E, Owens, O-W-E-N-S.

21    Q.    And what connection, if any, did

22    he have?  Was he at the scene?

23    A.    I was never given his name at all

24    at the scene, no.

25    MR. HARTLEY:  One moment, Judge.

1     Q.    In your record, there is a

2    reference to Nicole Judkins, information

3    about a gun, right?

4     A.    Yes.

5     Q.    And does your report reflect the

6    color that she said the gun was?

7     A.    Black.

8     Q.    Okay.

9          MR. HARTLEY:   No further

10    questions.

11          REDIRECT EXAMINATION

12    BY MR. POWELL:

13     Q.    Detective, Mr. Hartley asked you

14    questions about is it possible the number

15    of shots fired and other shell casings.   Is

16    it possible that in between those two

17    buildings there could have been an echo?

18     A.    It is possible, yes.

19     Q.    And it is also possible other

20    witnesses just didn't hear the number of

21    shots that were actually fired?

22     A.    That's correct.

23     Q.    Is that common when you are

24    investigating a shooting incidents to have

25    wild variations in the number of shots

1      people heard?

2              A.    Yes.

3              Q.    Now, let's talk about back to

4      this initial investigation.  Now,

5      initially, you would agree with me, you

6      were in fact looking at two different

7      Darryls as possible suspects?

8              A.    That's correct.

9              Q.    And the fact that this Bryan

10     Thomas identified Darryl Foggy out of a

11     photo lineup was one of the things you were

12     using to develop Darryl Foggy as a possible

13     suspect?

14             A.    Yes.

15             Q.    At any point were you able to

16     exclude the other Darryl, Darryl Joyce, as

17     a possible suspect?

18             A.    No.

19             Q.    Why?

20             A.    I couldn't find Mr. Joyce.

21             Q.    Were you able to locate and

22     follow up on Darryl Foggy?

23             A.    Yes.

24             Q.    How?

25             A.    I located Mr. Foggy and -- plus,

1      the recovery of the gun.  Then, of course,

2      like I said, we interviewed Mr. Foggy.

3          Q.    Now, is it common in homicide

4      investigations to potentially have two

5      suspects that are developed?

6          A.    Yes.

7          Q.    And is it standard procedure in

8      those type of investigations to follow up

9      on both of the suspects?

10         A.    Yes.

11         Q.    And in this case, were you able

12     to exclude either one of those suspects?

13         A.    Yes.

14         Q.    Which one?

15         MR. HARTLEY:  Objection, Your

16     Honor.  I object to the form of the

17     question.  Exclude means that that's some

18     sort of conclusion or mental process of

19     this witness.

20         THE COURT:  I agree.

21         Q.    Which suspect did you eventually

22     sign warrants on?

23         A.    Mr. Joyce.

24         MR. POWELL:  No further

25     questions.

RECROSS-EXAMINATION

BY MR. HARTLEY:

Q.    Just a couple questions about those number of shots.    Mr. Powell has raised the issue there could have been an echo out there, right?

A.    Yes, sir.

Q.    How many shots were -- how many injury wounds did Mr. Friendly -- James Friendly have, do you know that?

A.    He had three injuries.

Q.    And wasn't there a vehicle out there that had broken glass or was hit by a bullet in some kind of way?

A.    Yes.

Q.    Okay.    How many times was that vehicle hit?

A.    I don't know.    I never saw that vehicle.

Q.    Do you know from records that it was hit more than once?

A.    Yes.

Q.    So we are way above three shots right there, aren't we?

A.    Yes.

1      MR. HARTLEY:  Okay.  Thank you.

2                REDIRECT EXAMINATION

3      BY MR. POWELL:

4          Q.   Detective, some of those shots

5      that hit Mr. Friendly went all the way

6      through his body and came out the other

7      side, did they not?

8          A.   Yes.

9          Q.   Could the same three shots that

10     hit him possibly hit the Jeep as well?

