APPEAL TO THE ALABAMA
COURT OF CRIMINAL APPEALS

DARRYL JEVON JOYCE              )
                               )
        APPELLANT,             )
                               )
vs.                            )   CRIMINAL APPEAL: CR-02-2104
                               )
                               )
STATE OF ALABAMA,              )
                               )
        APPELLEE.              )

---

BRIEF OF APPELLANT

---

APPEAL FROM THE CIRCUIT COURT OF
THE FIFTEENTH JUDICIAL CIRCUIT
MONTGOMERY COUNTY
MONTGOMERY, ALABAMA
CASE NO. CR-02-2104
CRIMINAL CASE NO. 02-1417 TH

AIMEE C. SMITH (SMI 220)
640 S. McDONOUGH STREET
2ND FLOOR
MONTGOMERY, ALABAMA 36104
(334) 264-6466

EXHIBIT
B

# TABLE OF CONTENTS

<u>Page</u>

TABLE OF CONTENTS………..…………………………………………………..…..i

STATEMENT REGARDING ORAL ARGUMENT…………………………………..…ii

TABLE OF AUTHORITIES..................................…..…………………....…..iii, iv

STATEMENT OF THE CASE……....………………………..............................................1

ISSUES PRESENTED FOR REVIEW.............................…………………………...……2

     I.     DID THE TRIAL COURT ERR BY ALLOWING TESTIMONY FROM THE STATE'S WITNESS ABOUT A MUG BOOK CONTAINING THE DEFENDANT'S PHOTOGRAPH FROM A PRIOR ARREST?

     II.    DID THE TRIAL COURT ERR BY SUBMITTING THE CASE TO THE JURY WHEN THE STATE SUBMITTED INSUFFICIENT EVIDENCE?

STATEMENT OF THE FACTS.......................…………………………………....3

ARGUMENT.......................................…………………………………………..20

CONCLUSION...........................................…………………………………….27

CERTIFICATE OF SERVICE...........................…………………………………..28

## STATEMENT REGARDING ORAL ARGUMENT

The Defendant hereby requests oral argument in this appeal.

## <u>ISSUES PRESENTED FOR REVIEW</u>

I.    DID THE TRIAL COURT ERR BY ALLOWING TESTIMONY FROM THE STATE'S WITNESS ABOUT A MUG BOOK CONTAINING THE DEFENDANT'S PHOTOGRAPH FROM A PRIOR ARREST?

II.   DID THE TRIAL COURT ERR BY SUBMITTING THE CASE TO A JURY WHEN THE STATE PRESENTED INSUFFICIENT EVIDENCE?

## STATEMENT OF THE FACTS

### DIRECT EXAMINATION OF ERIC STEWART

On February 1, 2002, the Defendant attended a party at 432 Marlyn Street, which is located in Smiley Court, Montgomery County Alabama. (T-79) The party was being held for Christopher McQueen, who was a cousin to Eric Stewart. (T-78, 79). Mr. Stewart is also known as "Rabbit". (T-78). Christopher McQueen is also known as "Flip". Mr. McQueen's girlfriend is Nicole Judkins. (T-79).

Mr. Stewart arrived at the party around 9:30PM, and that they were approximately thirty people at the party. (T-80) There was beer and liquor at the party. (T-81) There was a porch light, but witness Stewart testified you could still see (T-82). He further stated he could see between the two apartment buildings. (T-83) Mr. Stewart could not recall if the moon was out, but it was cold. (T-82)

Mr. Stewart acknowledged knowing the Defendant in the case because they went to school together. Mr. Stewart knew the victim, James Friendly, because the victim's girlfriend "stayed" upstairs above him. (T-83). Mr. Stewart referred to the victim, James Friendly, as "Boo". (T-85) Mr. Stewart acknowledged knowing Darryl Foggy, because they grew up together. Mr. Stewart acknowledged that Mr. Foggy was present at the party. (T-83, 84)

After an hour, Mr. Stewart went outside onto the front porch where he saw the victim. (T-84) Mr. Stewart admitted he had at least three drinks at this point. (T-84) Mr. Stewart testified this was the first time he had seen the victim since they had been released from the city jail. (T-85, 86) Mr. Stewart acknowledged he had been locked up

3

in the city jail for Domestic Violence, and had been to prison for possession of cocaine. (T-86)

The victim asked Mr. Stewart if he wanted to get high, and the two discussed getting a " pile of cocaine". (T-87) They obtained $50 worth of cocaine and went to the side of the building to snort it. (T-87, 88) The victim took the cocaine first, but only tasted it. (T-87, 88) Mr. Stewart snorted the cocaine and did what is called " two-on-two". (T-88) Mr. Stewart testified that "two-on-two" is when you snort cocaine up both nostrils. (T-89) After snorting the cocaine, Poncho (Defendant) came around to the side of the building where Mr. Stewart and the victim were standing. (T-89) Mr. Stewart identified Poncho as the Defendant in the courtroom. (T-89)

As the Defendant approached, he shook hands with Mr. Stewart. Mr. Stewart testified the Defendant then shook hands with the victim. (T-90) The victim and Defendant had a disagreement and began arguing. (T-90) Mr. Stewart testified he did not know what the argument was about. (T-91) Mr. Stewart testified that the Defendant commented "he all right", and shook hands with the victim. (T-92)

