B VOL 2 of 3

COURT OF CRIMINAL APPEALS NO. CR-02-2104

# APPEAL TO ALABAMA COURT OF CRIMINAL APPEALS

FROM

## CIRCUIT COURT OF ___MONTGOMERY___ COUNTY, ALABAMA

CIRCUIT COURT NO. ___CC 2002-1417___

CIRCUIT JUDGE ___HOBBS___

Type of Conviction / Order Appealed From: ___INTENTIONAL MURDER___

Sentence Imposed: ___LIFE WITHOUT PAROLE___

Defendant Indigent: ■ YES ☐ NO

DARRYL JEVON JOYCE
NAME OF APPELLANT

AIMEE C. SMITH                    (334) 264-6466
(Appellant's Attorney)                    (Telephone No.)
640 S. MCDOUNOUGH STREET
(Address)
MONTGOMERY          AL          36104
(City)                (State)              (Zip Code)

V.

STATE OF ALABAMA

(State represented by Attorney General)
NOTE: If municipal appeal, indicate above, and enter
name and address of municipal attorney below.

NAME OF APPELLEE

(For Court of Criminal Appeals Use Only)

Part 2 of 5



EXHIBIT
A

1           IN THE FIFTEENTH JUDICIAL CIRCUIT

2             IN AND FOR MONTGOMERY COUNTY

3                MONTGOMERY, ALABAMA

4

5   STATE OF ALABAMA,

6           Plaintiff,

7   VS.                       CRIMINAL ACTION

8   DARRYL J. JOYCE,        CASE NO. 02-1417

9           Defendant.

10   _____/

11

12              INDEX OF PROCEEDINGS

13   TRIAL . . . . . . . . . . . .  Page   8

14   SENTENCING . . . . . . . . . .  Page 376

15

16

17

18

19

20

21

22

23

24

25

**COPY**

1

2                    IN THE CIRCUIT COURT OF

3                 MONTGOMERY COUNTY, ALABAMA

4

5        STATE OF ALABAMA,              )

6                    Plaintiff,         )

7        VS.                            )  CC NO. 02-1417

8        DARRYL J. JOYCE,               )

9                    Defendant.         )

10        _____/

11

12       **INDEX TO REPORTER'S TRANSCRIPT ON APPEAL**

13       <u>EXHIBITS</u>                       <u>ADMITTED</u>

14       SX 1 - Photograph                 186

15       SX 2 - Photograph                 186

16       SX 2A - Photograph                193

17       SX 3 - Photograph                 186

18       SX 4 - Photograph                 186

19       SX 5 -   Photograph              186

20       SX 6 -   Photograph              145

21       SX 7 - Photograph                 138

22       SX 8 - Photograph                 252

23       SX 9 - Photograph                 144

24       SX 10 - Photograph                252

25       SX 11 - Photograph                252

1        SX 12 - Photograph                        252

2        SX 13 -  Photograph                       252

3        SX 14 - Photograph                        252

4        SX 15 -  Gun Casing                       240

5        SX 16 - Gun Casing                        240

6        SX 17 - Gun Casing                        240

7        SX 20 - Forensic Science                  297

8               Documents

9        SX 20A - Dr. Bristol's CV                 295

10       SX 21 - Weapon                            319

11       SX 27 - Diagram of Smiley Court           249

12       SX 27A - Police Dept. Document            249

13       SX 29 - Photocopy of James               144

14               Friendly

15       SX 31 - Photocopy of Projectile           284

16

17       DX1 - Photo lineup                        319

18

19

20

21

22

23

24

25

1

2               IN THE FIFTEENTH JUDICIAL CIRCUIT
                  IN AND FOR MONTGOMERY COUNTY
3                     MONTGOMERY, ALABAMA

4

5

6        STATE OF ALABAMA,

7                   Plaintiff,

8        VS.                        CRIMINAL ACTION

9        DARRYL J. JOYCE,              NO. 02-1417

10                  Defendant.

11       _____/

12

13                  TRANSCRIPT OF PROCEEDINGS
                      JULY 21 - 22, 2003
14             MONTGOMERY COUNTY COURTHOUSE
                     COURTROOM 3-A

15

16       BEFORE:  THE HON. TRUMAN M. HOBBS, JR.

17               CIRCUIT JUDGE

18

19                  APPEARANCES

20

21       FOR THE STATE:
         WILLIAM POWELL, ESQUIRE
22       VERNETTA PERKINS, ESQUIRE
         DEPUTY DISTRICT ATTORNEY
23       MONTGOMERY, ALABAMA

24       FOR THE DEFENDANT:
         J. WILEY HARTLEY, ESQUIRE
25       MONTGOMERY, ALABAMA
                  JUDY E. SHELTON
              OFFICIAL COURT REPORTER

5

1

2                                INDEX

3          JURY VOIR DIRE. . . . . . . .           8

4

5                          ERIC STEWART

6      Direct Exam. by Mr. Powell . . .        77

7      Cross Exam. by Mr. Hartley . . .        118

8      Redirect Exam. by Mr. Powell . .        142

9      Recross Exam. by Mr. Hartley . .        145

10

11                          J. MACKEY

12     Direct Exam. by Mr. Powell . . .        148

13

14                       JOHNNY OSBORNE

15     Direct Exam. by Mr. Powell . . .        159

16     Cross Exam. by Mr. Hartley . . .        174

17     Redirect Exam. by Mr. Powell . .        179

18

19                       C.J. GRANDISON

20     Direct Exam. by Mr. Powell . . .        182

21

22                       BRIAN OSBORNE

23     Direct Exam. by Mr. Powell . . .        199

24     Cross Exam. by Mr. Hartley . . .        213

25     Redirect Exam. by Mr. Powell . .        220

1    Recross Exam. by Mr. Hartley . .        222

2    Redirect Exam. by Mr. Powell . .        226

3

4              E.E. HOWTON,

5    Direct Exam. by Mr. Powell . . .        231

6    Cross Exam. by Mr. Hartley . . .        256

7    Redirect Exam. by Mr. Powell . .        274

8    Recross Exam. by Mr. Hartley . .        277

9    Redirect Exam. by Mr. Powell . .        278

10   Recross Exam. by Mr. Hartley . .        278

11

12           KATHERINE RICHART

13   Direct Exam. by Mr. Powell . . .        279

14

15           DR. BEN BRISTOL

16   Direct Exam. by Mr. Powell . . .        292

17

18           NICOLE JUDKINS

19   Direct Exam. by Mr. Powell . . .        305

20   Cross Exam. by Mr. Hartley . . .        311

21

22              E.E. HOWTON,

23   Direct Exam. by Mr. Hartley . . .        320

24   Cross Exam. by Mr. Powell . . . .        323

25   Redirect Exam. by Mr. Hartley . .        325

1    Recross Exam. by Mr. Powell . . .        326

2    Redirect Exam. by Mr. Hartley . .        327

3

4

5

6    COURT'S ORAL CHARGE TO JURY . . .        361

7    VERDICT. . . . . . . . . . . .            372

8    SENTENCING. . . . . . . . . .            376

9    REPORTER'S CERTIFICATE. . . . . .        398

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2                    *   *   *   *   *   *   *   *   *   *   *   *   *

3            THE COURT:  It's still morning

4    so good morning everybody.  I told you

5    I'd be seeing some of you shortly.  We

6    are about to start the selection of the

7    jury in the case of State of Alabama

8    versus Darryl Joyce.

9            Mr. Joyce is charged with the

10   crime of murder in this case.  I'm going

11   to tell you that because in a little bit

12   I will be asking if any of you know

13   anything about the facts of this case.

14            Before I do that, I want to

15   introduce to y'all everybody that is

16   seated at the table here.  Representing

17   the State of Alabama are Deputy District

18   Attorneys Will Powell and Ms. Vernetta

19   Perkins.

20            MR. POWELL:  Good morning.

21            MS. PERKINS:  Good morning.

22            THE COURT:  Ms. Perkins, who

23   is --

24            MR. POWELL:  This is Ms. Sally

25   Friendly, Judge.  She is the victim's

1    mother.   She will be seated with us at

2    counsel's table this week.

3            THE COURT:   Okay.   Ms. Sally

4    Friendly.   Over here is Mr. Wiley

5    Hartley.   He is an attorney for the

6    defendant.   Seated with him is Mr.

7    Joyce.   I have introduced everybody up

8    here to you.

9            What I'm going to do now is ask

10   the clerk to call the roll.   When he

11   calls your name, if you would please

12   stand up, tell us what you do for a

13   living, what your spouse does for a

14   living.   If you are retired, tell us what

15   you did before you retired.   And if your

16   spouse retired, what your spouse did

17   before he or she retired.   Okay.

18           (At which time the roll of the

19   venire was called.)

20           THE COURT:   Okay.   I'm going to

21   ask everybody a few questions.   If you

22   need to respond to a question, if you

23   would stand up and repeat your name for

24   us and tell us whatever information you

25   need to give us.

1          If I ask a question that refers
2     to family members, I'm referring to your
3     spouse, your children, your
4     grandchildren, your parents,
5     grandparents, brothers and sisters.  Let
6     me say up front, we are not trying to
7     delve into your personal life.  We are
8     not here to embarrass anybody.  If you
9     need to make a response that you find
10    would be embarrassing to say in front of
11    a room full of strangers, that's fine.
12          When we ask everybody to go
13    back to the jury assembly room, you just
14    stay behind and share with us whatever
15    information you think you need to give
16    us.
17          As I said earlier, Mr. Joyce is
18    seated here.  Are any of y'all related to
19    him by blood or marriage or anyway
20    personally acquainted with Mr. Joyce?
21    Are any of y'all related by blood or
22    marriage or personally acquainted with
23    his attorney Wiley Hartley who is seated
24    here?  Have any of y'all ever been to his
25    office for any reason?

1           The State of Alabama is
2   represented by Deputy District Attorney
3   Will Powell and Vernetta Perkins.  Our
4   District Attorney is Ellen Brooks.  Are
5   any of y'all related by blood or marriage
6   to any of those folks or personally
7   acquainted with them for any reason?
8   Yes, ma'am?
9           PROSPECTIVE JUROR:  My name is
10  Sarah Andrews.  I'm acquainted with Ellen
11  Brooks.
12          THE COURT:  How are you
13  acquainted, Ms. Andrews?
14          PROSPECTIVE JUROR:  I handled
15  her insurance when I was with an
16  insurance company.
17          THE COURT:  Other than -- was
18  she personally your client?
19          PROSPECTIVE JUROR:  Well, no.
20  She was just one of our clients.
21          THE COURT:  Did you know her
22  personally at all?
23          PROSPECTIVE JUROR:  I knew her
24  personally, yes.
25          THE COURT:  Just to speak to

1          her?

2                    PROSPECTIVE JUROR:  Yes.

3                    THE COURT:  She has never been

4          to your house?

5                    PROSPECTIVE JUROR:  No.

6                    THE COURT:  Y'all don't go eat

7          meals together or anything like that?

