B VOL 2 OF 3

COURT OF CRIMINAL APPEALS NO. CR-02-2104

# APPEAL TO ALABAMA COURT OF CRIMINAL APPEALS

### FROM

CIRCUIT COURT OF _MONTGOMERY_ COUNTY, ALABAMA

CIRCUIT COURT NO. _CC 2002-1417_

CIRCUIT JUDGE _HOBBS_

Type of Conviction / Order Appealed From: _INTENTIONAL MURDER_

Sentence Imposed: _LIFE WITHOUT PAROLE_

Defendant Indigent: ■ YES ☐ NO

---

AIMEE C. SMITH
(Appellant's Attorney)             (334) 264-6466
640 S. MCDOUNOUGH STREET          (Telephone No.)
(Address)
MONTGOMERY          AL          36104
(City)              (State)      (Zip Code)

DARRYL JEVON JOYCE
NAME OF APPELLANT

V.

STATE OF ALABAMA
(State represented by Attorney General)

NAME OF APPELLEE

NOTE: If municipal appeal, indicate above, and enter
name and address of municipal attorney below.

---

(For Court of Criminal Appeals Use Only)

Part 3 of 5



EXHIBIT
A
tabbies

1          A.    To go do what we went and
2    bought.
3          Q.    Y'all were going to do some
4    more cocaine?
5          A.    Yeah.
6          Q.    At that point had Mr. Friendly
7    done any cocaine?
8          A.    No.
9          Q.    Because Mr. Joyce had gotten in
10   there and started the argument?
11         A.    Yes.
12         Q.    So y'all are going back around
13   to the other side of the building?
14         A.    Yes.
15         Q.    The same place you were before?
16         A.    Yes.
17         Q.    What happened?
18         A.    We were in front of Poncho and
19   Darryl.  We were in front of them -- and
20   fuck this here.  He said, I ain't worried
21   about that.  So he heard him.  I guess he
22   heard him.  He said, fuck me.  So then he
23   reach for the gun.  I was like, hold up,
24   man.
25         Q.    Now who was standing where when

1    y'all got to the other side of the

2    apartment this time?

3        A.    Boo was like closer to the end

4    and I was on the side of Boo.

5        Q.    I'm going to show you a

6    photograph and ask you if you recognize

7    that.  This is going to be State's 6.  Do

8    you recognize this?

9        A.    Yes, sir.

10        Q.    What is it?

11        A.    It is a picture of where we

12    was.

13        Q.    Does this photograph show the

14    area where you would have been standing?

15        A.    Yes, sir.

16        Q.    Where the shooting would have

17    occurred?

18        A.    Yes, sir.

19        Q.    Now, Mr. Stewart, you see this

20    little button right here.  If you push

21    it, you see how that laser comes up.

22        A.    Yeah.

23        Q.    Take this pointer.  Using this

24    button and that laser -- you got it.  You

25    see up on the ceiling?  There you go.

1    Show the jurors on State's 6 about where

2    you were standing.

3         A.    About that window right there.

4         Q.    Right over there at the end of

5    the building?

6         A.    The one like in the middle like

7    right there where the window at.  I was

8    standing right there.

9         Q.    Where is the nearest porch

10   light?

11        A.    The porch light going to be on

12   the side a little bit where you come

13   around over there.  There is going to be

14   the porch light.

15        Q.    Now who is standing closest to

16   the building?

17        A.    Me and James is.

18        Q.    You and James?

19        A.    Yeah.

20        Q.    So I'm James and you are you,

21   we are standing like this?

22        A.    Right there.

23        Q.    Where is the defendant?

24        A.    He came around us, came

25   around --

1    Q.    What do you mean?  Like around
2    you?
3    A.    Yeah.
4    Q.    And put me where he was
5    standing on the red dot.  If you are
6    standing where you were standing and Boo
7    is standing beside you, put me where
8    Poncho was.
9    A.    He is like right here.
10    Q.    Even closer to where --
11    A.    He wasn't that close.
12    Q.    About right here?
13    A.    Yeah, about like that.
14    Q.    How would you say -- about
15    three, four feet?
16    A.    Yeah.
17    Q.    This is where who was standing?
18    A.    Poncho.
19    Q.    That guy right over there?
20    A.    Yes.
21    Q.    This close?
22    A.    Yes.
23    Q.    Okay.  Now, what happened once
24    the three of y'all were over there like
25    that?

1    A.    Well, when he made the
2    statement like he called Boo -- called
3    him the F word, but he didn't.  He said,
4    F me, nigger.  You know what I'm saying.
5    He start fumbling with his back.  I said,
6    no, there ain't going to be none of this
7    here.
8    Q.    Let me stop you a minute.  If
9    he was fumbling with his back, why would
10    that cause you to start going --
11    A.    You know, like when people have
12    a gun in that back like that.
13    Q.    He was making a move?
14    A.    Yes.
15    Q.    What happened then?
16    A.    Like I had grabbed Poncho from
17    the side because Boo was walking around
18    like from the -- fixing to walk around.
19    Fuck it, you know what I'm saying.  He is
20    like fuck that nigger then.  That's when
21    he start shooting.
22    Q.    Now, with the Court's
23    permission, step down for me from the
24    witness stand and demonstrate -- put me
25    where Boo was first off as he walked

1    around.

2        A.    I was telling -- puts me before

3    Boo, around where he was.

4        Q.    Now you stand over there where

5    Poncho was.  Demonstrate for the jurors

6    how he drew the gun.

7        A.    From the back like that there.

8    Fuck you, like that.

9        Q.    And he shot?

10       A.    Yeah, he shot.

11       Q.    Okay.  And which direction?  If

12   you are standing over here and he shot,

13   which direction would the bullets have

14   gone?

15       A.    When he first shot?

16       Q.    Yes.

17       A.    It would have came down right

18   there.

19       Q.    No.  Come show me.  Come this

20   way.

21       A.    We were like right here and Boo

22   came right behind here.  He was facing

23   that right here.

24       Q.    Okay.  Thank you.  Have a

25   seat.  If I got that correct, Boo came

1    around this way?

2        A.    Yes.

3        Q.    And the shot went that way?

4        A.    Yes, he shot him.

5        Q.    Kind of away from the building?

6        A.    Yes.  Like in the opening right

7    there.

8        Q.    And you were standing right

9    there?

10       A.    Yes, sir.

11       Q.    Within feet of the person doing

12   the shooting?

13       A.    Yes, sir.

14       Q.    And who was the person doing

15   the shooting?

16       A.    Darryl.

17       Q.    Now are you familiar with

18   another individual that was at that party

19   by the name of Darryl Foggy?

20       A.    Yes, sir.

21       Q.    Was he out there with y'all?

22       A.    No.  He was across the street.

23       Q.    Across the street?

24       A.    Yes.

25       Q.    Did you ever see him anywhere

1    in the vicinity of where James Friendly

2    got shot?

3         A.    Yes.  He came afterwards.

4         Q.    Afterwards?

5         A.    Yeah.  When everybody start

6    gathering around he came up.

7         Q.    But as the shooting occurred

8    did you see this Darryl Foggy person?

9         A.    No.

10        Q.    Now I'm going to ask you one

11   more question about that in just a minute

12   but let's go back to the shooting.  After

13   Mr. Friendly was shot --

14        A.    Yeah.

15        Q.    -- what happened?

16        A.    Then I guess he hit him

17   somewhere in the leg or something.  And

18   then Boo is like backing up, go on, go

19   on, man.

20        Q.    Let me stop you right there.

21   Demonstrate for the jury again what the

22   victim was doing.

23        A.    (Witness complies.)

24        Q.    He was holding his hands up.

25   You saw James Friendly put his hands up

1    to the man with the gun?

2         A.    Yes.

3         Q.    And what did the defendant do

4    in response to that?

5         A.    He shot at -- my cousin was

6    backing in in a car.  In a truck, I

7    mean.  He shot at them.

8         Q.    Okay.  Did he shoot anymore

9    times?

10        A.    Yes.  When he shot them, he

11   shot Boo again.  I don't know where he

12   shot him at.  Then Boo stumbling and he

13   fell.  He was like, hold up, man, hold

14   up, and he just shot again.

15        Q.    Shot him again?

16        A.    Yes.

17        Q.    And what did you do?

18        A.    I got down and talked to Boo.

19        Q.    What happened to Darryl?

20        A.    He ran away.

21        Q.    Do you know which direction he

22   ran?

23        A.    He ran like --

24        Q.    Use the picture.

25        A.    Like where the -- by the

1    clothesline pole, right there.

2        Q.    Back towards the tree through

3    the clothesline?

4        A.    Yeah.  He would have been

5    running into that picture like going that

6    way.

7        Q.    All right.  Now, did you see

8    the defendant again at any point that

9    night?

10        A.    No, sir.

11        Q.    Did you see him in the next few

12    days?

13        A.    No, sir.

14        Q.    You didn't see him again?

15        A.    Until just now.

16        Q.    Now, what happened after Boo

17    got shot?

18        A.    Well, I was hollering and

19    telling the guys on the street to call

20    the paramedics.  Me and him was there and

21    he was like talking to me.  We were on

22    the ground.  Talking to me, telling me

23    don't let him die.  Another girl, Nicole,

24    whose party it was, she came out there.

25    We were trying to keep him up, keep him

1   alive, telling him don't die.

2       Q.    Did he say anything while you

3   were there with him?

4       A.    Yes.  He was like please don't

5   let me die.  I got kids, man.  I got

6   kids.

7       Q.    That's what he said?  Now, Mr.

8   Stewart, eventually the paramedics

9   arrive; is that right?

10      A.    Yes.

11      Q.    And the police.  And you went

12  down and gave a statement to the police?

13      A.    Yes, sir.

14      Q.    Now, did the detectives that

15  interviewed you ever show you any

16  photographs?

17      A.    Yes.

18      Q.    And did anyone ever show you

19  any photographs of Darryl Joyce?

20      A.    Yes.

21      Q.    And were you able to identify

22  Mr. Joyce from those photographs?

23      A.    Yes, sir.

24      Q.    Now, Mr. Stewart, let's go back

25  for a minute and talk about Darryl

1    A.    No, sir.

2    Q.    What does he go by on the

3    street?

4    A.    D.

5    Q.    Does anybody call him Poncho?

6    A.    No.

7    Q.    They just have the same first

8    name, Darryl?

