B VOL 3 of 5

COURT OF CRIMINAL APPEALS NO. CR-02-2104

# APPEAL TO ALABAMA COURT OF CRIMINAL APPEALS

FROM

CIRCUIT COURT OF ___MONTGOMERY___ COUNTY, ALABAMA

CIRCUIT COURT NO. ___CC 2002-1417___

CIRCUIT JUDGE ___HOBBS___

Type of Conviction / Order Appealed From: ___INTENTIONAL MURDER___

Sentence Imposed: ___LIFE WITHOUT PAROLE___

Defendant Indigent: ■ YES ☐ NO

DARRYL JEVON JOYCE
NAME OF APPELLANT

AIMEE C. SMITH          (334) 264-6466
(Appellant's Attorney)          (Telephone No.)
640 S. MCDONOUGH STREET
(Address)
MONTGOMERY          AL          36104
(City)          (State)          (Zip Code)

V.

___STATE OF ALABAMA___

(State represented by Attorney General)
NOTE: If municipal appeal, indicate above, and enter
name and address of municipal attorney below.

NAME OF APPELLEE

_____

_____

(For Court of Criminal Appeals Use Only)

Part 5 of 5

EXHIBIT
A

1    bullet.

2         Q.   So it went from looking -- if I

3    am looking at this right, it went from left

4    to right?

5         A.   Yes, sir.

6         Q.   And the entry of that bullet

7    would have been approximately in the

8    individual's side about where I'm pointing?

9         A.   Yes, sir.

10         Q.   Now, this wound, next wound that

11    is circled, I believe you marked as wound

12    number two; is that correct?

13         A.   That's correct.

14         Q.   What is this a photograph of?

15         A.   This is a photograph of an

16    entrance wound on the left buttock and

17    there is a little ruler underneath it.   It

18    has got that rim of -- it has got that

19    round circular entrance wound

20    characteristic.

21         Q.   Doctor, I believe it is real

22    faint, but toward the top can you see wound

23    one as well?

24         A.   Toward the top, there is also,

25    yes, wound one.

1          Q.    So these are on the same side of
2     the body?
3          A.    Yes, sir.
4          Q.    That's another characteristic of
5     an entrance wound?
6          A.    Yes.
7          Q.    Now, again, another diagram has
8     come up showing the rear of the individual
9     with an arrow going across.  Did you
10    prepare that diagram as well?
11         A.    Yes, I did, sir.
12         Q.    And what does the green arrow
13    indicate?
14         A.    The direction of the bullet.
15         Q.    Now, Doctor, did -- was there an
16    exit wound that corresponded to this
17    injury?
18         A.    This bullet entered in the left
19    buttock, traveled through the pelvis and
20    then it stopped in the right hip.  The
21    bullet stopped there in the right hip and
22    that's where we recovered it from.
23         Q.    So you were able to recover this
24    projectile?
25         A.    Yes, sir.

1          Q.    Now what is that a photograph of?

2          A.    That's the projectile I

3     recovered.

4          Q.    Also we have got a larger

5     photograph admitted as State's 31.  Do you

6     recognize that?

7          A.    Yes, sir.

8          Q.    This is the actual physical

9     bullet you took out of the victim?

10         A.    Yes, sir.

11         Q.    Now, Doctor, let's talk about the

12    final wound, number three.  What is that a

13    photograph of that just appeared?

14         A.    That's a photograph of an

15    entrance gunshot wound in the left thigh.

16         Q.    And the blue circle in the

17    photograph that just appeared?

18         A.    Of an exit gunshot wound in

19    the --

20         Q.    So we have a matching entrance

21    and exit wound?

22         A.    Yes.  The bullet simply went

23    through the left thigh.

24         Q.    Again, we have a diagram of an

25    arrow.  You prepared that diagram?

1            A.    Yes, sir.

2            Q.    And what does the green arrow

3       indicate?

4            A.    The direction of the bullet.

5            Q.    Now, Doctor, the angles are a

6       little bit confusing from time to time.  So

7       is this a diagram of all three entrance

8       wounds?

9            A.    Yes, sir.

10           Q.    And what do the green arrows

11      indicate?

12           A.    They indicate the direction of

13      the path of the bullet through the body.

14           Q.    So he was all shot in the same

15      direction from the same side based on a

16      medical examination of the entrance wounds?

17           A.    Yes, sir.

18           Q.    And the photograph that just

19      appeared, what is that a photograph of?

20           A.    It shows the side of his body and

21      the three entrance gunshot wounds.

22           Q.    Now, Doctor, were you able to

23      determine a cause of death for James

24      Friendly?

25           A.    Yes, sir.

1          Q.    What?

2          A.    Multiple gunshot wounds.

3                MR. POWELL:  I believe that's all

4    the questions I have for the doctor,

5    Judge.

6                MR. HARTLEY:  No cross

7    examination.

8                THE COURT:  Okay.  Thank you,

9    Doctor.

10               MR. POWELL:  Your Honor, I

11   believe the State is going to call Nicole

12   Judkins to the stand.

13               NICOLE JUDKINS,

14   having been first duly sworn, was examined

15   and testified as follows:

16               DIRECT EXAMINATION

17   BY MR. POWELL:

18         Q.    Could you state your name for the

19   jury?

20         A.    Nicole Judkins.

21         Q.    Nicole, I'm going to need you to

22   speak up a little bit for me.  Okay?

23         A.    Okay.

24         Q.    Back in February of 2002, about

25   the 1st, were you hosting a birthday party?

1          A.    Yes.

2          Q.    Over at your house?

3          A.    Yes.

4          Q.    Where were you living at the

5     time?

6          A.    Smiley Court.

7          Q.    Over in Smiley Court?  I'm going

8     to show you State's 11.  Do you recognize

9     that?

10         A.    Yes.

11         Q.    Is that your apartment over at

12    Smiley Court?

13         A.    Yes, sir.

14         Q.    And just for the Record, is

15    Smiley Court the area where you were living

16    when all this occurred?  Is that here in

17    Montgomery County?

18         A.    Yes.

19         Q.    State's 12, is this a closeup

20    photograph of the apartment where you were

21    living?

22         A.    Yes.

23         Q.    And you were having a birthday

24    party at that apartment for who?

25         A.    For my boyfriend.

1          Q.    What was his name?

2          A.    Christopher McQueen.

3          Q.    Some people call him Flip?

4          A.    Yes.

5          Q.    So it was Flip's birthday.  About

6     how many -- you don't have to know the

7     exact number.  About how many people were

8     over at your house that day -- that night

9     for the party?  Can you even say?

10         A.    I don't know.  It was so many.

11         Q.    A lot?  Like more than thirty?

12         A.    Not that much.

13         Q.    Not that much.  But a lot of

14    people?

15         A.    Yeah.

16         Q.    And a lot of coming and going?

17         A.    Yeah.

18         Q.    Did you ever see the defendant at

19    that party?

20         A.    No.

21         Q.    You never saw him over there.

22    Did you ever see an individual name Boo or

23    James Friendly at that party?

24         A.    Boo was not at the party.  He was

25    outside.

1    Q.    He was outside?

2    A.    Yeah.

3    Q.    Did you ever see an individual

4    named Darryl Foggy at the party?

5    A.    Yes.

6    Q.    Okay.  He was there.

7    A.    Yes.

8    Q.    Now, were you outside when the

9    shooting occurred?

10    A.    No.

11    Q.    You weren't.  How did you know

12    about it?

13    A.    I heard the gunshots.

14    Q.    You heard the gunshots.  Do you

15    have any idea where Darryl Foggy was when

16    the shooting occurred?

17    A.    He was in my house then.

18    Q.    You saw him in your house

19    somewhere around the time the shooting

20    occurred?

21    A.    Yes.

22    Q.    Do you know where Darryl Joyce

23    was when the shooting occurred?

24    A.    When I came out the door, he was

25    leaving.

1        Q.   He was leaving.  Describe for the
2    jury how he was leaving.
3        A.   In a blue truck or a blue
4    sidekick, something.
5        Q.   You saw him in a blue truck
6    leaving the scene?
7        A.   Yes.
8        Q.   Where was that blue truck?  Which
9    side of your apartment was it on?
10        A.   It was in the parking lot.
11        Q.   In the parking lot.  Okay.  Now
12    did you ever see James Friendly again at
13    that party?
14        A.   Yes.
15        Q.   Where was Boo?
16        A.   He was laying on the ground.
17        Q.   Was he shot?
18        A.   Yes.
19        Q.   Okay.  Now, when you saw Darryl
20    Foggy at this party, did you -- you did see
21    him with a gun, didn't you?
22        A.   I seen the gun in his pocket.
23        Q.   You seen a gun in his pocket.
24    Describe for the jurors how it was in his
25    pocket.

1          A.    In his front pocket.

2          Q.    In the front pocket.  And what

3    did that gun look like when it was in his

4    pocket?

5          A.    I didn't see the gun.  I just

6    seen the --

7          Q.    The handle?

8          A.    Yeah.

9          Q.    What did the handle look like?

10         A.    It was black.

11         Q.    So the handle of the gun was

12   black when you saw it in his front pocket?

13         A.    (Witness nodding head

14   affirmatively.)

15         Q.    Did you see who shot James

16   Friendly?

17         A.    No.

18         Q.    Do you know whether or not Darryl

19   Foggy shot James Friendly?

20              MR. HARTLEY:  Objection, Your

21   Honor.  She doesn't know who shot him.

22         A.    He was in the house during the

23   shooting.  That's what I'm saying.

24              MR. POWELL:  Nothing further,

25   Judge.

1              CROSS-EXAMINATION

2     BY MR. HARTLEY:

3          Q.   Ms. Judkins, let's go back over

4     this again, okay.  Of course, you were

5     having a birthday party out there that

6     night, right?

7          A.   Yes.

8          Q.   Now, the events that Mr. Powell

9     was asking you about didn't happen until

10    about 11:30 or so, right?

11         A.   I guess so.  I'm not sure.

12         Q.   You don't remember what time a

13    shooting took place at your own home?

14         A.   No, I do not because it was not

15    at my home.

16         Q.   Where was it?

17         A.   It was outside my home.

18         Q.   How close would it be then?

19         A.   Well, I don't know.  I mean, it

20    was a party.  People was drinking and

21    stuff.  So I don't know.

22         Q.   Were you drinking?

23         A.   Yes.

24         Q.   Were you using any illegal drugs?

25         A.   No.

1          Q.    Okay.  Were persons -- were
2     people at your party using illegal drugs?
3          A.    I don't know.
4          Q.    Now, you gave a statement to
5     Detective Howton, didn't you, about 6:00 in
6     the morning.  Do you remember talking to a
7     Montgomery police officer and that
8     statement being recorded by a videotape or
9     a tape reporter or something?
10         A.    I believe -- yeah, I believe so.
11    It's been so long.
12         Q.    I just want to know if you have
13    given a statement.  I have a copy of it in
14    my hand.
15         A.    Yes.
16         Q.    You haven't seen your statement,
17    have you?  You haven't seen a copy of this
18    statement previously, have you?
19         A.    No.
20         Q.    I'm going to show it to you in
21    just a moment.  But let me ask you, do you
22    remember if when you were talking to
23    Detective Howton, did you tell him about
24    Darryl Foggy having a gun?
25         A.    Yes.