11         A.   It is possible, yes.

12             MR. POWELL:  Nothing further,

13     Judge.

14               RECROSS-EXAMINATION

15     BY MR. HARTLEY:

16         Q.   Do you think that's a very

17     minimal probability, like almost

18     impossible, for bullets to be fired in a

19     downward direction to go up and then hit a

20     vehicle?  What would you give the

21     probability out of a hundred?  What

22     percentage would you give?

23         A.    I don't know.  I mean, the

24     possibility exists that it could happen.

25     That's the only way I can answer that.

1      MR. HARTLEY:  Thank you.  No

2   further questions.

3      MR. POWELL:  Nothing further,

4   Judge.

5      THE COURT:  Thank you.  You can

6   step down.  Why don't we take a short

7   break.  If y'all can be back here in the

8   jury assembly room at a quarter after.

9      (The jury exits the courtroom.)

10      (Brief Recess.)

11      MR. POWELL:  The State calls

12   Katherine Richart.

13      KATHERINE RICHART,

14   having been first duly sworn, was examined

15   and testified as follows:

16      DIRECT EXAMINATION

17   BY MR. POWELL:

18      Q.   Would you state your name for the

19   members of the jury?

20      A.   Katherine Richart.

21      Q.   And how are you employed, Ms.

22   Richart?

23      A.   I'm employed with the Alabama

24   Department of Forensic Sciences, Montgomery

25   Regional Laboratory.

1        Q.   What is your job with the

2  Department of Forensic Sciences?

3        A.   I'm a forensic scientist

4  specializing in firearms and tool mark

5  identification.

6        Q.   Briefly, for the jurors, explain

7  to us what that is?

8        A.   Basically, what I do is I look at

9  fire bullets and fire cartridge cases and

10  try to microscopically compare those back

11  to a specific firearm.

12        Q.   What training, education or

13  experience have you had to qualify you as a

14  firearms analyst or a tool marks examiner?

15        A.   I have a bachelor's degree in

16  science from the University of Alabama at

17  Birmingham.  I have trained for

18  two-and-a-half years.  Been to the Alabama

19  Department of Forensic Science in the

20  examination of firearms and tool marks

21  evidence.  I have attended two one-week

22  courses put on by the California

23  Criminalist Institute.  I have attended

24  seven one-week training seminars put on by

25  the Association of Firearms and Tool Marks

1    Examiners.  I have attended armored courses

2    put on by Bloch, Smith and Wesson, Savage,

3    Seek (sic) and Colt, and I have attended

4    the FBI Firearms Instructor School and the

5    Certified Instructor in Rifles, Missiles

6    and Shotguns by the FBI.

7              MR. POWELL:  Your Honor, we move

8    to qualify Ms. Richart as an expert in

9    firearms analysis and tool mark

10   examination.

11             THE COURT:  Okay.

12        Q.    Mr. Richart, were you submitted

13   some evidence to examine in the case

14   involving the victim of James Friendly?

15   That tox. number is going to be

16   2002-MM00226.

17        A.    Yes, I was.

18        Q.    And do you have a file with that

19   same tox. number?

20        A.    Yes, I do.

21        Q.    And what does that number

22   indicate to you?  Which case is this about?

23        A.    Well, it is -- our department

24   gives a case number for every case we

25   enter.  In this case it was a death case.

1       Q.    So anything with this 226 number

2   on it involves the shooting death of James

3   Friendly?

4       A.    That is correct.

5       Q.    In other words, the firearms and

6   physical evidence you analyzed?

7       A.    That is correct.

8       Q.    Now I'm going to present to you

9   three casings and a photograph.  I need to

10  mark State's 31.  Also, State's 21.  First

11  off, I think we have been wondering the

12  whole trial, is that weapon safe?

13      A.    It is.

14      Q.    Is it unloaded?

15      A.    Yes, I have.

16      Q.    And have you examined it prior to

17  coming in the courtroom today?

18      A.    Yes, I did.

19      Q.    Did you test fire that weapon?

20      A.    Yes, I did.

21      Q.    Is it operational?  Will it

22  shoot?