Mr. Stewart and the victim were casually talking about being in jail and the Defendant was just listening. (T-93) When they started joking about Gibbs Village, the Defendant became involved in the conversation. (T-93, 94) Mr. Stewart testified to running with Smiley Court, that the victim runs with Gibbs Village, and that the Defendant is from English Village. (T-94, 95)

Mr. Stewart testified the Defendant made a comment about "niggers be weak". (T-95, 96) Mr. Stewart opined the Defendant was referring to people who were down the

4

road, meaning in prison, and that they acted differently. (T-96)  At this point, the victim and Defendant got into an argument. (T-96)  The victim commented that "he is his own man...he didn't need to go anywhere by hisself...his is his own man". (T-96)   The Defendant responded that he is "I'm my own man...I'm my own man, you know what I'm saying". (T-96)   The argument lasted approximately ten minutes. (T-97)  Mr. Stewart asked the Defendant and victim to "chill out", and to not spoil his cousin's party. (T-97)  Mr. Stewart asked them to "show some love" and they complied by shaking hands. (T-98)

At this point, the victim went back to the front porch, Mr. Stewart went to get a beer out of the house, and left the victim alone on the porch. (T-98, 99)  The victim remained on the porch because he was not invited to the party. (T-99)  While Mr. Stewart was inside, the Defendant and victim began arguing again. (T-99)   The victim commented to the Defendant that he "ain't going nowhere.  I saw you sleeping on the porch, if I wanted to do something to you." (T-100)  Mr. Stewart testified that he and the victim proceeded back to the side of the apartment to do more cocaine. (T-100, 101)

Mr. Stewart testified that "**we** were in front of **Poncho and Darryl**." (T-101) Note, Poncho is the Defendant, Darryl Joyce, but here Mr. Stewart suggests that Poncho (who he has identified as the Defendant) and Darryl were present.  Mr. Stewart further testified that "**we** were in front **them --** and fuck this here". (T-101)  Note, Mr. Stewart again, suggests the presence of the Defendant and another Darryl.  Mr. Stewart guessed the Defendant heard him and said, "Fuck me", and "he reach for the gun". (T-101)  Mr. Stewart asked him to hold up. (T-101)  The Defendant stated to the victim, "F me,

5

nigger" and started fumbling with his back "like when people have a gun in that back like that". (T-105)  Mr. Stewart stated he grabbed Poncho from the side, and that's when "he" started shooting. (T-105)

Mr. Stewart testified he was within feet of the Defendant, and that he shot away from the building into the opening. (T-107)  Mr. Stewart testified the Defendant "Darryl" was doing the shooting. (T-107)  Mr. Stewart admitted he knew "Darryl Foggy". (T-107) Mr. Stewart claims Darryl Foggy was not out there but was across the street. (T-107)  Mr. Stewart stated Darryl Foggy came to the area "when everybody started gathering around". (T-108)  Mr. Stewart testified the victim was hit in the leg and started backing up. (T-108)  Mr. Stewart stated the victim was holding up his hands. (T-109)  Mr. Stewart stated the Defendant responded by shooting at his cousins who had backed their car up into a parking slot. (T-109)  After shooting at the car the Defendant shot at the victim again, but Mr. Stewart was unsure where he shot him. (T-109)  The victim was stumbling, fell, and was shot again. (T-109)  Mr. Stewart got down and talked to the victim while the Defendant ran away towards the trees through the clothes line. (T-109, 110)

Mr. Stewart did not see the Defendant again until trial. (T-110)  Mr. Stewart began hollering to call the paramedics while he talked to the victim. (T-110)  Nicole Judkins came outside where the victim was located. (T-110)

Mr. Stewart acknowledged he gave a statement to the police, and that he was shown photographs by the police department. (T-111)  Mr. Stewart acknowledged that he

was shown a photograph of the Defendant, Darryl Joyce, and that he was able to identify Mr. Joyce from those photographs. (T-111)

Mr. Stewart testified that he first met Darryl Foggy when he got out of prison, and started lived with him for a couple of months. (T-112)  Mr. Stewart admitted Darryl Foggy was at the party when Mr. Stewart arrived. (T-112)  Mr. Stewart testified he never saw Darryl Foggy around the area when the Defendant and victim were arguing. (T-112)  Mr. Stewart stated he was not covering up for Darryl Foggy. (T-112, 113)

Mr. Stewart testified that Darryl Foggy goes by the name of "D" and not "Poncho". (T-113)

Mr. Stewart identified State's exhibit number 21 as a gun that looked like Darryl Fogy's gun. (T-113, 114)  Mr. Stewart acknowledged he was familiar with Darryl Foggy's gun because he brought it over in the past. (T-114)  Mr. Stewart admitted Darryl Foggy had the gun on the night in question, but that he did not take or receive the gun from Darryl Foggy. (T-114)  Mr. Stewart testified that he knows Darryl Foggy " keeps a gun", but that States exhibit 21 was not the gun that he saw shoot the victim. (T-115)  The gun Mr. Stewart saw was "black with red like". (T-115)  Mr. Stewart claims he never took the gun to hide it anywhere that night, but that he saw Darryl Foggy hide the gun "under the rug". (T-115, 116)  Mr. Foggy hid the gun across the street in Amy Albright's apartment. (T-116)  Mr. Stewart claims Ms. Albright was unaware that Darryl hid the gun under her rug in her apartment. (T-116, 117)  Mr. Stewart testified that no one ever asked if he had seen anyone there that night with a gun, but he did tell the police about the gun and where it was located. (T-117)  The police were able to locate the gun. (T-117)  Mr.