8                    PROSPECTIVE JUROR:  No, sir.

9                    THE COURT:  Thank you, Ms.

10         Andrews.  Anybody else personally

11         acquainted with any of the District

12         Attorneys or Ms. Brooks?  Yes, ma'am?

13                    PROSPECTIVE JUROR:  I know

14         Ellen Brooks.  We served on the American

15         Cancer Society Board together.  We don't

16         go to each other's houses or anything

17         like that.

18                    MS. PERKINS:  What is your

19         name?

20                    PROSPECTIVE JUROR:  Lisa

21         Beers.

22                    THE COURT:  And there was one

23         more.  Yes, ma'am?

24                    PROSPECTIVE JUROR:  I'm Connie

25         Colvin and it's just kind of a social

```
 1          contact but not like to each other's home
 2          or anything.
 3                    THE COURT:  Y'all know her to
 4          speak to her sort of thing?
 5                    PROSPECTIVE JUROR:  Right.
 6                    THE COURT:  Would the fact that
 7          y'all know Ms. Brooks personally, would
 8          that affect your decision in this case
 9          one way or the other?
10                    PROSPECTIVE JUROR:  No, it
11          wouldn't.
12                    THE COURT:  Y'all could call it
13          right down the middle?
14                    PROSPECTIVE JUROR:  I don't
15          believe it would be a problem.
16                    MR. HARTLEY:  Would you ask
17          those questions of Mr. Bledsoe.  I
18          believe his wife works in the DA's
19          office.  Would you ask him the same
20          line.
21                    THE COURT:  Mr. Bledsoe, your
22          wife works in the DA's office?
23                    PROSPECTIVE JUROR:  Yes.
24                    THE COURT:  Are you personally
25          acquainted with Ms. Brooks?
```

1                  PROSPECTIVE JUROR:  I have only

2      spoken to her.  We are not personally

3      acquainted.

4                  THE COURT:  Would the fact that

5      your wife works in the District

6      Attorney's office, would that make it

7      difficult for you to serve on a jury

8      where her office is involved?

9                  PROSPECTIVE JUROR:  I don't

10     believe it would.

11                THE COURT:  You still think you

12     could call it right down the middle?

13                PROSPECTIVE JUROR:  I'll do my

14     best.

15                THE COURT:  Okay.

16                MR. HARTLEY:  Thank, you,

17     Judge.

18                THE COURT:  Anybody else?  Any

19     of y'all know anything about the facts

20     and circumstances of this case?  Is

21     anybody here personally acquainted with

22     Mr. Friendly, the victim in this case?

23     Do any of y'all know his mother Ms.

24     Friendly who is sitting over here?

25     Related by blood or marriage to the

1    Friendlys, anybody?

2                I'm going to let y'all ask

3    about the witnesses because all I have

4    got up here is a lengthy list.  I don't

5    know who you are actually going to call.

6    So I will let y'all hash that out.

7                Anyone here or any of your

8    family been employed by the Montgomery

9    Police Department or any other law

10   enforcement agency?  Yes, Ms. Andrews?

11               PROSPECTIVE JUROR:  My son is a

12   DEA instructor at Quantico.

13               THE COURT:  Thank you.  Anybody

14   else?

15               PROSPECTIVE JUROR:  I have a

16   police officer residing with me on a

17   temporary basis.  He is going through a

18   divorce.  It is a nephew by a previous

19   marriage.

20               THE COURT:  And your name is,

21   sir?

22               PROSPECTIVE JUROR:  Durden.

23               THE COURT:  Mr. Durden, thank

24   you.

25               PROSPECTIVE JUROR:  He is a

1          motorcycle officer.

2                    THE COURT:  Okay.  Yes, sir?

3                    PROSPECTIVE JUROR:  I worked as

4          a reserve deputy sheriff in Lee County

5          for about eight years.

6                    THE COURT:  And your name

7          again?

8                    PROSPECTIVE JUROR:  Eubanks.

9                    THE COURT:  Mr. Eubanks, thank

10         you.  Other than Mr. Bedsole, anybody

11         here have a family member that works in

12         the DA's office?  Ever been employed --

13         has anybody in your immediate family ever

14         been employed with the District

15         Attorney's office?  Anybody here have an

16         interest -- I'm sorry, ma'am?

17                    PROSPECTIVE JUROR:  Just

18         friends, a neighbor?

19                    THE COURT:  Well, family

20         members.

21                    PROSPECTIVE JUROR:  No.  A

22         close friend.

23                    THE COURT:  Anybody here -- I'm

24         sorry.  Yes, sir?

25                    PROSPECTIVE JUROR:  Yes.  Ray

1    Caudill.  I'm in that volunteer program

2    for the Montgomery police.  I don't know

3    that that has an impact here or not.

4              THE COURT:  You just -- you

5    fill in --

6              PROSPECTIVE JUROR:  Yes.  We

7    patrol special events and I'm doing some

8    work down at the crime scene laboratory.

9              THE COURT:  Okay.  Thank you,

10   sir.  Anybody else?  Anybody here have an

11   interest in the outcome of this case

12   either way, either for a conviction or

13   for acquittal?  Anybody here for whatever

14   reason just doesn't think you can be fair

15   to one side or the other?

16              In other words, is there

17   anybody here that just doesn't think that

18   for whatever reason they can't call it

19   right down the middle, be fair to

20   everybody in this case?

21              This is one of those questions

22   that could cause somebody some

23   embarrassment.  If you want to wait until

24   we finish with the questions, that would

25   be fine with me.

1         Does anybody have anyone in
2    your immediate family who has been
3    charged with an offense of murder within
4    the last twelve months?  Okay.  I will
5    let the attorneys ask some questions
6    now.
7              MR. POWELL:  Good morning.
8              PROSPECTIVE JURORS:  Good
9    morning.
10              MR. POWELL:  Again, my name is
11   Will Powell.  Before we go any further,
12   now that we have had an opportunity to be
13   in here together and observe one another,
14   I want to ask now that y'all have had an
15   opportunity to see Ms. Friendly, does
16   anyone recognize her, Ms. Sally
17   Friendly?  They live over off the
18   Boulevard.  Okay.
19              I want to talk about the
20   Friendlys.  This is James Friendly's
21   brother, Kevin.  Stand up Kevin.  Does
22   anyone recognize Kevin?  Okay.  Have a
23   seat.
24              Now the victim in this case,
25   James Friendly, also went by the name of

1       Boo.  Does anyone recognize him with that
2       additional piece of information?  And
3       along the same lines, the defendant is
4       known also by the name of Poncho or
5       Puncho or even Willie Faulk.
6                With that additional
7       information does anyone here know or
8       think they may have heard of the
9       defendant or the victim?  Okay.
10               Now, stand up Detective
11      Howton.  This is Detective Gino Howton
12      with the Montgomery Police Department,
13      does anyone know Detective Howton?
14               Okay.  Thank you.  Some other
15      names:  Two brothers, Johnny Osborne and
16      Brian Osborne.  Does anybody know them or
17      think they might?  Another individual
18      lives over in Smiley Court by the name of
19      Eric Stewart, goes by the name of
20      Rabbit.  Anybody know Mr. Stewart?
21               PROSPECTIVE JUROR:  I know Mr.
22      Stewart.
23               MR. POWELL:  You know Mr.
24      Stewart?  How do you know him without
25      going --

1              PROSPECTIVE JUROR:  I was

2      married to his family.

3              MR. POWELL:  You were married

4      to that family at one time.  And what is

5      your name, ma'am?

6              PROSPECTIVE JUROR:  Ella Boyd.

7              MR. POWELL:  Ella Boyd.  Thank

8      you, Ms. Boyd.  Anyone other than Ms.

9      Boyd know of Mr. Stewart, or Rabbit, of

10      that family?  Okay.

11              One of our forensic experts

12      that did the firearms analysis is Kathy

13      or Katherine Richart with the Department

14      of Forensic Science.  Is anyone familiar

15      with Ms. Richart?

16              The medical examiner that

17      looked at Mr. Friendly's body that

18      performed the autopsy is Ben Bristol, Dr.

19      Ben Bristol.  Does anyone know him?

20              One of the patrol officers is

21      M.T. McCaskill and J. Mackey.  Does

22      anyone know them?  The patrol supervisor

23      at the scene was R. Wallace.  Anybody

24      know Officer Wallace?

25              PROSPECTIVE JUROR:`  Is that

1          Richard Wallace?

2                    MR. POWELL:  I'm not sure what

3          his name is.  All I have is an initial.

4          I have only met him a couple times.

5                    OFFICER HOWTON:  That's

6          Richard.

7                    MR. POWELL:  Is that him,

8          Gino?  It is?  Yes, ma'am.  What is your

9          name?

10                    PROSPECTIVE JUROR:  Sarah

11         Andrews.

12                    MR. POWELL:  Now Ms. Andrews,

13         how do you know Mr. Wallace?

14                    PROSPECTIVE JUROR:  He was a

15         friend of my son's and they grew up

16         together.

17                    MR. POWELL:  So you know him

18         pretty well.  Would the fact that Officer

19         Wallace was the supervising patrol

20         officer at this crime scene affect your

21         opinion of the case one way or the

22         other?

23                    PROSPECTIVE JUROR:  No.

24                    MR. POWELL:  You believe you

25         could sit and impartially hear both the

1     state and the defendant's evidence and

2     judge this in a fair and impartial

3     manner?

4             PROSPECTIVE JUROR:  Yes.

5             MR. POWELL:  Now the evidence

6     technician that is involved in this case

7     is Brian Jurkofsky.  Is anyone familiar

8     with Detective Jurkofsky?  Another

9     detective that worked the scene was a

10    Detective J.W. Haynie and Detective C.J.

11    Grandison.  Is anyone familiar with

12    either one of those detectives?

13            Now before I go into this next

14    set of witnesses, let me ask you this

15    question.  This happened over in Smiley

16    Court.  Who all knows where Smiley Court

17    is?  Okay.

18           Specifically, it happened over

19    in the 400 block or 4000 block of Marlyn

20    Street.  A lady over there was having a

21    party at her residence and the shooting

22    occurred at about 11:30 that night.

23          Obviously, it was a party so

24    there were a whole bunch of people

25    there.  We are not going to call all of

1    them as witnesses, not everybody saw what

2    happened.  All right?  But now just -- is

3    anyone familiar with specifically 4000-A

4    over on Marlyn Court?  Yes, ma'am?

5              PROSPECTIVE JUROR:  Ella Boyd.

6              MR. POWELL:  Ms. Boyd.  Anyone

7    other than Ms. Boyd?  The lady that lived

8    there at the time, her name was Nicole

9    Judkins.  Do you know her?  All right,

10   Ms. Boyd.  Anyone other than Ms. Boyd?

11             At the time she was having a

12   birthday party for an individual named

13   Christopher McQueen.  Does anyone know

14   Mr. McQueen?  Besides Ms. Boyd.

15             Mr. McQueen went by the name of

16   Flip if that helps anybody out.  It was

17   Flip's birthday, and Ms. Judkins was

18   having a party for him.  Some other

19   individuals at the party whose names you

20   might hear are Bryant Thomas.  Are you

21   familiar with him?