9    A.    Yes.

10    Q.    And from where you could see,

11    he was nowhere around the incident that

12    occurred?

13    A.    As far as I could see, yes,

14    sir.

15    Q.    As far as you could see?

16    A.    Yes, sir.

17    Q.    I'm going to show you what has

18    been marked as State's 21.  Take a look

19    at this for me.  Do you recognize this?

20    A.    Yes.

21    Q.    Whose gun is it?

22    MR. HARTLEY:  I think we should

23    establish it is unloaded before we wield

24    it all over the place.

25    MR. POWELL:  It is, Judge.

1          A.    It look like Darryl Foggy's

2   gun.

3          Q.    It looks like Darryl Foggy's

4   gun?

5          A.    Yes.

6          Q.    How would you know what Darryl

7   Foggy's gun looks like?

8          A.    Because he brung it over there

9   about like two -- I can't remember the

10   time but he brung it over like he fixing

11   to leave in the car and go with a

12   female.  He didn't want to ride with it.

13          Q.    Are we talking about the same

14   night of the shooting?

15          A.    Yes.

16          Q.    At any point did Darryl Foggy

17   give you this gun?

18          A.    Give it to me?

19          Q.    Yes.

20          A.    No.  No, sir.

21          Q.    Did you ever take this gun from

22   Darryl Foggy?

23          A.    No.

24          Q.    How do you know he had it that

25   night?

A.    How do I know he had it?  He keeps a gun.

Q.    He keeps a gun on him?

A.    Yeah.

Q.    Is this the gun you saw out there that shot James Friendly?

A.    No, it wasn't.

Q.    What did the gun you saw look like?

A.    It was black.  Black with red like.

Q.    It had black in it?  Did it have silver like that slip has?

A.    It had black on it.

Q.    I'm saying, did the gun you see shoot James Friendly, the gun that shot Boo, did it have silver on it?

A.    Yes.  It had a little silver like on the bottom part.

Q.    At the bottom.  What about this part up here, was that silver?

A.    No, not -- I didn't see.

Q.    Now, did you ever take that gun and hide it anywhere that night?

A.    No.

1      Q.    Why not?

2      A.    Take it and hide it?

3      Q.    Yeah.

4      A.    He put it up.

5      Q.    Who put it up?

6      A.    Darryl Foggy.

7      Q.    Did you see him do it?

8      A.    Yes.

9      Q.    Where did he put it up?

10     A.    Up under the rug.

11     Q.    Where?

12     A.    If the first apartment, the

13   first room.

14     Q.    Which apartment?

15     A.    Across the street.

16     Q.    Across the street.  Who lives

17   there?

18     A.    Amy Albright.

19     Q.    Who is she?

20     A.    She is a friend we know.

21     Q.    Just a friend across the

22   street?

23     A.    Yes, sir.

24     Q.    And she let Foggy stash his

25   gun?

1    A.    She didn't know.

2    Q.    She didn't know?

3    A.    No.

4    Q.    Now, when all this came up in

5    the investigation, did anyone ever ask

6    you if you had seen anyone there that

7    night with a gun?

8    A.    No.

9    Q.    Did you ever tell the police

10    about this gun right here?

11    A.    Yes.

12    Q.    When did you do that?

13    A.    After they ask me if Darryl

14    Foggy normally have a gun.  I said, yes.

15    That's how I know where it at.

16    Q.    And did you tell the police

17    where it was at?

18    A.    Yes, sir.

19    Q.    And based on the information

20    you gave the police, were they able to

21    locate this gun?

22    A.    Yes, sir.

23    Q.    Now, did you ever see Darryl

24    Foggy with any kind of black gun?

25    A.    No, sir.

1          Q.    That's the gun you saw him

2     with?

3          A.    That's the gun.

4          Q.    Did you ever see Darryl Joyce

5     with a black gun?

6          A.    Until that night.

7          Q.    That night?

8          A.    Yeah.

9          Q.    You saw him that night?

10         A.    Yes.

11         Q.    What did Darryl Joyce do with a

12    black gun that night?

13         A.    He fired on James Friendly.

14              MR. POWELL:  Nothing further,

15    Judge.

16              (Brief Recess.)

17              (At which time the jury

18    re-enters the courtroom.)

19              THE COURT:  Whenever you're

20    ready.

21              MR. HARTLEY:  Thank you,

22    Judge.

23              CROSS-EXAMINATION

24    BY MR. HARTLEY:

25         Q.    Mr. Stewart, let me review some

1   of the testimony you have already given.

2   First of all, let's establish that you do

3   admit you have been convicted of domestic

4   violence not long ago in the city court;

5   is that right?

6       A.   Yes, sir.

7       Q.   And also you have served prison

8   time because of possession of cocaine?

9       A.   Yes, sir.

10      Q.   And I have listened to the --

11  to your testimony throughout and you seem

12  to know the lingo and the language of

13  drug culture or the drug business pretty

14  well.  You must be pretty familiar with

15  using drugs?

16      A.   Yes, sir.

17      Q.   Are you a drug addict?

18      A.   No, sir.

19      Q.   You just recreationally use

20  cocaine and maybe marijuana, too?

21      A.   Yes.

22      Q.   And drink along with it, right?

23      A.   Yes, sir.

24      Q.   So on the night in question --

25  what time -- strike that.  What time did

1      the birthday party start on February 1st?

2          A.   Like 8:00, something like that.

3          Q.   8:00?

4          A.   Yes.

5          Q.   And you were there from the

6      beginning of the party?

7          A.   No, sir.

8          Q.   What time did you arrive?

9          A.   I arrived about 9:30 or so.

10          Q.   Had you been drinking before

11      you got there?

12          A.   No, I just got off work.

13          Q.   Where were you working?

14          A.   Southeast Auto.

15          Q.   Excuse me?

16          A.   Southeast Auto.

17          Q.   It's a little late for a

18      business to be open at 8:30 on a Friday

19      night, isn't it?

20          A.   No, sir.

21          Q.   But when you got there, you

22      started drinking, didn't you?

23          A.   Yes, sir.

24          Q.   What kind of alcohol were you

25      consuming?

1        A.    Well, I like Natural Lights.

2        Q.    And you had several of them

3   that night, didn't you?

4        A.    I wouldn't say several.

5        Q.    How many had you had when it

6   got to be about 11:00 or 11:30?

7        A.    I couldn't give you a number.

8   I'd say three or more.

9        Q.    Excuse me?

10       A.    I said like three or four.

11       Q.    Three or four.  So at least

12  three, maybe a lot more, right?  You

13  could drink them pretty fast, can't you?

14       A.    No, I wasn't trying to dog them

15  out, no.

16       Q.    Is that what you call it,

17  dogging them out?

18       A.    Yeah.

19       Q.    You weren't dogging them out on

20  that occasion?

21       A.    Yeah.

22       Q.    You were more interested in

23  getting something a little stronger than

24  that, weren't you?

25       A.    Not interested, no.  I ain't

2c21ee6f9ae6068a

1    had it on my mind what you talking about.

2        Q.    Oh.    You just spontaneously

3    thought about getting some powder with

4    James Friendly?

5        A.    Say what now?

6        Q.    You and James Friendly at some

7    point made the decision to go and

8    purchase some powder cocaine, right?

9        A.    Yes, sir.

10       Q.    So y'all had not -- it was just

11   a spur of the moment type thing?

12       A.    Yes.

13       Q.    Is it pretty easy to get it in

14   that neighborhood?

15       A.    I guess.

16       Q.    Well --

17       A.    For me, I can get it.  I got

18   it.

19       Q.    You can get it.  It is pretty

20   easy?

21       A.    Yes.

22       Q.    You are pretty familiar with

23   the drug culture, right?

24       A.    Yes.  I been staying in Smiley

25   Court for twenty years.

1      Q.    And you deal in drugs, right?

2      A.    I don't deal in drugs.

3      Q.    I mean possess it and use it?

4      A.    I use it.

5      Q.    And y'all did buy, I think,

6    fifty dollars worth of powder cocaine?

7      A.    No.  We didn't have a chance

8    to.  We purchased -- I purchased that but

9    we didn't get a chance to do it.

10      Q.    But the purchase was for -- you

11    did acquire fifty dollars worth of it?

12      A.    Yes.

13      Q.    To be used if you could?

14      A.    Yes.  If we could, yes.

15      Q.    You said you were doing

16    something called snorting cocaine two on

17    the two.  I don't know what two on two

18    means.  Is that some sort of unique way

19    you snort it or something?

20      A.    Well, that's with both nose.

21      Q.    Oh.  Some on each side of your

22    nose?

23      A.    Yes.

24      Q.    And this is something you had

25    done that night at least a little while

1    before this event took place with James

2    Friendly, right?

3        A.    You saying did I do anything

4    before that?

5        Q.    How many minutes was it or what

6    period of time was it that you were

7    snorting cocaine before James Friendly

8    got shot?

9        A.    I'd say the time like thirty

10   minutes.

11       Q.    Okay.   Tell the jury how long

12   did it take to get a rush off of a snort

13   of cocaine.

14       A.    Well, I guess like two minutes,

15   something like that.

16       Q.    So you are under the influence

17   of cocaine within minutes after you snort

18   it, right?   In seconds, in fact, isn't

19   it?

20       A.    Well, you can feel it.   Like I

21   said, it depend on what kind of

22   cocaine, if it's been cut or not.

23       Q.    Didn't you say this was some

24   good stuff?

25       A.    It was pretty good, yes.

1          Q.    You know your dope real well?

2          A.    There's no signs on it but

3   it'll get me high.

4          Q.    Excuse me?

5          A.    There's no signs on it but it

6   sometimes gets me high.

7          Q.    Now, let me ask you -- and I

8   have advised the District Attorney that I

9   wanted to find out a little bit more

10  about the statement that you gave to the

11  police on the day following the

12  incident.

13         Have you seen your statement in

14  some time?  Have you ever read it?

15        A.    Yes, I saw it.

16        Q.    When was the last time you read

17  your statement?

18        A.    The whole page?

19        Q.    Any part of it or all of it or

20  whatever.

21        A.    Today.

22        Q.    Now you have testified this

23  afternoon.  Didn't you say that you are

24  accusing Darryl Joyce of having shot Mr.

25  Friendly?

1        A.    Yes.

2        Q.    Didn't you say the first shot

3    that he fired was into his leg?