1    Q. Do you know what became of that

2  gun in the minutes after this event took

3  place?  Do you know what happened to that

4  gun?

5    A. No.

6    Q. What did Darryl Foggy do at or

7  about the time of the -- that y'all heard

8  the gunshots go off?

9    A. Well, we were in the kitchen then

10  but I know after the shooting he left.  I

11  don't know where he went.

12    Q. Well, did he leave from the

13  kitchen and then go out the front door and

14  just part or did he go by where James

15  Friendly was and Rabbit were and those

16  people?

17    A. I didn't see him out there.  I

18  don't remember seeing nobody but me and

19  Rabbit was out there.

20    Q. You don't remember seeing Darryl

21  Foggy out there?

22    A. No.

23    Q. One moment, please.  Let me show

24  you on page six of your statement.  You

25  have admitted or acknowledge that you did

1     talk to a police officer.  I'm going to

2     show you what appears to be a statement

3     taken by Corporal E.E. Howton, your

4     statement on February the 2nd, and

5     beginning time is 6:24 in the morning,

6     right?

7          A.    Uh-huh (indicating yes).

8          Q.    And going over -- much further

9     over into page six, they ask you, does he

10    normally carry a gun?  And you said -- who

11    are you talking about right here when you

12    said when you came in you saw a gun on him.

13      Who were you talking about?

14         A.    That was Darryl -- I mean the

15    other, D.

16         Q.    Let's just use last names so

17    we'll be sure.  There are two Darryls.

18         A.    I don't know the last names.

19         Q.    D.  Well, you called him D.

20         A.    I don't know either one of them

21    really, you know.

22         Q.    You don't know them very well but

23    you know that he carries a gun, don't you,

24    Darryl Foggy?

25         A.    I seen him with one.

1          Q.   And they asked, how did you see

2     it, and you said you saw it, it was in his

3     back pocket.  Right?

4          A.   It was in his front pocket.

5          Q.   Well, why did they write on there

6     because it was in his back pocket?

7          A.   I don't know.  It been so long

8     since I have had to go through this.

9          Q.   But then Officer Howton asked you

10    this question:  Okay.  But right after the

11    shooting he left?  And your answer was

12    what?  Would you read that to the jury

13    please?

14         A.   Well, he'd been shot.  He had to

15    be shot because the man dead.  Yes.  He

16    disappeared.

17         Q.   You said yes, he disappeared.

18    But yes, he disappeared.  You are referring

19    to Darryl Foggy as disappearing right?

20         A.   Yes.  He left.

21         Q.   All right.  Now, did you discuss

22    this matter about Darryl Foggy leaving

23    right after this event took place with Mr.

24    Howton before the statement was taken?  Do

25    you remember if you sat down with Detective

1        Howton and talked about it and y'all went

2        through a preliminary interview?  Do you

3        remember if that happened or if it didn't

4        happen?

5            A.    I don't know.

6            Q.    Did you ever tell Officer Howton

7        that you went outside and saw Darryl Foggy

8        out there and that he fled the scene from

9        the outside?

10           A.    Yes, I remember going outside

11       after the shooting.  I mean, it been so

12       long I don't remember.  I just went out

13       there just to see was he all right.  That's

14       all.

15           Q.    If Darryl Foggy wasn't involved,

16       why do you think he ran from the scene?

17           A.    I don't know that.

18           Q.    And you don't know Darryl Joyce

19       at all, the man sitting there at the end of

20       the table?

21           A.    No.

22           MR. HARTLEY:  Thank you.  No

23       further questions.

24           MR. POWELL:  Nothing further,

25       Judge.

1          THE COURT:  Okay.  Thank you

2     ma'am.

3          MR. HARTLEY:  Judge, we are going

4     to call -- I have already told Counsel we

5     are going to want to call Mr. Howton back

6     to the stand.

7          MR. POWELL:  At this time, Your

8     Honor, the State rests.  Hang on one

9     second.  I'm sorry.  Before we rest, I

10    think -- I don't know if Mr. Hartley has

11    got an objection to it.  Again, we can call

12    Detective Howton to cure it, but I think I

13    forgot to move to admit 21.  I will move to

14    admit that at this time.

15         MR. HARTLEY:  So for the Record,

16    what is 21?

17         MR. POWELL:  The gun.

18         THE COURT:  The gun.

19         MR. POWELL:  Do you have any

20    objection to that?

21         MR. HARTLEY:  We are going to

22    call him back anyway.

23         MR. POWELL:  I will move to admit

24    State's 21 as far the State's case in

25    chief.  With that being done, the State

1    rests.

2              (State's Exhibit Number 21

3    admitted into evidence.)

4              THE COURT:  Folks, why don't we

5    take about a five minute break.

6              MR. HARTLEY:  Judge, could we ask

7    for a little longer.  We have motions to

8    do.

9              THE COURT:  Be back in the jury

10   assembly room at 11:15.

11             (Brief Recess.)

12             (The following was held outside

13   the presence and hearing of the jury.)

14             MR. HARTLEY:  Judge, we would

15   make a motion for a judgment of an

16   acquittal on behalf of Mr. Darryl Joyce.

17   We submit that the State has failed to make

18   a prima facie case of murder in this matter

19   against Darryl Joyce.  We submit that the

20   State has shown no motive.  We submit that

21   they have shown no witnesses who have any

22   credibility that could tie Darryl Joyce to

23   the death of James Friendly, and we ask the

24   Court to dismiss these charges and not

25   allow this case to go to the jury.  Failure

1          to a amke prima facie case.

2                    THE COURT:  Denied.

3                    MR. HARTLEY:  No response from

4          the State, Judge?

5                    THE COURT:  I don't need one.

6                    MR. HARTLEY:  Okay.  Judge, I

7          think we can do this without the jury.  We

8          did not offer -- and I think the state

9          will.

10                   MR. POWELL:  I have no objection.

11                   MR. HARTLEY:  We'll call it

12         Defendant's Exhibit 1, but it is also

13         State's Exhibit 26 but you never offered

14         it, did you?

15                   MR. POWELL:  I never offered it.

16                   MR. HARTLEY:  It is just marked

17         State's Exhibit Number 1.

18                   MS. PERKINS:  It's State's 26.

19                   MR. HARTLEY:  26.

20                   MS. PERKINS:  Put a Defendant's 1

21         on there.

22                   (Defendant's Exhibit Number 1

23         admitted into evidence.)

24                   (The following was held in the

25         presence and hearing of the jury.)

1              E.E. HOWTON,

2      having been previously sworn, was examined

3      and testified as follows:

4              DIRECT EXAMINATION

5      BY MR. HARTLEY:

6          Q.    Thank you for coming back,

7      Officer Howton.  Let me pick up with your

8      -- this one matter I would like to ask you

9      about at this point.

10             We have heard testimony since you

11     left the stand from a Nicole Judkins.

12         A.    Yes, sir.

13         Q.    Are you familiar with who she is?

14         A.    Yes, sir.

15         Q.    And back at the time of this

16     event, more specifically on February the

17     2nd, 2002, did you take a statement from

18     her?

19         A.    Yes.

20         Q.    So information from her would be

21     included in your case file in your

22     investigation; is that right?

23         A.    Yes.

24         Q.    Now, her statement is recorded,

25     of course, and put into paper form as a

1       matter of routine, right?

2              A.    Yes, sir.

3              Q.    Now, you also prepared, because

4       we have already talked about it, incident

5       reports where you include information that

6       you compiled into this report, right?

7              A.    Yes.

8              Q.    Let me get you to refer to the

9       same one that I asked you about before, the

10      lengthy report that is dated 2/5/02.  Page

11      five.  Page five at the bottom.

12             A.    Okay.

13             Q.    And in this you are referencing

14      information that you obtained from Nicole

15      Judkins, did you not?

16             A.    Yes, sir.

17             Q.    Would you read the first six

18      lines of that down to the one where the

19      sentence ends with the word ground, and I

20      think you will see that.  What did you

21      record as to what she had told you about

22      Darryl Foggy?

23             A.    You want me to read this?

24             Q.    I would appreciate it.

25             A.    Okay.  According to Nicole

1    Judkins, she was in the kitchen when a

2    black female she identified as Kesha

3    Billups came in the kitchen area and told

4    her that someone was fighting outside.  She

5    stated that she then went outside at which

6    time she observed Eric Stewart, a/k/a

7    Rabbit, and Darryl Foggy, a/k/a D,

8    disappear and the victim James Friendly on

9    the ground.

10        Q.    Did you get that information from

11    her?

12        A.    Yes.

13        Q.    And in that you said that she

14    went outside and named these following

15    people, Eric Stewart and saw Darryl Foggy,

16    right?

17        A.    Yes.

18        Q.    And then at that -- combined in

19    that sentence, she said Darryl Foggy left

20    the scene, right?

21        A.    Yes.

22        Q.    Nowhere in there did you record

23    that Darryl Foggy was inside the apartment,

24    did you?

25        A.    Not in that particular area, no.

1          Q.    I don't think you did anywhere,

2     did you?  I'm talking about at the time of

3     the shooting.

4          A.    I don't think so, no.

5               MR. HARTLEY:  Thank you, no

6     further questions.

7                    CROSS-EXAMINATION

8     BY MR. POWELL:

9          Q.    Are you trying to deny that

10    initially there were two suspects developed

11    in this case?

12         A.    No.

13         Q.    And who were those two suspects

14    again?

15         A.    Darryl Joyce and Darryl Foggy.

16         Q.    And is the information Mr.

17    Hartley keeps pointing out part of the

18    factual basis used to develop Darryl Foggy

19    as a suspect?

20         A.    Yes.

21         Q.    And is that the same factual

22    information that y'all followed up on?

23         A.    Yes.

24         Q.    Until the point you recovered

25    State's 21?

1         A.    Yes.

2         Q.    And I believe Ms. Richart

3    testified that she tested this gun, did she

4    not?

5         A.    Yes.

6         Q.    And did it match the bullets that

7    were dug out of James Friendly's body?

8         A.    No.

9         Q.    When you went looking for Darryl

10   Foggy, were you able to find him?

11        A.    Yes.

12        Q.    When you went looking for Darryl

13   Joyce, were you able to find him?

14        A.    No.

15        Q.    Where did Darryl Joyce eventually

16   end up?

17        A.    Los Angeles, California.

18        Q.    And who did you sign warrants on?

19        A.    Darryl Joyce.

20        Q.    Why?

21        A.    Because all the information I had

22   at that point directed the investigation in

23   his direction.

24             MR. POWELL:    Nothing further,

25   Judge.

1              REDIRECT EXAMINATION

2      BY MR. HARTLEY:

3          Q.    Were the people who were hiding

4      that gun hiding the evidence from a crime

5      scene?

6          A.    Yes.

7          Q.    If somebody picked up those

8      bullets and took them away from the scene,

9      would they be hiding evidence from a crime

10     scene?

11         A.    Yes.

12         Q.    And you have a witness who

13     identified Darryl Foggy positively,

14     according to your records, as the person

15     who did this crime, right?

16         A.    Yes.

17         Q.    And who was that?

18         A.    Mr. Thomas.

19         Q.    Bryan Thomas?

20         A.    Yes.

21         Q.    And he was interviewed at what

22     date on what location?