23      A.    It will.

24      Q.    But you made sure it didn't have

25  any bullets in it?

1      A.    That's correct.

2      Q.    Ms. Richart, I'm going to put

3  State's 15, 16 and 17 on the overhead here

4  so we can see them a little closer.

5           Now, take a look at your records

6  and tell me if these three shell casings,

7  the projectile from State's 31 and a gun

8  were basically the physical evidence you

9  received in this case?

10     A.    I am, but may I look at the

11  cartridge cases just to be sure?

12     Q.    Sure.  Here you go.

13     A.    (Witness examining evidence.)

14     Q.    While we are doing this, do you

15  recognize State's 31?

16     A.    Yes, I do.

17     Q.    What is it?

18     A.    It is a fired copper jacket

19  bullet.

20     Q.    A picture --

21     A.    A picture of a fired copper

22  jacket bullet.

23     Q.    Does this picture fairly and

24  accurately represent the actual physical

25  object you examined?

1          A.    Yes, it does.

2               MR. POWELL:  We offer State's 31,

3     Judge.

4               THE COURT:  Admitted.

5               (State's Exhibit Number 31

6     admitted into evidence.)

7          Q.    Now you have had an opportunity

8     to examine State's 15, 16 and 17, the shell

9     casings.

10         A.    That's correct.

11         Q.    Are these the actual casings you

12    examined?

13         A.    Yes, they are.

14         Q.    First, let's start with the

15    projectile, State's 31.  Did this bullet

16    come from this gun?

17         A.    No, it did not.

18         Q.    And now let's go to the shell

19    casings.  Did you examine those shell

20    casings?

21         A.    Yes, I did.

22         Q.    Did any three of those shell

23    casings come from this gun, State's 21?

24         A.    They were not fired in the

25    chamber of that firearm, no, sir.

1        Q.    How do you know that?

2        A.    When I received the Franklin

3    Jennings pistol and I test fired that and

4    collected the fired bullets and the fired

5    cartridge cases and then microscopically

6    compared those back to the cartridge cases

7    and the bullets that were submitted in this

8    case, I was able to determine

9    microscopically that these particular

10   cartridge cases, State's Exhibits 15, 16

11   and 17, were not fired in the chamber of

12   State's Exhibit 21.

13       Q.    In case you need to refer to any

14   of it.  So scientifically that gun didn't

15   shoot any of these bullets; is that right?

16       A.    The cartridge cases were not

17   fired in the chamber of that firearm nor

18   was the bullet, State's Exhibit 31, which

19   is the picture of the bullet, fired through

20   the barrel of this firearm, that is

21   correct.

22       Q.    Now what can you tell us about

23   the projectile itself?

24       A.    I can tell you that the copper

25   jacket and bullet that I received was a

nine millimeter thirty-eight class and from
the general rifling characteristics of this
bullet, mainly the number of lands and
grooves and the actual measurements of
those lands and grooves, I was able to
determine that it was most probably fired
but not limited to a High Point pistol.

Q.    And is the pistol in front of you
a High Point?

A.    No, it's not.

Q.    Explain for us briefly the lands
and grooves and why you have to measure
them and can that tell you anything.

A.    Prior to manufacture of a barrel
of a firearm, the manufacturer decides how
many lands and grooves they are going to
place in the barrel.  And what these lands
and grooves do, it is what gives the bullet
the spin as it comes out of the barrel,
kind of like throwing a football.  It
stabilizes the bullet in flight.  An
example, Smith and Wesson has five lands
and grooves with a right-handed twist,
where a Colt has six lands and grooves with
a left-handed twist.