7

Stewart claimed had never seen Darryl Foggy with a black gun. (T-118)  Mr. Stewart

testified that the evidence gun was the gun that he saw Darryl Foggy with.  Mr. Stewart

then testified that he saw Darryl Joyce with a black gun when he shot the victim. (T-118)

## CROSS-EXAMINATION OF E. STEWART

Mr. Stewart acknowledged he had was convicted of Domestic Violence recently in

City Court and had served prison time for possession of cocaine. (T-119)  Mr. Stewart T-

testified that he was familiar with drugs, and used cocaine and marijuana. (T-119)  He

admitted he would drink alcohol while using drugs. (T-119)

Mr. Stewart stated the party began at 8:00PM, but he arrived around 9:30PM. (T-

120)  Mr. Stewart started drinking upon arrival and had approximately three plus drinks.

(T-121)  Mr. Stewart acknowledged that he and the Victim made the decision to purchase

cocaine. (T-122)  Mr. Stewart acknowledged he was familiar with the drug culture and

had been staying in Smiley Court for 20 years. (T-122)  Mr. Stewart testified he did not

get a chance to do the cocaine, but admitted he was snorting "with both nose" about thirty

minutes before the Victim was shot. (T-123, 124)  Mr. Stewart testified it took "two

minutes" to get a rush off of the cocaine. (T-124)  Mr. Stewart testified he could feel the

effect of the cocaine, and that it was "pretty good" cocaine. (T-124)

Mr. Stewart acknowledged that the last time he read he statement he gave to the

police was on the date of trial. (T-125)  Mr. Hartley questioned Mr. Stewart as to the

sequence of to when and where the shots were fired. (T-126)  Mr. Stewart testified the

first shot went into the victim's leg and the second shot went into his body. (T-126)  Mr.

8

Stewart claims his statements in court were not inconsistent with what he told the police during two statements on the date of incident. (T-126)

Mr. Stewart was able to identify the first statement at 2:14 in the morning as his. (T-127)  Mr. Hartley obtained testimony from Mr. Stewart that "when Joyce, Darryl Joyce, pulled a gun out and like shot two or three times in the ground.  Then shot Boo". Note, Boo is the victim. (T-128)  Mr. Hartley was able to establish the inconsistent statement by Mr. Stewart about what the Defendant allegedly shot first by having Mr. Stewart acknowledge the Defendant could not have shot into the ground and shot the victim with the same bullet. (T-129)  Mr. Stewart then acknowledged he told Detective Haynie during his statement that shots were fired into the ground before the victim was shot. (T-129)  When asked by Mr. Hartley if Mr. Stewart was messed up on drugs and could not able to accurately report what happened, Mr. Stewart responded "Not really, no". (T-129)

Mr. Hartley referenced Mr. Stewart's 7:00 AM statement to Corporal E.E. Howton taken at 7:00AM.  Mr. Stewart recalled giving this statement. (T-130)  When asked to read his statement, Mr. Stewart responded, "they were fixing to - - they were fixing to go. You know, they were saying, it wasn't, you know, what I'm saying, it wasn't - - they were fixing to go.  When I pushed Poncho like back like this and they up with the gun and shot the truck." (T-131)  Mr. Hartley asked Mr. Hartley to read the entire sentence because he was leaving a crucial word out of his statement as written.  Mr. Stewart responded by saying he " shot the truck **first**". (T-131)  Mr. Hartley had to repeatedly ask the Mr.

9

Stewart to read the quote in full because Mr. Stewart kept leaving the word "first" out of the statement. (T-131, 132, 133)

Mr. Stewart testified that Johnny was standing in front of the building and about to get into the truck when the truck was shot. Mr. Stewart suggested that maybe the Defendant thought Johnny was about to get a gun. (T-133) Mr. Stewart finally read his statement to police citing that "he shot the truck first and Boo was like still standing up". Mr. Stewart continued reading his statement and commented that Poncho shot the first. (T-133)

Mr. Stewart testified he heard guns shots six times. (T-133) Mr. Hartley asked Mr. Stewart if he had changed his story from the 2:00 statement wherein he said the Defendant shot into the ground first and the 7:00 statement wherein he claimed the Defendant shot into the truck first about four or five times. Mr. Stewart admitted the inconsistency. (T-134) Mr. Stewart admitted he did not know why he had totally inconsistent answers on such an important question. (T-134) When questioned further about his inconsistency, Mr. Stewart responded, he was shocked when the victim was shot, but that he knew the Defendant shot him." (T-135) Mr. Stewart continued to admitt he got the sequence wrong, but maintained that "he shot him". (T-135) Mr. Stewart claimed the inconsistency had nothing to do with the fact that he was on drugs that night. (T-135)

Mr. Stewart acknowledged he never mentioned Darryl Foggy's gun to the police in his two statements. Mr. Stewart maintained that Darryl Fogy's gun was not hidden even though it was across the street under a rug in an apartment without that tenant's

10

knowledge. (T-137, 138)   Mr. Stewart acknowledged he and Darryl Fogy had been friends for a "good little while", but he finally admitted they knew each other "for a long time... about six or seven" years. (T-138, 139)  Mr. Stewart testified he was familiar with an Bryant Thomas, and that Mr. Thomas was at the party but left. (T-139, 140)   Mr. Stewart was aware that Bryant Thomas had identified Darryl Foggy in a photo line up as the person who shot the victim. (T-140)