22             PROSPECTIVE JUROR:  No.

23             MR. POWELL:  Also goes by B.T.

24   Another person at the party was Antwan

25   Giles.  Anyone know him?  Another

1    individual named Darryl Foggy.  Also goes

2    by the name D.  Anyone familiar with that

3    name?  The lady that lived across the

4    street, her name was Amy Albright.  Her

5    name may come up in this.

6         Just because I'm reading all

7    these names out doesn't necessarily mean

8    all these people are going to be called

9    as witnesses.  It's just these are the

10   names you are going to hear most

11   frequently throughout the course of the

12   trial.  And if any of you know them, we

13   need to ask some questions.

14        Ms. Boyd, what we are going to

15   do, after all the questions are over

16   with, if you will just stay back instead

17   of going through all these individually

18   with everyone here.

19        Now with what I have said so

20   far with the names, the location of

21   Smiley Court, with the birthday party,

22   has anyone heard or read anything in the

23   paper or heard anything on television

24   about this shooting that occurred last

25   year in February?

1            Ms. Boyd has heard this
2    before. She has got a few more details.
3    Anyone else? Okay. Now, I just have a
4    few more follow-up questions. First off,
5    this is -- obviously, it was a birthday
6    party. There were lots of people
7    around. They were doing things that
8    happen at a birthday party over in Smiley
9    Court. There was a lot of drinking going
10   on. There is going to be some instances
11   where people were using drugs; sometimes
12   marijuana, sometimes cocaine.
13           Is there anyone who just is
14   going to automatically knee-jerk reaction
15   exclude somebody's testimony simply
16   because alcohol or drugs are involved?
17   Okay. So I'm taking by no one answering
18   that question yes, you are at least going
19   to listen to the folks that testify and
20   hear what they have to say before you
21   reach any kind of opinion on whether or
22   not they were too drunk or too high or
23   too stoned or whatever to see what they
24   may have seen because, again, this is at
25   a party. It is not just going to be this

1    witness or that witness.  Most of the
2    witnesses in this case are going -- were
3    at the party on Friday or Saturday night
4    at 11:30 at night.  It is the kind of
5    case we got.  That's what we are dealing
6    with.

7         So, as jurors, one of the
8    factors you can take into consideration
9    in the credibility of a witness is their
10   state of mind or mental capacity to see
11   what they saw at the time, and you are
12   well within your purview to take that
13   into consideration.  Just to make sure we
14   are all on the same page, what I'm asking
15   is if the fact that somebody had a couple
16   beers or smoked a marijuana cigarette or
17   snorted some cocaine, does that mean
18   automatically you are going to disbelieve
19   their testimony without hearing anything
20   else?  So everybody can at least hear the
21   witnesses in this case?

22        Now, I looked at some of your
23   questionnaires.  How many of y'all watch
24   crime shows like CSI and that kind of
25   stuff?  Just about everybody.  Does

1  everyone understand that the law on

2  television is a whole lot different than

3  what Judge Hobbs is going to tell you

4  from the bench?  Does everybody

5  understand that?  And that what they do

6  on CSI is television and that doesn't

7  have a whole lot to do with reality.

8  Does everybody understand that?

9         Now there were some forensics

10  done in this case.  There were some shell

11  casings that were analyzed.  There was an

12  autopsy that was done.  But pretty much

13  when you boil this down, it's going to

14  come down to the witnesses, who saw who

15  do what.  That's important.

16         MR. HARTLEY:  Judge, I

17  appreciate Mr. Powell's explanation to

18  the jury but this is hardly in the form

19  of a question to the jury.

20         THE COURT:  If you have got a

21  question, Mr. Powell, let's get to it.

22         MR. POWELL:  And my question

23  is:  Is there anyone who is going to be

24  hung up on what they have seen on

25  television or asking questions, well, I

1    saw this on television, why couldn't they

2    do that back in the jury room as opposed

3    to hearing the evidence and listening to

4    the law as the Judge reads it?  So

5    everybody can agree that you will decide

6    the case based on what you hear in the

7    courtroom, not what you may or may not

8    have seen on television.  Okay.

9            Now, my next question:  Is

10   there anybody in here who just doesn't

11   like cops?  Just decided, you know, you

12   heard bad stories or whatever.  Okay.

13   Got a traffic ticket and you didn't think

14   you were speeding and he gave it to you

15   anyway.  You couldn't get out of it,

16   anything like that?

17           On the other hand, is there

18   anyone who just because someone has a

19   badge and wears a police uniform is going

20   to believe that person more than you

21   would, say, a civilian witness?  Anyone

22   put more emphasis on a police officer's

23   testimony simply because they are a sworn

24   officer of the law?  Okay.

25           So everybody can pretty much

1   agree to look at the witnesses and judge

2   them based on what you see in this

3   courtroom here today?  All right.

4   Because if there is -- if anybody is

5   bringing anything to court with them

6   today, this is the only time we have to

7   ask about it and find out.  Not that it

8   is bad.  We all have our opinions.  We

9   all have our experiences.  That's what

10   makes the system work because we put

11   twelve people over there and they can all

12   put their minds together and judge this

13   evidence and come out with the right

14   verdict in this case.  Okay?

15         Now speaking of that, as the

16   State of Alabama, it is our job to prove

17   to the twelve people that get selected

18   for that jury that this man is guilty

19   beyond a reasonable doubt.  Has anybody

20   heard that term before, reasonable

21   doubt?  The Judge is going to explain it

22   to you.

23         But as Mr. Joyce sits in this

24   courtroom right now, he is presumed

25   innocent.  It is our job to put forth

1    evidence and testimony and exhibits and

2    witnesses to prove he did what we say he

3    did.  Okay?

4            Now here is my question:  Is

5    there anyone that is going to require the

6    State of Alabama to remove all doubt from

7    this case?  That may be kind of a

8    convoluted question.  Let me clarify

9    that.  I'm not saying you are going to

10   have a doubt about this or about that

11   necessarily as far as what happened but,

12   for example, you may have a question in

13   your mind, you know, where did this come

14   from or what about that?

15           If you simply have a question

16   in your mind that is not related to the

17   murder charge, do y'all understand the

18   difference between having an unanswered

19   question in the case and the State not

20   meeting its burden beyond a reasonable

21   doubt?  Does that make sense?  I'm

22   getting confused here and I'm standing up

23   here talking about it.

24           We are not required to answer

25   every single possible question you may

1    have about that party that night and who

2    was where and --

3          MR. HARTLEY:  Judge, I think

4    this is getting very far into the state

5    of the evidence at the close of the case

6    as opposed to questioning these jurors as

7    to their --

8          THE COURT:  Will, let's wrap it

9    up.

10          MR. POWELL:  So everybody

11    agrees that there's a difference between

12    all doubt and reasonable doubt.  Okay.

13          Ms. Boyd, if you will stay

14    after, we'll follow up.  If there is

15    anybody else based on any of the

16    questions I've asked that wants to stay

17    afterwards or because of any of the

18    responses on the questionnaires or the

19    supplemental questionnaires, just feel

20    free to stay behind afterwards if you

21    want to talk to us individually.  Thank

22    you.

23          THE COURT:  Mr. Hartley.

24          MR. HARTLEY:  Thank you,

25    Judge.  Good morning.  I think y'all have

1   been asked probably a hundred questions

2   in the last few minutes.  So basically I

3   think they have exhausted most of the

4   topics but I do have a two-prong

5   question.  The easy one, I think, would

6   be first.

7             I have read your questionnaires

8   and only a few of you but -- maybe three

9   or four or five indicated on the

10  questionnaire that there might be some

11  conflict with your ability to serve in

12  the trial this week.  I think maybe

13  either for personal reasons or for

14  scheduling matters or something like

15  that.  I invite you to stay behind if you

16  need to to resolve that because I would

17  like to ask if anybody has got a problem

18  with serving on the jury of this trial,

19  it might start today and go, we think,

20  into late tomorrow, Judge?  Is that what

21  we think?

22            THE COURT:  It better be over

23  late tomorrow.

24            MR. HARTLEY:  Okay.  I realize

25  that some of your responses indicate that

1   there might be some issue with you

2   serving on the jury. I invite you to

3   stay behind or either tell us right now

4   if you have got a problem, if you want

5   the judge to resolve it.

6       Then in a sort of related type

7   question, both of in the questionnaire

8   and the supplemental questionnaire, these

9   -- each of those have questions

10  pertaining to whether you or family

11  members have been victims of crimes or

12  have somehow been involved in a crime.

13      Again, I found on there

14  positive -- or yes type responses on

15  probably anywhere from a third to half of

16  the questionnaires. I ask this of all of

17  you, particularly of people who have

18  family members or in some way connected

19  to a serious crime like murder or

20  manslaughter or a violent crime.

21      If the case were real, real

22  close on the evidence at the close of the

23  case, the defense and the state had just

24  -- almost a tie or almost a match, is

25  there anything in your personal

1    experience about your having been either
2    connected to somebody who was involved in
3    a crime or the victim of a crime, if it
4    would sway your vote on the case if you
5    -- if your state of mind or your
6    existence is such that that fact might
7    affect your verdict in this case, I ask
8    you to stay behind and tell the Judge
9    about it because some of you have had
10   family members or somehow were connected
11   to very serious crimes. So I ask you to
12   stay with us if y'all meet either one of
13   those; one, you got a problem sitting on
14   the case for scheduling reasons or
15   personal reasons, or if you think that
16   something has happened in your life that
17   might affect your verdict. That's all I
18   have.
19            THE COURT: Okay. Thank you.
20   Ladies and gentlemen, we are going to
21   start the selection of the jury. I don't
22   think y'all need to sit in here and watch
23   us do that. So I'm going to let y'all go
24   back to the jury assembly room. If you
25   would, if you need to respond to any of

1    the questions and you need to stay

2    behind, just do so.

3         Ms. Boyd, I know they have

4    asked that you stay behind. You are

5    probably upset that you didn't get

6    invited to the party to begin with. It

7    seems like you know everybody that was

8    there anyway.

9         If you would, just go on back

10   to the jury assembly room. Don't break

11   for lunch just yet. This will take us

12   probably about thirty minutes. Then

13   we'll bring the jurors back in.

14        I will go ahead and tell you,

15   if you are not selected for the jury, you

16   are dismissed for the remainder of the

17   day. Please call the code-a-phone number

18   tonight so I can give you a little bit of

19   good news here today. If you would go

20   back to the jury assembly room. Thank

21   you.

22        (The following proceedings were

23   held outside the presence of the jury

24   venire.)