4        A.    Yes.

5        Q.    And the second shot was into

6    his body somewhere?

7        A.    Yeah, somewhere.

8        Q.    Is that correct?

9        A.    Yes.  I ain't had no -- they

10   didn't tell me where all he got shot.

11       Q.    Excuse me?

12       A.    No one told me where all he got

13   shot at, but I assume the first shot was

14   into his leg.

15       Q.    Now isn't that very

16   inconsistent -- in fact, totally

17   inconsistent with what you told the

18   police happened when you were giving them

19   your statement that morning?

20       A.    No.

21       Q.    Let me show it to you then.

22   Okay?  Let me make sure I get the first

23   one first.  You gave a statement to the

24   Detective Haynie; is that right?

25       A.    I don't know his name.

1          Q.    Did you give a statement at the
2    police station?
3          A.    Twice, yeah.
4          Q.    Twice.  And one of them at
5    about 2:14 in the morning, if that helps
6    you remember which statement was first
7    and which one was second, right?
8          A.    Okay.
9          Q.    I'm going to refer you to this
10   and see if you can look at the first page
11   and see if it appears to be a statement
12   -- you know, a transcript of a statement
13   that you gave to the police when they
14   were talking to you about what happened
15   out there.  Do you identify yourself on
16   there?
17         A.    Yes.
18         Q.    The first question was state
19   your name and address.  And it's Eric
20   Stewart, right?
21         A.    Yes.
22         Q.    Would you dispute that this is
23   your statement?
24         A.    No.
25         Q.    On page two of that statement,

1    you were given a narrative of what

2    happened, about what happened.  This

3    portion that is about -- and, counselor,

4    I'm going to the first lengthy paragraph

5    -- one, two, fourth question down.  I'm

6    going to ask you to start -- if you will

7    read -- this is supposed to be your

8    answer to their question.

9          When you say they shook hands,

10   would you read that to the jury and tell

11   me if this is what you told the police on

12   that night.

13        A.    Read it out loud?

14        Q.    Yes.

15        A.    They shook hands the first time

16   so I went out and got a beer.  I came

17   back out there.  They still was arguing.

18   Then they shook hands again after -- and

19   they still was arguing.  So we went -- so

20   I was trying to break them up again.  And

21   when Joyce, Darryl Joyce, pulled a gun

22   out and like shot two or three times in

23   the ground.  Then shot Boo.  And went

24   -- and then I went and got on top of

25   him.

1          Q.    Now you said today -- this

2     afternoon the first shot went into Mr.

3     Friendly.  Now in that statement, you

4     said he shot two or three times into the

5     ground, didn't you?

6          A.    Yes.

7          Q.    That's inconsistency or a

8     different statement, isn't it?

9          A.    That's the question?

10         Q.    He couldn't have shot into the

11    ground and shot Mr. Friendly with the

12    same bullet, could he?

13         A.    I guess not.

14         Q.    So you told Detective Haynie

15    that before he shot Mr. Friendly he shot

16    several shots into the ground.  That's

17    what you told him, right?

18         A.    Yes.

19         Q.    What it is, you were really

20    messed up on drugs and couldn't really

21    accurately report what happened, could

22    you?

23         A.    Not really, no.

24         Q.    Not really, you couldn't tell

25    accurately?

1    A.    I said I wasn't messed up like

2    that.

3    Q.    Well, let's go to the second

4    statement that you gave the police at

5    that time.  Again, I will show you

6    -- this is a copy provided to me by the

7    District Attorney's office.  Again, it

8    starts off -- this one was taken at 7:00

9    in the morning, right?  Beginning time,

10    0700 hours.

11    A.    Yes.

12    Q.    Do you remember giving a

13    statement this time to Corporal E.E.

14    Howton of the police department?

15    A.    Yes.

16    Q.    And you were going over it

17    again, weren't you?

18    A.    Yes.  He was asking me

19    questions then.

20    Q.    Let me go over here to page

21    eight.  The first question -- the first

22    question at the top of that page.  And

23    they asked you in the form of a question

24    or whatever:  So they were fixing to get

25    out of there.  What did you tell

1        A.    Yes.

2        Q.    Read it out loud one more

3    time.  Since you omitted it the first

4    time, let's read it again.

5        A.    He shot the truck first.

6        Q.    Read the next question.

7        A.    Why did he shoot the truck?

8        Q.    First.

9        MR. HARTLEY:  Judge --

10        A.    First.

11        Q.    You need to read every word of

12    it because where it says first is real

13    important.  The officer asked you why did

14    he shoot the truck first.  And read your

15    answer.

16        A.    I didn't know he -- why.  I

17    didn't know he shot the truck first

18    because Johnny was like -- Johnny was

19    standing in the front of the building

20    like fixing to get in the truck.

21        Q.    Where are you reading from

22    now?  Oh, fixing to get in the truck.

23    Now, did -- and the officer said yeah

24    like a question.  Now read your next

25    answer.

1      A.    I guess he thought, you know,

2   I'm saying Johnny was getting a gun or

3   something out of the car.  I don't know.

4   He shot the truck and Boo.

5      Q.    Wait, wait.  Every time the

6   word first is on here you skip it.

7      A.    I am saying first.

8      Q.    I didn't hear it.

9      A.    Oh.

10     Q.    If you want the court reporter

11  to read it back.  Let's start with that

12  over again and put every word in there.

13     A.    I guess he thought, you know

14  what I'm saying.  Johnny was going and

15  getting a gun or something.  I don't

16  know.  And he shot the truck first and

17  Boo was like still standing up.

18     Q.    And the next question please?

19     A.    Okay.  Okay.  So Poncho shot

20  the truck first?  Yeah, shot the truck

21  first.  And then shot the victim, right?

22  I answered, yeah.  How many times did you

23  hear a gunshot?  Answer, said it was like

24  six times, six times.

25     Q.    Okay.  That's sufficient for

1    now.  So now you have switched your story

2    from 2:00 in the morning where he had

3    shot in the ground first.  And now at

4    7:00 in the morning you have got him

5    shooting into the truck first.  And you

6    said it was about four or five times,

7    didn't you, that he shot the truck first?

8         A.    Yeah.  I said that, yeah.

9         Q.    How could a person who was such

10   a good eye witness have totally

11   inconsistent answers on a critical

12   question like that?

13        A.    I don't know, sir.

14        Q.    You don't know.  Could it be

15   because you are not telling the truth?

16        A.    You saying eye witness?

17        Q.    You are the eye witness.

18        A.    Oh, okay.

19        Q.    How could a person who claims

20   to be an eye witness and giving this jury

21   information that they can rely on be that

22   inconsistent with your first statement to

23   the police, your second to the statement,

24   and your statement that you gave at this

25   trial this afternoon?

1        A.    Well, sir, I can say this.
2    When they shot -- when he shot, I was
3    shocked but I know he shot him.
4        Q.    Excuse me?
5        A.    I said I know he shot him.
6        Q.    Why didn't you just say I don't
7    know if the officer asked you those
8    questions instead of making up answers as
9    you went along?  What you are saying is
10   that you really don't know?
11       A.    I do know that he shot him.
12       Q.    But you got the sequence all
13   wrong when they asked you where did he
14   shoot first, right?
15       A.    Yes.
16       Q.    Okay.  Is that indicative of
17   the fact that you were messed up and on
18   drugs that night?
19       A.    No, it is not.
20       Q.    Let's move to your version of
21   what happened with Darryl Foggy's gun.
22   You didn't mention that gun in either one
23   of those statements that you gave, did
24   you?
25       A.    No.

1    Q.    Right.  But you knew at that

2    time that Darryl Foggy had hidden a gun

3    that was at the scene that night?

4    A.    I ain't know Darryl Foggy had

5    anything to do with it.

6    Q.    It is that gun right there,

7    right?

8    A.    Yeah.  I say it looked like it,

9    yes.

10    Q.    Is this the gun that the

11    detective went to Amy Albright's

12    apartment and recovered from her

13    apartment?

14    A.    Yes.

15    Q.    Tell the whole story on that

16    again about how it came -- why you

17    disclosed that that gun existed to the

18    police.  What was the deal on that?

19    A.    I was the one who told the

20    police about the gun.

21    Q.    Why did you tell him about it

22    if it's not involved in this matter at

23    all?

24    A.    Because he asked me did Darryl

25    have a gun.  I said he always have a

1    gun.  He asked me how I know, and I told

2    him what happened.

3         Q.    Well, if this gun wasn't

4    involved, why would Darryl Foggy -- did

5    Darryl Foggy hide it or did you hide it?

6         A.    He didn't hide it.  He was

7    going somewhere with a female and he

8    didn't want to ride with it.

9         Q.    But you say he didn't hide it?

10         A.    He didn't hide it.  Anybody

11    could have saw where the gun was.

12         Q.    Excuse me?

13         A.    Anybody could have saw the

14    gun.  It was up under the rug.  Anybody

15    would have saw that.

16         Q.    So your statement is Darryl

17    Foggy had that gun at the scene, right?

18         A.    I guess.

19         Q.    You said he always has a gun?

20         A.    Yes.

21         Q.    It is his gun?

22         A.    Yes.

23         Q.    And it is later recovered in

24    Amy Albright's apartment, which is not

25    far away, is it?

1        A.    Yes.

2        Q.    How close is it?

3        A.    Directly across the street from

4    that right there.

5        Q.    And it was under a rug?

6        A.    Yes.

7        Q.    But you are saying he wasn't

8    hiding it?

9        A.    No.  He wasn't -- the rug isn't

10   that big.

11       Q.    Just puts it under a rug

12   -- it's the normal course of business,

13   right?

14       A.    Just putting it up, right.

15       Q.    You and Darryl Foggy have been

16   friends for how long in your life?

17       A.    It has been a good little

18   while.

19       Q.    Excuse me?

20       A.    It has been a couple years.

21       Q.    I think you said you grew up

22   with him, didn't you?

23       A.    Yes.

24       Q.    Would that be like ten years or

25   fifteen years?

1          A.    When we say grow up, like a

2    couple years with each other.

3          Q.    I thought -- I thought you said

4    something about you had known him since

5    he was a child?

6          A.    I've known him.

7          Q.    Let me just ask you directly.

8    How old was he when you first got to know

9    him or how long have y'all known each

10   other?