23         A.    He was interviewed that Saturday

24     and -- what was the other part of that

25     question?

1      Q.    Where did you interview him?

2      A.    At headquarters.

3      Q.    As a result of that, that photo

4   lineup with Darryl Foggy's picture

5   identified on it was generated, right?

6      A.    Yes.

7          MR. HARTLEY:  Thank you.  No

8   further questions.

9              RECROSS-EXAMINATION

10  BY MR. POWELL:

11     Q.    Detective Howton, how many people

12  that were outside at that party -- are you

13  familiar that other people showed up after

14  the shooting occurred?

15     A.    Well, there were supposed to be

16  numerous people at the party when all this

17  was going on.

18     Q.    And after the shooting occurred,

19  waiting on the paramedics, other people

20  started coming out of Smiley Court; is that

21  right?

22     A.    Yes.

23     Q.    How many of those people said

24  they saw people looking through the grass

25  picking up shell casings?

1          A.    Nobody.

2                MR. POWELL:  Nothing further.

3                <u>REDIRECT EXAMINATION</u>

4     <u>BY MR. HARTLEY:</u>

5          Q.    How many people were asked that

6     question?

7          A.    Nobody.

8                MR. HARTLEY:  Thank you.

9                MR. POWELL:  Nothing further.

10               THE COURT:  Is that it?  Thank

11    you, sir.  Can he be released?

12               MR. HARTLEY:  I think we are

13    through, Judge.

14               (Off-the-Record Discussion.)

15               MR. HARTLEY:  Judge, that's our

16    last witness so the defense rests.  We are

17    going to renew that motion that we made so

18    I want to be sure that's on the Record.

19               THE COURT:  Ladies and gentlemen,

20    why don't we do this.  Why don't we kind of

21    take a break for an early lunch.  Would

22    anybody have a problem being back here at

23    about 12:30?  All right.  If y'all could be

24    back here at 12:30, we will go to the

25    closing arguments and I will give you the

1    law in the case and we'll turn the case

2    over to y'all.  So be back in the jury

3    assembly room at 12:30.

4              Remember, don't talk to anybody

5    about the case.  Don't let anybody talk to

6    you about the case.  If anybody attempts to

7    talk to you about the case, please let us

8    know.  Don't even talk to each other about

9    the case.  Okay.  Thank you.

10              (Lunch Recess.)

11              (The following proceedings were

12    held outside the presence and hearing of

13    the jury.)

14              THE COURT:  Take a look at the

15    verdict form and tell me what you think.

16              MR. POWELL:  The state is

17    satisfied with the jury form, Judge.

18              MR. HARTLEY:  Satisfied.

19              (The jury enters the courtroom.)

20              THE COURT:  Ladies and gentlemen

21    of the jury, we are now through with the

22    trial where the attorneys will make their

23    closing arguments to you.  I will remind

24    you that what the attorneys say is not

25    evidence in the case.  They will simply try

1    to persuade you that you should vote for an

2    acquittal in the case of the defense or

3    guilty in the case of the prosecution.

4    They will be telling you what they recall

5    the facts of the case to be.

6              You are not bound by the

7    attorneys' recollection of the facts but

8    you should rely on your own recollection if

9    it is different from how the attorneys

10    remember it.  Mr. Powell.

11              MR. POWELL:  May it please the

12    Court, counsel.  Members of the jury, back

13    on February the 1st of last year an

14    argument occurred outside of a birthday

15    party over who was tougher than who or

16    whose set was better than whose set, or

17    whatever the reason the argument occurred.

18    But this man, the defendant, pulled out a

19    gun and shot James Friendly dead.

20              State's 29, that's a photograph

21    of Mr. James Friendly.  That's the person

22    who wasn't able to walk away from that

23    argument.  In other words, they were

24    arguing over who was the baddest.

25              Unfortunately, it is clear that

1    Mr. Joyce won that argument that night

2    because he jerked out a pistol and shot

3    James Friendly dead over just some words

4    that they were having. Nothing else. This

5    was a senseless act of violence that should

6    never have occurred.

7         But it occurred on that night

8    because this defendant decided to arm

9    himself with a gun, decided to go to that

10   party, decided to keep that gun in his

11   pants where he could get to it at a

12   moment's notice, decided that those words

13   or that argument escalated to the point he

14   was going to kill someone. Then decided to

15   reach into his waistband, pull out that

16   gun, point it at Boo and pull the trigger,

17   not once, not twice, three times. Maybe

18   more.

19        That, members of the jury, is an

20   intentional act. There is no question that

21   the person that pulled the trigger of that

22   gun intended to kill James Friendly.

23        The only issue that has even been

24   brought up in this trial is do we have the

25   right person. Let me be the first one to

1    tell you, if you go back in that jury room

2    and do not believe beyond a reasonable

3    doubt that Darryl Joyce is the man who

4    pulled that trigger, by all means cut him

5    loose. We are not trying to convict an

6    innocent person.

7    But you heard the state's

8    evidence from that witness stand. Eric

9    Stewart was right in the middle of this

10   argument. He was there. The person that

11   was arguing and shooting was not this

12   Darryl Foggy the defense keeps trying to

13   inject into the case. It was that man

14   sitting right there.

15   He was standing in the middle of

16   the two of them trying to stop the argument

17   when he pulled out the gun and shot him

18   dead. There was an eye witness standing

19   within feet of that man as he shot him

20   dead.

21   Now, admittedly, I told you this

22   in voir dire, I told you this in opening

23   statements, he testified to it from the

24   witness stand, it was a party. There was

25   alcohol. There was drugs. That's

1    something to take into consideration.  I'm
2    not asking you to convict Darryl Joyce
3    based solely on the testimony of Eric
4    Stewart.
5            Whatever questions you may have
6    in your mind about should I believe Eric
7    Stewart, there is physical evidence and
8    there are other eye witnesses, the Osborne
9    brothers.  Particularly, Brian Osborne said
10   when he heard the shot he looked back over
11   his shoulder and saw the fire coming from
12   the gun.  He was within feet -- remember,
13   he was on the witness stand and I was
14   standing about right here and he said he
15   saw that man pull the gun, pull the trigger
16   and shoot James Friendly dead.
17           Finally, there is the physical
18   evidence.  They all told the story of where
19   the shooting occurred, how it occurred.
20   The shots were on the ground.  The shots
21   went into the truck.  There are photographs
22   of the truck.  You see the shell casings.
23   All of it is consistent with the story that
24   the eye witnesses told.
25           That story is plain and it is

1     simple, that that man sitting right over

2     there got into a senseless argument at a

3     party and decided to pull a gun and shoot

4     somebody dead.  That's what happened in

5     this case.  That's what all of the evidence

6     has pointed to.  Thank you.

7           MR. HARTLEY:  Thank you, Your

8     Honor and Counsel.  Good afternoon, members

9     of the jury.  I sure want to thank you for

10    participating in our case.  The role that

11    the jury plays is so important.  I won't

12    belabor it.  It is just essential that we

13    have a system like we have.  Ultimately

14    cases are -- civil and criminal cases are

15    handed to a jury and y'all are vested with

16    a very heavy responsibility of doing a

17    compound task of deciphering the facts and

18    applying them to legal standards.

19           Judge Hobbs will give you some

20    legal standards a little later that apply

21    to this case and all criminal cases.  He

22    will give you a burden of proof type jury

23    instruction.  He will give you the elements

24    of the offense of the general charges that

25    go with you back to the jury room.  You do

1   not get written charges so you will have to

2   memorize this as it goes.

3            With all that being said, you

4   gave an oath to be the jury in this case

5   and you were summoned down here.  I hope

6   you weren't too inconvenienced.  But this

7   is so important.  This is a major important

8   case.  All of them are important but this

9   one is important because it is the one we

10  are doing today.  It involves serious

11  charges.

12           I preface that to say that you

13  are going to be applying a standard of

14  proof beyond a reasonable doubt.  The Judge

15  will give you a definition of that, but I

16  want to mention to you that that standard

17  -- it is sort of unique to criminal cases

18  in the legal system, and that standard is

19  sort of an interesting concept because

20  y'all are going to have to decide what

21  beyond a reasonable doubt is.

22           I suggest to you it is a pretty

23  high standard.  We make decisions every day

24  in our lives.  I will try to use the

25  example of people decide virtually every

1    day where they go to lunch or what they are

2    going to do for lunch.  Some days you go

3    get a good lunch and some days you may pick

4    out some place where the lunch wasn't so

5    good and you reflect back on it and you

6    say, you know, I wish I hadn't gone to that

7    place.  But you didn't really ponder on it

8    real hard before you did it.  Maybe on

9    impulse you did it.

10              You applied a standard of

11    probably just say there is a preponderance

12    of my grounds for going to restaurant A or

13    restaurant B or whatever.  That's just one

14    of the decisions we make in routine

15    everyday life and we don't apply a beyond a

16    reasonable doubt standard to such

17    decisions.

18              But when things get real, real,

19    real important, we apply a standard that is

20    more like beyond a reasonable doubt.  I

21    think an example of that might be if you or

22    somebody -- and I'm not going to make you

23    particularly, but I'm talking about you in

24    the general sense.

25              If you or a person is going to

1   face maybe some kind of major surgery and a

2   doctor told them -- told you that you could

3   take this major surgery and your problem

4   might be cured, but on the other hand, the

5   downside is you might not survive the

6   surgery.

7            That's when you start getting to

8   the situation where you put more weight

9   into the decision and you might take in

10  more factors.  You might take in a second

11  opinion.  You might go see another doctor

12  or research the topic yourself or put some

13  tremendous amount of deep thought into it.

14           That's more of the kind of

15  decision we are making now is the weight of

16  this.  The gravity of this matter is so

17  high that the standard of proof is very

18  high -- or the burden of proof is very high

19  and the standard of proof is very high

20  because the consequences are great,

21  somewhat like it would be if you were

22  facing major surgery.  So I try to make

23  that differentiation so you can see how

24  important it is.

25           But let's go to this case now.

1    He is presumed innocent.  You will hear a

2    charge on that.  I will submit to you that

3    the state hasn't proved him guilty of

4    anything because the quality of their

5    evidence is not that good.

6        I got several areas I want to go

7    into, and I apologize that I'm not the most

8    organized person but I'm going to try to go

9    to them.  One of the things I mentioned in

10   my opening was that one of the things you

11   are going to need to take into

12   consideration is the overall -- what did we

13   call it -- I think I called it the

14   circumstances or the conditions that

15   night.

16       I'm going to submit to you the

17   state got in a lot of exhibits and they got

18   in a good bit of testimony, but I really

19   like these two exhibits.  Now, I know and

20   I'm going to admit that a picture can't

21   always capture what a scene looks like, but

22   I submit to you that these are original

23   photographs because they portray a very

24   dark area, and I think these are more like

25   the scene than, for instance, this

1    picture.  I ask you to keep that in mind

2    because it happened at 11:30 or a quarter

3    to 12:00.  It happened way up close to

4    midnight.

5         The significance or the

6    importance of that is it goes to all this

7    testimony about who saw what and what they

8    were able to observe.  I think that the

9    witnesses that the state tried to use

10   overstated what could be seen and what

11   could actually be observed.