1        This data is put together with
2    the FBI from all the gun manufacturers and
3    I get a list of that that is updated
4    annually of all the gun manufacturers'
5    specifications, not only how many lands and
6    grooves a gun manufacturer puts in the
7    barrel but the actual measurement of the
8    groove that is put in there. And those
9    from lands and groove measurements, I'm
10   able to determine the possibility of a
11   bullet coming from a particular
12   manufacturer.
13        Q.    And in this case it was a High
14   Point type of weapon?
15        A.    Yes, it was.
16        Q.    What kind of caliber did you say
17   this was?
18        A.    A thirty-eight nine millimeter.
19        Q.    What does that mean?
20        A.    That the bullet caliber, the
21   diameter of the bullet measured .355s of an
22   inch, which is consistent with a nine
23   millimeter or a thirty-eight class caliber
24   firearm.
25        Q.    Why can't you differentiate

1    between a thirty-eight or a nine

2    millimeter?

3        A.    Because they have the same

4    diameter.

5        Q.    Now, this -- does High Point make

6    an automatic weapon consistent with a nine

7    millimeter?

8        A.    Yes, they do.  Many.

9        Q.    Many?

10       A.    (Witness nodding head

11   affirmatively.)

12       Q.    And the lands and grooves on that

13   particular projectile in this photograph

14   match the same from various models from

15   High Point automatic weapons?

16       A.    This bullet had nine lands and

17   grooves with a left-handed twist, which is

18   consistent with High Point firearms.

19       Q.    And that, of course, would be

20   different from the lands and grooves

21   produced on the test bullet from this gun,

22   State's 21?

23       A.    That is correct.

24       Q.    Now, can you determine whether or

25   not the same gun -- well, let me ask you

1    this:  Let's talk about the shell casings.

2    Did you test the shell casings?

3        A.    Yes, I did.

4        Q.    What can you tell us about the

5    shell casings?

6        A.    That these -- I received two

7    fired Federal brand and one fired Remington

8    brand cartridge case.  They were all

9    caliber nine millimeter, and I

10   microscopically compared those to each

11   other and was able to determine that they

12   were all fired in the chamber of the same

13   firearm.

14       Q.    Okay.  That firearm, was that

15   State's 21?

16       A.    No, it was not.

17       Q.    The marks on these shell casings

18   did not match that gun in front of you?

19       A.    That is correct.

20       Q.    Okay.  How can you tell about a

21   shell casing whether or not it came from a

22   particular gun?

23       A.    Again, during the gun

24   manufacture, there is a process that is

25   used to make the actual groove to the

1    firearm, which is when a cartridge is fired

2    where the cartridge case is -- the pressure

3    of the powder burning which pushes the

4    bullet down the barrel with an equal and

5    opposite pressure, the cartridge case is

6    going to slam up against the breech.

7    Whatever tool was used to make that breech

8    space, it has microscopic marks as well,

9    along with the firing pin, however the

10   firing pin is manufactured, and it leaves a

11   unique mark on a cartridge case.

12        Q.    Okay.  Now you spoke of a firing

13   pin.  How do you look to where the firing

14   pin left a mark?

15        A.    How do I look?

16        Q.    Yes.  Can you see it on the shell

17   casing itself?

18        A.    You can.

19        Q.    Okay.  Can you point that out to

20   us?

21        A.    Sure.

22        Q.    You can just use this.  Let's

23   make it look bigger.

24        A.    This here is the head of the

25   cartridge case where it says nine

1    millimeter Luger, and I believe this is an

2    SE.  This is the Federal brand cartridge

3    case.  This right here is the primer of the

4    cartridge case, which is what the firing

5    pin hits, which this is the firing pin

6    indentation right here.

7         The firing pin hits here which

8    ignites the primer, which is what ignites

9    the powder that burns.  So the whole breech

10   of this can be marked by the breech facing

11   the firearm.  But most of the microscopic

12   marks that we look at are on the primer

13   because it is of a softer metal.

14        Q.   Now, Ms. Richart, does the fact

15   that these three shell casings, two come

16   from one brand and one is another, does

17   that indicate more than one firearm

18   present?

19        A.   No, it does not.

20        Q.   Why not?

21        A.   Because you can load any

22   ammunition manufacturer in a particular

23   firearm.