## RE-DIRECT EXAMINATION OF ERIC STEWART

Mr. Stewart was able to identify State's exhibit 28 as a photo line up of a couple of guys.  Mr., Stewart acknowledged the photo line up had been shown to him by one of the detectives and that he was able to identify the Defendant out of a series of photos. (T-141, 142,143)  Mr. Stewart was shown State's exhibit number six which was a photo of the apartment complex.  Mr. Stewart testified that this photo was an accurate representation of the way the building and everything around it was set up. (T-144, 145)

## RE- CROSS EXAMINATION OF ERIC STEWART

Mr. Hartley elicited testimony from Mr. Stewart that State's exhibit 6 did not fairly and accurately depict the scene on the night in question.  Mr. Stewart acknowledged that the photo did not look the same because the photo was taken during the daytime. (T-146) Mr. Stewart also testified that he was not hiding to use drugs, but had gone behind the building in order to show respect to others. (T-146)

## DIRECT EXAMINATION OF JOHNNY OSBORNE

J. Osborne testified that he went to his cousin's party with his brother, Brian Osborne. (T-160) J. Osborne was driving a red Jeep Cherokee with a black bottom. (T-

161) J. Osborne arrived at the party at about 10:30 PM or 10:35 PM. (T-162, 163) Upon arrival, J. Osborne noticed "a group of guys huddled over in like between the two buildings where the party was at". (T-163) At this point, B. Osborne left in the Jeep to go to the store. (T-163) J. Osborne testified there were "about four or five people" between the buildings, and the only person he recognized in the group was his cousin, Eric Stewart. (T-164) J. Osborne testified he heard "a lot of arguing back and forth" and then entered the apartment where the party was.

When he came back onto the porch, he heard someone say, "You're not going to fuck with me", but did not know which person made the statement. (T-165) The State asked J. Osborne if he could see these people or just hear them. He replied, "No, I didn't see them because at nighttime by the building it's a shadow of the building, and they was like back up in the building -back up in the cut, so I couldn't see who said it or who was talking at the time." (T-166) J. Osborne testified he went back into the apartment then back outside on the porch to wait for his brother. He further testified that when he came back out onto the porch, the people between the buildings were getting louder and louder. (T-166). J. Osborne testified he could not recall what was being said, but thought it was about who did this or that, about who was the baddest gang banger". (T-167)

Once back on the porch, J. Osborne waited about two minutes before his brother returned in the Jeep and backed the vehicle into a parking space. (T-167). At that point, J. Osborne approached the Jeep and told his brother he was about to leave the party. (T-168). J. Osborne got into the driver's seat and B. Osborne walked around the front and got into the passenger side. (T-169) J. Osborne testified he heard gunshots as he was

12

about to drive off and the windows in the truck started shattering. (T-169)  J. Osborne claimed he stopped and ducked. (T-169)  J. Osborne admitted he did not see where the gunshots were coming from. (T-169)  After several more shots were fired, J. Osborne and his brother got out of the Jeep.  He testified that he "saw Boo laying on the ground and Eric was on top of him". (T-171)  J. Osborne testified he did not see anyone else other than Rabbit and Boo. (T-171)  He further testified he did not see anyone running. (T-172)

### CROSS EXAMINATION OF JOHNNY OSBORNE

J. Osborne testified he did not see Bryant Thomas at the party, but did see Darryl Foggy inside the apartment. (T-175)  J. Osborne testified it was dark that night, and admitted there were no lights on the front of the building that carried to the back. (T-176)

### REDIRECT EXAMINATION OF JOHNNY OSBORNE

J. Osborne testified that Darryl Foggy inside the house when he arrived. (T-179) J. Osborne first claimed Darryl Foggy did not come out of the house before the shooting. (T-179) He then testified he came back out on the porch when B. Osborne came back, and was there when "they were shooting". (T-180)  J. Osborne recalled this because he had a conversation with Darryl Foggy at the time. (T-180) J. Osborne claims this was the last time he saw Darryl Foggy. (T-180)

### DIRECT EXAMINATION OF DETECTIVE C.J. GRANDISON

Detective Grandison was questioned about various photographs taken by him and used for the State's exhibits.  The only relevant testimony elicited from Detective Grandison is that his camera worked, but that the lighting outside was poor for taking quality photographs. (T-189)

13

## DIRECT EXAMINATION OF BRIAN OSBORNE

B. Osborne testified that he and his brother, Johnny Osborne, dropped J. Osborne's girlfriend off at work and then drove to the party in Smiley Court. (T-200) When they arrived, the party was over. (T-200)  B. Osborne saw his cousin, Eric, and Boo outside. (T-200)  Eric and Boo came to the truck and spoke with Mr. B. Osborne. (T-200)  B. Osborne testified that Eric and Boo had been standing in the yard between the two buildings before they walked over to the Jeep. (T-201)  B. Osborne then took the Jeep to the service station and was gone about ten or fifteen minutes. (T-202, 203)  When he returned, he testified, "they were out there arguing. So I called- told Rabbit to tell my brother to come on. Told him to tell Johnny to come on." (T-204)  B. Osborne testified that after his brother got into the driver's seat and he got into the passenger's seat, "they were still arguing." (T-206)  State asked who they were, and he replied, "James and Darryl."  The State asked which Darryl he was referring to and he replied, "Darryl Joyce". (T-206)  B. Osborne testified that Darryl Joyce also goes by the name "Poncho". (T-206)  B. Osborne testified that he had met Darryl Joyce once through Rabbit (Eric Stewart). (T-206)  B. Osborne admitted he really did not know what they were arguing about, but thought it was gang related." (T-207)