25        MS. PERKINS: Judge, we have

1       three people standing.
2                THE COURT:  Yes, sir?
3                PROSPECTIVE JUROR:  All I
4       wanted to do is clarify I mentioned that
5       I was working over at the crime scene as
6       a volunteer.  All I'm doing over there
7       -- and I have been there a total of six
8       hours.  All I'm doing over there is
9       inputting some fairly old information on
10      weapons into the computer.
11               You mentioned some names and I
12      got some looks.  I don't know the names
13      of the people over there.
14               MR. POWELL:  Yes, sir.
15               PROSPECTIVE JUROR:  I just
16      wanted to clarify that.
17               THE COURT:  Okay.  Thank you,
18      sir.  Appreciate you sharing that with
19      us.  Yes, ma'am?
20               PROSPECTIVE JUROR:  You said
21      something about if you had a family
22      member or something that was involved in
23      a crime.
24               THE COURT:  Yes, ma'am.
25               PROSPECTIVE JUROR:  It has been

1    a lot of years and the person is deceased

2    that was involved in the crime.  So --

3            MR. POWELL:  If you don't mind

4    me asking, what happened?

5            PROSPECTIVE JUROR:  Well, it

6    was my father.  He shot somebody, I

7    guess.  So I was told.  I wasn't here.

8            MR. POWELL:  Yes, ma'am.  Is

9    there anything about that incident that

10   would make you go for or against one side

11   or the other?

12           PROSPECTIVE JUROR:  No.

13           MR. HARTLEY:  What is your name

14   again?

15           PROSPECTIVE JUROR:  Bailey,

16   Myree.

17           MR. HARTLEY:  Yes, ma'am.

18           PROSPECTIVE JUROR:  I have

19   another question.  I don't know if this

20   is relevant or not but this young lady

21   here, is she involved in this crime or

22   something?  I notice she's been watching

23   me all the time so I was wondering -- do

24   you know me or do I know you?  I don't

25   think I know you.

1          UNKNOWN WITNESS:  I don't think

2     I do.

3          THE COURT:  Okay.

4          PROSPECTIVE JUROR:  I just

5     wanted to clear that up.

6          THE COURT:  Any followup?

7          MR. POWELL:  The State doesn't

8     have any, Judge.

9          THE COURT:  Thank you, ma'am.

10     Appreciate it.  What was her name?

11          MR. DARNIELLE:  Bailey, Myree

12     Bailey.

13          THE COURT:  Anybody have any

14     followup for Ms. Boyd?

15          MR. POWELL:  Yes, ma'am.  Ms.

16     Boyd, basically, what have you heard

17     about the incident?  It sounds like you

18     were pretty familiar with what happened

19     out there that night.

20          PROSPECTIVE JUROR:  I am.  My

21     son was out there.

22          THE COURT:  What was your

23     son --

24          PROSPECTIVE JUROR:  Flip is his

25     uncle.  They talked about it.

1           MR. POWELL:  What was your

2    son's name?

3           PROSPECTIVE JUROR:  Willie.

4           MR. POWELL:  Willie?

5           PROSPECTIVE JUROR:  He came out

6    there after it happened.  So -- and they

7    told him about it and they talked to him

8    about it.

9           MR. POWELL:  I don't have any

10    followup, Judge.

11           MR. HARTLEY:  Let's approach

12    the bench.  Judge, I think we need to try

13    to get a juror which basically has an

14    independent mind.  I think we have to be

15    real careful because all of these

16    questions --

17           MR. POWELL:  I don't want

18    anybody who has personal knowledge like

19    that being on the jury.

20           THE COURT:  So we agree?

21           MS. PERKINS:  Strike for cause.

22           THE COURT:  Ms. Boyd, thank you

23    so much.  If you will go back to the jury

24    assembly room.  I can go ahead and tell

25    you, you are released for the rest of the

1      day.

2                    PROSPECTIVE JUROR:  I can go

3      home?

4                    THE COURT:  Call the

5      code-a-phone tonight, ma'am.

6                    PROSPECTIVE JUROR:  Thank you.

7                    MR. POWELL:  I noticed this

8      when I was going over the jury panels but

9      I forgot because we were striking the

10     jury.  My wife, Emily Rhodes, just took a

11     job in the admissions office at

12     Huntingdon where this juror works so she

13     knows my wife, and Mr. Hartley may need

14     to make a record about that.

15                   MR. HARTLEY:  Yeah, we need to

16     get that on the record.  Bring him on as

17     soon as you can.

18                   THE COURT:  Okay.  Mr. Joyce

19     has rejoined us.  I understand that Ms.

20     Catching works at the admissions office

21     in Huntingdon with Mr. Powell's wife.

22     Mr. Hartley, you want to followup?

23                   MR. HARTLEY:  Yes, Judge.  Ms.

24     Catching, you now have -- we didn't

25     realize it because I think she has a

1       different last name because the lady you

2       work with and Mr. Powell but they are

3       married.

4                  PROSPECTIVE JUROR:  Right.

5                  MR. HARTLEY:  At least you know

6       about that last name.  Have y'all become

7       friends?  Have you and his wife become

8       friends at work?  You know, get to know

9       each other better and better?

10                  PROSPECTIVE JUROR:  Well, it is

11      a small office but she has only been

12      there two weeks or about two weeks.  So I

13      wouldn't say we were friends but we see

14      each other every day.

15                  MR. HARTLEY:  Now that you know

16      this information, would it be -- I just

17      need to ask.  Could your association with

18      her in any way affect your verdict in

19      this case since, you know, the sort of

20      friendship with her might likewise be a

21      friendship with Mr. Powell.  I realize

22      that you might say no but I am talking

23      about in the scheme of things, could it

24      affect your verdict in this case?

25                  PROSPECTIVE JUROR:  I don't

1   think so.  Do I have to be absolutely

2   sure?  I wouldn't think so.

3            MR. HARTLEY:  Well, I would

4   like to ask it in the terms that I did

5   when I focused on that question a while

6   ago.  What if it came down to a real,

7   real close case on the issue of guilt or

8   innocence, could it possibly affect your

9   verdict?  And if your answer to that is

10  yes, please tell me.  If the answer is

11  no, tell us the best you can.

12           PROSPECTIVE JUROR:  No.

13           MR. HARTLEY:  The answer is

14  no?

15           PROSPECTIVE JUROR:  No.

16           MR. POWELL:  No questions, Your

17  Honor.

18           THE COURT:  Ms. Catching, let

19  me ask you something.  Would you prefer

20  not to be on this jury because you are in

21  the same office with Mr. Powell's wife?

22           PROSPECTIVE JUROR:  It makes me

23  a little uncomfortable.

24           THE COURT:  Okay.

25           MR. HARTLEY:  Judge, I think if

1    it makes her uncomfortable, I think

2    that's -- we have to move to make a

3    motion to strike her. And really, we do

4    respect her ability to serve.

5              THE COURT: I understand. I

6    wouldn't want to be in her predicament

7    either. I will grant your motion.

8              MR. HARTLEY: Thank you,

9    Judge.

10              THE COURT: You are excused,

11    ma'am, for the remainder of the day.

12    Thank you.

13              (At which time the jury was

14    struck, placed in the jury box, and the

15    following proceedings were held in the

16    presence and hearing of the jury.)

17              THE COURT: Before you sit

18    down, just raise your right hand. I'm

19    going to swear you in as the jurors.

20              (At which time the jury was

21    duly sworn.)

22              THE COURT: Be seated.

23    Obviously, you know y'all have been

24    selected as jurors in this case. The

25    first official duty will be to go to

1      lunch.  I mean that.  I'm just going to

2      let y'all go break for about an hour.

3                  Before I let you go, let me

4      just tell you some do's and don'ts,

5      mostly don'ts, when you leave the jury

6      box.  Don't discuss this case with

7      anybody.  Don't let anybody discuss the

8      case with you.  Don't even discuss it

9      with each other.  The reason we say that

10     is when you go back here in the jury room

11     to decide the guilt or innocence, we want

12     everybody to start at the same place.

13     And if some of y'all have had discussions

14     about the case with anybody for any

15     reason, you are not all starting at the

16     same place.

17                  If you see me out in the

18     hallway, I'm not going to talk to you.

19     The attorneys, it's going to be the same

20     way.  It is not that we are being rude.

21     We don't want there to be any contact.

22     We don't want there to be any -- make it

23     look like we are talking with you because

24     we want you to decide the case based

25     solely on what you hear in the witness

1    box and the evidence in the case.

2                So don't talk to anybody about

3    the case.  Don't let anybody talk to

4    you.  I will talk to you more when we

5    break for the day about newspapers and

6    that sort of thing.  You know, don't go

7    get in your car and drive down to Smiley

8    Court and try to look at the scene of

9    where the shooting took place.  Don't get

10   on the internet and try to look up any

11   legal terms or call your buddy who is a

12   lawyer or something like that and start

13   asking him technical, legal issues in the

14   case.  Again, we want you to decide the

15   case solely on what you hear in this

16   courtroom.  And if you are trying to do

17   any of that on your own, it means that

18   you are letting an outside influence come

19   in.  We want you to be influenced only on

20   what you hear in this courtroom.

21               Having said all that, if y'all

22   will be back here at 1:45, we will get

23   started.  Just for planning purposes, we

24   will probably go today to about 4:30 in

25   the afternoon.  If we get to a natural

1          break right around then, that's when

2          we'll try to break.  We'll try -- I will

3          let you know when we get back what time

4          we'll start back in the morning.  I am

5          sitting here right now.  I don't know

6          what my schedule is in the morning, but

7          hopefully we'll be able to start back

8          around 8:30 or 9:00 in the morning.  If

9          you will just return to the jury assembly

10         room, we'll come get you at 1:45.  Please

11         be prompt.

12                  (Lunch Recess.)

13                  (The following proceedings were

14         held outside the presence and hearing of

15         the jury.)

16                  THE COURT:  We are on lunch

17         break and a juror has come in and said he

18         needs to speak.  Mr. Joyce isn't here.

19         We are just trying to find out right now,

20         with the consent of his attorney, what

21         the nature of the request is.

22                  JUROR:  It was brought to my

23         attention as I was leaving the courtroom

24         that the defendant's mother and I worked

25         at the same place a few years ago back in

1    the latter part of 1999 when I was

2    employed by the U.S. Postal office. Now,

3    I don't know how that will have any

4    bearing on the case or not, sir, but we

5    were not, as you would say, close or

6    anything like that. I just knew her from

7    seeing her at work.

8         THE COURT: Okay.

9         JUROR: That's about the basis

10   of it.

11        THE COURT: Why don't we -- we

12   will wait until Mr. Joyce gets here and

13   we'll take that up. Are you going to be

14   in the jury assembly room anyway?

15        JUROR: Yes, sir. That's where

16   I was headed back to now.

17        THE COURT: Okay. We'll just

18   come and get you and talk about it when

19   you get back. Thank you for letting us

20   know that.

21        JUROR: Thank you, sir.

22        THE COURT: Thank you, sir.

23        (Brief Recess.)

24        THE COURT: Before we get the

25   jury back in here -- where did Will go?

1    We had a juror come in and say that he

2    knew Mr. Joyce's momma when he worked at

3    the post office.  The record will speak

4    for what he actually said, but does

5    anybody have anything to say about it at

6    this time?

7                THE COURT:  Yes.  I didn't know

8    -- I was going to ask a couple follow-up

9    questions.  I don't think I have a

10   problem with it but I just wanted to -- I

11   thought the way you addressed it before

12   made it sound like you wanted to wait

13   until the defendant was here before we

14   probed into it.