11         A.    First know him like hanging

12   with him?  I knowed him a long time.  I

13   started hanging with him when he moved

14   back to Smiley Court.

15         Q.    And how many years ago would

16   that have been?

17         A.    I'd say about six or seven.

18         Q.    So your relationship with him

19   goes back a pretty good way, right?

20         A.    Yes.

21         Q.    Oh.  Where was Bryant Thomas

22   that night?  Are you familiar with Bryant

23   Thomas?

24         A.    Yes.

25         Q.    Was he at the party?

1        A.    He was there but he left.

2        Q.    Okay.  Did he come back?

3        A.    No, I did not see him anymore.

4        Q.    You didn't see him?

5        A.    No.

6        Q.    Are you aware that Bryant

7   Thomas identified Darryl Foggy in a photo

8   lineup as being the person who shot James

9   Friendly that night?

10       A.    Yeah, they told me.

11       Q.    They told you that, didn't

12   they?

13       A.    Yeah.

14       Q.    And they really didn't go very

15   far with that investigation, did they?

16       A.    I don't know.

17       MR. HARTLEY:  Thank you.  No

18   further questions.

19              REDIRECT EXAMINATION

20   BY MR. POWELL:

21       Q.    They went far enough to find

22   Darryl Foggy's gun, didn't they?

23       A.    Yes.

24       Q.    Do you know whether or not that

25   gun was tested against the bullets they

1    dug out of James Friendly's body?

2         A.   I guess it's sort of procedure

3    if they found it.

4         Q.   But you are aware that

5    happened?

6         A.   Yes.

7         Q.   I will get to that in a

8    minute.  Now, before we go any further,

9    did you ever look at any photographs of

10   the person you saw do the shooting out

11   there that night?

12        A.   Yes.

13        Q.   I'm going to show you State's

14   Exhibit 28 just for identification

15   purposes only.  Do you recognize this?

16        A.   Yes.

17        Q.   What is it?

18        A.   It is a lineup of a couple

19   guys.

20        Q.   A couple guys.  It looks like

21   there's a bunch of guys?

22        A.   A bunch of guys.

23        Q.   Was this ever shown to you?

24        A.   Yes.

25        Q.   How was it shown to you?

1           A.    One of the detectives showed it
2    to me.
3           Q.    Did he just hand you the book
4    or was it open to a page or what?
5           A.    No.  I was flipping through it.
6           Q.    And you flipped through it?
7           A.    Yes.
8           Q.    What was the purpose of you
9    flipping through this book?
10          A.    He asked me can I identify
11   Poncho.
12          Q.    And did you do it?
13          A.    Yes.
14          Q.    I'm just going to go ahead and
15   turn to the page.  Which one is Poncho?
16          A.    This one right here.
17          Q.    You are identifying out of the
18   -- I guess that's going to be the
19   right-hand page out of the set of nine
20   photographs the one at the top left; is
21   that right?
22          A.    Yes.
23          Q.    This one right here.  Okay.
24   Now, again, use your laser pointer and
25   point to the picture I picked out.

1          A.    (Witness complies.)

2          Q.    That one there.  You picked

3     that one out as the Poncho you saw do the

4     shooting?

5          A.    Yes.

6          Q.    Now do you know who that

7     individual is?

8          A.    Yes.

9          Q.    Who?

10         A.    Right there.

11         Q.    Darryl Joyce?

12         A.    Yes.

13         Q.    You are pointing to the

14    defendant?

15         A.    Yes.

16         Q.    Is that individual Darryl

17    Foggy?

18         A.    No.

19         Q.    Thank you, Ms. Perkins.  This

20    is the book.  It has got four ten written

21    on it --

22         A.    Yes.

23         Q.    -- that the detective showed

24    you?

25         A.    Yes.

1          Q.    While we are identifying folks,
2     I'm going to show you State's 29.  Do you
3     recognize that?
4          A.    Yes.
5          Q.    Who is that a photograph of?
6          A.    Boo.
7          Q.    Who is that a photograph of?
8          A.    James Friendly.
9          Q.    Does that appear to be a fair
10    and accurate representation of what he
11    looked like on the night he was killed?
12         A.    Yes.
13         Q.    Different clothing?
14         A.    Yes.
15              MR. POWELL:  We offer State's
16    29, Judge.
17              THE COURT:  Admitted.
18              (State's Exhibit Number 29 was
19    admitted into evidence.)
20         Q.    Going back to State's 6, the
21    photograph of the apartment complex.
22    Does that appear to be a fair and
23    accurate representation of the way the
24    buildings and everything were set up on
25    the night in question?

1    A.    Yes.

2    Q.    That's the way they were?

3    A.    Yes, sir.

4         MR. POWELL:  We offer State's

5    Exhibit 6, Judge.

6         THE COURT:  Admitted.

7         (State's Exhibit Number 6 was

8    admitted into evidence.)

9    Q.    Now, Mr. Stewart, when these

10   gunshots started going off, how close

11   were you to the person firing that gun?

12   A.    About four feet.

13   Q.    Was it possible for you to have

14   gotten shot that night?

15   A.    Yes.

16   Q.    Were you paying a whole lot of

17   attention as to where the bullets went

18   first?

19   A.    No.

20        MR. POWELL:  Nothing further,

21   Judge.

22        RECROSS-EXAMINATION

23   BY MR. HARTLEY:

24   Q.    You answered every question as

25   to where they went first, didn't you?

1      A.    Yes, I did answer the
2   questions.
3      Q.    Let's go back to this exhibit,
4   this picture that is up here now.  Mr.
5   Powell asked you if it fairly and
6   accurately depicted the scene as it was
7   on that night.
8          It really doesn't look at all
9   like that because this is a daytime
10  photograph, right?
11     A.    Yeah.  True.
12     Q.    And in fact you and Mr.
13  Friendly had gone back here in this area
14  because y'all were kind of hiding back
15  there to use that dope, weren't you?
16     A.    We weren't hiding.  We were on
17  the side to respect everybody else.
18     Q.    What, respect everybody else?
19     A.    Respect.
20     Q.    As in R-E-S-P-E-C-T?
21     A.    Yes.
22     Q.    Okay.  So you are going to go
23  do something illegal so you slip around
24  the side of the building because out of
25  respect for other people, right?

1    A.    Yes.

2    Q.    It just coincidentally happens

3    to be about the darkest place you can get

4    to out there, right?

5    A.    Well, it's not the darkest

6    place because if you want to get more

7    dark you go on by the trees.

8    Q.    Well, I guess that's -- so it's

9    dark all out there.  You said there were

10   no lights back on this side of the

11   building.  The only lights were on the

12   porch is what you said earlier, right?

13   A.    It was nighttime, yes.

14   Q.    It was nighttime?

15   A.    Yes.

16   Q.    So what y'all were doing was

17   kind of hiding back there, right?

18   A.    Well, you can call it hiding.

19   I'm not calling it hiding.

20   Q.    It just doesn't bother you one

21   bit using dope in public, does it?

22   A.    That's why we went on the side

23   to respect everybody.

24        MR. HARTLEY:  No further

25   questions.

1           MR. POWELL:  Nothing further,

2   Judge.

3           THE COURT:  You can step down.

4           MR. POWELL:  The state calls

5   Detective Mackey.

6               J. MACKEY,

7   having been first duly sworn, was

8   examined and testified as follows:

9           DIRECT EXAMINATION

10  BY MR. POWELL:

11      Q.  Would you state your name for

12  the jury?

13      A.  J.K.T. Mackey.

14      Q.  Detective Mackey, where are you

15  currently employed?

16      A.  Montgomery Police Department.

17      Q.  And how long have you been a

18  detective?

19      A.  Approximately one year.

20      Q.  One year.  Back in February of

21  last year, how were you employed?

22      A.  Montgomery Police Department

23  third shift officer.

24      Q.  A third shift officer.

25  Describe for the jury what that means

1    briefly.

2          A.    I work in patrol from the hours

3    of ten at night to seven in the morning.

4          Q.    So basically, not to

5    oversimplify it, but you were one of the

6    black and white's in a squad car riding

7    around patrolling the city?

8          A.    Yes.

9          Q.    And that's different from what

10    you do now as a detective?

11          A.    Yes, sir.

12          Q.    Would you consider that a

13    promotion?

14          A.    Yes, sir.

15          Q.    Now, Detective Mackey, back at

16    the time you were a patrol officer, did

17    you have an opportunity to go over to a

18    call about 11:30 in Smiley Court on

19    February 1st of last year?

20          A.    Yes, sir.

21          Q.    What was the nature of that

22    call?

23          A.    A subject being shot.

24          Q.    Now, what did you do when you

25    got over there?

1        A.    When I got there I saw the

2    subject laying down in the grass.  At

3    that time, I alerted the detectives and

4    my supervisors and security.

5        Q.    Do you know what time you

6    arrived at the scene?

7        A.    No, sir.

8        Q.    I'm going to show you what I'm

9    going to mark for identification purposes

10   only as State's 30.  I want you to take a

11   look at State's 30 for me.

12       A.    (Witness complies.)

13       Q.    Now I'm going to ask you the

14   same question again.  Do you recall what

15   time you arrived at the crime scene?

16       A.    Yes, sir.

17       Q.    What time was that?

18       A.    0156 hundred hours.

19       Q.    156 hours?

20       A.    Yes, sir.

21       Q.    So that's about 11:56?

22       A.    No.

23       Q.    What time?

24       A.    That's 1:00 in the morning.

25       Q.    Oh.  Take a look at that

1    again.

2         A.    (Witness complies.)

3         Q.    There was a hole punch right

4    there so you might want to use something

5    else for reference.

6         A.    Okay.  1345 hundred hours,

7    which is 11:45.

8         Q.    Okay.

9         A.    23 -- there's supposed to be a

10   2 there.

11        Q.    There was supposed to have been

12   a 2 there?  Now, how do you know that?

13        A.    Because based on the times that

14   the other officers arrived and I was

15   there first.

16        Q.    Okay.  Did other officers

17   arrive at the same time?

18        A.    Yes, sir.

19        Q.    And does that log show what

20   time the other officers arrived?

21        A.    Yes, sir.

22        Q.    So basically let me get this

23   straight.  Was it like two patrol units

24   arriving at the scene at basically the

25   same time?