12        I'm going to try to establish

13   that by -- let's use Eric Stewart, the

14   first witness, I think, whom we'll say that

15   his testimony or his ability to recall and

16   accurately testify in this case would be

17   affected by his alcohol use, his use of

18   cocaine on that evening, and I think that

19   it is illustrated by the way he changed his

20   statement when I cross-examined him and

21   tried to pin him down on where the first

22   shots were fired.  I think Eric Stewart was

23   all over the place.  Three different

24   versions:  One time in the ground, one time

25   in the back of the truck, and another time

1       he shot the victim.

2               If he is such a spectacular or

3       stellar eye witness, as Mr. Powell wants

4       you to believe, then how could he account

5       for such inconsistencies in his statement.

6       He tried to implicate Darryl Joyce, but he

7       also told us that he was very close friends

8       with Darryl Joyce, that they had been

9       raised together or they had been friends

10      for a very, very, very long time.

11              I submit to you an overview of

12      the evidence in this case would show that

13      there could be a loyalty to Darryl Foggy --

14      I hope I didn't get the Darryls mixed up

15      -- a loyalty to Darryl Foggy that would be

16      strong enough for him to lie to him.  I

17      think that is verified by this episode of

18      this gun being at the scene and then moved

19      to the apartment.

20              Now, of course, he tried to

21      disavow that he participated in hiding that

22      gun, but I will suggest to you that raises

23      two questions.  If he didn't participate in

24      hiding the gun then why did Detective

25      Howton write in his report these exact

1    words, it's an open question as to why Eric

2    Stewart aided in hiding the gun. You heard

3    Mr. Howton say that he put that in his

4    report.

5          And the second or the same

6    related question is, if he didn't

7    participate in hiding the gun, how did he

8    no where it went and how did he know how to

9    send Detective Howton to find the gun if he

10   didn't know or have knowledge of it being

11   hidden and where it was hidden.

12         I believe that Eric Stewart's

13   testimony falls or fails for that reason to

14   make any kind of proof beyond a reasonable

15   doubt.

16         Now, let me go to two other

17   witnesses I found interesting in this

18   case. The Brian Osborne and Johnny Osborne

19   witnesses, who, if you don't really analyze

20   their testimony, seem like they really --

21   really were on the ball on the testimony.

22   But I watched this and I'm sure y'all saw

23   it, too. It was when Johnny Osborne was

24   testifying, the state -- I'm not going to

25   change it -- I'm going to use this

1     -- projected this up on there.  I guess I
2     might could do it.
3               (Off-the-Record Discussion.)
4               Well, I'm going to point because
5     I might get confused.  I will just point.
6     It won't take but a second.  The testimony
7     from Johnny Osborne was that the event took
8     place on this side, or more particularly,
9     if he didn't -- wasn't specific about the
10    other side.  I recall exactly that this is
11    where Eric Stewart said it was.  He
12    described all the events, they had come out
13    of this apartment and that he and James
14    Friendly were right over in here to use
15    drugs or to have their conversation or
16    whatever.
17              But then when we got to Brian
18    Osborne, he moved it over to this side.
19    That's real interesting because it creates
20    a question now about who could see the
21    best.  We don't know which side -- both of
22    them can't be correct.  It can't be over
23    here, it can't be over here.  I don't think
24    it can be in both places.
25              It is interesting that the shell

1    casings -- I think they said the shell
2    casings from all the other testimony were
3    found in this area, which would not resolve
4    which side of the cut or this alley they
5    were in.  But then you put in this area
6    right here where this car was, the Osborne
7    vehicle, a Jeep-type vehicle, it looked
8    like, backed into the parking place.
9         Brian Osborne starts testifying
10   -- if we just use this -- I will use this
11   if I can do it one more time right.  Let's
12   use this hypothetically as the Jeep and
13   let's consider the front or back or
14   -- let's presume this is the front of the
15   Jeep and the back would be away from it.
16        If the shooting and all this
17   activity took place over here, then the
18   driver's side of the Jeep would have the
19   better opportunity to observe because that
20   person wouldn't be able to see over here.
21   Again, and if it occurred over here, then,
22   of course, Mr. Brian Osborne who said he
23   was getting in the passenger side would
24   have been able to observe what happened
25   here but that completely contradicts Eric

1       Stewart's testimony.  So we can't have

2       Brian Osborne's testimony that it happened

3       over here and Eric Stewart's testimony that

4       it happened -- Brian Osborne and Eric

5       Stewart who said it happened over here.

6       Those things are totally inconsistent.

7              And if the state thinks that you

8       should reject Brian's testimony that it

9       occurred over here and go with the fact

10      that it took place over here, then that

11      gives Johnny Osborne the better opportunity

12      to observe.  All this clouds the issue of

13      what really happened out there because

14      Brian Osborne is positive that there were

15      three people out there.  Johnny Osborne is

16      positive that there were four or five

17      people out there.

18             So which one is it?  And I am

19      sure the state would not say that that is

20      an immaterial point.  I think it would be

21      of huge importance, who had the opportunity

22      to observe when you talk about Brian or

23      Johnny Osborne, because we have got

24      different stories about where the whole

25      thing happened.

1          It's undoubtedly dark out there,

2      undoubtedly some confusion as to who and

3      what position, et cetera, and that kind of

4      stuff.  Now, this all comes from the

5      state's evidence.  This does not -- this

6      was their witnesses.  Oh, yeah.

7          Let me go to something now.

8      Let's go to Mr. Howton.  What did Mr.

9      Howton add to this case that we suggest

10     substantiates a reasonable doubt theory in

11     this case.  He verified for us that he had

12     a witness who came in the morning after it

13     happened and was asked if he could identify

14     the person who did this -- committed this

15     crime.  This photo lineup was used, and a

16     person named Bryan Thomas identified that

17     individual right there as being the

18     shooter.  Remember the report was he

19     positively identified him.  That's Darryl

20     Foggy.  That's the person who was at the

21     scene that night.

22          I will go back to that in a few

23     minutes when I have a little theory I want

24     to give you about this case.  But also he

25     did some other things that I think I have

1        already alluded to, the fact that he noted

2        that there was -- I made a reference that

3        he -- a reference that said there was an

4        open question about why Eric Stewart had

5        gone and hidden the gun.  I think Eric did

6        in fact hide the gun or participate in

7        hiding it.

8             Another place that Mr. Howton

9        contributed to this issue of what really

10       happened or is this case against Darryl

11       Joyce that strong, he also took a little

12       bit away from Ebony Judkins' testimony.

13       She was trying to be so emphatic that she

14       was trying to place Darryl Foggy back in

15       her apartment at the time she heard the

16       shots but she didn't particularly make that

17       so clear in her statement.

18            But we asked Mr. Howton, the last

19       witness we called, the only witness we

20       called, to go back to his incident report,

21       and he said that she had told him that she

22       came out and saw Eric Stewart, a/k/a

23       Rabbit, and Darryl Foggy, a/k/a D, fleeing

24       from the scene.  That's an odd way to put

25       it if he had just been inside with her.  It

1      just sort of creates an issue as to --

2      there was a real possibility that Darryl

3      Foggy was out there when the action was

4      going on and she is just now covering for

5      him as a matter of friendship or loyalty to

6      him.

7             There is not a single photo

8      lineup like this in this case that

9      identifies Darryl Joyce being the shooter

10     in this case. There are some people that

11     identify him as being a person but nobody

12     picked him out of a six-person lineup like

13     that and said he did it. The state is not

14     offering one of these with Darryl Joyce's

15     picture in it.

16            Let me tell y'all, as I close my

17     statement to you, that I think if I -- I

18     haven't drawn this yet so I'm going to give

19     it a shot. I'm going to characterize this

20     case as being an incomplete or sort of a

21     curtailed investigation. Let me see if I

22     can represent this -- I should have already

23     drawn it, but I'm going to do it if I can.

24     I'm going to think of the investigation of

25     this case was sort of like a travel or

1    going down something like maybe a highway

2    from the standpoint of trying to get from

3    point A, which is the -- when the event

4    occurred, when James Friendly was killed,

5    and trying to get to -- I'm going to call

6    it an S for solution.

7              Here is what I think the state

8    did in its course.  It went along for a

9    while.  Then right after the event occurred

10   -- of course, you have the possibility of

11   where it branches like this in the course

12   of the investigation, and it might branch

13   even more times.  It might branch again and

14   it might be another branch over here, and

15   the size or the shape of the branches I'm

16   not trying to emphasize because there are

17   multiple suspects.

18             What I think happened is when

19   this case got going -- let me correct that

20   just a little bit -- the state had a -- or

21   the investigation in this case led directly

22   at one point to Darryl Foggy by an eye

23   witness who said that he positively

24   identified this person as being a suspect

25   -- being the person who perpetrated the

1      crime, who actually did it.

2              And the state had that evidence,

3      and we still have it with us today.  But

4      when these other people who had, we will

5      submit, reasons to possibly protect him

6      came along, the state went up this path

7      which they say tries to lead to Darryl

8      Joyce.  And what they did was, whatever

9      reason -- you know, they weren't satisfied

10     they had an eye witness who said they did

11     it.  They just cut this off.  This just

12     sort of goes like that, boom.

13              Then they go down this path and

14     they try to stay on this path to hope

15     Darryl Joyce did it but on what grounds or

16     what evidence?  The very weak evidence of

17     Eric Stewart who was a druggy, a convicted

18     felon, and then possibly one other witness,

19     Mr. Osborne, who has some serious

20     inconsistencies and conflicts in his

21     statement.  And that's all they have got.

22              But they never went very far down

23     this path.  In other words, once they got

24     -- they had it sort of as a possibility or

25     a probability that this man was involved in

1    the case, and it just stopped right there.

2    Boom.  And the only way it comes back up

3    again is because I bring it back into this

4    case about Darryl Foggy who had a gun.

5         Apparently, he is the kind of

6    person who would be involved in a crime

7    like this.  And how do we know that this

8    gun is not a decoy gun or a fake gun

9    against somebody to give somebody an

10   alibi.  How do we know that this wasn't a

11   plan, a false gun planted.

12        Are you sure -- Eric Stewart sure

13   volunteered it mighty quickly.  He sure

14   came up with it in a heartbeat.  We'll lead

15   you to a gun, a decoy gun.  Not the gun

16   that committed the felony but, hey, it sure

17   gave Darryl Foggy an out.  So why did he

18   even tell about it if it was zero or

19   immaterial to the case.

20        So mainly the state's case failed

21   because they didn't pursue this branch of

22   their course of conduct and focused too

23   narrowly on this branch.

24        Now I submit to you that that

25   creates reasonable doubt, serious

1   reasonable doubt that Darryl Joyce did not
2   commit that crime.  He had no motive.  I
3   know the state said it was all about an
4   argument.  Well, we don't know who was
5   arguing with who out there because of these
6   pictures, State's Exhibit Number 1 and
7   State's Exhibit Number 5.
8           And by the way, there is a --
9   some evidence in this case that somebody
10  was cleaning the gun shells off the ground
11  out there after it happened.  It wasn't my
12  client, he was gone.  You know, there is
13  more to this story that has been found or
14  has been told and it is not sufficient to
15  carry this case to the verdict that the
16  state is going to ask you for.  Too many
17  unanswered questions, too many mysterious
18  deadends that don't go anywhere and don't
19  resolve themselves.
20          And I think very importantly the
21  fact that the two Osbornes got the shooting
22  on the wrong side of the -- on opposite
23  sides of this little alley way.  And that's
24  -- in and of itself it appears to be
25  insignificant but it is not because you

1    have got to think about it, which one was

2    on which side of the vehicle.  The vehicle

3    was backed in, what perspective would the

4    driver have, what perspective the passenger

5    would have, and how much light did they

6    have to see what they said they saw.