24        Q.   Is there anything about those

25   three casings that would definitively

1    determine whether they came from one or
2    more firearms?
3         A.    These three fired cartridge cases
4    were all fired from the chamber of the same
5    firearm.
6              MR. POWELL:  I think that's all
7    the questions I have for Ms. Richart.
8              MR. HARTLEY:  No cross.
9              THE COURT:  Thank you, ma'am.
10             MR. POWELL:  The State calls Dr.
11   Ben Bristol, Judge.
12             DR. BEN BRISTOL,
13   having been first duly sworn, was examined
14   and testified as follows:
15             DIRECT EXAMINATION
16   BY MR. POWELL:
17        Q.    Could you state your name for the
18   jury?
19        A.    My name is Dr. Ben Bristol.
20        Q.    Dr. Bristol, how are you
21   currently employed?
22        A.    I work for the National Medical
23   Examiner's office.
24        Q.    And at one time were you employed
25   by the Alabama Department of Forensic

1    would, explain to the jury what is the

2    difference between forensic medicine and

3    normal medicine?

4         A.   Forensic medicine concerns itself

5    with the examination of dead people with

6    doing autopsies, determines causes and

7    manners of death, whether it is a natural

8    death or a heart attack or a hanging or a

9    -- all different sorts.  We concern

10   ourselves primarily with violent,

11   suspicious or unnatural deaths.

12             MR. POWELL:  Your Honor, at this

13   point, we would like to --

14        Q.   Let me show you this, Doctor.  I

15   have marked this as Exhibit 20-A.  Do you

16   recognize that?

17        A.   Yes, sir.

18        Q.   Is this your curriculum vitae?

19        A.   Yes, it is.

20        Q.   And is this listing of your

21   credentials basically a resume?

22        A.   Yes, sir.

23             MR. POWELL:  We offer State's

24   20-A, Your Honor.

25             THE COURT:  It's admitted.

1                    (State's Exhibit Number 20-A

2          admitted into evidence.)

3                    MR. POWELL:  Judge, at this point

4          we move to qualify Dr. Bristol as an expert

5          in autopsy examination.

6                    THE COURT:  Okay.

7                    MR. HARTLEY:  Have you

8          established how many times he has done

9          this?

10              Q.   How many autopsies have you

11         performed, Doctor?

12              A.   I performed perhaps six to seven

13         hundred autopsies, at least that number.

14         And maybe a hundred and fifty homicides.

15                   MR. POWELL:  Again, we renew our

16         motion to qualify him as an expert.

17                   THE COURT:  Okay.

18              Q.   Now, Doctor, were you the medical

19         examiner in the case involving the shooting

20         death of James Friendly?

21              A.   Yes, sir.

22              Q.   And did you perform the autopsy

23         in that case?

24              A.   Yes, I did.

25              Q.   And as a result of your autopsy

1 did you prepare a record and make medical

2 findings related to the cause of death and

3 other observations you made in making that

4 autopsy?

5   A. Yes, sir.

6   Q. Now I'm going to show you State's

7 Exhibit 20.  Do you recognize that?

8   A. Yes, I do.  That is a diagram I

9 prepared of the body of Mr. Friendly.

10   Q. And it is a multipage or eight

11 page exhibit.  Can you flip through there.

12 And incorporated in with that diagram is a

13 series of photographs with some lines and

14 arrows.  Do you recognize those

15 photographs?

16   A. Yes, I recognize these.  These

17 are photographs and the diagram I did of

18 the body of Mr. Friendly.

19   Q. And as for the photographs and

20 diagrams, are they fair and accurate

21 representations of the manner of the body

22 during the autopsy you performed?

23   A. Yes, they are, sir.

24   Q. And would the lines and arrows

25 assist you in explaining to the jury your

1    findings for an autopsy report?

2       A.   Yes.  The lines and the arrows

3    designate -- connect words that connect to

4    the wounds on the body.

5         MR. POWELL:  We offer State's

6    Exhibit, Judge.

7         THE COURT:  Which number is

8    that?

9         MR. POWELL:  20.

10        (State's Exhibit Number 20

11    admitted into evidence.)