B. Osborne testified that the next thing he heard was Boo saying, "Man, I ain't no proud person. If I wanted to do something to you, I could have got you that night you were asleep on the porch, you know what I'm saying." (T-208)  The State asked what happened next.  B. Osborne testified, "Then that's when I seen the gun up. I seen him shoot him one time in the leg. So by that time he shot him one time in the leg. I'm

14

looking back on the passenger side. He shot towards our truck. He hit our truck three times. Shot the windows out on my side." (T-208)  B. Osborne testified he saw "Poncho shoot Boo." (T-209)  B. Osborne identified Darryl Joyce as the shooter that night by pointing to him in the courtroom. (T-210)  He testified that when the shooting was over, Mr. Joyce ran off through a back field. (T-212)

## CROSS-EXAMINATION OF BRIAN OSBORNE

B. Osborne testified there was no lighting out there, but that "you could still see the person's face good though".  (T-215)  He stated he saw three people between the buildings, but did not see anyone on the porch at that time. (T-216, 220)

## DIRECT EXAMINATION OF E. E. HOWTON

Detective Howton testified as the case agent. (T-233)  He stated he developed Darryl Joyce and Darryl Foggy as suspects. (T-236)  Detective Howton testified that Eric Stewart was adamant that Mr. Foggy was not the shooter and that he gave Detective Howton the location of Mr. Foggy's gun. (T-237)  He testified that the police did recover a nine millimeter handgun from Amy Albright's apartment and sent it to the Department of Forensic Sciences. (T-238)  He testified that one bullet was recovered from the victim's body and three shell casings were recovered from the scene. (T-239)

Detective Howton stated that after speaking with Darryl Foggy, he signed warrants on Darryl Joyce. (T-242)  When asked if there was other evidence implicating Darryl Joyce, Detective Howton replied that he couldn't find him. (T-242)  He further testified that a gun was never recovered from Mr. Joyce. (T-242)  Detective Howton stated that

Mr. Joyce was arrested on approximately February 11, 2002, in California when he was stopped in a traffic stop, and had used a fake name and identification. (T-243)

Detective Howton identified State's exhibit 28 as a mug book. (T-245) The State asked, "What does that mean?" to which Detective Howton explained, "It has a- or has photographs of several individuals which have been arrested over a period of time, and they are collected in this book." (T-245)  Defense counsel objected and moved for a mistrial. (T-245)  The Court gave an instruction to the jury that the book was not to be considered as any implication as to the Defendant's guilt or innocence. (T-246) Detective Howton testified that the Defendant was identified from the mug book by Eric Stewart. (T-248)

## CROSS-EXAMINATION OF E. E. HOWTON

In a supplement prepared by Detective Howton, he recorded, "At this time it is unknown why Eric Stewart took Foggy's gun and hid the gun". (T-259)  Detective Howton admitted that Bryant Thomas positively identified Darryl Foggy in a photo lineup as the person who shot Mr. Friendly. (T-265)

Detective Howton admitted that Nicole Judkins identified the gun (State's Exhibit 21) as belonging to Darryl Foggy. (T-268)  Detective Howton testified that Officer Grandison recovered three shell casings from the scene. (T-271)

## REDIRECT EXAMINATION OF E. E. HOWTON

Detective Howton testified that it is common to have variations in the number of shots reported by witnesses. (T-274, 275)  He testified that he was unable to exclude Mr. Joyce as a suspect because he could not find him. (T-275)

### RECROSS EXAMINATION OF E. E. HOWTON

Detective Howton testified that Mr. Friendly was shot three times. (T-277) He testified that he did not know how many shots were fired into the Jeep, but it was hit more than once. (T-277)

### REDIRECT EXAMINATION OF E. E. HOWTON

When asked if some of the shots that hit Mr. Friendly went through his body and came out the other side, Detective Howton replied, "Yes." He also testified that it was possible for some of those bullets to also hit the Jeep. (T-278)

### DIRECT EXAMINATION OF KATHERINE RICHART

Ms. Richart is employed with the Department of Forensic Sciences and is a forensic scientist specializing in firearms and tool mark identification. (T-279, 280) Ms. Richart was qualified as an expert. (T-281) Ms. Richart testified that she test fired the gun identified as State's Exhibit 21, and that the gun worked. (T-282) She further testified that she examined the three shell casings recovered at the scene and that they were not fired from the gun identified as State's Exhibit 21. (T-284) Ms. Richart testified that the bullets fired at the scene came from a nine millimeter thirty-eight class and she could determine they were most probably fired from a High Point pistol. (T-286)

### DIRECT EXAMINATION OF DR. BEN BRISTOL

Dr. Bristol testified that he is employed by the National Medical Examiner's Office, and was at one time a medical examiner with the Alabama Department of Forensic Sciences. (T-292, 293) Dr. Bristol was qualified as an expert witness. (T-295) Dr. Bristol performed the autopsy of James Friendly. (T-295) Dr. Bristol testified to

17

identifying three entrance gunshot wounds on Mr. Friendly's body. (T-297) He testified that Mr. Friendly was shot from the same side based on his examination. (T-304) Dr. Bristol determined the case of death as multiple gunshot wounds. (T-305)