15               THE COURT:  Yes.  I didn't know

16   you wanted to probe.  If you want to

17   probe --

18               MR. POWELL:  Just briefly.  I

19   don't think I'm going to have a problem

20   with it, but the indication he gave us

21   earlier was they just had brief contact

22   and he knew who she was and it took him a

23   little while to realize she was that same

24   person he worked with in '99 or '96,

25   whenever it was.  But I just want to make

1     sure -- if that's the extent of it, I

2     don't have any problem.  I just need to

3     put that on the record.

4                THE COURT:  Let me also say for

5     the benefit of those people here in the

6     courtroom that I understand there has

7     been some jawing back and forth between

8     the families.  I am not going to tolerate

9     it.  We are going to run this trial

10    smoothly.  We are going to get through

11    this thing without any fights breaking

12    out.

13               If anybody has a problem with

14    that, they need to leave now because I

15    won't hesitate to hold somebody in

16    contempt of Court if they start causing

17    an uproar or commotion in this courtroom

18    or out in the hallway.

19               (At which time the juror

20    returns to the courtroom.)

21               THE COURT:  I think some of the

22    lawyers may want to ask you a few

23    questions.  We just wanted to wait until

24    we had everybody here.

25               MR. POWELL:  More specifically,

1      where did you know Ms. Joyce from, the

2      defendant's mother?

3              JUROR:  At the postal service.

4              MR. POWELL:  How long had you

5      been working there?

6              JUROR:  I started with the

7      postal service in '89.  I started out in

8      the general facility in 1991.

9              MR. POWELL:  What was your job

10     there at the time?

11             JUROR:  I was a mail handler.

12             MR. POWELL:  You were a mail

13     handler at the time.  What was her job?

14             JUROR:  I think she might have

15     been a clerk or something of that

16     magnitude.

17             MR. POWELL:  And how often did

18     y'all see each other or come into contact

19     with each other?

20             JUROR:  No more than clocking

21     in and clocking out.  Just see each other

22     in the hallway and things such as that.

23             MR. POWELL:  And y'all didn't

24     know each other like didn't see each

25     other at a barbecue or at church or

1    anything like that?

2    JUROR:  Nothing.  Just work.

3    MR. POWELL:  Just from work

4    strictly?

5    JUROR:  That was it.

6    MR. POWELL:  Did y'all have

7    lunch breaks or anything?  Were y'all in

8    the same work room or anything like

9    that?

10    JUROR:  No.

11    MR. POWELL:  Would the fact

12    that you know Ms. Joyce influence you in

13    favor of her son or make you feel awkward

14    about sitting on this jury or anything

15    like that?

16    JUROR:  Well, it is -- actually

17    the evidence itself would make my

18    decision for me.

19    MR. POWELL:  Do you still work

20    with Ms. Joyce?

21    JUROR:  No.  I'm with the State

22    of Alabama at this time.

23    MR. POWELL:  You have a

24    different job now?

25    JUROR:  Yes.

1           MR. POWELL:  And I'll ask you:

2    How did you come to realize -- put the

3    pieces together that this lady was the

4    same one you might have worked with

5    earlier?

6           JUROR:  Well, as I said, when I

7    was going to lunch, I -- we spoke to one

8    another and I remembered her from being

9    at the postal service and she reminded me

10   -- she mentioned to me the fact that

11   that was her son that was on trial at the

12   time.

13          MR. POWELL:  Ms. Joyce actually

14   addressed that to you?

15          JUROR:  Yes.

16          MR. POWELL:  Did she approach

17   you or did you approach her?

18          JUROR:  No.  We just spoke to

19   one another as we were leaving the

20   courthouse grounds.

21          MR. POWELL:  And she mentioned

22   that that was her son?

23          JUROR:  Right.

24          MR. POWELL:  And that's how you

25   became aware of it?

1           JUROR:  Right.

2           MR. POWELL:  Until that point,

3   you didn't have any independent

4   recollection of it?

5           JUROR:  None whatsoever.

6           MR. POWELL:  Nothing further,

7   Judge.

8           THE COURT:  Thank you, sir.

9   Just go back in the jury assembly room.

10          MR. POWELL:  Judge, the state

11  doesn't have a problem with that juror.

12          THE COURT:  Okay.

13          MR. POWELL:  We would ask for

14  an instruction.

15          THE COURT:  Yes.  Ms. Joyce,

16  you are not to talk to any jurors, make

17  eye contact with them.  That goes for

18  anybody in this courtroom.  Nobody is to

19  talk to a juror in this courtroom.  You

20  are not to speak to them in the hallways,

21  out on the street.  I don't want anybody

22  making eye contact.  You don't wave.  You

23  don't acknowledge that you even know them

24  or you don't acknowledge that you see

25  them.

1          We were going to have a fair

2    trial in this case.  If anybody has a

3    problem with that, let me know now.

4          Richard, will you tell Jason to

5    go ahead and bring the jury back.  I

6    assume nobody has a problem with the

7    issue about the jury?

8          MR. HARTLEY:  No, Your Honor.

9          (Brief Recess.)

10          (At which time the jury enters

11    the courtroom.)

12          THE COURT:  Be seated

13    everybody.  Before we get started, ladies

14    and gentlemen of the jury, let me just

15    sort of tell you a little bit about what

16    we are going to be doing this afternoon.

17    I will explain everybody's role in this

18    trial to you.  Let me start with my own

19    role.

20          I sort of see my role as like a

21    referee in a football game.  I don't have

22    a dog in the fight.  I don't really know

23    a whole lot more about the case than

24    y'all do at this point.  My job is to

25    make sure it is a fair trial for

1    everybody.  My job is when someone makes

2    an objection, I will rule on whether the

3    objection is well-founded or not.

4    Please, when you are sitting over there,

5    don't worry about why the judge did what

6    he did.  Don't sit there and worry about,

7    well, if that evidence had come in, what

8    would the witness have said or -- because

9    that gets into the realm of speculation.

10   We want you to decide the case based on

11   what you hear from the witness stand.

12        At the end of the case, I will

13   tell you what the law in Alabama is that

14   governs this case.  What is your role?

15   Your role is to sit and listen to the

16   evidence, and you hear the testimony of

17   the witnesses.  You look at the exhibits

18   that we might let into evidence.  From

19   that, you determine what the true facts

20   are in the case.  Then you take those

21   facts and the law of the case as I give

22   it to you and you reach a verdict in the

23   case.

24        Here is how we are going to

25   proceed in this case.  Each party will

1          get up and give an opening statement.

2          The prosecution goes first because they

3          have the burden of proof in the case.

4          They will tell you what they think the

5          evidence in the case will show.  The

6          defense attorney, Wiley Hartley, he will

7          do the same.

8                    After the opening statements,

9          the state will begin presenting its

10         case.  When the state rests its case, the

11         defense will put on their case.  And

12         following the presentation of the

13         evidence, the lawyers will be able to

14         give what is known as closing arguments

15         and that's where they try to sum up the

16         evidence and persuade you that you should

17         either acquit or convict in this case.

18                    Again, the state goes first in

19         the closing arguments and they get a

20         little rebuttal.  Again, that's because

21         they have the burden of proof in the

22         case.  After they finish their arguments,

23         I will tell you again what the law is in

24         this case.

25                    I have talked a lot about

1    evidence.  So let me go over with you

2    what is evidence in the case and, again,

3    by telling you really what is not

4    evidence.  Anything I say in this case is

5    not evidence.  Anything the lawyers say

6    in this case is not evidence.  Evidence

7    is what you hear from this witness stand

8    by people who are under oath.  It is also

9    any exhibits that we'll allow into

10   evidence.  It is also any presumptions of

11   law in the case.  I will tell you right

12   now that a presumption of law in this

13   case is that the defendant is presumed

14   innocent and that presumption stays with

15   the defendant until you reach your

16   verdict, and that is considered as

17   evidence in the case.

18           As I told you this morning,

19   we'll be trying to take breaks every

20   forty-five minutes to an hour.  If you

21   need a break before that, just raise your

22   hand and let me know -- or Judy Shelton

23   is my court reporter, or one of the

24   deputies.  Just let us know.  We'll try

25   to work with you any way that we can.

1        As I also said, we'll probably

2    be trying to take a break about 4:30 this

3    afternoon and come back in the morning.

4    Again, just listen to the evidence.

5    Don't discuss the case with anybody.

6    Don't let anybody discuss the case with

7    you.  Okay?  We'll get started.

8        MR. POWELL:  May it please the

9    Court, counsel.  Members of the jury,

10   back on Friday night, February 1st of

11   last year, right around 11:00, two men

12   were at a party over at Smiley Court.

13   They had been having words with each

14   other all night long until finally they

15   ended up between two of the apartments.

16   And after just some more words passed, no

17   fighting, nothing but words, this

18   defendant pulls out a handgun and shoots

19   at least three times striking James

20   Friendly in the side, in the leg, and in

21   the rear end.  He eventually died from

22   those gunshot wounds.

23        That's what we are here about

24   today.  The defendant is charged with

25   murder in the State of Alabama.  Again,

1    my name is Will Powell and along with my

2    co-counsel, Ms. Vernetta Perkins, we are

3    representing not only the State of

4    Alabama here in this courtroom here today

5    but also James Friendly. James didn't

6    just go by James. He also had another

7    name. You are going to hear a lot of

8    people refer to him as Boo, B-O-O. If

9    you hear somebody refer to somebody named

10   Boo, they are talking about the victim,

11   James Friendly.

12            Sitting here with us is his

13   momma, Ms. Sally Friendly. Now, the

14   Friendlys don't live in Smiley Court

15   where this happened. They live over off

16   the Boulevard, over off Fleming Road.

17   James just ended up in Smiley Court

18   because he knew somebody who knew

19   somebody who was at the party. Then he

20   comes across the defendant in this case.

21            Who was he? What are you going

22   to learn about the defendant? You are

23   going to learn that the defendant was at

24   this party and he shot a man to death

25   over nothing but a meaningless argument.

1      Now, in his mind, the argument might have
2      had some meaning, but I think the
3      evidence is going to be that it wasn't
4      threats.  It wasn't pushing or shoving.
5      It was just an argument over who was
6      better or badder than who, and he decided
7      he would win the argument by making the
8      decision to pull out a gun and fire it,
9      not once, not twice, but at least three
10     times striking the victim, striking James
11     Friendly and killing him dead.
12            Now, before we go any further,
13     let's talk for a minute about the crime
14     of murder in the State of Alabama.
15     Specifically, the defendant is charged
16     with the crime of intentional murder.
17     Now, when you hear intentional murder, a
18     lot of people think, well, some planned
19     out elaborate scheme where someone makes
20     a decision in advance and does all these
21     things leading up to it.  That is very
22     easily a manner of intentional murder.
23            But in the State of Alabama,
24     all the state is required to prove the
25     crime of intentional murder is that the

1    defendant made up his mind to kill the
2    victim.  That's it.  We don't have to
3    prove some elaborate, well thought out
4    scheme.  That's one way we could prove
5    it.  But all we have to prove is that he
6    made the decision, a clear decision to
7    reach into his waist band -- first off,
8    it started before that, to arm himself
9    that night, to go to this party with a
10   gun.  Then over words, over just an
11   argument, he made the decision to go for
12   that gun, to pull it up, to point it and
13   pull the trigger not one time, not two
14   times, but at least three, if not more
15   times.
16           We are going to submit to you,
17   members of the jury, that when you have
18   heard all the state's evidence in this
19   case, that act alone of making that
20   decision, even if it was, so to speak,
21   spur of the moment is enough to
22   constitute intentional murder in the
23   State of Alabama.
24           The focus is that the decision
25   was made, the intent was formed out there

1       between those two buildings that night to

2       pull that gun and to use it, and it ended

3       a man's life.