1      A.    Basically.

2      Q.    And what time was it officially

3   that y'all --

4      A.    2345 hundred hours.

5      Q.    2345?

6      A.    Yes, sir.                    .

7      Q.    So in regular time, that's

8   11:45 p.m.?

9      A.    Yes, sir.

10      Q.    Okay.  Now this document we are

11   looking at, what is this?

12      A.    That's the -- the crime scene

13   log.

14      Q.    And what is the purpose of

15   that?

16      A.    A crime scene log is to

17   document any person that come within the

18   scene of the crime that was committed.

19      Q.    And you were one of the first

20   people listed on this log?

21      A.    Yes, sir.

22      Q.    Now when you first got there,

23   you mentioned already you saw Mr.

24   Friendly's body or what you saw to be a

25   body.  You didn't know who it was at the

1    time, right?

2        A.    Yes, sir.

3        Q.    You identified the body.  Was

4    anybody else around the body?

5        A.    Well, at the current time, it

6    was a couple of people around, but my job

7    solely was to protect the crime scene and

8    to locate witnesses.

9        Q.    How did you go about first off

10    -- let's start with securing the crime

11    scene.  Did you do that?

12        A.    Yes, sir.

13        Q.    How?

14        A.    I got tape out of the trunk of

15    my car and roped off the area, the

16    immediate area of the victim that was

17    shot.

18        Q.    Okay.  Using State's 6 as a

19    reference, do you recognize State's 6?

20        A.    Yes, sir.

21        Q.    What is that?

22        A.    That's the crime scene.

23        Q.    That's a daytime photograph?

24        A.    Yes.

25        Q.    And obviously we are talking

1          about something that happened at night?

2              A.    Yes.

3              Q.    Does that photograph show

4          everything in the same basic location it

5          was except for the cars?

6              A.    Yes, sir.

7              Q.    Now what did you consider to be

8          the crime scene out there, officer?

9              A.    The crime scene from the

10         building on the left --

11             Q.    Let me show you this little

12         gizmo right here.  If you will press this

13         button right here on the top where it

14         says laser, you can point.

15             A.    Okay.

16             Q.    Use that to indicate what you

17         identified to be the crime scene in this

18         case.

19             A.    From the building here on the

20         left to the building all the way -- it's

21         going to be all the way to the porch

22         where the front door is, back to the

23         parking lot, and there was a red truck

24         that was sitting here.  Passed the red

25         truck and back to the building.

1    Q.    Okay.  You considered all that

2    to be the crime scene that you secured?

3    A.    Yes.

4    Q.    Now once you put the crime

5    scene tape up there, what -- let's talk

6    about people first.  Were there any

7    people inside that crime scene tape?

8    A.    The medics and a couple other

9    officers were there trying to keep the

10   family members and the people from the

11   neighborhood out of the crime scene.

12   Q.    Were there any family members

13   or people from the neighborhood inside

14   that crime scene after you got it roped

15   off?

16   A.    No, sir.

17   Q.    So at that point would you

18   consider that scene secured?

19   A.    Yes, sir.

20   Q.    What happened next?

21   A.    After that, my job was totally

22   to assist the medics in what they were

23   doing while the other officers were

24   standing at the corners of the crime

25   scene to keep other individuals out and

1    to make sure the body got on to the

2    ambulance and off to the hospital in a

3    safe manner.

4            Q.    Did that occur?

5            A.    Yes, sir.

6            Q.    Did you then -- did you ever

7    search the crime scene for any physical

8    evidence?

9            A.    No, sir, I didn't.

10           Q.    That wasn't your job?

11           A.    No, sir.

12           Q.    What was your next role in

13   assisting with this investigation?

14           A.    Just to assist the detectives

15   when they came out to survey the crime

16   scene.

17           Q.    I believe a minute ago you

18   mentioned something about looking for

19   witnesses?

20           A.    Yes, sir.

21           Q.    Were you able to identify any

22   witnesses?

23           A.    One witness I was able to

24   identify, and that's the gentleman -- I

25   don't know his name.  He was called

1    Rabbit.

2         Q.   Okay.

3         A.   He was just up.

4         Q.   Did you recognize him in the

5    courtroom here today?

6         A.   Yes, sir.

7         Q.   The guy you passed coming in?

8         A.   Yes, sir.

9         Q.   You identified him as being a

10   witness?

11        A.   Yes, sir.

12        Q.   And after you've identified an

13   individual as a witness, what happens

14   then?

15        A.   He was secured in a patrol car

16   and taken to headquarters for statements.

17        Q.   What is the purpose of putting

18   the person in a patrol car?

19        A.   So he doesn't get a lot of

20   conversation from other individuals to

21   taint his story of what he saw.

22        Q.   And you, in fact, did that?

23        A.   Yes, sir.

24        Q.   Did you put him actually in

25   your patrol car?

1      A.    No.   He wasn't in my patrol

2   car.   I think it was Officer Jones who

3   put him in a car because I was doing --

4   trying to do a lot of other things at the

5   crime scene.

6      Q.    What else were you trying to do

7   at the crime scene?

8      A.    Basically, it was a crowd

9   gathering from the neighborhood and it

10  was persons in the crowd who knew the guy

11  that was shot.   So they were trying to

12  get to the body and actually see and

13  verify who it was.

14     Q.    Were they able to do that?

15     A.    No, sir.

16     Q.    You wouldn't let them inside

17  that tape?

18     A.    No, sir.

19     Q.    Do you know which detective

20  came out to the scene and then took over

21  the actual scene investigation?

22     A.    No, sir.

23     Q.    You don't recall that?

24     A.    Can't recall.   I'm sorry.

25     Q.    Did you do anything else in

1    relation to securing this crime scene or

2    collection of physical evidence or

3    identifying witnesses?

4              A.    No, sir.

5                   MR. POWELL:  Nothing further,

6    Judge.

7                   MR. HARTLEY:  I don't have any

8    questions for the witness.

9                   THE COURT:  Okay.  Step down.

10                  MR. POWELL:  The State calls

11   Johnny Osborne.

12                  JOHNNY OSBORNE,

13   having been first duly sworn, was

14   examined and testified as follows:

15                  DIRECT EXAMINATION

16   BY MR. POWELL:

17        Q.    Would you state your name for

18   the jury?

19        A.    Johnny Osborne.

20        Q.    And, Mr. Osborne, where do you

21   currently live?

22        A.    1305 Devonshire Drive.

23        Q.    Devonshire?

24        A.    Yes.

25        Q.    Do you currently have a job?

1      A.    No, sir.

2      Q.    Have you ever had a job before?

3      A.    Yes, sir.

4      Q.    What kind of stuff do you do

5 for a living?

6      A.    Well, I used to work at Sylvest

7 Processing.  It's a chicken plant over

8 there across from Smiley Court.  Also, I

9 did build houses with Faulk Construction,

10 and I worked at McLendon Furniture at one

11 point in time.

12      Q.    Now, we are here today about an

13 incident that happened over in Smiley

14 Court in February of last year.  Are you

15 familiar with the area and the incident

16 I'm referring to?

17      A.    Uh-huh (indicating yes).

18      Q.    What happened out there that

19 night?

20      A.    Well, we was -- me and my

21 brother was going to this party that my

22 cousin was having.

23      Q.    Let me stop you right there.

24 Who is your brother?

25      A.    Brian Osborne.

1    Q.    Brian Osborne?

2    A.    Yes, sir.

3    Q.    Okay.  And the cousin whose

4    party you were going to, who was that?

5    A.    His name is Christopher

6    McQueen.

7    Q.    What does he go by?

8    A.    Flip.

9    Q.    So you were going to your

10   cousin Flip's party over in Smiley Court?

11   A.    Yes, sir.

12   Q.    How did you get over there?

13   A.    Well, me and my girl at that

14   point in time was renting a car from

15   Budget Rental Company, and I drove over

16   there, me and my brother.

17   Q.    Tell the jurors what kind of

18   car it was.

19   A.    It was a Jeep Cherokee.

20   Q.    What color was it?

21   A.    It was red with a black

22   bottom.

23   Q.    And who was driving that car

24   when y'all went over there?

25   A.    I was driving.

1     Q.    Where was your brother sitting?

2     A.    Passenger side.

3     Q.    Was anybody else with you when

4     you went over there?

5     A.    No, sir.

6     Q.    Just the two of you?

7     A.    Yes, sir.

8     Q.    And you were going to your

9     cousin's birthday party?

10    A.    Yes.   We were going to the

11    party.

12    Q.    Do you remember about what time

13    you got over there?

14    A.    Well, she had to be at work at

15    10:30.  So we left our house at 10:00

16    because she wanted to get there early.

17    So after we left the Best Suites on

18    Carmichael Road where she worked at, we

19    probably got there about 10:30, 10:35.

20    Q.    You keep referring to she.  Did

21    your girlfriend go with you to the party?

22    A.    No, I dropped her off at work.

23    She had to be at work.  She was working

24    third shift or the late shift.  So I

25    dropped her -- she had to be there at

1    10:30.   I dropped her off like 10:15, and

2    I got on '85, '85 south, and came to

3    Smiley Court.

4        Q.    About what time did you and

5    your brother get to the party?

6        A.    We arrived at about 10:30,

7    10:35.

8        Q.    Now, what was going on when you

9    got over to this address over on Marlyn

10   Street?

11       A.    Well, when I got to the party,

12   he -- well, when I pulled up, I noticed

13   that it was a group of guys huddled over

14   in like in between the two buildings

15   where the party was at.  My brother asked

16   me to go to the store.  I guess he was

17   going to get some more cigars or

18   something.

19             So I stayed at the party.  I

20   got out of the truck.  I walked up to the

21   party where it was going on at my

22   cousin's house.

23       Q.    Let me stop you right there.

24   If you could press on this button.  See

25   how that works.  You can point.  Hold

1    that for me.

2              When you say you got to the

3    party and you saw a group of guys huddled

4    together in between the two buildings,

5    show the jury about where that was.

6         A.    It was about right here.

7         Q.    Okay.  Over there between those

8    two buildings?

9         A.    Yes, sir.

10         Q.    Now what did you do?

11         A.    Well, I looked over there but I

12    didn't go over there to see what they was

13    talking about because they was like

14    around each other.  So I walked on up to

15    the porch where my cousin's house was.

16         Q.    How many people were in that

17    group?

18         A.    As far as I could see it was

19    about four or five people.