7            A big discrepancy on how many

8    people.  Brian Osborne was essentially

9    positive there were three and his brother

10   was essentially positive there were four or

11   five people out there.  I believe you

12   probably clearly understand my argument.  I

13   submit to you that the jury -- that this

14   jury -- you should find Mr. Darryl Joyce

15   not guilty.

16           We want again to say that we

17   appreciate you being the jury.  If we have

18   done anything during the course of the

19   trial -- if we jump up and object

20   sometimes, and we have to, we are not

21   trying to be as bad as you might think we

22   are.  It is what we think the legal rules

23   require and that kind of thing.  So if we

24   did anything that looked awkward or

25   inappropriate, hold that against me, not

1    against him.  He has exercised his right

2    not to testify.

3              I think that's all I wanted to

4    say.  I might glance at my notes but that's

5    really about all I can think of in this

6    case from the evidence.  You have heard it,

7    and I will leave it with you, but I will

8    ask you to find Darryl Joyce not guilty.

9              MR. POWELL:  Mr. Hartley and I

10   certainly agree that at the initial stage

11   of this investigation there was a fork in

12   the road.  The case of the two Darryls, if

13   you will.  They interviewed one set of

14   witnesses and they were all identifying

15   Poncho or Darryl Joyce.

16             There was some indication that

17   another Darryl was at the party, and

18   another Darryl may have had a gun.  So

19   let's look at what the police did.  First

20   off, the only person -- I mean, there is no

21   dispute that Darryl Foggy was at this

22   party.  I don't think anybody is arguing

23   that.  But has a single witness in this

24   case ever said that Darryl Foggy was

25   outside or that he was in any manner

1    involved in this incident.   There has been

2    absolutely no testimony from this witness

3    stand about that at all.

4             All you know is that someone

5    named Bryant Thomas identified Darryl Foggy

6    from a photo lineup.   When you are deciding

7    and discussing this in the back, I want you

8    to ask some questions.   Where was Darryl --

9    where was Bryant Thomas when the incident

10   occurred?   Where was he standing?   Was he

11   even still at the party?

12            Eric Stewart, in some other

13   testimony, indicated that he was there but

14   he left.   Was he saying that he was the

15   shooter or was he saying that he was at the

16   party?   We know nothing about Bryant Thomas

17   other than he identified someone named

18   Darryl Foggy from a photo lineup.

19            There is no evidence about his

20   vantage point, where he was standing, what

21   he saw, nothing.   Yet the defense wants you

22   to base a reasonable doubt on unanswered

23   questions and innuendo that is not based on

24   evidence.

25            What about Nicole Judkins?   What

1    did she say?  She hosted a party.  She saw

2    Darryl Foggy there.  She saw him with the

3    gun.  She didn't think he was involved in

4    the shooting, and he elicited some

5    testimony from Detective Howton that after

6    everything was over with he saw Eric

7    Stewart and Foggy out there with the body

8    and they left.

9         Well, that is entirely possible.

10   I think all the other witnesses indicated

11   after it was over with, Eric Stewart

12   remained with the body until the paramedics

13   got there and he left.  That is not

14   evidence that Darryl Foggy shot anybody.

15   But nonetheless, Detective Howton had his

16   name.  He had the name of Darryl Joyce and

17   he had the name of Darryl Foggy.

18        So what did he do?  Did he just

19   stop the investigation as Mr. Hartley

20   indicates?  No.  He wanted to know, okay,

21   if he had a gun at the party that night,

22   where is the gun?  Where is this hidden gun

23   the defense has talked about so much?

24        It is across the street, members

25   of the jury.  It is not hidden.  It is in

1      an apartment directly across the street

2      from where the shooting happened.  Now, if

3      you were going to hide a gun, does that

4      make a whole lot of sense to leave it

5      within ten yards of where the shooting

6      occurred.

7            Detective Howton is able to get

8      this gun.  This is the gun in question,

9      State's 21.  There has been no evidence to

10     the contrary.  Mr. Hartley got up here and

11     told you some wild theory about a planted

12     gun or a gun used to mislead somebody.

13     That's what Mr. Hartley said in closing

14     argument.  Find one witness that said

15     anything to support that.  One fact, one

16     shell casing, anything to support that.

17           Judge Hobbs is going to tell you

18     what Mr. Hartley said, even what I'm saying

19     now, is not evidence.  So a wild

20     speculation by the defense attorney.  This

21     is the gun.  Why does he want you to

22     believe it is not the gun, because Kathy

23     Richart, the forensic expert, tested this

24     gun.  She tested this gun against those

25     three shell casings that were picked up at

1    the scene.

2            After the shooting occurred, they

3    went and picked up the casings that were in

4    that cut where it occurred, regardless of

5    which side it was on.  And it didn't match

6    this gun.

7            When Dr. Bristol performed the

8    autopsy, one of the bullets was still in

9    Boo's body.  They got it out.  They tested

10   it.  It didn't match this gun.  The

11   so-called hidden gun theory did not match

12   the evidence.  We still, to this day, do

13   not have the murder weapon.

14           We found Darryl Foggy's gun.  We

15   still have not found the gun that was used

16   to kill James Friendly, which makes a whole

17   lot more sense that the person that used a

18   gun to kill someone isn't going to just

19   leave it across the street where the cops

20   can find it.  They are going to ditch it

21   where nobody can find it because they don't

22   want it found.

23           Well, let's talk about what else

24   was and was not found in this case, members

25   of the jury.  First off, Darryl Foggy was

1    Smiley Court all the way to California if
2    they didn't have the lick of nothing to do
3    with who shot James Friendly.  That's
4    evidence.  That's evidence of consciousness
5    of guilt, all that running away.
6            Darryl Foggy never left.  They
7    found him right here in Montgomery.  They
8    found his gun.  They talked to him.  The
9    eye witnesses never put him involved, so
10   this fork in the road was a dead end.  He
11   didn't do it.  The forensic evidence says
12   he didn't do it.  The ballistics evidence
13   says he didn't do it.  There are no eye
14   witnesses saying he had anything to do with
15   it.  Nothing in the case points to Darryl
16   Foggy.
17           But everything in the case points
18   to Darryl Joyce.  Did the police take that
19   fork in the road?  You bet they did.  They
20   followed it for Foggy and came up with
21   nothing.  Came up with evidence that said
22   he didn't do it.
23           They followed it for Joyce and
24   the more and more and more they found.
25   Eric Stewart.  And if you don't believe

 1          Eric Stewart, there is Brian Osborne.  If

 2     you don't believe Brian Osborne, you got

 3     two people telling the same story about an

 4     argument and Darryl Joyce pulling a gun.

 5     It is hard to make those stories match,

 6     members of the jury, if it didn't happen.

 7               Then if that's not enough for

 8     you, the shell casings were found in that

 9     cut where they said the shooting occurred.

10     Johnny Osborne testified that it happened

11     just the way everyone else said it

12     happened.

13               In that cut, there was an

14     argument.  Darryl Joyce was arguing with

15     Boo over who was the baddest, who was the

16     toughest, who could do this or who could do

17     that, and he was going to prove to James

18     Friendly once and for all who won that

19     argument, and he did it by pulling out a

20     gun and shooting him dead over nothing.

21     Over nothing.

22               Now, the last thing I'm going to

23     say to you is the Judge is going to read

24     you the law.  He is going to read you the

25     law on intentional murder.  That's what

1       happened in this case, members of the

2       jury.  And to meet our burden of proof

3       beyond that reasonable doubt, the same

4       standard that is used in all criminal

5       cases, we have got to prove to you that

6       James Friendly is dead.

7               I think we know that.  He was

8       shot to death.  All the evidence in the

9       case points to one person.  It doesn't

10      point to Darryl Foggy.  It points to this

11      man on trial today, Darryl Joyce.  James

12      Friendly is dead.

13              Number two, that the defendant,

14      Darryl Joyce, caused the death of James

15      Friendly by shooting him with a gun, and

16      that in committing the act which caused the

17      death of James Friendly, the defendant

18      acted with intent.  A person acts

19      intentionally when it is his purpose to

20      cause the death of another person.  That's

21      technically how the law is going to read

22      and what you are going to hear from the

23      Judge.

24              The State of Alabama has met

25      every one of those elements.  James

1    Friendly is dead.  Darryl Joyce did it.  We
2    proved he did it beyond a reasonable doubt,
3    and he did it with intent.  Members of the
4    jury, he is guilty of intentional murder.
5    Thank you.
6          THE COURT:  Ladies and gentlemen
7    of the jury, we are now at the point in the
8    trial where I tell you what the law is
9    regarding the deliberations in this case.
10   Please listen carefully as I explain it to
11   you.  It is going to take a little bit of
12   time to get through it.
13          This case is brought to you by
14   way of an indictment in this case.  Let me
15   read the indictment to you real quickly.
16   The State of Alabama, Circuit Court of
17   Montgomery County, November term of 2002,
18   the Grand Jury of said county charges that
19   before the finding of this indictment,
20   Darryl Joyce, whose name is otherwise not
21   known to the Grand Jury, did intentionally
22   cause the death of another person, James
23   Friendly, by shooting him with a gun in
24   violation of section 13A-6-2, Code of
25   Alabama.

1       The indictment has no bearing on

2   the guilt or innocence of any person.  Keep

3   that in mind.  That's just the way that the

4   case gets to this Court.  Now, the

5   defendant, to that charge, has pled not

6   guilty.  The plea of not guilty places the

7   burden on the State of Alabama to prove by

8   the evidence presented the guilt of Mr.

9   Joyce beyond a reasonable doubt.

10      Before a conviction can be had,

11  each of you must be satisfied beyond a

12  reasonable doubt of Mr. Joyce's guilt.

13  Otherwise, he is entitled to an acquittal.

14  We've talked about the presumption of

15  innocence.

16      The defendant is presumed to be

17  innocent of the offense of murder and that

18  presumption attends him until his guilt is

19  established from the evidence beyond a

20  reasonable doubt.  This presumption is

21  evidence in the case.  It is to be

22  considered by you along with the other

23  evidence in the case.  It is a fact which

24  is to be considered by you and goes with

25  the defendant to your verdict unless the

1    evidence convinces you beyond a reasonable
2    doubt of the proof of each and every
3    element of the charge.
4         We talk about reasonable doubt.
5    Let me try and explain that for you. The
6    state's burden of proof in this case is a
7    stricter, heavy burden but it is not
8    necessary that the defendant's guilt be
9    proved beyond all possible doubt. It is
10   only required that the state's proof
11   exclude any reasonable doubt concerning the
12   defendant's guilt.
13        A reasonable doubt is a real
14   doubt based upon reason and common sense
15   after careful and partial consideration of
16   all the evidence in the case. Proof beyond
17   a reasonable doubt, therefore, is proof of
18   such a convincing character that you would
19   be willing to rely and act upon it without
20   hesitation in most important of your own
21   affairs. If you are convinced the
22   defendant has been proved guilty beyond a
23   reasonable doubt, say so. If you are not
24   convinced, say so.
25        As I told you at the beginning of

1    this case, y'all are the sole judges of the

2    evidence. I am going to explain to you

3    again what is and is not evidence. The

4    indictment that I read to you is not

5    evidence. The arguments, statements and

6    assertions of the attorneys in this case

7    are not evidence. Any rulings that I make

8    in this case are not evidence. Please

9    don't get caught up in, well, I think the

10   Judge is leaning this way or he overruled

11   that side's objection, he must be favoring

12   -- hu-huh. I'm like the referee. I'm

13   totally neutral in this case.