12       Q.   Now, Doctor, I'm going to refer

13    to a blowup of State's 20 on the screen.

14    Is this the diagram you prepared?

15       A.   Yes, sir, it is.

16       Q.   Now, Doctor, three circles just

17    came up on the diagram.  What do those

18    indicate?

19       A.   Those indicate entry wounds.

20       Q.   Now, entry wounds from what?

21       A.   Entry wounds from a bullet, sir.

22       Q.   Gunshot wounds?

23       A.   Yes.  Entry gunshot wounds.

24       Q.   So how many gunshot wounds were

25    you able to identify on the body of James

1    Friendly when you performed the autopsy?

2        A.    There were three entrance gunshot

3    wounds.

4        Q.    Did you observe any other major

5    trauma to Mr. Friendly other than, you

6    know, medical treatment, that kind of

7    thing?

8        A.    I am just reviewing my report

9    here and, no, there was no -- there was no

10   evidence of any trauma to the mouth or to

11   the hands.

12       Q.    Basically three gunshot wounds?

13       A.    The three entry gunshot wounds

14   and there were two exits.

15       Q.    Two exits?

16       A.    Two exits, yes.

17       Q.    Now, let's start with this wound

18   that just came up -- I think you have got

19   it marked as wound number one.  What is

20   that a photograph of?

21       A.    It's a photograph of the entrance

22   gunshot wound on the left side there of his

23   torso.

24       Q.    The blue circle that just

25   appeared, what is that circling?

1       A.    That's an exit on the right side

2  of the abdomen.

3       Q.    And the photograph?

4       A.    Shows the tattoo and the exit

5  wound there with a ruler placed slightly

6  over it.

7       Q.    And that photograph, what is that

8  a picture of?

9       A.    It's another picture of the

10  wound.

11      Q.    Dr. Bristol, how can you look at

12  this entrance would and exit wound and tell

13  us that one is an entrance as opposed to an

14  exit?

15      A.    Sure.  Take, for example, the

16  entrance wound, the one in the red circle.

17  You will see that there is a red -- you can

18  see that there is a red to black rim around

19  the central defect that is a little bit

20  more pink.  That's very characteristic of

21  an entrance wound.  That's what is referred

22  to as marginal rating.  That's where a

23  bullet pushed in through the skin.

24           The exit wound on the other side,

25  the one surrounded by blue is a little more

1    -- it is not as round as the other wound.

2    It is more -- it is more of a laceration

3    kind of.  That's how we tell it is an exit

4    wound.

5        Q.  Now, Doctor, did you examine the

6    pathway the bullet traveled through Mr.

7    Friendly's body from this wound?

8        A.  Yes, sir.

9        Q.  And from that examination of the

10   pathway, can you scientifically determine

11   these two wounds are connected?

12       A.  Yes.

13       Q.  Now, Doctor, I want to talk about

14   -- another diagram came up with some

15   arrows drawn across it.  Did you prepare

16   that diagram as well?

17       A.  Yes, sir.

18       Q.  And what do the red circles again

19   indicate?

20       A.  The entrance wounds.

21       Q.  And the blue circles?

22       A.  The exit gunshot wound.

23       Q.  Now, the green arrow, what does

24   that indicate?

25       A.  More are or less the path of the

CR-02-2104
Part 4 of 5

**DOCUMENT NAME:** Joyce, Darryl Jevon

**CLIENT & MATTER:** 58199-001

**DESCRIPTION:**

County: Montgomery                    CWOP

CC#s: 2002-1417

Attorney: Jean Therkelsen

Circle: (TRANSCRIPT)    CASE FILE    BOTH

3 volumes

## CERTIFICATION

I hereby certify that the preceding imaged records and documents

are a true, accurate, and complete image of the original records or

documents as received by the Office of the Attorney General of

the State of Alabama.

This the 19th day of January, 2005.

Signed: _Melisa A. Martin_

Notary: _Coleen F Gibson_

Coleen F. Gibson
Notary Public
Commission expires 06/11/06