## DIRECT EXAMINATION OF NICOLE JUDKINS

Ms. Judkins testified that she hosted a birthday party for her boyfriend on February 1, 2002. (T-306) She testified that she never saw Darryl Joyce at her apartment. (T-307) She admitted she saw Darryl Foggy at the party. (T-308) Ms. Judkins testified that she and Darryl Foggy were inside her apartment when the shooting occurred. (T-308) When she went outside, she saw Darryl Joyce leaving in a blue truck. (T-308, 309) She also observed the victim on the ground. (T-309) She testified that she saw a gun in Mr. Foggy's front pocket. (T-309, 310) She testified she did not see who shot Mr. Friendly. (T-310)

## CROSS EXAMINATION OF MS. JUDKINS

Ms. Judkins acknowledged she had been drinking at the party, but denied using any illegal drugs. (T-311) She testified she did not see Darryl Foggy outside after the shooting. (T-313) She only remembered seeing Rabbit outside. (T-313)

Defense Counsel showed Ms. Judkins her statement given to the police at approximately 6:00 AM on February 2, 2002. (T-313) When asked why in her statement she said Mr. Foggy's gun was in his back pocket, she answered, "I don't know." (T-315) Ms. Judkins testified that she said in her statement that Mr. Foggy disappeared right after the shooting. (T-315) She was then asked if she remembered telling Detective Howton that she went outside and saw Mr. Foggy out there and he fled the scene. (T-316) She

replied, "Yes, I remember going outside after the shooting. I mean, it been so long I don't remember. I just went out there just to see if he was all right. That's all". (T-316)

### DIRECT EXAMINATION OF E. E. HOWTON BY DEFENSE

Detective Howton testified that he took a statement from Nicole Judkins. (T-320) He testified that she stated she went outside and observed Eric Stewart and Darryl Foggy disappear and victim on the ground. (T-322)  Detective Howton also testified that Ms. Judkins did not mention that she saw Mr. Foggy inside the apartment. (T-322)

### CROSS EXAMINATION ON E. E. HOWTON BY STATE

Detective Howton testified that Darryl Joyce and Darryl Foggy were both originally developed as suspects. (T-323)  He stated that he signed warrants on Mr. Joyce because the information he had pointed the investigation in that direction. (T-324)

### REDIRECT EXAMINATION OF E. E. HOWTON BY DEFENSE

Detective Howton testified that Bryan Thomas identified Darryl Foggy as the shooter. (T-325)

### RECROSS EXAMINATION ON E. E. HOWTON BY STATE

Detective Howton testified that after the shooting other people came out of Smiley Court. (T-326)  The State asked, "How many of those people said they saw people looking through the grass picking up shell casings?" to which Detective Howton answered, "Nobody". (T-327)

### REDIRECT EXAMINATION OF E. E. HOWTON BY DEFENSE

Detective Howton admitted that no one was asked if they saw anyone looking through the grass for shell casings. (T-327)

19

<u>ARGUMENT</u>

I.   **DID THE TRIAL COURT ERR BY ALLOWING TESTIMONY FROM THE STATE'S WITNESS ABOUT A MUG BOOK CONTAINING THE DEFENDANT'S PHOTOGRAPH FROM A PRIOR ARREST?**

The Trial Court erred in allowing into evidence testimony regarding a "mug book" during the prosecution's case in chief.   Said testimony was highly prejudicial to the Defendant and was used solely for the purpose of attacking the Defendant's character and reputation.  Said mug book contained photographs of individuals arrested over a period of time. (T-245)   Counsel for the Defendant made a proper objection and moved for a mistrial.   An off the record discussion was held outside the presence of the jury.   The Trial Court offered a curative instruction to the jury that the fact that the police department has a photo of the Defendant was not to be considered as any implication of the Defendant's innocent or guilty.   The Trial Judge further commented that the mug book was not evidence of guilt and not to be considered by the jury.  (T-246).

In <u>Ex parte Long</u>, 600 So.2d 982 (Ala. 1992), overruled on other grounds, <u>Ex parte Edwards</u>, 816 So.2d 98 (Ala. 2001), the Alabama Supreme Court stated the following regarding the admissibility of mug shots:

> "Mug shots are generally inadmissible in a criminal trial because the jury may infer from them that the defendant has a criminal history.  <u>Gross v. State</u>, 395, So.2d 485 (Ala. Crim. App. 1981).   However, under certain circumstances, admitting a mug shot into evidence does not constitute reversible error...."

The Court in <u>Long</u> relied upon the three requirements set out in <u>United States v. Harrington</u>, 490 F.2d 487, 484 (2nd Cir. 1973).  In order for the trial court to rule that the

20

introduction of a mug shot type photograph of the Defendant into evidence does not result in reversible error, the prosecution must 1) show a demonstrable need to introduce the photograph; 2) the photograph must not imply that the Defendant has a prior record; and 3) the manner of introduction must be such that it does not draw particular attention to its source or implications of the photographs.  See also Walker v. State, 523 So.2d 528, 535 (Ala. Crim. App. 1988).  In Walker, the Trial Court found no error in admitting a photographic spread into evidence where the admission of the same did not serve to bolster the witness's identification and one could not infer that the Defendant had a prior criminal record from the photographic spread.