4               Now, what are you going to hear

5       about?  What is going to be the evidence

6       that is presented to you in this

7       courtroom this afternoon and tomorrow?

8       First, you are going to learn this was a

9       birthday party.  An individual by the

10      name of Christopher McQueen or Flip had

11      just had a birthday and they were having

12      a party for him over at Nicole Judkins'

13      house.  They didn't really see much and

14      they didn't know a whole lot about what

15      was going on.  That's just where the

16      people were gathering over in Smiley

17      Court that night.

18              The defendant arrived in a blue

19      pickup truck.  He arrived with an

20      individual named Antwan Giles.  They get

21      to the party and they start milling

22      around.  They go into the apartment where

23      the party is.  There are other apartments

24      close by.  They are going across the

25      street.

1          Well, in the meantime, the
2    victim is there, Boo, and other people
3    are there.  They are mingling and having
4    a big time until finally the two men's
5    paths cross because of a very key
6    individual in this trial.  His name is
7    Eric Stewart, also known as Rabbit.
8          Rabbit was hanging out with Boo
9    and they see James Friendly.  I think
10   Rabbit is even going to testify that he
11   and Boo were trying to figure out a way
12   they could find some cocaine and get
13   high.  I think they will tell you that
14   this was a party.  They had been drinking
15   and they were looking for some cocaine.
16          And while they were in this
17   process, they kept bumping into the
18   defendant and they kept having words with
19   each other.  They weren't arguing over
20   the cocaine.  They were just arguing over
21   I could do this to you, you could do that
22   to me.  Over nothing is what it amounts
23   to.  Kind of a bad, bad Leroy kind of an
24   argument and it just went on.
25          Finally, Mr. Stewart was like,

1        look, look, it don't have to go like

2        this.  Let's just have another drink and

3        just let this go, and it died down.  So

4        he goes in the house, in the apartment.

5        Comes back out with a drink.  He and Boo

6        are standing there.  They decide they are

7        going to go around the side and drink the

8        beer or do the cocaine or whatever.

9            Only the defendant is there and

10       the argument starts again.  Eric Stewart

11       is right there.  He is right there in the

12       middle of it.  There is a witness

13       standing from me to y'all about what is

14       going on.

15           Now, let me just say this about

16       Mr. Stewart.  You may not like him.  He

17       is not a -- this is not a popularity

18       contest, and he will be the first to tell

19       you he has picked up drug charges being

20       they were out trying to do cocaine that

21       night.  We are dealing with people at

22       this party that have a history, but these

23       are just the cards that have been dealt.

24       That's who was standing there when the

25       shooting occurred.  So just keep that in

1    mind as you are listening to Mr. Stewart

2    or Rabbit's testimony.  We are not asking

3    you to like him.  We are asking you to

4    listen to him and evaluate his testimony

5    with all of the other testimony in the

6    case to determine whether or not this

7    defendant committed this murder.

8         Now, Mr. Stewart, Rabbit, is

9    going to tell you, as the argument

10    continued, the defendant, who he was

11    standing right there, just pulls out a

12    gun and ends it.  Ends the argument by

13    shooting, pow, pow, pow, pow.  Bullets

14    not only hit Mr. Friendly, but they also

15    hit a red Jeep Cherokee that is backed

16    into a parking place.

17         Like this is the parking lot

18    and there is an apartment building there

19    where the party is there and there is

20    another apartment building there.  That

21    Jeep is just backed right there with the

22    back of that Jeep facing the area where

23    these men are standing.  Other people are

24    milling around.  But it was Joyce and it

25    was Friendly that were having an

1    argument, and Stewart was standing right

2    there.

3                Now when that bullet hit that

4    Jeep, there were two other people in that

5    Jeep.  One's name is Johnny Osborne and

6    the other one's name was Brian Osborne.

7    They had been at that party.  I think the

8    Osbornes will tell you they were sitting

9    there getting ready to roll a joint when

10   something hits their Jeep that they are

11   sitting in.  So Johnny Osborne gets down

12   but Brian Osborne almost sticks his head

13   out the window to look back to see what

14   -- who is getting hit or where the shots

15   are coming from.

16               He looks back.  We think the

17   evidence is going to be he is going to

18   tell you he saw that man right there

19   shooting James Friendly.  He saw the

20   defendant shooting Boo.  Saw the fire

21   from the gun.  So that's two eye

22   witnesses.

23               Now the police get there and

24   there is not a whole lot of a crime

25   scene.  Basically, you got a grassy area

1    in between two parking lots.  They took

2    some pictures of it but they are not that

3    great of pictures, but you get to see

4    them.  They also picked up three shell

5    casings from the grounds.  And the body

6    -- they did an autopsy on it.  There

7    were three injuries to the body.

8             Now maybe some other shots were

9    fired.  Some people say they heard four

10   or five shots but the police only found

11   three shell casings.  The department and

12   ballistics experts looked at them, people

13   that worked all their lives with them.

14   The three shell casings match each

15   other.

16             That's all they can tell you

17   about those shell casings.  But that's

18   important because it does mean there was

19   one gun that left physical evidence at

20   that crime scene, not two guns, not three

21   guns, but one single gun.  We submit to

22   you it was the defendant's gun.  There

23   were nine millimeter shell casings that

24   were picked up, that ballistics indicate

25   most likely came from a Hot Point, a name

1    of a gun, a type firearm or handgun.  The

2    slug that was taken, one of the bullets

3    that went through his chest or his

4    abdomen and then another bullet went

5    through his lower -- a little lower down,

6    and that's the bullet they were able to

7    recover.  We think the medical evidence

8    is going to be -- those gunshot wounds

9    inflicted by the defendant killed James

10   Friendly.

11          That's in addition to having a

12   medical examiner.  You can also use your

13   common sense.  Someone shot three times,

14   twice across the gut.  There is a good

15   chance that's what killed him, and it

16   was.  So that's going to be the state's

17   case.

18          You have got eye witness

19   testimony.  That eye witness testimony

20   all points to one person, the defendant.

21   You have got that eye witness testimony

22   corroborated by physical evidence, shell

23   casings from one gun, the autopsy

24   report.  All of this evidence, when taken

25   as a whole, tells the exact same story.

1    It tells the story of Darryl Joyce

2    pulling a gun, pointing it at James

3    Friendly and deciding to intentionally

4    pull that trigger at least three times

5    killing him dead.

6         Now we feel confident that

7    after you have seen the physical

8    evidence, seen the photographs, heard

9    from the eye witnesses, we feel confident

10   that you are going to return a verdict of

11   guilty, that this man sitting in front of

12   you today shot James Friendly in that

13   grassy area between those two apartments

14   over nothing, over nothing, or at least

15   not anything somebody should die for.

16   Thank you.

17         THE COURT:  Mr. Hartley.

18         MR. HARTLEY:  Yes, sir.  Judge,

19   counsel, good afternoon members of the

20   jury.  I'm John Hartley and I have been

21   practicing here for a lot of years in

22   Montgomery.  I do these kinds of cases as

23   part of my professional career, I guess

24   you would say.  I'm representing Darryl

25   Joyce and will assist in putting on his

defense today.

Mr. Powell and I have tried a few cases against each other and we know each other real well. We just see a different perspective on this case, with due respect to him, and I think he understands that there is a difference -- there is a difference, two sides to this story. There is more to this than what was told to you. I want to just say that the judge emphatically told you about the presumption of innocence and how it rises to the level of evidence in this case.

You have also been told in either the form of questions or directly that the state has got the burden of proof and they have got to prove my client guilty beyond a reasonable doubt. I submit to you they will not be able to. I will not make a lengthy opening statement. I think a lot of this case will come out in cross-examination.

But there is going to be some stuff that Mr. Powell didn't tell you about. I will get to a few particulars

1      in just a moment.  First of all, I want
2      to emphasize to you, and this has already
3      been -- you are going to have to take it
4      -- kind of what the circumstances were
5      on that night as to how good this eye
6      witness's testimony that Mr. Powell talks
7      about is going to be in this case.
8              I think they are going to show
9      you some slides that portray the scene.
10     They were taken in the daytime.  This all
11     happened at night in the middle dark part
12     of the apartments, late enough where
13     there would be no natural lighting.  This
14     didn't happen in the daytime.  It
15     happened close to midnight on February 1,
16     2002.  There were a number of people out
17     there.  This was an ongoing birthday
18     party as Mr. Powell mentioned to you.
19     But I think it is going to come across --
20     you know, a broad view of the testimony
21     and the evidence in this case is that the
22     people that are implicating my client are
23     actually -- I'm going to say friends --
24     they are actually covering for another
25     individual.  They are covering for Darryl

1    Foggy who we submit to you is going to be
2    the real or the specific person who shot
3    James Friendly, if anyone can be
4    identified.  It was Darryl Foggy who was
5    physically present out there and whose
6    name comes up several times during this
7    case.
8            The illogical part for Mr.
9    Powell is that my client didn't have any
10   beef with James Friendly.  If he didn't
11   know the man, he didn't have any reason
12   to be out there arguing with him and
13   fighting with him.
14           Now what happened between
15   Darryl Foggy and James Friendly is beyond
16   us.  Some of it may come out during this
17   case but it is something that -- there
18   was no way to go back and reconstruct
19   exactly what happened that night.  We can
20   only go through the testimony and see
21   what can be pieced together about it.
22   But we are going to find that there is a
23   loyalty or sort of a tightness between
24   Eric Stewart, Darryl Foggy and possibly a
25   man named Brian Osborne.  And we are

1   going to submit to you that they are
2   trying to put this on Darryl Joyce
3   because he wasn't one of their little
4   tight-knit group, their clique, whatever
5   you want to call it. He really didn't
6   even know the man. I think he came there
7   with Antwan Giles.
8           As Mr. Powell has said, there
9   was a pretty big function and some people
10  just came there. They heard about it or
11  there was something going on and it just
12  drew a crowd. But the most remarkable
13  thing you are going to find in this case
14  is that there is eye witness testimony.
15  Then there is a witness who was
16  identified by Bryant Thomas, and on the
17  -- when he was identified by the police
18  -- I mean when Bryant Thomas was
19  interviewed by the police, when he was
20  first asked who it was, he was shown a
21  photo lineup and identified Darryl Foggy
22  as being the shooter. That's reflected
23  in Mr. E.E. Howton's report that he made
24  in the police files. Whether or not he
25  sticks to that story now, we don't know

1     but he did that night.  He first said

2     it.