20         Q.    Four or five people?

21         A.    Four or five.

22         Q.    Did you recognize any of them?

23         A.    The only person I recognized

24    was my cousin Eric Stewart.

25         Q.    Your cousin Eric Stewart?

1        A.    Yes, sir.

2        Q.    You saw him over there?

3        A.    Yes, sir.

4        Q.    What happened next?

5        A.    Well, they was arguing over --
6    I heard a lot of arguing back and forth,
7    and I went in the house where the party
8    was.  Then I came back outside.  When I
9    came back outside, I heard -- I don't
10    know which one was said -- well, who said
11    during the argument but I just heard
12    somebody say you're not going to fuck
13    with me.  Excuse me.  That's the word
14    that was said.

15        Q.    You heard somebody say that?

16        A.    Yes, sir.

17        Q.    At that point were you standing
18    on the porch?

19        A.    Yes.

20        Q.    Could you see these people or
21    could you just hear them?

22        A.    No, I didn't see them because
23    at nighttime by the building it's a
24    shadow of a building, and they was like
25    back up in the building -- back up in the

1    cut, so I couldn't see who said it or who

2    was talking at the time.

3         Q.   So you -- at that point, once

4    you went in and came back out, you didn't

5    even know where they were standing?

6         A.   I still see them standing over

7    there.

8         Q.   Okay.

9         A.   But they was like just huddled

10   up talking.

11        Q.   Just still in between the two

12   buildings?

13        A.   Yes, sir.

14        Q.   What did you do next?

15        A.   Well, I was waiting on my

16   brother to come back.  So I went back

17   inside.  Then I came -- came back outside

18   because they was like getting louder and

19   louder.  So I came back inside because

20   the party wasn't doing anything really.

21   Everybody was like -- had already been

22   there and drunk up all the beer and

23   whatever.  So I just came back outside

24   waiting on my brother.  That's when

25   the --

1        Q.    Now when you say this argument

2    that you are hearing bits and pieces of

3    getting louder and louder, can you hear

4    anything of what they are saying?

5        A.    No more than about what -- it

6    was about who did this, who did that, who

7    -- it was about who was the bad -- what

8    I heard was about who was the baddest

9    gang banger, I guess.

10        Q.    That's what you heard?

11        A.    What I heard.

12        Q.    That's what the two were

13    arguing about?

14        A.    Yes, sir.

15        Q.    Now what happened when you came

16    back out on the porch the second time

17    waiting on your brother?

18        A.    Well, I stayed out there about

19    two minutes and then by that time he came

20    around the corner.  So when he came

21    around the corner, as I was walking out

22    to the parking lot, he backed up into the

23    parking lot.  When he backed up, I came

24    to the driver's side.  I told him I'm

25    about to leave.  So if you are going with

1    me, let's go, because they are out there

2    bickering and battering back and forth

3    with each other.  So I'm about to leave.

4         Q.    Now when you are getting in the

5    Jeep, show me on that picture about where

6    the Jeep pulled in.

7         A.    The Jeep pulled in right where

8    this car is at.

9         Q.    Right where this car was?

10        A.    Yeah.

11        Q.    Now, I'm going to show you what

12   has been marked as State's 5.  Do you

13   recognize that picture?  It isn't much of

14   a picture.

15        A.    Yes.  That's the vehicle I was

16   driving.

17        Q.    Is that the position it was in

18   after -- where y'all left it that night?

19   This is a picture of the Jeep at the

20   scene.

21        A.    I can't tell if the picture was

22   taken from the back or if that's the

23   position because he backed back into the

24   parking lot.  He didn't pull up in

25   there.  He backed into the parking lot.

1      Q.   I think for reference purposes,

2   let's go back to State's 6.  So if the

3   car was here where that Camaro is in the

4   picture, it would have been backed in

5   there?

6      A.   Yes, sir.

7      Q.   What did you do once he got

8   there and backed the car up?

9      A.   I told him I was going to leave

10  because something was about to escalate

11  because -- they was like really at each

12  other.  So I told him to get out of the

13  driver's side and let me drive because I

14  had a license to drive.  So he walked

15  around the car.  He walked around the

16  front and I got in the passenger -- in

17  the driver's side.  As soon as I got

18  ready to drive off, I heard gunshots and

19  the windows in the car -- in the truck

20  started shattering.

21     Q.   What did you do?

22     A.   I just stopped and ducked.

23     Q.   Did you see anything about

24  where the gunshots were coming from?

25     A.   No.

1       Q.   Did you see anything -- did

2   they sound like they were coming in front

3   of you, behind you or what?

4       A.   It sound like it hit me in the

5   back but it most definitely came through

6   the back because the back window was shot

7   out first.

8       Q.   The back window was shot out

9   first?

10       A.   Yes.

11       Q.   And it sounded to you like the

12   gunshots were coming from behind you?

13       A.   Yes, sir.

14       Q.   And what had you seen earlier

15   about what was going on behind your truck

16   or that Jeep?

17       A.   I saw all of them still

18   standing up there.

19       Q.   Arguing?

20       A.   Yeah.

21       Q.   And the one you recognized was

22   who?

23       A.   The only person I recognized

24   there was my cousin, Eric.

25       Q.   Okay.  Now what happened after

1    these shots busted out your window of the

2    Jeep?

3         A.   Well, after the shots were

4    fired, after the windows shattered, some

5    more shots were fired.  About three more

6    rounds were fired.  Then we got out of

7    the truck.  When we got out of the truck,

8    we saw Boo laying on the ground and Eric

9    was on top of him.

10        Q.   Now do you know who Boo is?

11        A.   Yeah, I know Boo.

12        Q.   How do you know Boo?

13        A.   Me and him growed up when we

14   were staying on Huntley Drive in

15   Ridgecrest.  Me and him and my brother,

16   we growed up together.  We used to play

17   together.

18        Q.   Did you see anybody else other

19   than just Rabbit and Boo?

20        A.   Other than Rabbit and Boo, no,

21   because my cousin who was having the

22   party, he was passed out.  So anybody

23   else, I didn't see.  I didn't see them up

24   close enough to see who was there.

25        Q.   Did you see anybody running or

1    anything like that?

2         A.    No, I didn't see anybody

3    running. The only person I seen, it was

4    -- the other two people had to run

5    because, you know, it wasn't nobody there

6    but Rabbit and Boo, and Boo was laying on

7    the ground and Rabbit was on top of him.

8         Q.    Now Boo was laying on the

9    ground and Rabbit was on top of him.

10   What happened next?

11        A.    Nothing. We was like shouting

12   out call the police, call the paramedics,

13   you know. That's about it.

14        Q.    Did the police and the

15   paramedics eventually show up?

16        A.    About thirty-five, forty

17   minutes later, the paramedics did, but

18   the police came on.

19        Q.    The police were there first?

20        A.    Yeah. The police arrived

21   first.

22        Q.    Now when you say the paramedics

23   are you talking about the firemen around

24   there or the ambulance?

25        A.    Well, I say the paramedics.

1    They came like simultaneously.  The
2    paramedics came up.  Then like a few
3    minutes later the paramedics -- the
4    ambulance came up.
5         Q.    Now, after the ambulance --
6    they took Boo away.  Back to the hospital
7    is where they took him; is that right?
8         A.    I don't know.  They -- it was a
9    minute before they picked him up off the
10   ground and everything.  They was like
11   trying to see if they could save him, I
12   guess, but they didn't immediately pick
13   him up and take him on.
14        Q.    While he was there for that
15   time y'all were waiting on the paramedics
16   and the ambulance, was he talking, was he
17   conscious?
18        A.    Well, the only thing I heard
19   him say was do something -- was help him.
20   That's all I heard him saying was help
21   me.
22        Q.    Just asking for help?
23        A.    Yes.
24        Q.    Did you see anything else going
25   on that night once the paramedics and

1    everybody came?

2         A.   No.  It just that -- his

3    brother and them -- all they came on.

4    The family came on.  That was about it.

5    They was like in a big rage because the

6    ambulance took so long to come.  It took

7    so long to attend to him and leave, take

8    him away from the crime scene.

9         MR. POWELL:  I don't think I

10   have anything further, Judge.

11        THE COURT:  Wiley.

12        CROSS-EXAMINATION

13   BY MR. HARTLEY:

14        Q.   Mr. Osborne, did you recognize

15   or know some other people that were out

16   there that night besides just Eric

17   Stewart?

18        A.   Well, the only other people I

19   knew that was there were in the house.

20        Q.   All right.  Let me just name a

21   couple people and see if you can tell me

22   if they were there or not.  Are you

23   familiar with Bryant Thomas?

24        A.   Bryant Thomas.  B.T.?

25        Q.   That may be his nickname, B.T.

1        A.    Yeah, I am familiar with him.

2        Q.    Did you see him there that

3    night?

4        A.    No.

5        Q.    Could he have been there

6    earlier or later?

7        A.    He could have because my cousin

8    said that it was some people there at the

9    party but they had left.

10        Q.    Okay.  How about Darryl Foggy,

11    do you know Darryl Foggy?

12        A.    He was inside the house.

13        Q.    He was outside some, too,

14    wasn't he?

15        A.    When I got there, he was inside

16    the house.  He only came out after all

17    the shooting.

18        Q.    How about -- let me see if

19    there was anybody else.  Was there

20    anybody else there that you know of that

21    saw this matter that could have been an

22    eye witness to it?

23        A.    The only person that I know

24    that saw it was Eric Stewart.

25        Q.    Okay.  Let me go back to the

1       matter of what you could see from

2       wherever you were.  You parked your

3       vehicle right here, right?

4            A.    Yes, sir.

5            Q.    Then your brother left in the

6       vehicle and returned not too much later,

7       I guess, right?  He wasn't gone long?

8            A.    He probably was gone about ten

9       minutes.

10           Q.    Back then to this position?

11           A.    Yes, sir.

12           Q.    But you said there was

13      something going on over on this side,

14      right?

15           A.    Yes, sir.

16           Q.    Now you have also emphasized, I

17      think, how dark it was out there.

18           A.    Yes, it was dark.

19           Q.    Like there wasn't -- like

20      whatever lights on the front side of the

21      building wasn't carrying to the back?

22           A.    No, sir.

23           Q.    You even mentioned a shadow.

24           A.    A shadow because across the

25      street from the building right there that

1    you just pointed at, it's a -- like a

2    street light.  So that what made the

3    shadow of the building.