14          Please don't speculate as to what

15   might have happened if I had allowed in

16   some evidence or I had not overruled --

17   overruled an objection or something like

18   that because that gets us back into

19   speculation. We want you to decide the

20   case based on the evidence. The evidence

21   in the case is the testimony of witnesses

22   from the witness stand. It is what you

23   heard from the witness stand by people

24   under oath. Okay? It is also any exhibits

25   that we allowed into the case. Finally, it

1    is the presumption of innocence.  We have

2    talked about that.

3            Your job -- one of your jobs in

4    this case will be to try and decide what

5    the evidence in the case is.  It is to

6    decide the credibility of the witnesses in

7    the case.  You are the sole exclusive

8    judges of the credibility of witnesses and

9    the weight that should be given to their

10   testimony.

11           In deciding to pass on the

12   credibility of a witness, you have the

13   right to consider, number one, any bias,

14   interest or prejudice that may have been

15   exhibited to you while that witness

16   testified.  Number two, the demeanor of the

17   witness on the stand, that is, how did they

18   appear to act while they testified.  Number

19   three, the witness's basis for testifying,

20   that is, how did that witness know the

21   facts that he or she testified to, whether

22   they had an opportunity to observe and

23   discern and know those facts.

24           You may accept or reject any part

25   of the testimony of a witness and you

1   should accept only that part of the

2   testimony that you consider worthy of

3   belief.  In other words, if you think a

4   witness was not being completely candid

5   with you, you can accept that part that you

6   think the witness was being candid or you

7   can reject the witness's testimony in its

8   entirety.  That's up to you to decide.

9          The defendant in this case has

10  chosen not to take the stand.  As I told

11  you earlier, he is presumed to be innocent

12  and he is not required to prove his

13  innocence and he is not required to take

14  the witness stand.  He has a constitutional

15  right not to testify in this case, and you

16  should not infer anything prejudicial

17  whatsoever because he has not testified.

18          I charge you that flight from the

19  scene can be inferred by you as a guilty

20  state of mind.  Let me talk to you a little

21  bit about the elements of intentional

22  murder.  Mr. Joyce is charged with murder.

23  A person commits the crime of murder if he

24  causes the death of another person and in

25  performing the act or acts which caused the

1    death of that person, he intends to kill

2    that person.  To convict, the state must

3    prove beyond a reasonable doubt each of the

4    following elements of murder:  Number one,

5    that Mr. Friendly is dead.  Number two,

6    that Mr. Joyce caused the death of Mr.

7    Friendly by shooting him; and number three,

8    that in committing the act which caused the

9    death of Mr. Friendly, Mr. Joyce acted with

10    intent.

11        A person acts intentionally when

12    it is his purpose to cause the death of

13    another person.  If you find from the

14    evidence that the state has proved beyond a

15    reasonable doubt each of the above elements

16    of the offense of murder as charged then

17    you shall find the defendant guilty of

18    murder.  If you find that the state has

19    failed to prove beyond a reasonable doubt

20    any one or more of the elements of the

21    offense of murder, then you cannot find the

22    defendant guilty of murder.

23        In a moment we are going to ask

24    you to go back here in this jury

25    deliberation room and begin your

1    deliberations.  When you consider the

2    evidence in reaching your verdict, you have

3    the right to use your knowledge of people

4    and their affairs.  That's what we call

5    common sense.  It is more than your right

6    to use your common sense.  We ask you to

7    please use your common sense.  That's why

8    we've got y'all here to begin with.

9         Do not let sympathy, prejudice or

10   emotion influence your verdict.  Do not

11   base your verdict upon any preconceived

12   ideas of what would be a popular or

13   unpopular verdict.  As you know, your

14   verdict must strictly be based on the

15   evidence presented and the law that applies

16   to the case.

17        Also, I want to explain to you

18   that before you can reach a verdict, all

19   twelve of you must agree on that verdict.

20   It cannot be a split verdict, it must be

21   unanimous.  In a moment when you go back to

22   the jury room, the first thing you need to

23   do is select a person to act as your

24   foreperson.  That person has no greater

25   weight in your deliberations than anyone

1    else.    That person is simply going to act

2    as your spokesperson.

3            I also notice that some of y'all

4    have taken notes, and that's fine.    I

5    encourage that.    I have no problem with

6    that.    Just because someone has something

7    written down as a note doesn't mean that

8    that's exactly the way it happened.    Rely

9    on -- each of y'all has a say on what goes

10   on back there.    If your recollection

11   differs from someone else's notes, the fact

12   that someone took a note doesn't

13   necessarily make it so.    Y'all need to talk

14   it out and arrive at the true facts of the

15   case.

16            In the course of your

17   deliberations you may have a question.    If

18   you do so, knock on this door that is

19   around on this side.    Someone from my

20   office will come answer the door.    Write

21   down your question on a piece of paper.

22   We'll do our very best to answer the

23   question.    I can promise you one thing, we

24   won't ignore your question.    However, I

25   don't think I can promise -- I may not be

1      able to answer your question.  Let me just

2      kind of give you this little test.  If it

3      is a question about the facts of the case,

4      what a witness said or something like that,

5      I probably will not be able to help you.

6      That is your job to decide the facts.  If

7      it is a question about the law, I may well

8      be able to help you.  My role is more with

9      the law.  But if you have a question, write

10     it down on a piece of paper, knock on

11     door.  We'll come and get you.

12              When you reach a verdict, have

13     your -- knock on the door.  We'll come and

14     get you.  Have your -- you need to fill out

15     this verdict form.  The verdict form -- I

16     don't know how well you can see this, but

17     it says, we, the jury, find the defendant

18     guilty of intentional murder as charged in

19     the indictment.  Or, second part.  We the

20     jury find the defendant not guilty.  Check

21     here if you find the defendant guilty, here

22     if you find the defendant not guilty.  Have

23     your foreperson print his name.  The

24     foreperson signs it.  Dates it.  Knock on

25     this door.  Again, we'll come and get you.

1           One last thing I have got to do

2      before we let you begin your

3      deliberations.  I keep talking about it has

4      got to be unanimous.  All twelve of you

5      have to agree.  You may have noticed we

6      have thirteen people here today.

7           Mr. Carr, you are our alternate

8      juror.  I always feel badly for the

9      alternate juror.  He has to sit there and

10     hear all the evidence.  You get right up to

11     the brink of actually being able to do

12     something in the case and we pull you back

13     and we won't let you decide.  However, some

14     people are happy at that point.  They don't

15     have to make that decision.

16          The reason we put an alternate on

17     the jury is you never know when someone is

18     going to have a family emergency or become

19     ill or something.  If that were to happen,

20     we would have to start all over.  So that's

21     why we have an alternate.  I hope you

22     understand, and we do appreciate your being

23     here.  I'm going to send you back.  Let you

24     begin your deliberations.  Ms. Shelton will

25     bring the exhibits back to you in just a

1    second.

2            (The jury begins their

3    deliberations.)

4            THE COURT:  Just note on the

5    record the parties -- both parties are

6    satisfied with the charge.

7            (Brief Recess.)

8            (The following proceedings were

9    held outside the presence and hearing of

10   the jury.)

11           THE COURT:  Let me have

12   everybody's attention while we are waiting

13   for everybody to get here.  When the jury

14   gives their verdict, I don't want there to

15   be any outbursts in this courtroom.  I

16   don't want there to be any noise.  I don't

17   want there to be any amens, hallelujahs or

18   regrets or anything else.  If you cannot

19   restrain yourself when the verdict is going

20   to be read, go ahead and leave now.

21   Otherwise, we are going to be spending some

22   extra time with you this afternoon.

23           When the verdict is read, the

24   Friendly family and their friends are going

25   to leave the courtroom first.  Then we are

1      going to let the jury leave.  Then we will

2      let the Joyce family leave.  I'm not going

3      to have altercations or anything in this

4      courthouse.  If there is anybody that can't

5      handle that, leave now and get out of the

6      courthouse.  Okay?

7                    (The jury enters the courtroom.)

8                    THE BAILIFF:  Be seated.

9                    THE COURT:  Ladies and gentlemen,

10     I understand y'all have reached a verdict?

11                   THE FOREPERSON:  Yes, sir, we

12     have.

13                   THE COURT:  I will read the

14     verdict form that you just handed me.  In

15     the Circuit Court of Montgomery County,

16     Alabama, the State of Alabama versus

17     defendant Darryl Joyce.  We the jury find

18     the defendant guilty of intentional murder

19     as charged in the indictment.  Is that

20     y'all's verdict?

21                   THE FOREPERSON:  Yes, it is, Your

22     Honor.

23                   THE COURT:  Okay.  MR. HARTLEY:

24     We ask for a poll of the jurors.

25                   (At which time the Court polls

1          the jury.)

2                    THE COURT:  The Court will enter

3          an adjudication of guilty on the charge of

4          murder in this case.  Ms. Friendly, if you

5          want to leave with your family and friends

6          right now, I would appreciate that.

7                    (Parties leaving the courtroom.)

8                    THE COURT:  Members of the jury,

9          I appreciate your service.  It was a

10         difficult case, I understand.  I appreciate

11         y'all hanging in there with us these two

12         days.  The only good news I can give you is

13         you are released for the rest of this day.

14         You need to call code-a-phone tonight and

15         they will let you know if you need to be

16         back in the morning or not.

17                    Again, every Judge, everybody

18         that works here at the courthouse deeply

19         appreciates y'all doing your civic duty of

20         coming down here and giving us your time.

21         Thank you.  If y'all will go back this way,

22         the deputy will take y'all out of the

23         courthouse.

24                    (The jurors exit the courtroom.)

25                    THE COURT:  Wiley, you need to

1    apply for a presentence report, and we will

2    do the sentencing on August 18th.

3              MR. POWELL:  Judge, did you

4    accept the verdict and adjudicate Mr. Joyce

5    guilty?

6              THE COURT:  Yes, I did.

7              MR. POWELL:  At this point, just

8    for the Record, the State is putting the

9    Court on notice of three prior felony

10   convictions for the purpose of the Habitual

11   Felony Offender Act.

12             THE COURT:  Anything else here

13   today?  The Court is in recess.

14             (COURT ADJOURNED.)