However, in the present case, the prosecution failed all three requirements set out in Walker.  No photographs were needed at trial because a previous State witness, Eric Stewart, made an in-court identification of the Defendant as well as an identification by photograph. (T-89, 111, 141, 142, 143)  Rather, questioning of Detective Howton about the Defendant's photograph in the mug book showing those previously arrested was used solely to bolster a witness's identification.   Secondly, Detective E.E. Howton made specific mention that the mug book contained photographs of several individuals that had been arrested over a period of time. (T-245).  Detective Howton made this statement following a specific question from the State prosecutor as to what the mug book meant. (T-245)  Naturally, a mug book of photographs from previous arrests implies that the Defendant, being in the book, has a prior criminal record.  The manner in which the prosecutor asked the Detective about the mug book on direction examination, during the State's case in chief when a previous in-court identification had occurred, drew particular

attention to the Defendant's presence within the book and implies his prior arrest. Unquestionably, the mug book was suggestive to the jury that the Defendant had a prior criminal arrest and should not have been allowed.

The Trial Court Judge gave a curative instruction to the jury that the fact that the police department has a photo of the Defendant was not to be considered as any implication of the Defendant's innocent or guilty. The Trial Judge further commented that the mug book was not evidence of guilt and not to be considered by the jury. (T-246) However, the instruction was general in nature and did not include that the jury should ignore the fact or issue of whether or not the Defendant had a prior arrest record or why the Defendant's photograph would be included in the mug book to begin with. While the State might argue that the witness testimony elicited was harmless error since the mug book was not admitted into evidence, the Defendant would strongly contend that the "skunk" left it's stink with the jury and that no curative instruction could resolve the undue prejudice and reversible error intentionally created by the State. The witness did not just volunteer the information. The State specifically asked the witness, Detective Howton, to explain what the mug book meant. (T-245) The State used the mug book merely to attack the Defendant's character and reputation during their case in chief for the sole purpose of inducing belief in his guilt or showing his tendency to commit the crime of murder. See Rule 404(b) of the Alabama Rules of Evidence establishing that "evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith." Should the State argue that the testimonial evidence was elicited for identity purposes, this argument would fail since a

22

previous witness had already made an in-court identification. The testimony was made during the State's case in chief and caused prejudicial harm to the Defendant's case. The Defendant had not had the opportunity to present any evidence of good character or reputation to allow the State the opportunity to present such evidence of bad character.

## II.   DID THE TRIAL COURT ERR BY SUBMITTING THE CASE TO A JURY WHEN THE STATE PRESENTED INSUFFICIENT EVIDENCE?

The Trial Court erred by denying the Defendant's motion for judgment of acquittal. Counsel for the Defendant made a timely motion for a judgment of acquittal at the conclusion of the State's case in chief. (T-318) The evidence before the jury at that time was insufficient to find the Defendant guilty beyond a reasonable doubt.

The Defendant would submit, "the court… shall direct the entry of judgment of acquittal as to any charged offense… for which the evidence is insufficient to support a finding of guilty beyond a reasonable doubt." Ballenger v. State, 720 So.2d 1034 (Ala. Crim. App. 1998), quoting Rule 20.1, Ala.R.Crim.P.

In the present case, another individual at the party, Darryl Foggy, was identified as the shooter. The State's witness, Detective E. E. Howton, testified that Brian Thomas identified Darryl Foggy as the person who shot Mr. Friendly. (T-265) Another State's witness, Nicole Judkins, placed Darryl Foggy in her apartment when the shooting occurred. (T-308) While still on direct examination, Ms. Judkins testified that she saw Mr. Foggy with a gun while he was in her apartment. (T-309) She further testified that she did not see who shot Mr. Friendly. (T-310) Detective Howton testified that Ms. Judkins stated to him that when she was told someone was fighting outside, she went

outside where she observed Eric Stewart and Darryl Foggy disappear and saw Mr. Friendly on the ground. (T-322) Johnny Osborne also places Darryl Foggy at the party. (T-175) The eyewitness testimony that Darryl Foggy was at the party along with testimony by two witnesses that Darryl Foggy, not Darryl Joyce, was the person who shot and killed Mr. Friendly creates a cloud of reasonable doubt.

According to Faircloth v. State, 471 So.2d 485 (Ala. Crim. App. 1984), the reviewing court must accept all evidence introduced by the State as true, accord the State all legitimate inferences there from, and consider all evidence in a light most favorable to the prosecution when determining the sufficiency of the evidence. "When there is legal evidence from which the jury could, by fair inference, find the defendant guilty, the trial court should submit it to the jury". Ward v. State, 557 So.2d 848, 850 (Ala. Crim. App. 1990). The reviewing court must determine whether there was legal evidence before the jury, at the time the motion for acquittal was made, from which the jury could have found the appellant guilty. Farrior v. State, 728 So.2d 695 (Ala. Crim. App. 1998), quoting Breckenridge v. State, 628 So.2d 1012, 1018 (Ala. Crim. App. 1993). See also Ex parte Bankston, 358 So.2d 1040, 1042 (Ala. 1978).