3              That's the first he -- and he

4     was looking at a photo array, a lineup of

5     people -- they have what they call a

6     photo lineup and he specifically

7     identified Darryl Foggy as the person who

8     shot him.  The story gets even more

9     convoluted involving Darryl Foggy that

10    night.  Eric Stewart was the witness that

11    Mr. Powell described as being so close.

12             Now, his motive for this, we

13    will have to figure it out as we go

14    along.  But he took Darryl Foggy's gun

15    away from the scene and hid it in an

16    apartment not far away.  And since that

17    time, I think the same detective may have

18    led through this part of the

19    investigation.  They went -- the

20    information became available and they

21    went to that apartment, found the gun and

22    recovered it.  It is going to be in

23    evidence in this case.

24             What is important about that?

25    Eric Stewart was in the police station

1    that morning giving statements. He gave
2    one about -- I'm just going to say about
3    3:00 that morning and another one about
4    7:00 in the morning. He gave kind of a
5    statement to the police about what had
6    happened the night before trying to
7    implicate Darryl Joyce, but he never told
8    the police that morning that he was
9    hiding a gun or had hid a gun for Darryl
10   Foggy. But the report reflects after he
11   gave these two statements when they were
12   a couple hours apart, they kind of
13   overlap, I guess, in some of the
14   details. But nowhere in those statements
15   where he was talking to the police did he
16   disclose that he had hidden a gun in the
17   last couple of hours. But it says in
18   there that at 8:00 he starts telling them
19   about where a gun had been.
20           I bring that to your attention
21   because -- to tell you that the evidence
22   is going to show that Eric Stewart is
23   very loyal to Darryl Foggy if he would go
24   hide a gun right after an incident like
25   this took place. So this is where the

1    evidence is going to become unclear. And

2    Mr. Powell said -- he said it was going

3    to be so clear that at the end of the

4    state's evidence, the finger is going to

5    be pointed at Darryl Joyce.

6           Well, I ask the question why

7    don't we have a photo lineup that shows

8    Darryl Joyce. I submit to you if I had

9    looked at this record closely, there's

10   nowhere where anybody correctly

11   identified Darryl Joyce from a photo

12   lineup or specifically picked him out as

13   being the one. So we go back now to who

14   is really telling the truth and what the

15   deal on this is. It is going to leave

16   some doubt. We will submit to you there

17   is going to be reasonable doubt and the

18   state cannot prove beyond a reasonable

19   doubt Darryl Joyce's guilt. Mr. Powell

20   has made the statements Darryl Joyce did

21   this and Darryl Joyce did that. He

22   doesn't know. He wasn't out there. He

23   is just relating to you what he hopes he

24   can prove. Then you will have to take

25   into your own concept of this case the

1    overall circumstances.

2          It was dark, nothing but

3    artificial lighting. A lot of people

4    were drinking and on drugs and then the

5    issue of who would taint or slant their

6    testimony. When all that is blended

7    together, I submit to you we may never

8    solve in this courtroom today or tomorrow

9    who shot Mr. James Friendly. Thank you.

10          THE COURT: Call your first

11    witness.

12          MR. POWELL: The state calls

13    Eric Stewart.

14          ERIC STEWART,

15    having been first duly sworn, was

16    examined and testified as follows:

17          DIRECT EXAMINATION

18    BY MR. POWELL:

19       Q.   Mr. Stewart, if you would scoot

20    up for me. Speak into this microphone so

21    all the jury can hear you. All right.

22    First off, state your name for the

23    record.

24       A.   Eric Stewart.

25       Q.   Mr. Stewart, do you have a

1    street name or something you go by other
2    than Eric Stewart?
3              A.    Yes.
4              Q.    What is that?
5              A.    Rabbit.
6              THE COURT:  So most people that
7    see you, what are they going to call
8    you?
9              THE WITNESS:  Rabbit.
10             Q.    Where do you live?
11             A.    403-A Marlyn Street.
12             Q.    Marlyn Street?
13             A.    Yes.
14             Q.    And where is that area here in
15   Montgomery?
16             A.    That's the Smiley Court area.
17             Q.    You live over in Smiley Court?
18             A.    Yes.
19             Q.    Now, do you currently have a
20   job?
21             A.    No, sir.
22             Q.    Have you had a job in the past?
23             A.    Yes.
24             Q.    What kind of things have you
25   done in the past?

1          A.     Detailing cars.

2          Q.     Detailing cars and that kind of

3     stuff?

4          A.     Yes, sir.

5          Q.     All right.  Now, bring your

6     attention back to February the 1st of

7     last year.  Do you recall that date?

8          A.     Yes, sir.

9          Q.     Do you recall a party that was

10    going on that night?

11         A.     Yes, sir.

12         Q.     Whose party was it?

13         A.     My cousin, Chris McQueen.

14         Q.     Christopher McQueen is your

15    cousin?

16         A.     Yes.

17         Q.     What does he go by usually?

18         A.     Flip.

19         Q.     Where was the party being held?

20         A.     At 432 Marlyn Street.

21         Q.     Who lives there, if you know?

22         A.     My cousin and his girlfriend

23    Nicole.

24         Q.     Nicole?

25         A.     Yeah.

1    Q.    What is her last name?

2    A.    I'm not sure.  Johnson or

3  something like that.

4    Q.    But you are having a party for

5  your cousin Flip over at Nicole's house?

6    A.    Yes.

7    Q.    How did you learn about this

8  party?

9    A.    My cousin told me.

10    Q.    And were you invited basically?

11    A.    Yes.

12    Q.    What time did you go over to

13  the party?

14    A.    Came about 9:30, 10:00.

15    Q.    How many folks were there once

16  you got there?

17    A.    About thirty.

18    Q.    About thirty people?

19    A.    Yes.

20    Q.    And how would you -- describe

21  the apartment for us.  What did it look

22  like over there in Smiley Court?

23  Describe the apartment where they were

24  having the party.

25    A.    Oh, the apartment.  Like I

1   said, it was like a lot of people against

2   the walls.  There were no chairs -- a

3   couple chairs there.

4        Q.   Did they have drinks or food or

5   anything like that?

6        A.   They had food.

7        Q.   What?

8        A.   We had beer, liquor like.

9        Q.   Inside the apartment?

10       A.   Yes.  Inside.

11       Q.   So if you wanted a drink you

12   would have to go inside?

13       A.   Yes.

14       Q.   And there were people inside?

15       A.   Yes.

16       Q.   Music, I take it?

17       A.   Yeah.  There were some music.

18       Q.   Smoking and that kind of stuff?

19       A.   Yes.

20       Q.   Just your basic party?

21       A.   Yes, sir.

22       Q.   And were there people also

23   outside?

24       A.   Yes, sir.

25       Q.   What was it like outside that

1      night?

2            A.    Like people standing on the

3      porch.  People like in the yard by the

4      mail box and stuff.  People walking past.

5            Q.    Were there any street lights or

6      porch lights or anything like that?

7            A.    Yes.  She had a porch light on.

8            Q.    A porch light?

9            A.    Yeah.

10           Q.    Now what was between the two

11     apartment complexes?  Were there any

12     lights or --

13           A.    No, sir, no lights.

14           Q.    Could you see?

15           A.    Yes, you could see.

16           Q.    Do you remember what the

17     weather was like that night?

18           A.    It was cold.  It was cold.

19           Q.    It was cold being back in

20     February?

21           A.    Yes.

22           Q.    Do you remember whether the

23     moon was out?

24           A.    No, sir.

25           Q.    If I am where I am and you were

1          where you are, would you be able to see

2          me out in between those two apartments?

3                  A.   Yes, sir.

4                  Q.   So you could see some things?

5                  A.   Yes.

6                  Q.   Now do you know the defendant

7          in this case?

8                  A.   Yes.

9                  Q.   How do you know him?

10                 A.   We went to Turner School

11         downstairs together.

12                 Q.   What about James Friendly, do

13         you know him?

14                 A.   Yes.

15                 Q.   How?

16                 A.   His girl stay upstairs from me.

17                 Q.   So you are familiar with him

18         and you knew a lot of other people at

19         this party?

20                 A.   Yes, sir.

21                 Q.   Did you know someone there

22         -- the defense has made a reference to

23         Darryl Foggy.

24                 A.   Yes.

25                 Q.   How did you know him?

1    A.    I growed up with Darryl Foggy.

2    Q.    Did you see him at the party

3    that night?

4    A.    Yes, he was.

5    Q.    Now, when was the first time

6    you saw James Friendly that night?

7    A.    When I came outside from the

8    party, he was standing on the porch.

9    Q.    How long had you been there?

10   A.    Been there like an hour or so.

11   Q.    Had you had anything to eat or

12   drink?

13   A.    Yes, I had something to drink.

14   Q.    What?

15   A.    A couple beers and a shot of

16   liquor.

17   Q.    So is it safe to say you had

18   about three drinks at that point?

19   A.    Yes.

20   Q.    Give or take about?

21   A.    Yes.

22   Q.    So you walked outside and

23   that's the first time you saw James

24   Friendly?

25   A.    Yeah.

1       Q.    Where was he?

2       A.    Standing on the porch.

3       Q.    Now when you saw James on the

4    street, what would you call him?

5       A.    Boo.

6       Q.    That was his name?

7       A.    Uh-huh (indicating yes).

8       Q.    And you are Rabbit.  Now we got

9    a Rabbit and a Boo out in front of the

10   apartment?

11      A.    Yes, sir.

12      Q.    And that's the first time you

13   had seen him that day?

14      A.    Yes, sir.

15      Q.    Do you have any idea how Boo

16   got to the party?

17      A.    No, sir.

18      Q.    What did you do once you saw

19   Mr. Friendly?

20      A.    We shook hands.  He said he

21   just got out of jail.  We were in the

22   city jail together.

23      Q.    That's the last time you saw

24   him?

25      A.    Yes, sir.

1          Q.    And that's the first time y'all

2     had seen each other since y'all got out

3     of the city jail?

4          A.    Yes.

5          Q.    What have you been locked up

6     for?

7          A.    I was in the city jail for

8     domestic violence.

9          Q.    You got into a fight with your

10    girlfriend?

11         A.    Yes, sir.

12         Q.    Have you ever been locked up on

13    any --

14         A.    I went to prison for possession

15    of cocaine.

16         Q.    Cocaine possession?

17         A.    Yes, sir.

18         Q.    Anything else?

19         A.    No, sir.

20         Q.    And other than the time y'all

21    spent over at the city jail, did you know

22    James Friendly before that?

23         A.    Yes.

24         Q.    How?

25         A.    Like I said, his girlfriend was

1    staying upstairs.  He would hang out with

2    my brother a lot.  Me and him met and we

3    would hang out.

4         Q.   Now what happened after you

5    hooked up with James at the party?

6         A.   He asked me do I want to go get

7    high, and I said yes.  And we went and

8    got something.

9         Q.   When you say you got something,

10   what are you talking about?

11        A.   A pile of cocaine.

12        Q.   Now what happened after you got

13   that?