4         Q.    So whatever street light you

5    were referring to was not illuminating or

6    was not lighting up the area right there?

7         A.    No.

8         Q.    And you couldn't see anybody

9    back there, right?

10        A.    No.

11        Q.    Could you tell if they were

12   back there using dope or not?

13        A.    Excuse me?

14        Q.    Could you tell if they were

15   back there doing a dope deal or anything?

16        A.    No.  I don't believe it was a

17   dope deal because they were arguing.

18        Q.    Well, I mean using dope.  Not

19   transacting dope, using dope.

20        A.    Okay.  Well, I don't know if

21   they were using or not because I didn't

22   -- when I got out of the truck, I

23   noticed them over there and, you know, it

24   wasn't my business what they was doing so

25   I just went on to the party.  So I didn't

1    go over there and see what was going on.

2         Q.    Do you know your cousin Eric to

3    use dope?

4         A.    Yes.

5         Q.    But when you looked up within a

6    matter of seconds -- let's say, there

7    were only two people there at the scene

8    at that time.  Are you saying Eric

9    Stewart was still there?

10         A.    At the scene when he got shot

11    or the scene when I got there?

12         Q.    I'm sorry.  This is all at the

13    point right after you got out of the

14    vehicle after your vehicle was hit by a

15    bullet.

16         A.    Okay.  When I got hit, yes.

17    There was nobody there but Eric Stewart

18    and Boo's body was laying on the ground.

19         Q.    So that means that at least two

20    or three people had left because you said

21    there were four or five to start with,

22    right?

23         A.    Yes.

24         Q.    So there had to be other

25    persons there besides Eric and Boo.

1      There had to be at least two more, didn't
2      there?
3          A.    Yes.
4          Q.    Could have been three more?
5          A.    Could have been.
6          Q.    A greater number than that?
7      You think it could have been six?
8          A.    No.
9          Q.    So two or three people left
10     that scene in those few seconds, right?
11         A.    Yes, sir.
12             MR. HARTLEY:    Thank you.    No
13     further questions.
14             REDIRECT-EXAMINATION
15     BY MR. POWELL:
16         Q.    One of those other three, two
17     or three people, however many there were,
18     one of those was not Darryl Foggy, was
19     it?
20         A.    When I got there, he was inside
21     the house.
22         Q.    And at any point did you ever
23     see him come out of the house before the
24     shooting?
25         A.    No.

1    Q.    When is the next time you saw

2    him?

3    A.    The next time I seen him he was

4    coming outside after I had came on the

5    porch.  When my brother was coming, he

6    came outside.

7    Q.    Okay.

8    A.    He was still on the porch when

9    they were shooting.

10    Q.    And you saw him on the porch?

11    A.    Yeah, because I had looked

12    back.  He asked me was I fixing to go to

13    the store.  I said B.K. had already came

14    -- B.K. was my brother.  That's what we

15    call him.  I said he already went to the

16    store, and I was going on to the truck to

17    leave.

18    Q.    And that's the last time you

19    saw Darryl Foggy?

20    A.    Yes.

21    Q.    He wasn't over there with all

22    the other people gathered around?

23    A.    No, because when I got there he

24    was inside the house.

25    Q.    Now when you went over to where

1    Boo's body was and where your cousin was,

2    where were they laying?

3         A.    (Witness indicating).   About

4    right there.

5         Q.    Okay.   About right there.   And

6    was Darryl Foggy over in that area?

7         A.    Well, after he had got shot,

8    everybody in the party, who was left at

9    the party, they came outside.

10        Q.    Outside.

11        A.    We got out of the truck and we

12   walked back up there.

13        Q.    Now, what was your brother's

14   name again?

15        A.    Brian.

16        Q.    And they call him B.K.?

17        A.    Yes, sir.

18        Q.    Why do they call him that?

19        A.    Because his name is Brian.

20   Well, they call him Brian Keith but they

21   just shorten it to B.K.

22        Q.    Brian Keith.

23             MR. POWELL:   Nothing further,

24   Judge.

25             MR. HARTLEY:   Nothing further.

1          THE COURT:  Thank you.  You can

2     step down.

3               (Off-the-Record Discussion.)

4               MR. POWELL:  The State calls

5     Detective C.J. Grandison.

6                    C.J. GRANDISON,

7     having been first duly sworn, was

8     examined and testified as follows:

9               DIRECT EXAMINATION

10    BY MR. POWELL:

11         Q.    Would you state your name for

12    the jury?

13         A.    Detective C.J. Grandison.

14         Q.    How are you employed?

15         A.    Montgomery Police Department,

16    detective division property bureau.

17         Q.    Now back on February 1st of

18    2002, what were you doing with the

19    department?

20         A.    I was working as a late car

21    detective.

22         Q.    Now describe for the jury what

23    that means that you were a late car

24    detective?

25         A.    It is actually, basically, a

1    detective working third shift hours and

2    responding to initial calls, any initial

3    calls due to work -- doing shifts at

4    night.

5         Q.    Now, Detective, you mentioned

6    you were specifically with the property

7    bureau; is that right?

8         A.    Yes.

9         Q.    How is the detective division

10   within the Police Department, how is it

11   divided up?

12        A.    Persons and property.  Persons,

13   investigate crimes against persons.

14        Q.    For example, like a homicide?

15        A.    Yes.  Or robberies.

16        Q.    And property, you don't

17   normally investigate that?

18        A.    No, not normally.

19        Q.    How did you end up being the

20   one called out to a homicide scene?

21        A.    Due to the skeleton shift, the

22   only -- it was myself, Detective Haynie

23   and our supervisor, Sergeant Howton --

24   I'm sorry.  Sergeant -- I can't even

25   remember his name.  He is on military

1    op.

2        Q.    Martino?

3        A.    No, not Martino.  Hoffman.  We

4    were working that night and we responded

5    to the call on Marilyn.

6        Q.    Do you remember approximately

7    what time that call came in?

8        A.    I don't recall.  I believe it

9    was like 1:30.

10        Q.    Let me show you.  Before you

11    guess, let me show you a police

12    supplement written by your late car

13    partner, Detective Haynie.  Take a look

14    at that.

15        A.    Okay.  Approximately 11:50 p.m.

16        Q.    11:50 p.m. is when y'all

17    responded to the scene?

18        A.    Yes.

19        Q.    Now what was going on when you

20    arrived at the scene?

21        A.    When we arrived, as I recall,

22    the victim was not present there.  We

23    located a vehicle that had gunshot or

24    holes in the vehicle.  I believe it was

25    -- I recall as being an SUV.  I had a

1    camera with me at the time.  I took

2    pictures of that and we located shell

3    casings, and I collected three shell

4    casings, as I recall.

5         Q.    What kind of camera did you

6    have with you?

7         A.    It was a digital -- Olympic

8    digital camera.

9         Q.    Was it department issue?

10        A.    Yes.

11        Q.    Do late car detectives

12   routinely carry those cameras with them?

13        A.    Yes, sir.

14        Q.    And you actually took some

15   photographs?

16        A.    Yes, I did.

17        Q.    I'm going to show you State's

18   1, 2, 3, 4 and 5 and ask you to look

19   through there.  I'm going to ask you some

20   questions.

21        A.    Okay.  Yeah, these appear to be

22   the photographs that I took.

23        Q.    These are the actual

24   photographs?

25        A.    Yes, sir.

1          Q.    And do they fairly and

2     accurately depict the scene as it was on

3     the night you snapped the pictures?

4          A.    Yes, sir.

5                MR. POWELL:  We offer State's 1

6     through 5, Judge.

7                MR. HARTLEY:  These are just

8     pictures of the shell casings?

9                MR. POWELL:  And the car and

10    the scene.

11               MR. POWELL:  We offer States's

12    1 through 5, Your Honor.

13               THE COURT:  Admitted.

14               (State's Exhibit Numbers 1

15    through 5 admitted into evidence.)

16         Q.    Now, Detective, before we go

17    any further, I want to also show you

18    State's 27 and 27-A.  It is a crime scene

19    diagram prepared by Detective Howton.

20    Take a second and look at that.

21               Now, does 27 and 27-A depict

22    the scene as you remember it?

23         A.    Yes.

24         Q.    Now, Detective, before we go

25    off on the pictures, tell me again what

1    was going on when you first got to the

2    crime scene.

3        A.    When I first got there, like I

4    said, the victim wasn't there and we

5    located some evidence.  I think some

6    witnesses were located as well.  We just

7    basically got information while at the

8    scene.  And once everything was

9    collected, we got in route to the ER to

10   check on the victim's condition.

11       Q.    All right.  Now, did you locate

12   any witnesses at the scene?

13       A.    I, myself, didn't get involved

14   with any witnesses.  I believe Detective

15   Haynie located a witness or two.

16       Q.    Now what was your primary

17   function while you were at the scene

18   itself?

19       A.    Just taking the pictures and

20   collecting the evidence.

21       Q.    So would it be fair to say that

22   your prime responsibility was location of

23   the physical evidence that was there

24   between those two apartment buildings?

25       A.    Yes, sir.

1          Q.    And what was it again that you
2     found?
3          A.    Three shell casings and the
4     vehicle that was shot up.
5          Q.    Anything else?
6          A.    Not to my knowledge.
7          Q.    Let's start off with State's
8     1.  That photograph is a little hard to
9     see.  What is that?
10         A.    That is an apartment and --
11    well, the scene basically just taped off.
12         Q.    From the yellow line there in
13    front of it?
14         A.    Yes.  From the yellow line,
15    other side of the yellow line.
16         Q.    Crime scene tape?
17         A.    Yes.
18         Q.    About where were you standing
19    when that picture was taken?
20         A.    On the other side of the yellow
21    line.  I can't recall how far.
22         Q.    I'm going to jump to State's
23    5.  What is this a photograph of?
24         A.    That was the vehicle that was
25    -- that had bullet holes in it.

1      Q.   Do you remember, Detective,
2   where were the bullet holes?
3      A.   I recall the rear window or the
4   cab window being shot.  It didn't really
5   take a very good picture because of the
6   lighting.
7      Q.   Use this point right here.
8   Maybe you can do a little better.
9      A.   Well, I'm sure it was going to
10  be on this side if -- yeah, this area
11  right here.
12     Q.   That back window was shot out?
13     A.   Yes, as I recall.  And I just
14  can't remember any other holes that were
15  in the vehicle.
16     Q.   Now, is the darkness of these
17  photographs, is that -- is that the way
18  it looked that night or is something
19  wrong with the camera?
20     A.   Nothing was wrong with the
21  camera, just the lighting.  It just
22  didn't take a very good picture.
23     Q.   Because the way the camera did
24  the lights out there?
25     A.   Yes, sir.