15

16

17

18

19

20

21

22

23

24

25

1              IN THE FIFTEENTH JUDICIAL CIRCUIT
            IN AND FOR MONTGOMERY COUNTY
2                   MONTGOMERY, ALABAMA

3

4

5       STATE OF ALABAMA,

6              Plaintiff,

7       VS.                          CRIMINAL ACTION

8       DARRYL J. JOYCE,             NO. 02-1417

9              Defendant.

10      _____/

11      COURT REPORTER'S TRANSCRIPT OF SENTENCING

12                  AUGUST 18, 2003

13          MONTGOMERY COUNTY COURTHOUSE

14              COURTROOM 3-A

15

16      BEFORE:  THE HON. TRUMAN M. HOBBS, JR.

17              CIRCUIT JUDGE

18

19                  APPEARANCES

20

        FOR THE STATE:
21      WILLIAM POWELL, ESQUIRE
        DEPUTY DISTRICT ATTORNEY
22      MONTGOMERY, ALABAMA

23      FOR THE DEFENDANT:
        J. WILEY HARTLEY, ESQUIRE
24      MONTGOMERY, ALABAMA

25

```
1              *  *  *  *  *  *  *  *  *  *  *  *  *  *  *

2              THE COURT:  Wiley, do you want

3        a formal sentencing hearing?

4              MR. HARTLEY:  Judge, this might

5        rise to the level of a formal sentencing

6        hearing.  We want to have an opportunity

7        for Mr. Joyce to speak if he is inclined

8        but we definitely want to have some

9        testimony from his mother -- and I'm

10       sorry, I will have to get you to

11       introduce this person to the Court, if

12       you would.

13             MS. PATTERSON:  I'm Pat

14       Patterson.  I'm his aunt.

15             MR. HARTLEY:  Yes, Judge.  We

16       do want to take these people.  If you

17       want to put them under oath or however

18       you want to proceed, Judge.

19             Judge, what I would like to

20       mention on behalf of Mr. Joyce is that

21       the Court, I presume, has looked at this

22       presentence report, which reflects part

23       of Mr. Joyce's record.  We submit to the

24       Court that of interest here, Judge, is

25       that I believe he has had no convictions
```

1    for anything other than class C

2    felonies.  The assault seconds on this

3    record are class C's.

4           I don't know what the State

5    might say about those cases but an

6    assault second is always a class C

7    felony.  Some of those original charges

8    -- one of them was disposed of by a

9    conviction of a misdemeanor.  So it

10    wasn't a class C felony when it was done.

11    That was a 1997 case.

12           We ask that the Court take all

13    the matters into consideration.  When we

14    hear from his mother and from his aunt,

15    that the Court only consider the

16    alternative for life in this case.  I

17    think that would be -- I think that would

18    be the correct sentence for Mr. Joyce

19    under the circumstances.  I would like to

20    let her speak, Ms. Ruby Joyce.

21           MS. JOYCE:  Judge, I would just

22    like to take this time to just really put

23    my son's life in your hands, on the mercy

24    of the Court.  He is the only son I

25    have.  I was married to his father for

1    twenty-seven years.  His father is now

2    deceased.  He died while he was in jail.

3    He has been dead now six years.

4            He has two daughters, one ten

5    and one eight.  I just would like to put

6    myself and my son and the family on the

7    Court's mercy.

8            THE COURT:  Thank you, ma'am.

9            MR. HARTLEY:  Ms. Patterson,

10   you want to say anything?

11           MS. PATTERSON:  Good morning.

12   How are you doing?  I would just like to

13   appeal for a life sentence.  I am aware

14   of his past.  All things considered, I

15   would really appreciate some mercy.

16           THE COURT:  Okay.

17           MR. POWELL:  Judge, first of

18   all, the victim's family is present.

19   They just are going to choose to remain

20   seated there because of the emotion

21   involved in the case.

22           We have a victim's impact

23   statement.  Does Your Honor have one in

24   the file?  If not, I would be happy to

25   provide you my copy.

1          THE COURT:  I don't.

2          MR. POWELL:  Here, Your Honor.

3          MR. HARTLEY:  We would like to

4     get a copy.

5          MR. POWELL:  We can arrange for

6     that, Judge.  The main thing I would like

7     to address at sentencing, Judge, is --

8          (Off-the-Record Discussion.)

9          THE COURT:  Let's just take a

10    two-minute break.  Let's make sure

11    everybody has got everything.

12         (Brief Recess.)

13         THE COURT:  Okay.  I have read

14    these letters.  I appreciate that.

15         MR. POWELL:  Judge, the main

16    thing I want to address at this point is

17    the Defendant's record.  Though Mr.

18    Hartley was correct that all of the

19    charges or most of them were either class

20    C misdemeanors or felonies or a

21    misdemeanor -- class C felonies or

22    misdemeanors, they all involve offenses

23    where the defendant was shooting at

24    people, at vehicles, or actually shooting

25    people.

1          It is just the way the assault

2     statutes are written in the State of

3     Alabama, particularly until recently

4     until they changed the law on how you

5     define serious physical injury.  Back

6     then it basically had to be life

7     threatening.  And if you just shoot

8     somebody in the leg or the arm or

9     something like that, then that's just a

10    class C felony.

11         But nonetheless, the first

12    offense occurred on 10/15 of 1994.  The

13    victim is Quivan (sic) Martin.  Stand up,

14    Quivan.  This individual, they were at an

15    intersection of Bitner and Sherwood, and

16    the defendant fired a .32 revolver at the

17    victim while the victim was inside

18    his '79 Olds Cutlass.

19         I think the defendant then gave

20    a statement in that case and said that he

21    shot four times and scared the victim.

22    Hit the windshield and ran and disposed

23    of his gun by giving it to a junky.

24         The next incident in this case

25    was nol-prossed but it was part of a

1      package deal with the prior case.  On

2      11/7 of '94 he again had an altercation

3      with Mr. Martin.  The victim, Mr. Martin,

4      was leaving the Hardee's restaurant over

5      around Oak and Mill Street.  The

6      defendant and several others followed.

7      One of them was hanging out the window

8      shooting.  Five shots were fired at the

9      victim's Olds Cutlass in that case.

10            MR. HARTLEY:  Your Honor, can I

11     interject -- I mean interrupt and ask Mr.

12     Powell to distinguish these by case

13     numbers so we will know exactly where we

14     are.  The first one -- go back and cite

15     for us, please, the case number on the

16     first one.

17            MR. POWELL:  The first incident

18     where he shot at Mr. Martin's car was

19     CC 94-2506.  Here is my certified prior

20     felony conviction on that one if you want

21     to look at it.  The second incident

22     involving Mr. Martin was CC 95 -- looks

23     like 132.

24            THE COURT:  Is this the one

25     that was nol-prossed?

1          MR. POWELL: This is the one
2     that was nol-prossed.
3          THE COURT: I can't consider
4     one that has been nol-prossed. Let's
5     don't even go there. That just creates a
6     problem for everybody.
7          MR. POWELL: The next incident
8     -- and this is going to be CC 96-1980.
9     It is an assault in the second degree.
10    The victim in that case was an individual
11    named Johnny Lawson, Jr. Here is our
12    certified on that one. The facts in this
13    case are markedly similar to the facts in
14    the case you heard at trial, Judge.
15         Basically, the victim and the
16    defendant were in an argument. The
17    defendant just pulled out a gun and shot
18    the victim. The victim ran and the
19    defendant shot him again in the leg.
20    There were several witnesses, and he pled
21    guilty to that count.
22         The next incident -- looks like
23    it is going to be CC 97-1984 and 1985.
24    These were felony convictions for assault
25    in the second degree. That involved an

1    individual named Henry Green and Pleasant

2    Polanski.  There the defendant and the

3    victims were all stopped at the same red

4    light.  Apparently words were exchanged

5    between the cars, and the defendant

6    pulled a gun and shot at the car five to

7    six times hitting both of the victims in

8    the process.  He pled guilty to that and

9    received a sentence of fifteen years

10   split to serve three.

11        The final case -- these were

12   the assault seconds that were pled out to

13   misdemeanors, were CC 97-2031 and

14   97-2053.  I have got certifieds on them.

15        MR. HARTLEY:  They are just

16   misdemeanors, Judge.  They are not

17   priors.

18        MR. POWELL:  We are not

19   offering them as priors.  We have already

20   got three priors, but he can consider

21   them for sentencing purposes.  They were

22   reduced to misdemeanors.

23        In that case, the victims were

24   Tawan Brown and Steven Stewart.  They are

25   driving through the Windy Wood

1          Apartments.  The defendant was driving in

2          the opposite direction.  They passed each

3          other at a speed bump, and the defendant

4          shot at the victim's car.  He shot Mr.

5          Stewart in the face and leg and he shot

6          Mr. Brown in the shoulder.  I think those

7          were pled out in a package deal with the

8          prior two felony convictions with Mr.

9          Green and Mr. Polanski.

10                    So, basically, if you look at

11         the defendant's priors, Judge, we have

12         got a progressive pattern from

13         discharging a gun into occupied vehicles,

14         to shooting at people, to actually

15         shooting people on one, two, three, four,

16         five people he has actually shot --

17         actually bullets hit them and one person

18         he shot at.

19                    That's before we even get to

20         this case you heard at trial, which he

21         finally lost his temper, or whatever you

22         want to call it out there, shot and

23         killed Mr. Friendly for basically no

24         apparent reason whatsoever.  At this

25         point --

```
 1                    THE COURT:  Am I correct he was
 2        on probation at the time he --
 3                    MR. POWELL:  That would be
 4        accurate, Judge.
 5                    THE COURT:  How long had he
 6        been out?
 7                    MR. POWELL:  That, I'm not
 8        sure.  It hadn't been long.
 9                    THE COURT:  Yeah.
10                    MR. POWELL:  I can't remember
11        what the witnesses told me.
12                    THE COURT:  Wiley, anything
13        y'all want to say?
14                    MR. HARTLEY:  Mr. Joyce wants
15        to speak, Judge.
16                    THE DEFENDANT:  Yes, Your
17        Honor.  Your Honor, I did that.  I did
18        all that.  Some of the issues I was
19        trying to get Mr. Hartley to speak at
20        trial, he said he couldn't bring forth
21        because I didn't take the stand with it.
22        I didn't kill the dude and ran to
23        California.  I seen the dude.  I know who
24        killed the dude.  When he was killed, me
25        and my home boy, we left.
```

1          THE COURT:  I'm sorry.  What

2     did you say?

3          THE DEFENDANT:  When the dude

4     was killed, the dude I was with, we

5     left.  Some dudes called on my cell

6     phone, which the only dude that have my

7     cell phone, right?  That's the only dude

8     I know.  And I met D. . .

9     (unintelligible).  When D called my cell

10    phone said if you and your home boy talk

11    to the police in any kind of way, you'll

12    end up like Boo or somebody close to

13    you.  I ain't trying to make up no lies.

14    It scared me for my folks.  I thought the

15    best thing for me to do is just leave.  I

16    told them on the phone, I said, look,

17    man, y'all ain't got to worry about me

18    because I'm gone.  Plus, I just got out

19    of prison five years.  I did five years.

20    I left for the safety of my folks in case

21    their house didn't got shot up.

22          A few years ago, I catch

23    another case or maybe somebody kill me.

24    That's the reason I left.  I ain't get in

25    no argument with no dude about who the

1    baddest.   The argument was about some

2    money.   Boo and Rabbit was arguing about

3    money.   Boo told Rabbit, man, you going

4    to take my mother fuckin' money, like

5    that.   I was trying to break them up.   I

6    thought Boo was from Smiley Court.   They

7    were still arguing.