In the present case, even accepting all of the State's evidence as true, the prosecution still fails to establish a prima facie case of murder against Darryl Joyce. The State's own witnesses gave conflicting testimony as to what transpired at the time of the shooting and otherwise introduced testimony to bring into question their credibility. Eric Stewart testified that he had at least three drinks at the party before running into Mr. Friendly. (T-84) Mr. Stewart then testified that he had been snorting cocaine thirty

24

minutes before the Victim was shot and that it took "like two minutes" to get a rush off of the cocaine. (T-124) Mr. Stewart further testified that the Defendant, Darryl Joyce, and Mr. Friendly got into an argument. (T-96) On direct examination, Mr. Stewart testified that Mr. Joyce shot Mr. Friendly in the leg, then began shooting at the Jeep, then shot at Mr. Friendly again. (T-109) In his statement to police, given at 2:14 AM on February 2, 2002, Mr. Stewart stated that Mr. Joyce fired two or three times into the ground, then shot the victim. (T-128) In a second statement to police given at 7:00 AM, Mr. Stewart stated twice that the shooter "shot the truck first". (T-131, 133) Mr. Stewart was unable to explain the varying sequence of events, but denied it was from being high. (T-135)

Mr. Stewart also testified on direct that he and Darryl Foggy had lived together for a couple of months. (T-112) He identified State's exhibit number 21 as looking like Mr. Foggy's gun. (T-113, 114) Mr. Stewart denied that he ever had Mr. Foggy's gun on the night of the shooting. (T-114) He admitted he saw Mr. Foggy hide the gun under a rug in an apartment across the street without the tenant's knowledge. (T-116, 117) On cross-examination, Mr. Stewart acknowledged he never mentioned Mr. Foggy's gun in either of his statements to police. (T-135)

Two of the State's witnesses, Johnny Osborne and Brian Osborne, arrived at the party together and were in the same vehicle at the time of the shooting. Johnny Osborne testified that he saw "four or five" people between the buildings when they arrived at the party. (T-164) Brian Osborne testified that there were three men by the buildings. (T-216) Brian Osborne also testified that Mr. Stewart and Mr. Friendly approached the vehicle and spoke with him. (T-200) Johnny Osborne made no such statement that these two men

25

came to the vehicle. Johnny Osborne testified, "As soon as I got ready to drive off, I heard gunshots and the windows in the car- in the truck started shattering". (T-169) Brian Osborne testified that he saw Mr. Joyce shoot Mr. Friendly in the leg, then shoot towards the truck. (T-208) Brian Osborne also testified that he was looking out the passenger window during the entire shooting, even while the Jeep he was in was fired upon. (T-211)

On re-cross examination, Brian Osborne was confronted with his statement given to police the day after the shooting. (T-222) The transcript of his statement indicates that Mr. Osborne said, "we looked up and when I seen the dude Poncho running behind the building, my brother pulled off." (T-222, 223) When asked why he would have to look up if he was watching the whole time, Mr. Osborne claimed that the police took down his statement wrong. (T-223) Upon further questioning, Mr. Osborne admitted he did duck down after shots were fired at the Jeep. (T-225)

In Odom v. United States, 377 F.2d 853 (5th Cir. 1967), the Court set out the procedure for reviewing the sufficiency of evidence. The Court said it is obligated to determine whether there is any theory of the evidence from which the jury may have excluded every hypothesis except guilty beyond a reasonable doubt. Id. See also Williamson v. United States, 5th Cir., 1966, 365 F.2d 12, 14. The Court will also determine whether any reasonable theory exists from which the jury might conclude the defendant was guilty. Cumbo v. State, 368 So.2d 871 (Ala. Crim. App. 1978). While the State's theory of the evidence could support a finding of guilt by the jury, it did not exclude all other theories beyond a reasonable doubt.

The State's theory in this case was that the Defendant and Mr. Friendly became involved in an argument that ended when Defendant fired a handgun at the Mr. Friendly, striking him three times, and causing fatal injuries. (T-58) According to the State's own witnesses, several identified an individual by the name of Darryl Foggy as the shooter. Several witnesses place Mr. Foggy at the scene immediately prior to and immediately after the shooting. By the State's own evidence, there is at least one alternative theory presented to the jury that created reasonable doubt, namely that Darryl Foggy, not the defendant, fatally shot Mr. Friendly.

Conflicts in evidence offered by the State and appellant generally go to the weight and not the sufficiency of the evidence. Johnson v. State, 555 So.2d 818 (Ala. Crim. App. 1989). However, conflicting evidence is not subject to review **provided the State has established a prima facie case.** Carroll v. State, 492 So.2d 323 (Ala. Crim. App. 1986). Defendant submits that the State failed to establish a prima facie case based on eyewitness testimony that the Defendant did not commit the murder for which he was convicted.

## CONCLUSION

For the foregoing reasons, the undersigned counsel requests this Honorable Court to reverse the decision of the trial court due to insufficiency of the evidence to establish a prima facie case presented by the State of Alabama against the Defendant, and for reversibly allowing testimony from a witness on direct examination about a mug book that contained the Defendant's photo from a prior arrest.

**Respectfully submitted** this the __10th__ day of December, 2003.

27

AIMEE C. SMITH (SMY 220)
ATTORNEY FOR APPELLANT

**AIMEE C. SMITH, ATTORNEY AT LAW**
640 S. McDonough STREET, 2ND FLOOR
MONTGOMERY, AL 36104
(334) 264-6466

## CERTIFICATE OF SERVICE

I hereby certify that I have served a true and correct copy of the Appellant's Brief

on the following:

**Via drop box at the Circuit Clerk's office:**

Clerk of the Circuit Court
Montgomery County Courthouse
Post Office Box 1667
Montgomery, AL 36102-1667

Hon. Ellen Brooks, DA
District Attorneys Office
Post Office Box 1667
Montgomery, AL 36102-1667

Hon. William Pryor
Attorney General of Alabama
Office of the Attorney General
The State House
11 South Union Street
Montgomery, Alabama, 36130

Done this the ___10th___ day of December, 2003.

OF COUNSEL

28