14        A.   We got the pile of cocaine from

15   a guy and we went on the side of the

16   building to do it.  He had gave it to me

17   first.  He said, no, let me see it.  He

18   takes it.  It would be some cocaine.

19        Q.   How much did you take, if you

20   know?

21        A.   Just the taste.  It wasn't like

22   a pile on your hand.

23             THE COURT:  Are you talking

24   about you snorted a little of it or

25   what?

1          A.    No.   He tasted it.

2          Q.    Just touched it to his tongue?

3          A.    Yeah.

4          Q.    How much did y'all buy or did

5      you get?

6          A.    Spent fifty dollars.

7          Q.    Fifty dollars worth of cocaine?

8          A.    Yes.

9          Q.    If you were holding it in your

10     hand, how much would it have been?

11         A.    It would be a lot.  It would be

12     like -- well, it would be a baggy like

13     this here.

14         Q.    A little corner of a bag?

15         A.    Yeah.  It filled it up.

16         Q.    And y'all were over there on

17     the side of the building?

18         A.    Yeah.

19         Q.    Then what happened?

20         A.    He passed it to me.

21         Q.    Then what did you do?

22         A.    I snorted it.

23         Q.    How much?

24         A.    Like what you call a

25     two-on-two.

1       Q.    What does that mean?

2       A.    Both nostrils, yes.

3       Q.    Now what happened after y'all

4 were around there on the other side of

5 the building?

6       A.    Well, I be around there.

7 Poncho came on the side when we were

8 there.

9       Q.    Now when you say Poncho, who

10 are you talking about?

11      A.    Darryl Joyce.

12      Q.    Do you see that person here in

13 the courtroom here today?

14      A.    Yes.

15      Q.    Would you point him out for the

16 jury?

17      A.    (Witness complies.)

18      Q.    Which one are you talking

19 about?

20      A.    With the brown on it.

21      Q.    Let the record reflect he has

22 identified the defendant.  Now had you

23 seen this man before?

24      A.    Yes, I saw him.

25      Q.    Had you seen him at the party

1    before?

2         A.    No, not the party.

3         Q.    This was the first time you had

4    seen him at the party?

5         A.    Yes.

6         Q.    So what happened?

7         A.    He walked -- me and him shook

8    hands.  He was standing.  I told him that

9    Boo was there.  Then he shook hands.

10   Then we did -- all of us got to talking.

11   I guess they disagreed or something,

12   something, and they got in an argument.

13        Q.    You were standing there when

14   they first came up?

15        A.    What now?

16        Q.    You were standing there when he

17   first came up?

18        A.    Yeah, we were standing up.

19        Q.    And he shook hands with you?

20        A.    Yes.

21        Q.    But he didn't act like he

22   wanted to shake hands with James

23   Friendly?

24        A.    Yes.

25        Q.    Do you know what that was

1        about?

2              A.    No, sir.

3              Q.    But did it look to you like

4        they had at least seen each other before?

5                    MR. HARTLEY:  Objection, Your

6        Honor, to the opinion or the subjective

7        answer of the witness.

8                    THE COURT:  He can tell what he

9        saw.  Sir, repeat it.

10              Q.    Mr. Stewart, from the way Mr.

11        Friendly -- or Mr. Joyce responded to Mr.

12        Friendly in shaking hands or not wanting

13        to shake his hand, did it look like from

14        where you were standing they had seen

15        each other before?

16                    MR. HARTLEY:  Judge, I object.

17              A.    Yes.

18                    THE COURT:  Get him to tell

19        what he saw.

20              A.    He look like he didn't

21        really --

22                    MR. HARTLEY:  He is not -- he

23        hadn't been asked a question yet.  Mr.

24        Powell needs to rephrase the question.

25                    THE COURT:  Ask a question.

1          Q.    Mr. Stewart, again, what

2      happened when Darryl Joyce -- after he

3      shook hands with you, did he shake hands

4      with James Friendly?

5          A.    Eventually he did.

6              MR. HARTLEY:  Only if he knows.

7      I think that requires a mental operation

8      or speculation.

9              THE COURT:  Don't guess as to

10     something he is thinking.  Just tell us

11     what you saw.

12         A.    Well, the reaction with his

13     hand.

14             THE COURT:  Reaction with his

15     hand?

16         A.    His hand on the side and that's

17     it.

18         Q.    Then what happened?

19         A.    He spoke like he all right.  He

20     shook hands and just put his hand back

21     down.

22         Q.    Now, after that occurred, what

23     happened next?

24         A.    We got to talking.  Still

25     talking.  Like I said, evidently they had

1      a disagreement on something and an

2      argument broke out.

3              Q.    Before you get to the argument

4      what were y'all talking about?

5              A.    Me and Boo --

6              Q.    The three of you.  Y'all are

7      standing there talking.  You tell me.

8      Are you talking -- all three of you are

9      talking?

10             A.    No.  He was.  Poncho was

11     standing.  Me and Boo.

12             Q.    Poncho is there.  You are here

13     talking about the defendant?

14             A.    Darryl.

15             Q.    Poncho was just standing

16     there.  What were y'all talking about?

17             A.    Jail stuff, when we were

18     sitting in jail.  Just kicking it.

19             Q.    And he was listening?

20             A.    Yeah.

21             Q.    And then at what point did he

22     become involved in the conversation?

23             A.    When everybody was joking about

24     Gibbs Village.

25             Q.    Gibbs Village?

1          A.    Yes.

2          Q.    What about Gibbs Village?   What

3     does that have to do with anything?

4          A.    No.   He was like -- it was like

5     mostly Smiley Court dudes in our cell.

6     And we were kicking like how we was

7     kicking it in jail like home boy Smiley

8     Court talking.   But Boo would be with

9     us.   You got your home boy.   You know

10    what you're saying.   You know what I'm

11    saying, he didn't want to talk because

12    you got the home boy and he was from

13    Gibbs Village.

14         Q.    Now, who was it at Gibbs

15    Village?

16         A.    Who lives in Gibbs Village?

17         Q.    Who was running with Gibbs

18    Village?

19         A.    Boo.

20         Q.    That's James Friendly?

21         A.    Yes.

22         Q.    And who is running with Smiley

23    Court?

24         A.    Me.

25         Q.    Okay.   And do you know anything

1      about the defendant?

2          A.    He is from English Village.

3          Q.    English Village?

4          A.    Yes.

5          Q.    Are you aware of any ongoing

6      dispute between Gibbs Village and English

7      Village?

8                MR. HARTLEY:  Objection, Your

9      Honor.

10               THE COURT:  I will sustain it.

11         Q.    At that point when you were

12     talking about who is where, Gibbs

13     Village, Smiley Court, that's when the

14     defendant chimed in?

15         A.    Yes.

16         Q.    At that specific point?

17         A.    Yes.

18         Q.    Did he bring anything up before

19     you started talking about Gibbs Village?

20         A.    No.  He didn't say nothing at

21     first.

22         Q.    That's when he jumped into it?

23         A.    Yes.

24         Q.    And then what happened?

25         A.    He made a comment about niggers

```
 1                    THE WITNESS:   Yes.
 2        Q.    How long did that go on?
 3        A.    This argument went on about
 4   like ten minutes.
 5        Q.    They were going back and forth?
 6        A.    Yes.
 7        Q.    About who is their own man or
 8   whatever?
 9        A.    Yeah.  Who can hold their own
10   on the street or whatever.
11        Q.    Who can hold their own on the
12   street?
13        A.    Yes.
14        Q.    That is what they were arguing
15   about?
16        A.    Yes.
17        Q.    Now what did you do?
18        A.    I was telling them chill out.
19   I was inside of them.  I was telling them
20   to chill out.  I was telling them they
21   had a party.  Don't spoil my cousin's
22   party.  Just chill out.
23        Q.    At that point had anyone
24   exchanged blows or jumping at the other
25   one or pushed or anything?
```

1        A.    No, sir.

2        Q.    Just talking?

3        A.    It was just talking.

4        Q.    Or arguing?

5        A.    Yes.

6        Q.    So after you jumped in, tried

7 to calm everything down, what happened?

8        A.    It was calm down but -- they

9 was still mumbling like.  So I said,

10 y'all show some love.  At that point he

11 gave him a hand shake.

12       Q.    So when you are referring to

13 show some love, you are talking about

14 shaking hands and making up?

15       A.    Yes, sir.

16       Q.    At least talking about it?

17       A.    Yes.

18       Q.    Did that happen?

19       A.    Yeah, they shook hands.

20       Q.    What is supposed to happen now?

21       A.    He walked over to me and Boo

22 went back in front.

23       Q.    And where did you go?

24       A.    I was going to get a beer out

25 of the house, from the party.

1      Q.    Did you do that?

2      A.    Yes, I went and got a beer.

3      Q.    At that point you left Mr.

4  Friendly alone out on the porch?

5      A.    Yes.

6      Q.    Is that correct?

7      A.    He wasn't invited to the party.

8      Q.    So he didn't feel comfortable

9  going inside the house?

10          MR. HARTLEY:  Objection, Your

11  Honor.  He is asking what Mr. Friendly

12  would be thinking.

13          THE COURT:  Sustained.

14     Q.    What happened when you came

15  back?  Did you get a beer?

16     A.    Yeah, I got a beer.

17     Q.    What happened?

18     A.    They bring the argument back

19  up.

20     Q.    Who is arguing now?

21     A.    Boo and Poncho.

22     Q.    The same two before?

23     A.    Yes.

24     Q.    Same defendant that is sitting

25  over here?

1   A.   Yes.

2   Q.   And any doubt in your mind

3   that's the guy?

4   A.   That's him.

5   Q.   That's him?

6   A.   Yes, sir.

7   Q.   What was the argument going on

8   about this time when you came back out of

9   the apartment?

10   A.   It was basically the same thing

11   about he was talking about earlier.  I

12   heard James Friendly told him, man, I

13   ain't going nowhere.  I saw you sleeping

14   on the porch, if I wanted to do something

15   to you.

16   Q.   You heard the victim say that,

17   Mr. Friendly?

18   A.   Yes.

19   Q.   Said he had seen him before?

20   A.   Yes.  He was on the porch

21   sleeping in Smiley Court.

22   Q.   Then what happened?

23   A.   Me and Boo proceeded to go back

24   on the side where we was.

25   Q.   What was the reason for that?

*CR-02-2104*
*Part 2 of 5*

**DOCUMENT NAME:** Joyce, Darryl Jevon

**CLIENT & MATTER:** 58199-001

**DESCRIPTION:**
County: Montgomery                                    LWOP

CC#s : 2002-1417

Attorney: Jean Therkelsen

Circle: (TRANSCRIPT)    CASE FILE    BOTH

*3 volumes*

## CERTIFICATION

I hereby certify that the preceding imaged records and documents

are a true, accurate, and complete image of the original records or

documents as received by the Office of the Attorney General of

the State of Alabama.

This the 19th day of January, 2005.

Signed: _Melisa C. Martin_

Notary: _Coleen F Gibson_

Coleen F. Gibson
Notary Public
Commission expires 06/11/06