1           MR. HARTLEY:  Objection, Your

2    Honor.  I think that calls for an opinion

3    by the officer.

4           THE COURT:  I'll overrule it.

5       Q.   Now, Officer, if you were

6    standing there looking at the Jeep, would

7    it look like that?

8           MR. HARTLEY:  Objection, Your

9    Honor.  The picture speaks for itself.

10   They offered the picture.  Now he is

11   criticizing his own picture.

12          MR. POWELL:  I think I'm

13   entitled, Judge.

14          THE COURT:  What are you

15   asking?

16          MR. POWELL:  I'm asking how it

17   looked to him while he was actually there

18   present standing there looking at the

19   Jeep.

20          MR. HARTLEY:  Judge, I object.

21   I don't think that's a question for which

22   a person -- any person can say how does

23   something look through my eyes as opposed

24   to what this picture represents, Judge.

25   That's some subjective analysis or

1    something.

2              THE COURT:   Overruled.

3        Q.    Okay.   Now, Detective, you were

4    physically there at the scene, were you

5    not?

6        A.    Yes, sir.

7        Q.    And you stood there in that

8    parking lot that night and looked at that

9    Jeep, did you not?

10       A.    Yes, sir.

11       Q.    Could you see it?

12       A.    Yes, sir.   I'm sure if

13   -- before I took the picture, what I saw

14   -- I thought the picture would capture

15   whatever I saw, but apparently it

16   didn't.   I thought I was a close enough

17   distance but maybe I should have stood a

18   little closer.

19       Q.    Now, let's just go through

20   these shell casings.   Now, Detective, I'm

21   going to show you what I have just marked

22   as State's 2-A.   I'm going to ask you to

23   take a look at that for me.   What is on

24   State's 2-A?

25       A.    This photograph shows a shell

1    casing.

2    Q.    Are those the three photographs

3    of the shell casings you took?

4    A.    Yes.

5    Q.    What have already been admitted

6    as State's 2, 3 and 4?

7    A.    Yes, sir.

8    Q.    Are there any lines or anything

9    going from those photographs?

10    A.    Any lines, yes.

11    Q.    What do those indicate?

12    A.    The distance in which they were

13    -- this is -- the circle is where

14    -- the general area where they were

15    located.

16    Q.    The general area?

17    A.    Yes.

18    Q.    So based on those series of

19    circles narrative does this fairly and

20    accurately demonstrate the location of

21    the shell casings you took that night?

22    A.    Yes, sir.

23    MR. POWELL:    We offer State's

24    2-A, Your Honor.

25    THE COURT:    It is admitted.

1              (State's Exhibit Number 2-A

2       admitted into evidence.)

3              Q.    Detective, just -- this is the

4       crime scene diagram that I had you

5       identify a minute ago.

6              A.    Yes.

7              Q.    Take this pointer here and

8       identify for us the apartment complex?

9              A.    This is the apartment complex,

10      and the rounds were located between this

11      apartment complex in 406 and 407.

12             Q.    In between those two buildings?

13             A.    Yes, sir.

14             Q.    And the two big blocks indicate

15      the buildings?

16             A.    Yes, sir.

17             Q.    Now, do you specifically recall

18      where inside that circle you picked up

19      those shell casings?

20             A.    No, sir, not -- you mean -- not

21      the exact location.

22             Q.    But just the general vicinity

23      where all three of those casings came

24      from?

25             A.    Yes, sir.

1          Q.    I believe the casings
2    themselves are circled in the smaller
3    picture?
4          A.    Yes, sir.
5          Q.    Now, these are going to
6    enlargements of these photographs,
7    State's 2.  Can you indicate to the jury
8    where that shell casing is in that
9    photograph?
10          A.    Yes.  Right here.
11          Q.    That metal object?
12          A.    Yes.
13          Q.    And going to State's 3, an
14    enlargement of another one of those
15    photographs.
16          A.    This area right here.
17          Q.    That's the casing?
18          A.    Yes, sir.
19          Q.    And finally, State's 4.  If you
20    would please indicate for the jurors
21    where that shell casing is located?
22          A.    It is located --
23          Q.    Do you need to look at the
24    picture up close?
25          A.    Yes, sir.  I can't find it.

1        Q.    They are hard to see, are they

2    not?

3        A.    Yes.  Because of the grass.

4        Q.    Okay.  If you would take this

5    pen and circle on that, as best you can,

6    that casing.

7        A.    Is it making a mark?  Well, I

8    see where it is --

9        Q.    It didn't do very good, did

10    it?  Let's try that one.  Okay.  State's

11    4, indicate for the jurors where you

12    located that casing in that photograph.

13        A.    Right here.

14        Q.    Now after you located these

15    three casings -- were you able to find

16    anymore first off?

17        A.    No, sir.

18        Q.    Those were the only three you

19    were able to locate?

20        A.    Yes, sir.

21        Q.    How good did you look through

22    all that grass there?

23        A.    We looked pretty good.  It was

24    kind of hard to see because, like I said,

25    the lighting.  We did like a grid search

1    but those were the only ones we could

2    find.

3        Q.    Explain to the jury what a grid

4    search consists of.

5        A.    Just basically covering one

6    section or diameter and going back and

7    forth through the whole scene.

8        Q.    Did you actually pick up those

9    shell casings?

10        A.    Yes, after I photographed them.

11        Q.    How did you do that?

12        A.    How did I pick them up?

13        Q.    Yes.

14        A.    I put on my gloves and picked

15    them up and put them in a brown paper

16    bag.

17        Q.    And then once you had them in

18    the brown paper bag, what happens to them

19    next?

20        A.    I took them to the -- back to

21    police headquarters and impound them.

22        Q.    Once they are impounded at

23    police headquarters, what happens to them

24    next?

25        A.    They are -- I believe they are

1    sent off to forensics.  I'm not exactly

2    sure because I don't work those type

3    cases.

4         Q.   Once you impounded them into

5    evidence, did you have any other contact

6    with the physical evidence in this case?

7         A.   I didn't have anything else to

8    do with it after that.

9         Q.   So basically your main function

10   was to search this scene for whatever

11   physical evidence was out there in that

12   cut?

13        A.   Yes, sir.

14        Q.   And that was basically the Jeep

15   and those three casings?

16        A.   Yes, sir.

17             MR. POWELL:  Nothing further,

18   Judge.

19             MR. HARTLEY:  I don't have any

20   questions for this witness, Judge.

21             THE COURT:  Okay.  Thank you,

22   Detective.

23             MR. POWELL:  Your Honor, the

24   State calls Brian Osborne.

25             THE COURT:  Just for planning

1        purposes, how long are you going to be?

2                MR. POWELL:  If we call Brian

3        Osborne, Judge, he is our other eye

4        witness.

5                (Off-the-Record Discussion.)

6                THE COURT:  Ladies and

7        gentlemen of the jury, we have got one

8        more witness.  We can put him on and be

9        out of here at 5:00 or we can just come

10       back and start in the morning.  I will do

11       whatever y'all want to do.  I don't want

12       to inconvenience y'all.  Can y'all hang

13       with us through one more witness if we

14       take about a five minute break?  Let's

15       take a five minute break.  Be back here

16       at 4:20 and we will finish that one

17       witness and adjourn for the day.

18               (The jury leaves the

19       courtroom.)

20               (Brief Recess.)

21               (The following proceedings were

22       held in the presence of the jury.)

23               BRIAN OSBORNE,

24       having been first duly sworn, was

25       examined and testified as follows:

```
 1              DIRECT EXAMINATION
 2    BY MR. POWELL:
 3         Q.    Okay.  Now can you tell the
 4    jury what is your name?
 5         A.    Brian Osborne.
 6         Q.    What is your middle name?
 7         A.    Brian Keith Osborne.
 8         Q.    Do some people call you B.K.?
 9         A.    Yes, sir.
10         Q.    Because it's Brian Keith?
11         A.    Yes, sir.
12         Q.    Who is your brother?
13         A.    Johnny Osborne.
14         Q.    The fella we just saw?
15         A.    Yes, sir.
16         Q.    Now, where do you live?
17         A.    1395 Devonshire Drive.
18         Q.    Do you still live on Devonshire
19    with your folks?
20         A.    Yes.
21         Q.    Do you work or go to school or
22    anything?
23         A.    No, sir.
24         Q.    Now, what were you doing back
25    in February of last year, Mr. Osborne?
```

1          A.    What do you mean what I was

2     doing?

3          Q.    February the 1st, do you

4     remember anything that occurred over in

5     Smiley Court?

6          A.    Yeah.  A dude got killed.

7          Q.    A dude got killed.  Were you

8     over there?

9          A.    Yes, sir.

10         Q.    Now describe for the jurors how

11     you got over to Smiley Court where the

12     dude got killed.

13         A.    Well, I was riding with my

14     brother in a red Jeep.  We had to

15     -- first we had to take his wife -- his

16     girlfriend to work.  Then we were headed

17     to go to my cousin's party.  So when we

18     dropped her off, we headed to the party

19     to Smiley Court.  By the time we got

20     there, the party was over with, you know

21     what I'm saying.  But when we got there,

22     there was my cousin Eric -- him and Boo

23     was outside, you know what I'm saying.

24             So Eric and Boo came to the

25     truck and spoke to me, you know what I'm

CR-02-2104
Part 3 of 5

**DOCUMENT NAME:** Joyce, Darryl Jevon

**CLIENT & MATTER:** 58199-001

**DESCRIPTION:**

County: Montgomery                          LWOP

CC#s: 2002-1417

Attorney: Jean Therkelsen

Circle:  (TRANSCRIPT)    CASE FILE    BOTH

3 volumes

## CERTIFICATION

I hereby certify that the preceding imaged records and documents

are a true, accurate, and complete image of the original records or

documents as received by the Office of the Attorney General of

the State of Alabama.

This the 10th day of January, 200 5.

Signed: _Melisa C. Martin_

Notary: _Coleen F Gibson_

Coleen F. Gibson
Notary Public
Commission expires 06/11/06