8            I told -- I told Boo -- I told

9    Boo, I said, look, man, whatever he -- I

10   know now he had some stuff.   I said, man,

11   whatever you owe him give it back to

12   him.   He said no, fuck that.   It's the

13   principle.   He got me fucked up.   He

14   ain't going to take my shit like that.

15   Boo said, you know, I'll come back and

16   shut this bitch down.   Rabbit said, you

17   ain't gonna shut shit down in Smiley

18   Court.

19           THE COURT:   Mr. Joyce, I will

20   listen to whatever you have got to say

21   but I don't decide your guilt or

22   innocence.

23           THE DEFENDANT:   It's the facts

24   that Mr. Hartley couldn't bring up that I

25   was telling him.

1          THE COURT:  The jury found you

2     guilty.  I've got to respect that

3     verdict.  I can't substitute my judgment

4     for the jury's verdict.

5          THE DEFENDANT:  I ain't shoot

6     the man, Mr. Hobbs.

7          THE COURT:  I can't -- the jury

8     says you did.  As far as I'm concerned --

9          THE DEFENDANT:  The dude that

10    came with me -- excuse me.  The dude that

11    came with him said who shot him.  Bryant

12    Thomas told the detective who shot him.

13    The gun was in the courtroom.  That's the

14    gun Rabbit had.  I was stopping Rabbit

15    from shooting me.  He told D to shoot

16    Boo.  Boo was shooting at Bryant Thomas.

17         THE COURT:  Anything else?

18         THE DEFENDANT:  Then the girl

19    in the corner said he was in the house

20    but first she said he fled the scene.  I

21    ain't shoot the dude.  The only thing I

22    knew -- I didn't shoot the dude.  I know

23    who did it.

24         THE COURT:  I understand you

25    are saying you are innocent.

1          THE DEFENDANT:  I ain't fixing

2     to -- ain't no way in the world I am

3     going to walk up to somebody I don't know

4     and say I'm badder than you.  I didn't

5     even know the man.  I was trying to break

6     them up.  I didn't want to be around no

7     trouble.  I just got out of prison.

8          THE COURT:  Anything else?

9          MR. HARTLEY:  Judge, if Mr.

10    Joyce wants to say more, I want him to

11    have every opportunity to speak to the

12    Court.  Judge, I would say that we would

13    ask you to consider the life sentence

14    because even at his best hope he will

15    serve a very, very, very long time on a

16    life sentence.  We ask the Court not to

17    take away that twenty years from now or

18    thirty years from now he might make a

19    parole date.  That's all we are asking

20    because the finality of a life without

21    parole sentence, Judge, we believe

22    doesn't fit this case.

23          MR. POWELL:  Your Honor, I just

24    remind you of the names of Quivan Martin,

25    Johnny Lawson --

1          THE DEFENDANT:  Your Honor, I

2     did that.

3          MR. POWELL:  -- Henry Green,

4     Pleasant Polanski, Tawan Brown, Steven

5     Stewart, and now James Friendly.  Enough

6     is enough.

7          THE DEFENDANT:  Your Honor, I

8     did that.  I was young.  I did that, but

9     if you know the issues behind that, it

10    was either me or them.  I didn't kill

11    this dude here.  Like I said, I know who

12    killed him.  I seen who killed him.  I

13    was right there.  B.K., he say -- he got

14    on the stand.  He said he didn't know the

15    dude but him and Rabbit, they grew up

16    together.  I know D, so I know you know

17    him.  The girl said when she came outside

18    they fled the scene.  Then she come to

19    court and say he was in the house when

20    she went outside.  Rabbit said he was

21    across the street.

22         THE COURT:  The problem in this

23    whole thing, you got two guys -- what I

24    remember the testimony being, it is

25    pretty clear to me, both in gangs.  I'm

1    not going to consider that for the

2    sentencing but, you know, I don't see any

3    thirty-five year old gangsters in the

4    courtroom.  They are either dead like Boo

5    or they are standing where you are.

6    That's the problem here is guns.

7    Shooting has just gotten to be a way of

8    life with some folks.

9              I'm sorry, Ms. Joyce.  I don't

10   know what got your son headed down this

11   path but that's the path he chose.

12   Sometimes I don't follow the

13   prosecution.  Sometimes I strongly

14   disagree with them.  But, you know, you

15   shot too many people, man.

16             THE DEFENDANT:  Judge, if you

17   just knowed everything.  In your

18   courtroom, the dude was lying on me.

19             THE COURT:  Mr. Joyce, let me

20   just say this.

21             THE DEFENDANT:  I was holding

22   my composure.

23             THE COURT:  I had a previous

24   case.  The jury found the guy -- a very

25   serious crime.  They found him guilty of

1       a lesser crime.  If they found him guilty

2       of the serious crimes, I would have

3       thrown the book at him but I couldn't do

4       it because I had to respect their verdict

5       when they found him guilty of relatively

6       lesser crimes.

7              But the jury has found you

8       guilty.  I can't do anything about that.

9       I have to believe -- I have to sit up

10      here and accept their jury verdict even

11      if I disagreed with it, which I don't.

12      They found you guilty.  And that's what

13      I'm looking at now.  You've shot at four

14      or five people.  Now, you killed a man.

15             THE DEFENDANT:  I didn't kill

16      that dude.

17             THE COURT:  Well, I think you

18      did.  The jury sure thought you did.

19             THE DEFENDANT:  The only reason

20      I was in California -- he never said why

21      I was in California.

22             THE COURT:  I don't think being

23      in California helped you one bit.

24             THE DEFENDANT:  The dude -- if

25      me and you go to a party and somebody

1    kill me, I know you know who killed me.

2            THE COURT:  If I go to a party,

3    I'm not going to carry a gun and I'm not

4    going to be at a party calling people

5    -- using the kind of language you've

6    just used in my courtroom.

7            THE DEFENDANT:  I'm just

8    speaking from the heart.

9            THE COURT:  Mr. Joyce, you have

10   got to learn to turn and walk away.

11           THE DEFENDANT:  I apologize,

12   Judge, for cussing.

13           THE COURT:  Don't apologize to

14   me.

15           THE DEFENDANT:  I ain't killed

16   all -- Ms. Friendly, I ain't killed your

17   son.

18           MS. FRIENDLY:  D said you did.

19   I don't --

20           THE COURT:  We are not going

21   there.  I'm going to sentence you to life

22   without parole.  I'll order you to pay

23   fifty dollars to the Crime Victims

24   Compensation Fund.

25           THE DEFENDANT:  What, Your

1    Honor?

2         THE COURT:  Restitution in the

3    amount of?

4         MR. POWELL:  The restitution

5    totals seven thousand six hundred and

6    seventy-five dollars and fifty-one cents.

7         THE COURT:  All right.

8    Restitution in that amount.  Court

9    costs.  A hundred and fifty dollars

10   attorney fee.  You have a right to appeal

11   your conviction and your sentence.  We

12   will appoint an attorney for you if you

13   can't afford one.  We'll give you a

14   transcript of the proceedings free of

15   charge.

16        MR. HARTLEY:  Judge, he does

17   give notice of appeal, both the sentence

18   and the trial -- and the conviction,

19   Judge.  We ask that the Court appoint him

20   a counsel on appeal, provide him with a

21   transcript.

22        THE COURT:  You need to enter a

23   piece of paper withdrawing.

24        MR. HARTLEY:  Yes.  I will make

25   a motion to withdraw.  I know you always

1    appoint.

2              MR. POWELL:  Are there any

3    fines or attorneys fees in this case?

4              THE COURT:  I said a hundred

5    fifty dollar attorney fee, I believe.

6    Fifty dollars Crime Victims Compensation

7    Fund.

8              MR. HARTLEY:  Judge, I have

9    gone over this with my client, but I

10   think we need to make a record on this.

11   We ask for an appeal bond, Judge.

12             THE COURT:  I'm not going to

13   give it.

14             MR. POWELL:  Besides that,

15   Judge, under the Rules of Criminal

16   Procedure in a sentence of twenty years

17   or more, you are ineligible for an appeal

18   bond.

19             MR. HARTLEY:  We just want that

20   on the Record.

21             THE COURT:  I understand.  It

22   is on the Record.  That's it.

23             END OF PROCEEDINGS

24

25

CERTIFICATE

STATE OF ALABAMA        )
COUNTY OF MONTGOMERY   )


I, JUDY E. SHELTON, OFFICIAL COURT REPORTER IN AND FOR THE FIFTEENTH JUDICIAL CIRCUIT, MONTGOMERY COUNTY, ALABAMA, DO HEREBY CERTIFY THAT I REPORTED IN MACHINE SHORTHAND THE FOREGOING HEARING AS STATED IN THE CAPTION HEREOF; THAT MY SHORTHAND NOTES WERE LATER TRANSCRIBED BY ME OR UNDER MY SUPERVISION, AND THAT THE FOREGOING PAGES REPRESENT A FULL, TRUE AND CORRECT TRANSCRIPT OF SAID PROCEEDINGS; THAT I AM NEITHER KIN NOR OF COUNSEL TO ANY PARTIES IN THIS PROCEEDING NOR IN ANY WAY INTERESTED IN THE RESULTS THEREOF.

DATED THIS THE ____ DAY OF _____, 2003.


_____

JUDY E. SHELTON
OFFICIAL COURT REPORTER

<u>C E R T I F I C A T E</u>

STATE OF ALABAMA        )
COUNTY OF MONTGOMERY    )


          I, JUDY E. SHELTON, OFFICIAL

COURT REPORTER IN AND FOR THE FIFTEENTH

JUDICIAL CIRCUIT, MONTGOMERY COUNTY,

ALABAMA, DO HEREBY CERTIFY THAT I

REPORTED IN MACHINE SHORTHAND THE

FOREGOING HEARING AS STATED IN THE

CAPTION HEREOF; THAT MY SHORTHAND NOTES

WERE LATER TRANSCRIBED BY ME OR UNDER MY

SUPERVISION, AND THAT THE FOREGOING PAGES

REPRESENT A FULL, TRUE AND CORRECT

TRANSCRIPT OF SAID PROCEEDINGS; THAT I AM

NEITHER KIN NOR OF COUNSEL TO ANY PARTIES

IN THIS PROCEEDING NOR IN ANY WAY

INTERESTED IN THE RESULTS THEREOF.

          DATED THIS THE 10th DAY OF Nov.,

2003.


                    _Judy E. Shelton_

                    JUDY E. SHELTON

                 OFFICIAL COURT REPORTER

CR - 02 - 2104
Part 5 of 5

**DOCUMENT NAME:** Joyce, Darryl Jevon

**CLIENT & MATTER:** 58199-001

**DESCRIPTION:**

County: Montgomery          CWOP

CC#s: 2002 - 1417

Attorney: Jean Therkelsen

Circle: (TRANSCRIPT)    CASE FILE    BOTH

3 volumes

## CERTIFICATION

I hereby certify that the preceding imaged records and documents

are a true, accurate, and complete image of the original records or

documents as received by the Office of the Attorney General of

the State of Alabama.

This the 19th day of January, 2005.

Signed: _Melisa C. Martin_

Notary: _Coleen F Gibson_

Coleen F. Gibson
Notary Public
Commission expires 06/11/06