B VOL 2 of 5

COURT OF CRIMINAL APPEALS NO. CR-02-2104

# APPEAL TO ALABAMA COURT OF CRIMINAL APPEALS

FROM

CIRCUIT COURT OF  MONTGOMERY  COUNTY, ALABAMA

CIRCUIT COURT NO.    CC 2002-1417

CIRCUIT JUDGE    HOBBS

Type of Conviction / Order Appealed From:    INTENTIONAL MURDER

Sentence Imposed:    LIFE WITHOUT PAROLE

Defendant Indigent:  ■ YES  ☐ NO

DARRYL JEVON JOYCE
NAME OF APPELLANT

AIMEE C. SMITH                    (334) 264-6466
(Appellant's Attorney)                 (Telephone No.)
640 S. MCDOUNOUGH STREET
(Address)
MONTGOMERY        AL        36104
(City)          (State)        (Zip Code)

V.

STATE OF ALABAMA

NAME OF APPELLEE

(State represented by Attorney General)
NOTE: If municipal appeal, indicate above, and enter
name and address of municipal attorney below.

_____

_____

(For Court of Criminal Appeals Use Only)

Part 2 of 5



1       IN THE FIFTEENTH JUDICIAL CIRCUIT

2           IN AND FOR MONTGOMERY COUNTY

3               MONTGOMERY, ALABAMA

4

5    STATE OF ALABAMA,                    **COPY**

6               Plaintiff,

7    VS.                          CRIMINAL ACTION

8    DARRYL J. JOYCE,             CASE NO. 02-1417

9               Defendant.

10   _____/

11

12               INDEX OF PROCEEDINGS

13   TRIAL . . . . . . . . . . . .   Page   8

14   SENTENCING . . . . . . . . . .   Page 376

15

16

17

18

19

20

21

22

23

24

25

1

2             IN THE CIRCUIT COURT OF

3           MONTGOMERY COUNTY, ALABAMA

4

5     STATE OF ALABAMA,              )

6                 Plaintiff,        )

7     VS.                           )  CC NO. 02-1417

8     DARRYL J. JOYCE,              )

9                 Defendant.        )

10     _____/

11

12     **INDEX TO REPORTER'S TRANSCRIPT ON APPEAL**

13     <u>EXHIBITS</u>                        <u>ADMITTED</u>

14     SX 1 - Photograph                 186

15     SX 2 - Photograph                 186

16     SX 2A - Photograph                193

17     SX 3 - Photograph                 186

18     SX 4 - Photograph                 186

19     SX 5 -  Photograph                186

20     SX 6 -  Photograph                145

21     SX 7 - Photograph                 138

22     SX 8 - Photograph                 252

23     SX 9 - Photograph                 144

24     SX 10 - Photograph                252

25     SX 11 - Photograph                252

1    SX 12 - Photograph                              252

2    SX 13 -  Photograph                             252

3    SX 14 - Photograph                              252

4    SX 15 -  Gun Casing                             240

5    SX 16 - Gun Casing                              240

6    SX 17 - Gun Casing                              240

7    SX 20 - Forensic Science                        297

8             Documents

9    SX 20A - Dr. Bristol's CV                       295

10   SX 21 - Weapon                                  319

11   SX 27 - Diagram of Smiley Court                 249

12   SX 27A - Police Dept. Document                  249

13   SX 29 - Photocopy of James                      144

14            Friendly

15   SX 31 - Photocopy of Projectile                 284

16

17   DX1 - Photo lineup                              319

18

19

20

21

22

23

24

25

1

2                    IN THE FIFTEENTH JUDICIAL CIRCUIT
                      IN AND FOR MONTGOMERY COUNTY
3                        MONTGOMERY, ALABAMA

4

5

6        STATE OF ALABAMA,

7                    Plaintiff,

8        VS.                              CRIMINAL ACTION

9        DARRYL J. JOYCE,                   NO. 02-1417

10                   Defendant.

11       _____/

12

13                    TRANSCRIPT OF PROCEEDINGS
                         JULY 21 - 22, 2003
14                  MONTGOMERY COUNTY COURTHOUSE
                          COURTROOM 3-A

15

16       BEFORE:  THE HON. TRUMAN M. HOBBS, JR.

17                 CIRCUIT JUDGE

18

19                        APPEARANCES

20

         FOR THE STATE:
21       WILLIAM POWELL, ESQUIRE
         VERNETTA PERKINS, ESQUIRE
22       DEPUTY DISTRICT ATTORNEY
         MONTGOMERY, ALABAMA
23
         FOR THE DEFENDANT:
24       J. WILEY HARTLEY, ESQUIRE
         MONTGOMERY, ALABAMA
25                       JUDY E. SHELTON
                    OFFICIAL COURT REPORTER

5

1

2                                    INDEX

3                   JURY VOIR DIRE. . . . . . . .              8

4

5                        ERIC STEWART

6       Direct Exam. by Mr. Powell . . .           77

7       Cross Exam. by Mr. Hartley . . .          118

8       Redirect Exam. by Mr. Powell . .          142

9       Recross Exam. by Mr. Hartley . .          145

10

11                        J. MACKEY

12      Direct Exam. by Mr. Powell . . .          148

13

14                      JOHNNY OSBORNE

15      Direct Exam. by Mr. Powell . . .          159

16      Cross Exam. by Mr. Hartley . . .          174

17      Redirect Exam. by Mr. Powell . .          179

18

19                      C.J. GRANDISON

20      Direct Exam. by Mr. Powell . . .          182

21

22                      BRIAN OSBORNE

23      Direct Exam. by Mr. Powell . . .          199

24      Cross Exam. by Mr. Hartley . . .          213

25      Redirect Exam. by Mr. Powell . .          220

1    Recross Exam. by Mr. Hartley . .          222

2    Redirect Exam. by Mr. Powell . .          226

3

4              E.E. HOWTON,

5    Direct Exam. by Mr. Powell . . .          231

6    Cross Exam. by Mr. Hartley . . .          256

7    Redirect Exam. by Mr. Powell . .          274

8    Recross Exam. by Mr. Hartley . .          277

9    Redirect Exam. by Mr. Powell . .          278

10   Recross Exam. by Mr. Hartley . .          278

11

12            KATHERINE RICHART

13   Direct Exam. by Mr. Powell . . .          279

14

15             DR. BEN BRISTOL

16   Direct Exam. by Mr. Powell . . .          292

17

18            NICOLE JUDKINS

19   Direct Exam. by Mr. Powell . . .          305

20   Cross Exam. by Mr. Hartley . . .          311

21

22             E.E. HOWTON,

23   Direct Exam. by Mr. Hartley . . .          320

24   Cross Exam. by Mr. Powell . . . .          323

25   Redirect Exam. by Mr. Hartley . .          325

1      Recross Exam. by Mr. Powell . . .        326

2      Redirect Exam. by Mr. Hartley . .        327

3

4

5

6      COURT'S ORAL CHARGE TO JURY . . .        361

7      VERDICT. . . . . . . . . . . .           372

8      SENTENCING. . . . . . . . . .            376

9      REPORTER'S CERTIFICATE. . . . . .        398

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2                    * * * * * * * * * * * * * *

3              THE COURT:   It's still morning

4      so good morning everybody.   I told you

5      I'd be seeing some of you shortly.   We

6      are about to start the selection of the

7      jury in the case of State of Alabama

8      versus Darryl Joyce.

9              Mr. Joyce is charged with the

10     crime of murder in this case.   I'm going

11     to tell you that because in a little bit

12     I will be asking if any of you know

13     anything about the facts of this case.

14              Before I do that, I want to

15     introduce to y'all everybody that is

16     seated at the table here.   Representing

17     the State of Alabama are Deputy District

18     Attorneys Will Powell and Ms. Vernetta

19     Perkins.

20              MR. POWELL:   Good morning.

21              MS. PERKINS:   Good morning.

22              THE COURT:   Ms. Perkins, who

23     is --

24              MR. POWELL:   This is Ms. Sally

25     Friendly, Judge.   She is the victim's

1      mother.  She will be seated with us at

2      counsel's table this week.

3              THE COURT:  Okay.  Ms. Sally

4      Friendly.  Over here is Mr. Wiley

5      Hartley.  He is an attorney for the

6      defendant.  Seated with him is Mr.

7      Joyce.  I have introduced everybody up

8      here to you.

9              What I'm going to do now is ask

10     the clerk to call the roll.  When he

11     calls your name, if you would please

12     stand up, tell us what you do for a

13     living, what your spouse does for a

14     living.  If you are retired, tell us what

15     you did before you retired.  And if your

16     spouse retired, what your spouse did

17     before he or she retired.  Okay.

18             (At which time the roll of the

19     venire was called.)

20             THE COURT:  Okay.  I'm going to

21     ask everybody a few questions.  If you

22     need to respond to a question, if you

23     would stand up and repeat your name for

24     us and tell us whatever information you

25     need to give us.

1          If I ask a question that refers
2   to family members, I'm referring to your
3   spouse, your children, your
4   grandchildren, your parents,
5   grandparents, brothers and sisters.  Let
6   me say up front, we are not trying to
7   delve into your personal life.  We are
8   not here to embarrass anybody.  If you
9   need to make a response that you find
10  would be embarrassing to say in front of
11  a room full of strangers, that's fine.
12          When we ask everybody to go
13  back to the jury assembly room, you just
14  stay behind and share with us whatever
15  information you think you need to give
16  us.
17          As I said earlier, Mr. Joyce is
18  seated here.  Are any of y'all related to
19  him by blood or marriage or anyway
20  personally acquainted with Mr. Joyce?
21  Are any of y'all related by blood or
22  marriage or personally acquainted with
23  his attorney Wiley Hartley who is seated
24  here?  Have any of y'all ever been to his
25  office for any reason?

1              The State of Alabama is

2       represented by Deputy District Attorney

3       Will Powell and Vernetta Perkins.  Our

4       District Attorney is Ellen Brooks.  Are

5       any of y'all related by blood or marriage

6       to any of those folks or personally

7       acquainted with them for any reason?

8       Yes, ma'am?

9              PROSPECTIVE JUROR:  My name is

10      Sarah Andrews.  I'm acquainted with Ellen

11      Brooks.

12             THE COURT:  How are you

13      acquainted, Ms. Andrews?

14             PROSPECTIVE JUROR:  I handled

15      her insurance when I was with an

16      insurance company.

17             THE COURT:  Other than -- was

18      she personally your client?

19             PROSPECTIVE JUROR:  Well, no.

20      She was just one of our clients.

21             THE COURT:  Did you know her

22      personally at all?

23             PROSPECTIVE JUROR:  I knew her

24      personally, yes.

25             THE COURT:  Just to speak to

1    her?

2              PROSPECTIVE JUROR:  Yes.

3              THE COURT:  She has never been

4    to your house?

5              PROSPECTIVE JUROR:  No.

6              THE COURT:  Y'all don't go eat

7    meals together or anything like that?

8              PROSPECTIVE JUROR:  No, sir.

9              THE COURT:  Thank you, Ms.

10   Andrews.  Anybody else personally

11   acquainted with any of the District

12   Attorneys or Ms. Brooks?  Yes, ma'am?

13             PROSPECTIVE JUROR:  I know

14   Ellen Brooks.  We served on the American

15   Cancer Society Board together.  We don't

16   go to each other's houses or anything

17   like that.

18             MS. PERKINS:  What is your

19   name?

20             PROSPECTIVE JUROR:  Lisa

21   Beers.

22             THE COURT:  And there was one

23   more.  Yes, ma'am?

24             PROSPECTIVE JUROR:  I'm Connie

25   Colvin and it's just kind of a social

1   contact but not like to each other's home

2   or anything.

3          THE COURT:  Y'all know her to

4   speak to her sort of thing?

5          PROSPECTIVE JUROR:  Right.

6          THE COURT:  Would the fact that

7   y'all know Ms. Brooks personally, would

8   that affect your decision in this case

9   one way or the other?

10          PROSPECTIVE JUROR:  No, it

11   wouldn't.

12          THE COURT:  Y'all could call it

13   right down the middle?

14          PROSPECTIVE JUROR:  I don't

15   believe it would be a problem.

16          MR. HARTLEY:  Would you ask

17   those questions of Mr. Bledsoe.  I

18   believe his wife works in the DA's

19   office.  Would you ask him the same

20   line.

21          THE COURT:  Mr. Bledsoe, your

22   wife works in the DA's office?

23          PROSPECTIVE JUROR:  Yes.

24          THE COURT:  Are you personally

25   acquainted with Ms. Brooks?

1          PROSPECTIVE JUROR:  I have only

2     spoken to her.  We are not personally

3     acquainted.

4          THE COURT:  Would the fact that

5     your wife works in the District

6     Attorney's office, would that make it

7     difficult for you to serve on a jury

8     where her office is involved?

9          PROSPECTIVE JUROR:  I don't

10     believe it would.

11          THE COURT:  You still think you

12     could call it right down the middle?

13          PROSPECTIVE JUROR:  I'll do my

14     best.

15          THE COURT:  Okay.

16          MR. HARTLEY:  Thank, you,

17     Judge.

18          THE COURT:  Anybody else?  Any

19     of y'all know anything about the facts

20     and circumstances of this case?  Is

21     anybody here personally acquainted with

22     Mr. Friendly, the victim in this case?

23     Do any of y'all know his mother Ms.

24     Friendly who is sitting over here?

25     Related by blood or marriage to the

1      Friendlys, anybody?

2            I'm going to let y'all ask

3      about the witnesses because all I have

4      got up here is a lengthy list. I don't

5      know who you are actually going to call.

6      So I will let y'all hash that out.

7            Anyone here or any of your

8      family been employed by the Montgomery

9      Police Department or any other law

10     enforcement agency? Yes, Ms. Andrews?

11           PROSPECTIVE JUROR: My son is a

12     DEA instructor at Quantico.

13           THE COURT: Thank you. Anybody

14     else?

15           PROSPECTIVE JUROR: I have a

16     police officer residing with me on a

17     temporary basis. He is going through a

18     divorce. It is a nephew by a previous

19     marriage.

20           THE COURT: And your name is,

21     sir?

22           PROSPECTIVE JUROR: Durden.

23           THE COURT: Mr. Durden, thank

24     you.

25           PROSPECTIVE JUROR: He is a

1          motorcycle officer.

2                    THE COURT:  Okay.  Yes, sir?

3                    PROSPECTIVE JUROR:  I worked as

4          a reserve deputy sheriff in Lee County

5          for about eight years.

6                    THE COURT:  And your name

7          again?

8                    PROSPECTIVE JUROR:  Eubanks.

9                    THE COURT:  Mr. Eubanks, thank

10         you.  Other than Mr. Bedsole, anybody

11         here have a family member that works in

12         the DA's office?  Ever been employed --

13         has anybody in your immediate family ever

14         been employed with the District

15         Attorney's office?  Anybody here have an

16         interest -- I'm sorry, ma'am?

17                   PROSPECTIVE JUROR:  Just

18         friends, a neighbor?

19                   THE COURT:  Well, family

20         members.

21                   PROSPECTIVE JUROR:  No.  A

22         close friend.

23                   THE COURT:  Anybody here -- I'm

24         sorry.  Yes, sir?

25                   PROSPECTIVE JUROR:  Yes.  Ray

1       Caudill.  I'm in that volunteer program
2       for the Montgomery police.  I don't know
3       that that has an impact here or not.
4                 THE COURT:  You just -- you
5       fill in --
6                 PROSPECTIVE JUROR:  Yes.  We
7       patrol special events and I'm doing some
8       work down at the crime scene laboratory.
9                 THE COURT:  Okay.  Thank you,
10      sir.  Anybody else?  Anybody here have an
11      interest in the outcome of this case
12      either way, either for a conviction or
13      for acquittal?  Anybody here for whatever
14      reason just doesn't think you can be fair
15      to one side or the other?
16                In other words, is there
17      anybody here that just doesn't think that
18      for whatever reason they can't call it
19      right down the middle, be fair to
20      everybody in this case?
21                This is one of those questions
22      that could cause somebody some
23      embarrassment.  If you want to wait until
24      we finish with the questions, that would
25      be fine with me.

1          Does anybody have anyone in
2    your immediate family who has been
3    charged with an offense of murder within
4    the last twelve months?  Okay.  I will
5    let the attorneys ask some questions
6    now.
7              MR. POWELL:  Good morning.
8              PROSPECTIVE JURORS:  Good
9    morning.
10             MR. POWELL:  Again, my name is
11   Will Powell.  Before we go any further,
12   now that we have had an opportunity to be
13   in here together and observe one another,
14   I want to ask now that y'all have had an
15   opportunity to see Ms. Friendly, does
16   anyone recognize her, Ms. Sally
17   Friendly?  They live over off the
18   Boulevard.  Okay.
19             I want to talk about the
20   Friendlys.  This is James Friendly's
21   brother, Kevin.  Stand up Kevin.  Does
22   anyone recognize Kevin?  Okay.  Have a
23   seat.
24             Now the victim in this case,
25   James Friendly, also went by the name of

1    Boo.  Does anyone recognize him with that

2    additional piece of information?  And

3    along the same lines, the defendant is

4    known also by the name of Poncho or

5    Puncho or even Willie Faulk.

6              With that additional

7    information does anyone here know or

8    think they may have heard of the

9    defendant or the victim?  Okay.

10             Now, stand up Detective

11   Howton.  This is Detective Gino Howton

12   with the Montgomery Police Department,

13   does anyone know Detective Howton?

14             Okay.  Thank you.  Some other

15   names:  Two brothers, Johnny Osborne and

16   Brian Osborne.  Does anybody know them or

17   think they might?  Another individual

18   lives over in Smiley Court by the name of

19   Eric Stewart, goes by the name of

20   Rabbit.  Anybody know Mr. Stewart?

21             PROSPECTIVE JUROR:  I know Mr.

22   Stewart.

23             MR. POWELL:  You know Mr.

24   Stewart?  How do you know him without

25   going --

1                    PROSPECTIVE JUROR:  I was

2    married to his family.

3                    MR. POWELL:  You were married

4    to that family at one time.  And what is

5    your name, ma'am?

6                    PROSPECTIVE JUROR:  Ella Boyd.

7                    MR. POWELL:  Ella Boyd.  Thank

8    you, Ms. Boyd.  Anyone other than Ms.

9    Boyd know of Mr. Stewart, or Rabbit, of

10   that family?  Okay.

11                   One of our forensic experts

12   that did the firearms analysis is Kathy

13   or Katherine Richart with the Department

14   of Forensic Science.  Is anyone familiar

15   with Ms. Richart?

16                   The medical examiner that

17   looked at Mr. Friendly's body that

18   performed the autopsy is Ben Bristol, Dr.

19   Ben Bristol.  Does anyone know him?

20                   One of the patrol officers is

21   M.T. McCaskill and J. Mackey.  Does

22   anyone know them?  The patrol supervisor

23   at the scene was R. Wallace.  Anybody

24   know Officer Wallace?

25                   PROSPECTIVE JUROR:` Is that

1          Richard Wallace?

2                    MR. POWELL:  I'm not sure what

3          his name is.  All I have is an initial.

4          I have only met him a couple times.

5                    OFFICER HOWTON:  That's

6          Richard.

7                    MR. POWELL:  Is that him,

8          Gino?  It is?  Yes, ma'am.  What is your

9          name?

10                   PROSPECTIVE JUROR:  Sarah

11         Andrews.

12                   MR. POWELL:  Now Ms. Andrews,

13         how do you know Mr. Wallace?

14                   PROSPECTIVE JUROR:  He was a

15         friend of my son's and they grew up

16         together.

17                   MR. POWELL:  So you know him

18         pretty well.  Would the fact that Officer

19         Wallace was the supervising patrol

20         officer at this crime scene affect your

21         opinion of the case one way or the

22         other?

23                   PROSPECTIVE JUROR:  No.

24                   MR. POWELL:  You believe you

25         could sit and impartially hear both the

1        state and the defendant's evidence and

2        judge this in a fair and impartial

3        manner?

4                  PROSPECTIVE JUROR:  Yes.

5                  MR. POWELL:  Now the evidence

6        technician that is involved in this case

7        is Brian Jurkofsky.  Is anyone familiar

8        with Detective Jurkofsky?  Another

9        detective that worked the scene was a

10       Detective J.W. Haynie and Detective C.J.

11       Grandison.  Is anyone familiar with

12       either one of those detectives?

13                 Now before I go into this next

14       set of witnesses, let me ask you this

15       question.  This happened over in Smiley

16       Court.  Who all knows where Smiley Court

17       is?  Okay.

18                 Specifically, it happened over

19       in the 400 block or 4000 block of Marlyn

20       Street.  A lady over there was having a

21       party at her residence and the shooting

22       occurred at about 11:30 that night.

23                 Obviously, it was a party so

24       there were a whole bunch of people

25       there.  We are not going to call all of

them as witnesses, not everybody saw what happened.  All right?  But now just -- is anyone familiar with specifically 4000-A over on Marlyn Court?  Yes, ma'am?

PROSPECTIVE JUROR:  Ella Boyd.

MR. POWELL:  Ms. Boyd.  Anyone other than Ms. Boyd?  The lady that lived there at the time, her name was Nicole Judkins.  Do you know her?  All right, Ms. Boyd.  Anyone other than Ms. Boyd?

At the time she was having a birthday party for an individual named Christopher McQueen.  Does anyone know Mr. McQueen?  Besides Ms. Boyd.

Mr. McQueen went by the name of Flip if that helps anybody out.  It was Flip's birthday, and Ms. Judkins was having a party for him.  Some other individuals at the party whose names you might hear are Bryant Thomas.  Are you familiar with him?

PROSPECTIVE JUROR:  No.

MR. POWELL:  Also goes by B.T. Another person at the party was Antwan Giles.  Anyone know him?  Another

1    individual named Darryl Foggy.  Also goes

2    by the name D.  Anyone familiar with that

3    name?  The lady that lived across the

4    street, her name was Amy Albright.  Her

5    name may come up in this.

6           Just because I'm reading all

7    these names out doesn't necessarily mean

8    all these people are going to be called

9    as witnesses.  It's just these are the

10   names you are going to hear most

11   frequently throughout the course of the

12   trial.  And if any of you know them, we

13   need to ask some questions.

14           Ms. Boyd, what we are going to

15   do, after all the questions are over

16   with, if you will just stay back instead

17   of going through all these individually

18   with everyone here.

19           Now with what I have said so

20   far with the names, the location of

21   Smiley Court, with the birthday party,

22   has anyone heard or read anything in the

23   paper or heard anything on television

24   about this shooting that occurred last

25   year in February?

1       Ms. Boyd has heard this

2  before.  She has got a few more details.

3  Anyone else?  Okay.  Now, I just have a

4  few more follow-up questions.  First off,

5  this is -- obviously, it was a birthday

6  party.  There were lots of people

7  around.  They were doing things that

8  happen at a birthday party over in Smiley

9  Court.  There was a lot of drinking going

10  on.  There is going to be some instances

11  where people were using drugs; sometimes

12  marijuana, sometimes cocaine.

13       Is there anyone who just is

14  going to automatically knee-jerk reaction

15  exclude somebody's testimony simply

16  because alcohol or drugs are involved?

17  Okay.  So I'm taking by no one answering

18  that question yes, you are at least going

19  to listen to the folks that testify and

20  hear what they have to say before you

21  reach any kind of opinion on whether or

22  not they were too drunk or too high or

23  too stoned or whatever to see what they

24  may have seen because, again, this is at

25  a party.  It is not just going to be this

1    witness or that witness. Most of the

2    witnesses in this case are going -- were

3    at the party on Friday or Saturday night

4    at 11:30 at night. It is the kind of

5    case we got. That's what we are dealing

6    with.

7              So, as jurors, one of the

8    factors you can take into consideration

9    in the credibility of a witness is their

10   state of mind or mental capacity to see

11   what they saw at the time, and you are

12   well within your purview to take that

13   into consideration. Just to make sure we

14   are all on the same page, what I'm asking

15   is if the fact that somebody had a couple

16   beers or smoked a marijuana cigarette or

17   snorted some cocaine, does that mean

18   automatically you are going to disbelieve

19   their testimony without hearing anything

20   else? So everybody can at least hear the

21   witnesses in this case?

22             Now, I looked at some of your

23   questionnaires. How many of y'all watch

24   crime shows like CSI and that kind of

25   stuff? Just about everybody. Does

1    everyone understand that the law on

2    television is a whole lot different than

3    what Judge Hobbs is going to tell you

4    from the bench?  Does everybody

5    understand that?  And that what they do

6    on CSI is television and that doesn't

7    have a whole lot to do with reality.

8    Does everybody understand that?

9           Now there were some forensics

10    done in this case.  There were some shell

11    casings that were analyzed.  There was an

12    autopsy that was done.  But pretty much

13    when you boil this down, it's going to

14    come down to the witnesses, who saw who

15    do what.  That's important.

16           MR. HARTLEY:  Judge, I

17    appreciate Mr. Powell's explanation to

18    the jury but this is hardly in the form

19    of a question to the jury.

20           THE COURT:  If you have got a

21    question, Mr. Powell, let's get to it.

22           MR. POWELL:  And my question

23    is:  Is there anyone who is going to be

24    hung up on what they have seen on

25    television or asking questions, well, I

1   saw this on television, why couldn't they

2   do that back in the jury room as opposed

3   to hearing the evidence and listening to

4   the law as the Judge reads it?  So

5   everybody can agree that you will decide

6   the case based on what you hear in the

7   courtroom, not what you may or may not

8   have seen on television.  Okay.

9          Now, my next question:  Is

10  there anybody in here who just doesn't

11  like cops?  Just decided, you know, you

12  heard bad stories or whatever.  Okay.

13  Got a traffic ticket and you didn't think

14  you were speeding and he gave it to you

15  anyway.  You couldn't get out of it,

16  anything like that?

17          On the other hand, is there

18  anyone who just because someone has a

19  badge and wears a police uniform is going

20  to believe that person more than you

21  would, say, a civilian witness?  Anyone

22  put more emphasis on a police officer's

23  testimony simply because they are a sworn

24  officer of the law?  Okay.

25          So everybody can pretty much

1    agree to look at the witnesses and judge
2    them based on what you see in this
3    courtroom here today?  All right.
4    Because if there is -- if anybody is
5    bringing anything to court with them
6    today, this is the only time we have to
7    ask about it and find out.  Not that it
8    is bad.  We all have our opinions.  We
9    all have our experiences.  That's what
10   makes the system work because we put
11   twelve people over there and they can all
12   put their minds together and judge this
13   evidence and come out with the right
14   verdict in this case.  Okay?

15            Now speaking of that, as the
16   State of Alabama, it is our job to prove
17   to the twelve people that get selected
18   for that jury that this man is guilty
19   beyond a reasonable doubt.  Has anybody
20   heard that term before, reasonable
21   doubt?  The Judge is going to explain it
22   to you.

23            But as Mr. Joyce sits in this
24   courtroom right now, he is presumed
25   innocent.  It is our job to put forth

1    evidence and testimony and exhibits and

2    witnesses to prove he did what we say he

3    did.  Okay?

4              Now here is my question:  Is

5    there anyone that is going to require the

6    State of Alabama to remove all doubt from

7    this case?  That may be kind of a

8    convoluted question.  Let me clarify

9    that.  I'm not saying you are going to

10   have a doubt about this or about that

11   necessarily as far as what happened but,

12   for example, you may have a question in

13   your mind, you know, where did this come

14   from or what about that?

15             If you simply have a question

16   in your mind that is not related to the

17   murder charge, do y'all understand the

18   difference between having an unanswered

19   question in the case and the State not

20   meeting its burden beyond a reasonable

21   doubt?  Does that make sense?  I'm

22   getting confused here and I'm standing up

23   here talking about it.

24             We are not required to answer

25   every single possible question you may

1    have about that party that night and who
2    was where and --
3             MR. HARTLEY:  Judge, I think
4    this is getting very far into the state
5    of the evidence at the close of the case
6    as opposed to questioning these jurors as
7    to their --
8             THE COURT:  Will, let's wrap it
9    up.
10            MR. POWELL:  So everybody
11   agrees that there's a difference between
12   all doubt and reasonable doubt.  Okay.
13            Ms. Boyd, if you will stay
14   after, we'll follow up.  If there is
15   anybody else based on any of the
16   questions I've asked that wants to stay
17   afterwards or because of any of the
18   responses on the questionnaires or the
19   supplemental questionnaires, just feel
20   free to stay behind afterwards if you
21   want to talk to us individually.  Thank
22   you.
23            THE COURT:  Mr. Hartley.
24            MR. HARTLEY:  Thank you,
25   Judge.  Good morning.  I think y'all have

1   been asked probably a hundred questions

2   in the last few minutes.  So basically I

3   think they have exhausted most of the

4   topics but I do have a two-prong

5   question.  The easy one, I think, would

6   be first.

7           I have read your questionnaires

8   and only a few of you but -- maybe three

9   or four or five indicated on the

10  questionnaire that there might be some

11  conflict with your ability to serve in

12  the trial this week.  I think maybe

13  either for personal reasons or for

14  scheduling matters or something like

15  that.  I invite you to stay behind if you

16  need to to resolve that because I would

17  like to ask if anybody has got a problem

18  with serving on the jury of this trial,

19  it might start today and go, we think,

20  into late tomorrow, Judge?  Is that what

21  we think?

22          THE COURT:  It better be over

23  late tomorrow.

24          MR. HARTLEY:  Okay.  I realize

25  that some of your responses indicate that

1    there might be some issue with you

2    serving on the jury. I invite you to

3    stay behind or either tell us right now

4    if you have got a problem, if you want

5    the judge to resolve it.

6         Then in a sort of related type

7    question, both of in the questionnaire

8    and the supplemental questionnaire, these

9    -- each of those have questions

10   pertaining to whether you or family

11   members have been victims of crimes or

12   have somehow been involved in a crime.

13        Again, I found on there

14   positive -- or yes type responses on

15   probably anywhere from a third to half of

16   the questionnaires. I ask this of all of

17   you, particularly of people who have

18   family members or in some way connected

19   to a serious crime like murder or

20   manslaughter or a violent crime.

21        If the case were real, real

22   close on the evidence at the close of the

23   case, the defense and the state had just

24   -- almost a tie or almost a match, is

25   there anything in your personal

1    experience about your having been either
2    connected to somebody who was involved in
3    a crime or the victim of a crime, if it
4    would sway your vote on the case if you
5    -- if your state of mind or your
6    existence is such that that fact might
7    affect your verdict in this case, I ask
8    you to stay behind and tell the Judge
9    about it because some of you have had
10   family members or somehow were connected
11   to very serious crimes.  So I ask you to
12   stay with us if y'all meet either one of
13   those; one, you got a problem sitting on
14   the case for scheduling reasons or
15   personal reasons, or if you think that
16   something has happened in your life that
17   might affect your verdict.  That's all I
18   have.
19               THE COURT:  Okay.  Thank you.
20   Ladies and gentlemen, we are going to
21   start the selection of the jury.  I don't
22   think y'all need to sit in here and watch
23   us do that.  So I'm going to let y'all go
24   back to the jury assembly room.  If you
25   would, if you need to respond to any of

1    the questions and you need to stay
2    behind, just do so.
3           Ms. Boyd, I know they have
4    asked that you stay behind. You are
5    probably upset that you didn't get
6    invited to the party to begin with. It
7    seems like you know everybody that was
8    there anyway.
9           If you would, just go on back
10   to the jury assembly room. Don't break
11   for lunch just yet. This will take us
12   probably about thirty minutes. Then
13   we'll bring the jurors back in.
14          I will go ahead and tell you,
15   if you are not selected for the jury, you
16   are dismissed for the remainder of the
17   day. Please call the code-a-phone number
18   tonight so I can give you a little bit of
19   good news here today. If you would go
20   back to the jury assembly room. Thank
21   you.
22          (The following proceedings were
23   held outside the presence of the jury
24   venire.)
25          MS. PERKINS: Judge, we have

1    three people standing.

2              THE COURT:  Yes, sir?

3              PROSPECTIVE JUROR:  All I

4    wanted to do is clarify I mentioned that

5    I was working over at the crime scene as

6    a volunteer.  All I'm doing over there

7    -- and I have been there a total of six

8    hours.  All I'm doing over there is

9    inputting some fairly old information on

10   weapons into the computer.

11             You mentioned some names and I

12   got some looks.  I don't know the names

13   of the people over there.

14             MR. POWELL:  Yes, sir.

15             PROSPECTIVE JUROR:  I just

16   wanted to clarify that.

17             THE COURT:  Okay.  Thank you,

18   sir.  Appreciate you sharing that with

19   us.  Yes, ma'am?

20             PROSPECTIVE JUROR:  You said

21   something about if you had a family

22   member or something that was involved in

23   a crime.

24             THE COURT:  Yes, ma'am.

25             PROSPECTIVE JUROR:  It has been

1          a lot of years and the person is deceased

2          that was involved in the crime.  So --

3                    MR. POWELL:  If you don't mind

4          me asking, what happened?

5                    PROSPECTIVE JUROR:  Well, it

6          was my father.  He shot somebody, I

7          guess.  So I was told.  I wasn't here.

8                    MR. POWELL:  Yes, ma'am.  Is

9          there anything about that incident that

10         would make you go for or against one side

11         or the other?

12                   PROSPECTIVE JUROR:  No.

13                   MR. HARTLEY:  What is your name

14         again?

15                   PROSPECTIVE JUROR:  Bailey,

16         Myree.

17                   MR. HARTLEY:  Yes, ma'am.

18                   PROSPECTIVE JUROR:  I have

19         another question.  I don't know if this

20         is relevant or not but this young lady

21         here, is she involved in this crime or

22         something?  I notice she's been watching

23         me all the time so I was wondering -- do

24         you know me or do I know you?  I don't

25         think I know you.

1          UNKNOWN WITNESS:  I don't think

2     I do.

3          THE COURT:  Okay.

4          PROSPECTIVE JUROR:  I just

5     wanted to clear that up.

6          THE COURT:  Any followup?

7          MR. POWELL:  The State doesn't

8     have any, Judge.

9          THE COURT:  Thank you, ma'am.

10    Appreciate it.  What was her name?

11         MR. DARNIELLE:  Bailey, Myree

12    Bailey.

13         THE COURT:  Anybody have any

14    followup for Ms. Boyd?

15         MR. POWELL:  Yes, ma'am.  Ms.

16    Boyd, basically, what have you heard

17    about the incident?  It sounds like you

18    were pretty familiar with what happened

19    out there that night.

20         PROSPECTIVE JUROR:  I am.  My

21    son was out there.

22         THE COURT:  What was your

23    son --

24         PROSPECTIVE JUROR:  Flip is his

25    uncle.  They talked about it.

1              MR. POWELL:  What was your

2       son's name?

3              PROSPECTIVE JUROR:  Willie.

4              MR. POWELL:  Willie?

5              PROSPECTIVE JUROR:  He came out

6       there after it happened.  So -- and they

7       told him about it and they talked to him

8       about it.

9              MR. POWELL:  I don't have any

10      followup, Judge.

11             MR. HARTLEY:  Let's approach

12      the bench.  Judge, I think we need to try

13      to get a juror which basically has an

14      independent mind.  I think we have to be

15      real careful because all of these

16      questions --

17             MR. POWELL:  I don't want

18      anybody who has personal knowledge like

19      that being on the jury.

20             THE COURT:  So we agree?

21             MS. PERKINS:  Strike for cause.

22             THE COURT:  Ms. Boyd, thank you

23      so much.  If you will go back to the jury

24      assembly room.  I can go ahead and tell

25      you, you are released for the rest of the

1    day.

2                    PROSPECTIVE JUROR:  I can go

3    home?

4                    THE COURT:  Call the

5    code-a-phone tonight, ma'am.

6                    PROSPECTIVE JUROR:  Thank you.

7                    MR. POWELL:  I noticed this

8    when I was going over the jury panels but

9    I forgot because we were striking the

10   jury.  My wife, Emily Rhodes, just took a

11   job in the admissions office at

12   Huntingdon where this juror works so she

13   knows my wife, and Mr. Hartley may need

14   to make a record about that.

15                   MR. HARTLEY:  Yeah, we need to

16   get that on the record.  Bring him on as

17   soon as you can.

18                   THE COURT:  Okay.  Mr. Joyce

19   has rejoined us.  I understand that Ms.

20   Catching works at the admissions office

21   in Huntingdon with Mr. Powell's wife.

22   Mr. Hartley, you want to followup?

23                   MR. HARTLEY:  Yes, Judge.  Ms.

24   Catching, you now have -- we didn't

25   realize it because I think she has a

1    different last name because the lady you

2    work with and Mr. Powell but they are

3    married.

4            PROSPECTIVE JUROR:  Right.

5            MR. HARTLEY:  At least you know

6    about that last name.  Have y'all become

7    friends?  Have you and his wife become

8    friends at work?  You know, get to know

9    each other better and better?

10           PROSPECTIVE JUROR:  Well, it is

11   a small office but she has only been

12   there two weeks or about two weeks.  So I

13   wouldn't say we were friends but we see

14   each other every day.

15           MR. HARTLEY:  Now that you know

16   this information, would it be -- I just

17   need to ask.  Could your association with

18   her in any way affect your verdict in

19   this case since, you know, the sort of

20   friendship with her might likewise be a

21   friendship with Mr. Powell.  I realize

22   that you might say no but I am talking

23   about in the scheme of things, could it

24   affect your verdict in this case?

25           PROSPECTIVE JUROR:  I don't

1          think so.  Do I have to be absolutely
2          sure?  I wouldn't think so.
3                    MR. HARTLEY:  Well, I would
4          like to ask it in the terms that I did
5          when I focused on that question a while
6          ago.  What if it came down to a real,
7          real close case on the issue of guilt or
8          innocence, could it possibly affect your
9          verdict?  And if your answer to that is
10         yes, please tell me.  If the answer is
11         no, tell us the best you can.
12                    PROSPECTIVE JUROR:  No.
13                    MR. HARTLEY:  The answer is
14         no?
15                    PROSPECTIVE JUROR:  No.
16                    MR. POWELL:  No questions, Your
17         Honor.
18                    THE COURT:  Ms. Catching, let
19         me ask you something.  Would you prefer
20         not to be on this jury because you are in
21         the same office with Mr. Powell's wife?
22                    PROSPECTIVE JUROR:  It makes me
23         a little uncomfortable.
24                    THE COURT:  Okay.
25                    MR. HARTLEY:  Judge, I think if

1        it makes her uncomfortable, I think
2        that's -- we have to move to make a
3        motion to strike her.  And really, we do
4        respect her ability to serve.
5                THE COURT:  I understand.  I
6        wouldn't want to be in her predicament
7        either.  I will grant your motion.
8                MR. HARTLEY:  Thank you,
9        Judge.
10               THE COURT:  You are excused,
11       ma'am, for the remainder of the day.
12       Thank you.
13               (At which time the jury was
14       struck, placed in the jury box, and the
15       following proceedings were held in the
16       presence and hearing of the jury.)
17               THE COURT:  Before you sit
18       down, just raise your right hand.  I'm
19       going to swear you in as the jurors.
20               (At which time the jury was
21       duly sworn.)
22               THE COURT:  Be seated.
23       Obviously, you know y'all have been
24       selected as jurors in this case.  The
25       first official duty will be to go to

1    lunch.  I mean that.  I'm just going to

2    let y'all go break for about an hour.

3              Before I let you go, let me

4    just tell you some do's and don'ts,

5    mostly don'ts, when you leave the jury

6    box.  Don't discuss this case with

7    anybody.  Don't let anybody discuss the

8    case with you.  Don't even discuss it

9    with each other.  The reason we say that

10   is when you go back here in the jury room

11   to decide the guilt or innocence, we want

12   everybody to start at the same place.

13   And if some of y'all have had discussions

14   about the case with anybody for any

15   reason, you are not all starting at the

16   same place.

17              If you see me out in the

18   hallway, I'm not going to talk to you.

19   The attorneys, it's going to be the same

20   way.  It is not that we are being rude.

21   We don't want there to be any contact.

22   We don't want there to be any -- make it

23   look like we are talking with you because

24   we want you to decide the case based

25   solely on what you hear in the witness

1       box and the evidence in the case.

2               So don't talk to anybody about

3       the case.  Don't let anybody talk to

4       you.  I will talk to you more when we

5       break for the day about newspapers and

6       that sort of thing.  You know, don't go

7       get in your car and drive down to Smiley

8       Court and try to look at the scene of

9       where the shooting took place.  Don't get

10      on the internet and try to look up any

11      legal terms or call your buddy who is a

12      lawyer or something like that and start

13      asking him technical, legal issues in the

14      case.  Again, we want you to decide the

15      case solely on what you hear in this

16      courtroom.  And if you are trying to do

17      any of that on your own, it means that

18      you are letting an outside influence come

19      in.  We want you to be influenced only on

20      what you hear in this courtroom.

21              Having said all that, if y'all

22      will be back here at 1:45, we will get

23      started.  Just for planning purposes, we

24      will probably go today to about 4:30 in

25      the afternoon.  If we get to a natural

1          break right around then, that's when

2          we'll try to break.  We'll try -- I will

3          let you know when we get back what time

4          we'll start back in the morning.  I am

5          sitting here right now.  I don't know

6          what my schedule is in the morning, but

7          hopefully we'll be able to start back

8          around 8:30 or 9:00 in the morning.  If

9          you will just return to the jury assembly

10         room, we'll come get you at 1:45.  Please

11         be prompt.

12                   (Lunch Recess.)

13                   (The following proceedings were

14         held outside the presence and hearing of

15         the jury.)

16                   THE COURT:  We are on lunch

17         break and a juror has come in and said he

18         needs to speak.  Mr. Joyce isn't here.

19         We are just trying to find out right now,

20         with the consent of his attorney, what

21         the nature of the request is.

22                   JUROR:  It was brought to my

23         attention as I was leaving the courtroom

24         that the defendant's mother and I worked

25         at the same place a few years ago back in

1    the latter part of 1999 when I was

2    employed by the U.S. Postal office.  Now,

3    I don't know how that will have any

4    bearing on the case or not, sir, but we

5    were not, as you would say, close or

6    anything like that.  I just knew her from

7    seeing her at work.

8                    THE COURT:  Okay.

9                    JUROR:  That's about the basis

10    of it.

11                    THE COURT:  Why don't we -- we

12    will wait until Mr. Joyce gets here and

13    we'll take that up.  Are you going to be

14    in the jury assembly room anyway?

15                    JUROR:  Yes, sir.  That's where

16    I was headed back to now.

17                    THE COURT:  Okay.  We'll just

18    come and get you and talk about it when

19    you get back.  Thank you for letting us

20    know that.

21                    JUROR:  Thank you, sir.

22                    THE COURT:  Thank you, sir.

23                    (Brief Recess.)

24                    THE COURT:  Before we get the

25    jury back in here -- where did Will go?

1       We had a juror come in and say that he

2       knew Mr. Joyce's momma when he worked at

3       the post office.  The record will speak

4       for what he actually said, but does

5       anybody have anything to say about it at

6       this time?

7                    MR. POWELL:  Judge, I wouldn't

8       -- I was going to ask a couple follow-up

9       questions.  I don't think I have a

10      problem with it but I just wanted to -- I

11      thought the way you addressed it before

12      made it sound like you wanted to wait

13      until the defendant was here before we

14      probed into it.

15                   THE COURT:  Yes.  I didn't know

16      you wanted to probe.  If you want to

17      probe --

18                   MR. POWELL:  Just briefly.  I

19      don't think I'm going to have a problem

20      with it, but the indication he gave us

21      earlier was they just had brief contact

22      and he knew who she was and it took him a

23      little while to realize she was that same

24      person he worked with in '99 or '96,

25      whenever it was.  But I just want to make

1    sure -- if that's the extent of it, I

2    don't have any problem.  I just need to

3    put that on the record.

4              THE COURT:  Let me also say for

5    the benefit of those people here in the

6    courtroom that I understand there has

7    been some jawing back and forth between

8    the families.  I am not going to tolerate

9    it.  We are going to run this trial

10   smoothly.  We are going to get through

11   this thing without any fights breaking

12   out.

13             If anybody has a problem with

14   that, they need to leave now because I

15   won't hesitate to hold somebody in

16   contempt of Court if they start causing

17   an uproar or commotion in this courtroom

18   or out in the hallway.

19             (At which time the juror

20   returns to the courtroom.)

21             THE COURT:  I think some of the

22   lawyers may want to ask you a few

23   questions.  We just wanted to wait until

24   we had everybody here.

25             MR. POWELL:  More specifically,

1          where did you know Ms. Joyce from, the

2          defendant's mother?

3                    JUROR:  At the postal service.

4                    MR. POWELL:  How long had you

5          been working there?

6                    JUROR:  I started with the

7          postal service in '89.  I started out in

8          the general facility in 1991.

9                    MR. POWELL:  What was your job

10         there at the time?

11                   JUROR:  I was a mail handler.

12                   MR. POWELL:  You were a mail

13         handler at the time.  What was her job?

14                   JUROR:  I think she might have

15         been a clerk or something of that

16         magnitude.

17                   MR. POWELL:  And how often did

18         y'all see each other or come into contact

19         with each other?

20                   JUROR:  No more than clocking

21         in and clocking out.  Just see each other

22         in the hallway and things such as that.

23                   MR. POWELL:  And y'all didn't

24         know each other like didn't see each

25         other at a barbecue or at church or

1    anything like that?

2             JUROR:  Nothing.  Just work.

3             MR. POWELL:  Just from work

4    strictly?

5             JUROR:  That was it.

6             MR. POWELL:  Did y'all have

7    lunch breaks or anything?  Were y'all in

8    the same work room or anything like

9    that?

10            JUROR:  No.

11            MR. POWELL:  Would the fact

12   that you know Ms. Joyce influence you in

13   favor of her son or make you feel awkward

14   about sitting on this jury or anything

15   like that?

16            JUROR:  Well, it is -- actually

17   the evidence itself would make my

18   decision for me.

19            MR. POWELL:  Do you still work

20   with Ms. Joyce?

21            JUROR:  No.  I'm with the State

22   of Alabama at this time.

23            MR. POWELL:  You have a

24   different job now?

25            JUROR:  Yes.

1            MR. POWELL:  And I'll ask you:

2    How did you come to realize -- put the

3    pieces together that this lady was the

4    same one you might have worked with

5    earlier?

6            JUROR:  Well, as I said, when I

7    was going to lunch, I -- we spoke to one

8    another and I remembered her from being

9    at the postal service and she reminded me

10   -- she mentioned to me the fact that

11   that was her son that was on trial at the

12   time.

13           MR. POWELL:  Ms. Joyce actually

14   addressed that to you?

15           JUROR:  Yes.

16           MR. POWELL:  Did she approach

17   you or did you approach her?

18           JUROR:  No.  We just spoke to

19   one another as we were leaving the

20   courthouse grounds.

21           MR. POWELL:  And she mentioned

22   that that was her son?

23           JUROR:  Right.

24           MR. POWELL:  And that's how you

25   became aware of it?

1          JUROR:  Right.

2          MR. POWELL:  Until that point,

3     you didn't have any independent

4     recollection of it?

5          JUROR:  None whatsoever.

6          MR. POWELL:  Nothing further,

7     Judge.

8          THE COURT:  Thank you, sir.

9     Just go back in the jury assembly room.

10         MR. POWELL:  Judge, the state

11    doesn't have a problem with that juror.

12         THE COURT:  Okay.

13         MR. POWELL:  We would ask for

14    an instruction.

15         THE COURT:  Yes.  Ms. Joyce,

16    you are not to talk to any jurors, make

17    eye contact with them.  That goes for

18    anybody in this courtroom.  Nobody is to

19    talk to a juror in this courtroom.  You

20    are not to speak to them in the hallways,

21    out on the street.  I don't want anybody

22    making eye contact.  You don't wave.  You

23    don't acknowledge that you even know them

24    or you don't acknowledge that you see

25    them.

1          We were going to have a fair

2     trial in this case.  If anybody has a

3     problem with that, let me know now.

4          Richard, will you tell Jason to

5     go ahead and bring the jury back.  I

6     assume nobody has a problem with the

7     issue about the jury?

8          MR. HARTLEY:  No, Your Honor.

9          (Brief Recess.)

10          (At which time the jury enters

11     the courtroom.)

12          THE COURT:  Be seated

13     everybody.  Before we get started, ladies

14     and gentlemen of the jury, let me just

15     sort of tell you a little bit about what

16     we are going to be doing this afternoon.

17     I will explain everybody's role in this

18     trial to you.  Let me start with my own

19     role.

20          I sort of see my role as like a

21     referee in a football game.  I don't have

22     a dog in the fight.  I don't really know

23     a whole lot more about the case than

24     y'all do at this point.  My job is to

25     make sure it is a fair trial for

1    everybody.  My job is when someone makes

2    an objection, I will rule on whether the

3    objection is well-founded or not.

4    Please, when you are sitting over there,

5    don't worry about why the judge did what

6    he did.  Don't sit there and worry about,

7    well, if that evidence had come in, what

8    would the witness have said or -- because

9    that gets into the realm of speculation.

10   We want you to decide the case based on

11   what you hear from the witness stand.

12            At the end of the case, I will

13   tell you what the law in Alabama is that

14   governs this case.  What is your role?

15   Your role is to sit and listen to the

16   evidence, and you hear the testimony of

17   the witnesses.  You look at the exhibits

18   that we might let into evidence.  From

19   that, you determine what the true facts

20   are in the case.  Then you take those

21   facts and the law of the case as I give

22   it to you and you reach a verdict in the

23   case.

24            Here is how we are going to

25   proceed in this case.  Each party will

get up and give an opening statement.
The prosecution goes first because they
have the burden of proof in the case.
They will tell you what they think the
evidence in the case will show. The
defense attorney, Wiley Hartley, he will
do the same.

After the opening statements,
the state will begin presenting its
case. When the state rests its case, the
defense will put on their case. And
following the presentation of the
evidence, the lawyers will be able to
give what is known as closing arguments
and that's where they try to sum up the
evidence and persuade you that you should
either acquit or convict in this case.

Again, the state goes first in
the closing arguments and they get a
little rebuttal. Again, that's because
they have the burden of proof in the
case. After they finish their arguments,
I will tell you again what the law is in
this case.

I have talked a lot about

1    evidence.  So let me go over with you

2    what is evidence in the case and, again,

3    by telling you really what is not

4    evidence.  Anything I say in this case is

5    not evidence.  Anything the lawyers say

6    in this case is not evidence.  Evidence

7    is what you hear from this witness stand

8    by people who are under oath.  It is also

9    any exhibits that we'll allow into

10   evidence.  It is also any presumptions of

11   law in the case.  I will tell you right

12   now that a presumption of law in this

13   case is that the defendant is presumed

14   innocent and that presumption stays with

15   the defendant until you reach your

16   verdict, and that is considered as

17   evidence in the case.

18            As I told you this morning,

19   we'll be trying to take breaks every

20   forty-five minutes to an hour.  If you

21   need a break before that, just raise your

22   hand and let me know -- or Judy Shelton

23   is my court reporter, or one of the

24   deputies.  Just let us know.  We'll try

25   to work with you any way that we can.

1          As I also said, we'll probably

2     be trying to take a break about 4:30 this

3     afternoon and come back in the morning.

4     Again, just listen to the evidence.

5     Don't discuss the case with anybody.

6     Don't let anybody discuss the case with

7     you.  Okay?  We'll get started.

8          MR. POWELL:  May it please the

9     Court, counsel.  Members of the jury,

10    back on Friday night, February 1st of

11    last year, right around 11:00, two men

12    were at a party over at Smiley Court.

13    They had been having words with each

14    other all night long until finally they

15    ended up between two of the apartments.

16    And after just some more words passed, no

17    fighting, nothing but words, this

18    defendant pulls out a handgun and shoots

19    at least three times striking James

20    Friendly in the side, in the leg, and in

21    the rear end.  He eventually died from

22    those gunshot wounds.

23          That's what we are here about

24    today.  The defendant is charged with

25    murder in the State of Alabama.  Again,

1     my name is Will Powell and along with my

2     co-counsel, Ms. Vernetta Perkins, we are

3     representing not only the State of

4     Alabama here in this courtroom here today

5     but also James Friendly. James didn't

6     just go by James. He also had another

7     name. You are going to hear a lot of

8     people refer to him as Boo, B-O-O. If

9     you hear somebody refer to somebody named

10    Boo, they are talking about the victim,

11    James Friendly.

12         Sitting here with us is his

13    momma, Ms. Sally Friendly. Now, the

14    Friendlys don't live in Smiley Court

15    where this happened. They live over off

16    the Boulevard, over off Fleming Road.

17    James just ended up in Smiley Court

18    because he knew somebody who knew

19    somebody who was at the party. Then he

20    comes across the defendant in this case.

21         Who was he? What are you going

22    to learn about the defendant? You are

23    going to learn that the defendant was at

24    this party and he shot a man to death

25    over nothing but a meaningless argument.

1    Now, in his mind, the argument might have

2    had some meaning, but I think the

3    evidence is going to be that it wasn't

4    threats.  It wasn't pushing or shoving.

5    It was just an argument over who was

6    better or badder than who, and he decided

7    he would win the argument by making the

8    decision to pull out a gun and fire it,

9    not once, not twice, but at least three

10   times striking the victim, striking James

11   Friendly and killing him dead.

12            Now, before we go any further,

13   let's talk for a minute about the crime

14   of murder in the State of Alabama.

15   Specifically, the defendant is charged

16   with the crime of intentional murder.

17   Now, when you hear intentional murder, a

18   lot of people think, well, some planned

19   out elaborate scheme where someone makes

20   a decision in advance and does all these

21   things leading up to it.  That is very

22   easily a manner of intentional murder.

23            But in the State of Alabama,

24   all the state is required to prove the

25   crime of intentional murder is that the

1    defendant made up his mind to kill the

2    victim. That's it. We don't have to

3    prove some elaborate, well thought out

4    scheme. That's one way we could prove

5    it. But all we have to prove is that he

6    made the decision, a clear decision to

7    reach into his waist band -- first off,

8    it started before that, to arm himself

9    that night, to go to this party with a

10   gun. Then over words, over just an

11   argument, he made the decision to go for

12   that gun, to pull it up, to point it and

13   pull the trigger not one time, not two

14   times, but at least three, if not more

15   times.

16        We are going to submit to you,

17   members of the jury, that when you have

18   heard all the state's evidence in this

19   case, that act alone of making that

20   decision, even if it was, so to speak,

21   spur of the moment is enough to

22   constitute intentional murder in the

23   State of Alabama.

24        The focus is that the decision

25   was made, the intent was formed out there

1    between those two buildings that night to

2    pull that gun and to use it, and it ended

3    a man's life.

4              Now, what are you going to hear

5    about?  What is going to be the evidence

6    that is presented to you in this

7    courtroom this afternoon and tomorrow?

8    First, you are going to learn this was a

9    birthday party.  An individual by the

10   name of Christopher McQueen or Flip had

11   just had a birthday and they were having

12   a party for him over at Nicole Judkins'

13   house.  They didn't really see much and

14   they didn't know a whole lot about what

15   was going on.  That's just where the

16   people were gathering over in Smiley

17   Court that night.

18             The defendant arrived in a blue

19   pickup truck.  He arrived with an

20   individual named Antwan Giles.  They get

21   to the party and they start milling

22   around.  They go into the apartment where

23   the party is.  There are other apartments

24   close by.  They are going across the

25   street.

1          Well, in the meantime, the

2    victim is there, Boo, and other people

3    are there.  They are mingling and having

4    a big time until finally the two men's

5    paths cross because of a very key

6    individual in this trial.  His name is

7    Eric Stewart, also known as Rabbit.

8          Rabbit was hanging out with Boo

9    and they see James Friendly.  I think

10   Rabbit is even going to testify that he

11   and Boo were trying to figure out a way

12   they could find some cocaine and get

13   high.  I think they will tell you that

14   this was a party.  They had been drinking

15   and they were looking for some cocaine.

16         And while they were in this

17   process, they kept bumping into the

18   defendant and they kept having words with

19   each other.  They weren't arguing over

20   the cocaine.  They were just arguing over

21   I could do this to you, you could do that

22   to me.  Over nothing is what it amounts

23   to.  Kind of a bad, bad Leroy kind of an

24   argument and it just went on.

25         Finally, Mr. Stewart was like,

1          look, look, it don't have to go like

2          this.  Let's just have another drink and

3          just let this go, and it died down.  So

4          he goes in the house, in the apartment.

5          Comes back out with a drink.  He and Boo

6          are standing there.  They decide they are

7          going to go around the side and drink the

8          beer or do the cocaine or whatever.

9                    Only the defendant is there and

10         the argument starts again.  Eric Stewart

11         is right there.  He is right there in the

12         middle of it.  There is a witness

13         standing from me to y'all about what is

14         going on.

15                    Now, let me just say this about

16         Mr. Stewart.  You may not like him.  He

17         is not a -- this is not a popularity

18         contest, and he will be the first to tell

19         you he has picked up drug charges being

20         they were out trying to do cocaine that

21         night.  We are dealing with people at

22         this party that have a history, but these

23         are just the cards that have been dealt.

24         That's who was standing there when the

25         shooting occurred.  So just keep that in

1    mind as you are listening to Mr. Stewart

2    or Rabbit's testimony.  We are not asking

3    you to like him.  We are asking you to

4    listen to him and evaluate his testimony

5    with all of the other testimony in the

6    case to determine whether or not this

7    defendant committed this murder.

8              Now, Mr. Stewart, Rabbit, is

9    going to tell you, as the argument

10   continued, the defendant, who he was

11   standing right there, just pulls out a

12   gun and ends it.  Ends the argument by

13   shooting, pow, pow, pow, pow.  Bullets

14   not only hit Mr. Friendly, but they also

15   hit a red Jeep Cherokee that is backed

16   into a parking place.

17             Like this is the parking lot

18   and there is an apartment building there

19   where the party is there and there is

20   another apartment building there.  That

21   Jeep is just backed right there with the

22   back of that Jeep facing the area where

23   these men are standing.  Other people are

24   milling around.  But it was Joyce and it

25   was Friendly that were having an

1    argument, and Stewart was standing right

2    there.

3            Now when that bullet hit that

4    Jeep, there were two other people in that

5    Jeep. One's name is Johnny Osborne and

6    the other one's name was Brian Osborne.

7    They had been at that party. I think the

8    Osbornes will tell you they were sitting

9    there getting ready to roll a joint when

10   something hits their Jeep that they are

11   sitting in. So Johnny Osborne gets down

12   but Brian Osborne almost sticks his head

13   out the window to look back to see what

14   -- who is getting hit or where the shots

15   are coming from.

16           He looks back. We think the

17   evidence is going to be he is going to

18   tell you he saw that man right there

19   shooting James Friendly. He saw the

20   defendant shooting Boo. Saw the fire

21   from the gun. So that's two eye

22   witnesses.

23           Now the police get there and

24   there is not a whole lot of a crime

25   scene. Basically, you got a grassy area

1    in between two parking lots.  They took

2    some pictures of it but they are not that

3    great of pictures, but you get to see

4    them.  They also picked up three shell

5    casings from the grounds.  And the body

6    -- they did an autopsy on it.  There

7    were three injuries to the body.

8            Now maybe some other shots were

9    fired.  Some people say they heard four

10   or five shots but the police only found

11   three shell casings.  The department and

12   ballistics experts looked at them, people

13   that worked all their lives with them.

14   The three shell casings match each

15   other.

16           That's all they can tell you

17   about those shell casings.  But that's

18   important because it does mean there was

19   one gun that left physical evidence at

20   that crime scene, not two guns, not three

21   guns, but one single gun.  We submit to

22   you it was the defendant's gun.  There

23   were nine millimeter shell casings that

24   were picked up, that ballistics indicate

25   most likely came from a Hot Point, a name

1    of a gun, a type firearm or handgun. The

2    slug that was taken, one of the bullets

3    that went through his chest or his

4    abdomen and then another bullet went

5    through his lower -- a little lower down,

6    and that's the bullet they were able to

7    recover. We think the medical evidence

8    is going to be -- those gunshot wounds

9    inflicted by the defendant killed James

10   Friendly.

11          That's in addition to having a

12   medical examiner. You can also use your

13   common sense. Someone shot three times,

14   twice across the gut. There is a good

15   chance that's what killed him, and it

16   was. So that's going to be the state's

17   case.

18          You have got eye witness

19   testimony. That eye witness testimony

20   all points to one person, the defendant.

21   You have got that eye witness testimony

22   corroborated by physical evidence, shell

23   casings from one gun, the autopsy

24   report. All of this evidence, when taken

25   as a whole, tells the exact same story.

1   It tells the story of Darryl Joyce
2   pulling a gun, pointing it at James
3   Friendly and deciding to intentionally
4   pull that trigger at least three times
5   killing him dead.
6        Now we feel confident that
7   after you have seen the physical
8   evidence, seen the photographs, heard
9   from the eye witnesses, we feel confident
10  that you are going to return a verdict of
11  guilty, that this man sitting in front of
12  you today shot James Friendly in that
13  grassy area between those two apartments
14  over nothing, over nothing, or at least
15  not anything somebody should die for.
16  Thank you.
17        THE COURT:  Mr. Hartley.
18        MR. HARTLEY:  Yes, sir.  Judge,
19  counsel, good afternoon members of the
20  jury.  I'm John Hartley and I have been
21  practicing here for a lot of years in
22  Montgomery.  I do these kinds of cases as
23  part of my professional career, I guess
24  you would say.  I'm representing Darryl
25  Joyce and will assist in putting on his

1    defense today.

2         Mr. Powell and I have tried a

3    few cases against each other and we know

4    each other real well. We just see a

5    different perspective on this case, with

6    due respect to him, and I think he

7    understands that there is a difference --

8    there is a difference, two sides to this

9    story. There is more to this than what

10   was told to you. I want to just say that

11   the judge emphatically told you about the

12   presumption of innocence and how it rises

13   to the level of evidence in this case.

14        You have also been told in

15   either the form of questions or directly

16   that the state has got the burden of

17   proof and they have got to prove my

18   client guilty beyond a reasonable doubt.

19   I submit to you they will not be able

20   to. I will not make a lengthy opening

21   statement. I think a lot of this case

22   will come out in cross-examination.

23        But there is going to be some

24   stuff that Mr. Powell didn't tell you

25   about. I will get to a few particulars

1    in just a moment.  First of all, I want

2    to emphasize to you, and this has already

3    been -- you are going to have to take it

4    -- kind of what the circumstances were

5    on that night as to how good this eye

6    witness's testimony that Mr. Powell talks

7    about is going to be in this case.

8         I think they are going to show

9    you some slides that portray the scene.

10   They were taken in the daytime.  This all

11   happened at night in the middle dark part

12   of the apartments, late enough where

13   there would be no natural lighting.  This

14   didn't happen in the daytime.  It

15   happened close to midnight on February 1,

16   2002.  There were a number of people out

17   there.  This was an ongoing birthday

18   party as Mr. Powell mentioned to you.

19   But I think it is going to come across --

20   you know, a broad view of the testimony

21   and the evidence in this case is that the

22   people that are implicating my client are

23   actually -- I'm going to say friends --

24   they are actually covering for another

25   individual.  They are covering for Darryl

1    Foggy who we submit to you is going to be

2    the real or the specific person who shot

3    James Friendly, if anyone can be

4    identified.  It was Darryl Foggy who was

5    physically present out there and whose

6    name comes up several times during this

7    case.

8         The illogical part for Mr.

9    Powell is that my client didn't have any

10   beef with James Friendly.  If he didn't

11   know the man, he didn't have any reason

12   to be out there arguing with him and

13   fighting with him.

14        Now what happened between

15   Darryl Foggy and James Friendly is beyond

16   us.  Some of it may come out during this

17   case but it is something that -- there

18   was no way to go back and reconstruct

19   exactly what happened that night.  We can

20   only go through the testimony and see

21   what can be pieced together about it.

22   But we are going to find that there is a

23   loyalty or sort of a tightness between

24   Eric Stewart, Darryl Foggy and possibly a

25   man named Brian Osborne.  And we are

going to submit to you that they are trying to put this on Darryl Joyce because he wasn't one of their little tight-knit group, their clique, whatever you want to call it. He really didn't even know the man. I think he came there with Antwan Giles.

As Mr. Powell has said, there was a pretty big function and some people just came there. They heard about it or there was something going on and it just drew a crowd. But the most remarkable thing you are going to find in this case is that there is eye witness testimony. Then there is a witness who was identified by Bryant Thomas, and on the -- when he was identified by the police -- I mean when Bryant Thomas was interviewed by the police, when he was first asked who it was, he was shown a photo lineup and identified Darryl Foggy as being the shooter. That's reflected in Mr. E.E. Howton's report that he made in the police files. Whether or not he sticks to that story now, we don't know

1    but he did that night.  He first said

2    it.

3            That's the first he -- and he

4    was looking at a photo array, a lineup of

5    people -- they have what they call a

6    photo lineup and he specifically

7    identified Darryl Foggy as the person who

8    shot him.  The story gets even more

9    convoluted involving Darryl Foggy that

10   night.  Eric Stewart was the witness that

11   Mr. Powell described as being so close.

12           Now, his motive for this, we

13   will have to figure it out as we go

14   along.  But he took Darryl Foggy's gun

15   away from the scene and hid it in an

16   apartment not far away.  And since that

17   time, I think the same detective may have

18   led through this part of the

19   investigation.  They went -- the

20   information became available and they

21   went to that apartment, found the gun and

22   recovered it.  It is going to be in

23   evidence in this case.

24           What is important about that?

25   Eric Stewart was in the police station

1    that morning giving statements. He gave

2    one about -- I'm just going to say about

3    3:00 that morning and another one about

4    7:00 in the morning. He gave kind of a

5    statement to the police about what had

6    happened the night before trying to

7    implicate Darryl Joyce, but he never told

8    the police that morning that he was

9    hiding a gun or had hid a gun for Darryl

10    Foggy. But the report reflects after he

11    gave these two statements when they were

12    a couple hours apart, they kind of

13    overlap, I guess, in some of the

14    details. But nowhere in those statements

15    where he was talking to the police did he

16    disclose that he had hidden a gun in the

17    last couple of hours. But it says in

18    there that at 8:00 he starts telling them

19    about where a gun had been.

20          I bring that to your attention

21    because -- to tell you that the evidence

22    is going to show that Eric Stewart is

23    very loyal to Darryl Foggy if he would go

24    hide a gun right after an incident like

25    this took place. So this is where the

1    evidence is going to become unclear.  And

2    Mr. Powell said -- he said it was going

3    to be so clear that at the end of the

4    state's evidence, the finger is going to

5    be pointed at Darryl Joyce.

6         Well, I ask the question why

7    don't we have a photo lineup that shows

8    Darryl Joyce.  I submit to you if I had

9    looked at this record closely, there's

10   nowhere where anybody correctly

11   identified Darryl Joyce from a photo

12   lineup or specifically picked him out as

13   being the one.  So we go back now to who

14   is really telling the truth and what the

15   deal on this is.  It is going to leave

16   some doubt.  We will submit to you there

17   is going to be reasonable doubt and the

18   state cannot prove beyond a reasonable

19   doubt Darryl Joyce's guilt.  Mr. Powell

20   has made the statements Darryl Joyce did

21   this and Darryl Joyce did that.  He

22   doesn't know.  He wasn't out there.  He

23   is just relating to you what he hopes he

24   can prove.  Then you will have to take

25   into your own concept of this case the

1    overall circumstances.

2         It was dark, nothing but

3    artificial lighting.  A lot of people

4    were drinking and on drugs and then the

5    issue of who would taint or slant their

6    testimony.  When all that is blended

7    together, I submit to you we may never

8    solve in this courtroom today or tomorrow

9    who shot Mr. James Friendly.  Thank you.

10        THE COURT:  Call your first

11   witness.

12        MR. POWELL:  The state calls

13   Eric Stewart.

14        ERIC STEWART,

15   having been first duly sworn, was

16   examined and testified as follows:

17        DIRECT EXAMINATION

18   BY MR. POWELL:

19        Q.   Mr. Stewart, if you would scoot

20   up for me.  Speak into this microphone so

21   all the jury can hear you.  All right.

22   First off, state your name for the

23   record.

24        A.   Eric Stewart.

25        Q.   Mr. Stewart, do you have a

1  street name or something you go by other
2  than Eric Stewart?
3          A.    Yes.
4          Q.    What is that?
5          A.    Rabbit.
6          THE COURT:  So most people that
7  see you, what are they going to call
8  you?
9          THE WITNESS:  Rabbit.
10         Q.    Where do you live?
11         A.    403-A Marlyn Street.
12         Q.    Marlyn Street?
13         A.    Yes.
14         Q.    And where is that area here in
15 Montgomery?
16         A.    That's the Smiley Court area.
17         Q.    You live over in Smiley Court?
18         A.    Yes.
19         Q.    Now, do you currently have a
20 job?
21         A.    No, sir.
22         Q.    Have you had a job in the past?
23         A.    Yes.
24         Q.    What kind of things have you
25 done in the past?

1    A.    Detailing cars.

2    Q.    Detailing cars and that kind of

3  stuff?

4    A.    Yes, sir.

5    Q.    All right.  Now, bring your

6  attention back to February the 1st of

7  last year.  Do you recall that date?

8    A.    Yes, sir.

9    Q.    Do you recall a party that was

10  going on that night?

11    A.    Yes, sir.

12    Q.    Whose party was it?

13    A.    My cousin, Chris McQueen.

14    Q.    Christopher McQueen is your

15  cousin?

16    A.    Yes.

17    Q.    What does he go by usually?

18    A.    Flip.

19    Q.    Where was the party being held?

20    A.    At 432 Marlyn Street.

21    Q.    Who lives there, if you know?

22    A.    My cousin and his girlfriend

23  Nicole.

24    Q.    Nicole?

25    A.    Yeah.

1       Q.   What is her last name?

2       A.   I'm not sure.  Johnson or

3  something like that.

4       Q.   But you are having a party for

5  your cousin Flip over at Nicole's house?

6       A.   Yes.

7       Q.   How did you learn about this

8  party?

9       A.   My cousin told me.

10      Q.   And were you invited basically?

11      A.   Yes.

12      Q.   What time did you go over to

13  the party?

14      A.   Came about 9:30, 10:00.

15      Q.   How many folks were there once

16  you got there?

17      A.   About thirty.

18      Q.   About thirty people?

19      A.   Yes.

20      Q.   And how would you -- describe

21  the apartment for us.  What did it look

22  like over there in Smiley Court?

23  Describe the apartment where they were

24  having the party.

25      A.   Oh, the apartment.  Like I

1   said, it was like a lot of people against

2   the walls.  There were no chairs -- a

3   couple chairs there.

4         Q.    Did they have drinks or food or

5   anything like that?

6         A.    They had food.

7         Q.    What?

8         A.    We had beer, liquor like.

9         Q.    Inside the apartment?

10        A.    Yes.  Inside.

11        Q.    So if you wanted a drink you

12   would have to go inside?

13        A.    Yes.

14        Q.    And there were people inside?

15        A.    Yes.

16        Q.    Music, I take it?

17        A.    Yeah.  There were some music.

18        Q.    Smoking and that kind of stuff?

19        A.    Yes.

20        Q.    Just your basic party?

21        A.    Yes, sir.

22        Q.    And were there people also

23   outside?

24        A.    Yes, sir.

25        Q.    What was it like outside that

1      night?

2         A.   Like people standing on the

3      porch.  People like in the yard by the

4      mail box and stuff.  People walking past.

5         Q.   Were there any street lights or

6      porch lights or anything like that?

7         A.   Yes.  She had a porch light on.

8         Q.   A porch light?

9         A.   Yeah.

10         Q.   Now what was between the two

11     apartment complexes?  Were there any

12     lights or --

13         A.   No, sir, no lights.

14         Q.   Could you see?

15         A.   Yes, you could see.

16         Q.   Do you remember what the

17     weather was like that night?

18         A.   It was cold.  It was cold.

19         Q.   It was cold being back in

20     February?

21         A.   Yes.

22         Q.   Do you remember whether the

23     moon was out?

24         A.   No, sir.

25         Q.   If I am where I am and you were

1          where you are, would you be able to see

2          me out in between those two apartments?

3                  A.    Yes, sir.

4                  Q.    So you could see some things?

5                  A.    Yes.

6                  Q.    Now do you know the defendant

7          in this case?

8                  A.    Yes.

9                  Q.    How do you know him?

10                 A.    We went to Turner School

11         downstairs together.

12                 Q.    What about James Friendly, do

13         you know him?

14                 A.    Yes.

15                 Q.    How?

16                 A.    His girl stay upstairs from me.

17                 Q.    So you are familiar with him

18         and you knew a lot of other people at

19         this party?

20                 A.    Yes, sir.

21                 Q.    Did you know someone there

22         -- the defense has made a reference to

23         Darryl Foggy.

24                 A.    Yes.

25                 Q.    How did you know him?

1          A.    I growed up with Darryl Foggy.

2          Q.    Did you see him at the party

3     that night?

4          A.    Yes, he was.

5          Q.    Now, when was the first time

6     you saw James Friendly that night?

7          A.    When I came outside from the

8     party, he was standing on the porch.

9          Q.    How long had you been there?

10         A.    Been there like an hour or so.

11         Q.    Had you had anything to eat or

12    drink?

13         A.    Yes, I had something to drink.

14         Q.    What?

15         A.    A couple beers and a shot of

16    liquor.

17         Q.    So is it safe to say you had

18    about three drinks at that point?

19         A.    Yes.

20         Q.    Give or take about?

21         A.    Yes.

22         Q.    So you walked outside and

23    that's the first time you saw James

24    Friendly?

25         A.    Yeah.

1    Q.    Where was he?

2    A.    Standing on the porch.

3    Q.    Now when you saw James on the

4    street, what would you call him?

5    A.    Boo.

6    Q.    That was his name?

7    A.    Uh-huh (indicating yes).

8    Q.    And you are Rabbit.  Now we got

9    a Rabbit and a Boo out in front of the

10   apartment?

11   A.    Yes, sir.

12   Q.    And that's the first time you

13   had seen him that day?

14   A.    Yes, sir.

15   Q.    Do you have any idea how Boo

16   got to the party?

17   A.    No, sir.

18   Q.    What did you do once you saw

19   Mr. Friendly?

20   A.    We shook hands.  He said he

21   just got out of jail.  We were in the

22   city jail together.

23   Q.    That's the last time you saw

24   him?

25   A.    Yes, sir.

1        Q.    And that's the first time y'all

2    had seen each other since y'all got out

3    of the city jail?

4        A.    Yes.

5        Q.    What have you been locked up

6    for?

7        A.    I was in the city jail for

8    domestic violence.

9        Q.    You got into a fight with your

10   girlfriend?

11       A.    Yes, sir.

12       Q.    Have you ever been locked up on

13   any --

14       A.    I went to prison for possession

15   of cocaine.

16       Q.    Cocaine possession?

17       A.    Yes, sir.

18       Q.    Anything else?

19       A.    No, sir.

20       Q.    And other than the time y'all

21   spent over at the city jail, did you know

22   James Friendly before that?

23       A.    Yes.

24       Q.    How?

25       A.    Like I said, his girlfriend was

1    staying upstairs.  He would hang out with

2    my brother a lot.  Me and him met and we

3    would hang out.

4        Q.    Now what happened after you

5    hooked up with James at the party?

6        A.    He asked me do I want to go get

7    high, and I said yes.  And we went and

8    got something.

9        Q.    When you say you got something,

10    what are you talking about?

11        A.    A pile of cocaine.

12        Q.    Now what happened after you got

13    that?

14        A.    We got the pile of cocaine from

15    a guy and we went on the side of the

16    building to do it.  He had gave it to me

17    first.  He said, no, let me see it.  He

18    takes it.  It would be some cocaine.

19        Q.    How much did you take, if you

20    know?

21        A.    Just the taste.  It wasn't like

22    a pile on your hand.

23        THE COURT:  Are you talking

24    about you snorted a little of it or

25    what?

1    A. No. He tasted it.

2    Q. Just touched it to his tongue?

3    A. Yeah.

4    Q. How much did y'all buy or did

5 you get?

6    A. Spent fifty dollars.

7    Q. Fifty dollars worth of cocaine?

8    A. Yes.

9    Q. If you were holding it in your

10 hand, how much would it have been?

11    A. It would be a lot. It would be

12 like -- well, it would be a baggy like

13 this here.

14    Q. A little corner of a bag?

15    A. Yeah. It filled it up.

16    Q. And y'all were over there on

17 the side of the building?

18    A. Yeah.

19    Q. Then what happened?

20    A. He passed it to me.

21    Q. Then what did you do?

22    A. I snorted it.

23    Q. How much?

24    A. Like what you call a

25 two-on-two.

1        Q.    What does that mean?

2        A.    Both nostrils, yes.

3        Q.    Now what happened after y'all

4    were around there on the other side of

5    the building?

6        A.    Well, I be around there.

7    Poncho came on the side when we were

8    there.

9        Q.    Now when you say Poncho, who

10   are you talking about?

11       A.    Darryl Joyce.

12       Q.    Do you see that person here in

13   the courtroom here today?

14       A.    Yes.

15       Q.    Would you point him out for the

16   jury?

17       A.    (Witness complies.)

18       Q.    Which one are you talking

19   about?

20       A.    With the brown on it.

21       Q.    Let the record reflect he has

22   identified the defendant.  Now had you

23   seen this man before?

24       A.    Yes, I saw him.

25       Q.    Had you seen him at the party

1    before?

2         A.    No, not the party.

3         Q.    This was the first time you had

4    seen him at the party?

5         A.    Yes.

6         Q.    So what happened?

7         A.    He walked -- me and him shook

8    hands.  He was standing.  I told him that

9    Boo was there.  Then he shook hands.

10   Then we did -- all of us got to talking.

11   I guess they disagreed or something,

12   something, and they got in an argument.

13        Q.    You were standing there when

14   they first came up?

15        A.    What now?

16        Q.    You were standing there when he

17   first came up?

18        A.    Yeah, we were standing up.

19        Q.    And he shook hands with you?

20        A.    Yes.

21        Q.    But he didn't act like he

22   wanted to shake hands with James

23   Friendly?

24        A.    Yes.

25        Q.    Do you know what that was

1        about?

2                A.    No, sir.

3                Q.    But did it look to you like

4        they had at least seen each other before?

5                       MR. HARTLEY:  Objection, Your

6        Honor, to the opinion or the subjective

7        answer of the witness.

8                       THE COURT:  He can tell what he

9        saw.  Sir, repeat it.

10               Q.    Mr. Stewart, from the way Mr.

11       Friendly -- or Mr. Joyce responded to Mr.

12       Friendly in shaking hands or not wanting

13       to shake his hand, did it look like from

14       where you were standing they had seen

15       each other before?

16                      MR. HARTLEY:  Judge, I object.

17               A.    Yes.

18                      THE COURT:  Get him to tell

19       what he saw.

20               A.    He look like he didn't

21       really --

22                      MR. HARTLEY:  He is not -- he

23       hadn't been asked a question yet.  Mr.

24       Powell needs to rephrase the question.

25                      THE COURT:  Ask a question.

1    Q.    Mr. Stewart, again, what

2  happened when Darryl Joyce -- after he

3  shook hands with you, did he shake hands

4  with James Friendly?

5    A.    Eventually he did.

6    MR. HARTLEY:  Only if he knows.

7  I think that requires a mental operation

8  or speculation.

9    THE COURT:  Don't guess as to

10  something he is thinking.  Just tell us

11  what you saw.

12    A.    Well, the reaction with his

13  hand.

14    THE COURT:  Reaction with his

15  hand?

16    A.    His hand on the side and that's

17  it.

18    Q.    Then what happened?

19    A.    He spoke like he all right.  He

20  shook hands and just put his hand back

21  down.

22    Q.    Now, after that occurred, what

23  happened next?

24    A.    We got to talking.  Still

25  talking.  Like I said, evidently they had

1    a disagreement on something and an

2    argument broke out.

3         Q.    Before you get to the argument

4    what were y'all talking about?

5         A.    Me and Boo --

6         Q.    The three of you.  Y'all are

7    standing there talking.  You tell me.

8    Are you talking -- all three of you are

9    talking?

10        A.    No.  He was.  Poncho was

11    standing.  Me and Boo.

12        Q.    Poncho is there.  You are here

13    talking about the defendant?

14        A.    Darryl.

15        Q.    Poncho was just standing

16    there.  What were y'all talking about?

17        A.    Jail stuff, when we were

18    sitting in jail.  Just kicking it.

19        Q.    And he was listening?

20        A.    Yeah.

21        Q.    And then at what point did he

22    become involved in the conversation?

23        A.    When everybody was joking about

24    Gibbs Village.

25        Q.    Gibbs Village?

1      A.   Yes.

2      Q.   What about Gibbs Village?  What

3   does that have to do with anything?

4      A.   No.  He was like -- it was like

5   mostly Smiley Court dudes in our cell.

6   And we were kicking like how we was

7   kicking it in jail like home boy Smiley

8   Court talking.  But Boo would be with

9   us.  You got your home boy.  You know

10  what you're saying.  You know what I'm

11  saying, he didn't want to talk because

12  you got the home boy and he was from

13  Gibbs Village.

14      Q.   Now, who was it at Gibbs

15  Village?

16      A.   Who lives in Gibbs Village?

17      Q.   Who was running with Gibbs

18  Village?

19      A.   Boo.

20      Q.   That's James Friendly?

21      A.   Yes.

22      Q.   And who is running with Smiley

23  Court?

24      A.   Me.

25      Q.   Okay.  And do you know anything

1       about the defendant?

2              A.    He is from English Village.

3              Q.    English Village?

4              A.    Yes.

5              Q.    Are you aware of any ongoing

6       dispute between Gibbs Village and English

7       Village?

8                    MR. HARTLEY:  Objection, Your

9       Honor.

10                   THE COURT:  I will sustain it.

11             Q.    At that point when you were

12      talking about who is where, Gibbs

13      Village, Smiley Court, that's when the

14      defendant chimed in?

15             A.    Yes.

16             Q.    At that specific point?

17             A.    Yes.

18             Q.    Did he bring anything up before

19      you started talking about Gibbs Village?

20             A.    No.  He didn't say nothing at

21      first.

22             Q.    That's when he jumped into it?

23             A.    Yes.

24             Q.    And then what happened?

25             A.    He made a comment about niggers

1               THE WITNESS:  Yes.

2        Q.   How long did that go on?

3        A.   This argument went on about

4 like ten minutes.

5        Q.   They were going back and forth?

6        A.   Yes.

7        Q.   About who is their own man or

8 whatever?

9        A.   Yeah.  Who can hold their own

10 on the street or whatever.

11        Q.   Who can hold their own on the

12 street?

13        A.   Yes.

14        Q.   That is what they were arguing

15 about?

16        A.   Yes.

17        Q.   Now what did you do?

18        A.   I was telling them chill out.

19 I was inside of them.  I was telling them

20 to chill out.  I was telling them they

21 had a party.  Don't spoil my cousin's

22 party.  Just chill out.

23        Q.   At that point had anyone

24 exchanged blows or jumping at the other

25 one or pushed or anything?

1          A.    No, sir.

2          Q.    Just talking?

3          A.    It was just talking.

4          Q.    Or arguing?

5          A.    Yes.

6          Q.    So after you jumped in, tried

7    to calm everything down, what happened?

8          A.    It was calm down but -- they

9    was still mumbling like.  So I said,

10   y'all show some love.  At that point he

11   gave him a hand shake.

12         Q.    So when you are referring to

13   show some love, you are talking about

14   shaking hands and making up?

15         A.    Yes, sir.

16         Q.    At least talking about it?

17         A.    Yes.

18         Q.    Did that happen?

19         A.    Yeah, they shook hands.

20         Q.    What is supposed to happen now?

21         A.    He walked over to me and Boo

22   went back in front.

23         Q.    And where did you go?

24         A.    I was going to get a beer out

25   of the house, from the party.

1      Q.    Did you do that?

2      A.    Yes, I went and got a beer.

3      Q.    At that point you left Mr.

4  Friendly alone out on the porch?

5      A.    Yes.

6      Q.    Is that correct?

7      A.    He wasn't invited to the party.

8      Q.    So he didn't feel comfortable

9  going inside the house?

10           MR. HARTLEY:  Objection, Your

11  Honor.  He is asking what Mr. Friendly

12  would be thinking.

13           THE COURT:  Sustained.

14     Q.    What happened when you came

15  back?  Did you get a beer?

16     A.    Yeah, I got a beer.

17     Q.    What happened?

18     A.    They bring the argument back

19  up.

20     Q.    Who is arguing now?

21     A.    Boo and Poncho.

22     Q.    The same two before?

23     A.    Yes.

24     Q.    Same defendant that is sitting

25  over here?

1      A.    Yes.

2      Q.    And any doubt in your mind

3  that's the guy?

4      A.    That's him.

5      Q.    That's him?

6      A.    Yes, sir.

7      Q.    What was the argument going on

8  about this time when you came back out of

9  the apartment?

10     A.    It was basically the same thing

11 about he was talking about earlier.  I

12 heard James Friendly told him, man, I

13 ain't going nowhere.  I saw you sleeping

14 on the porch, if I wanted to do something

15 to you.

16     Q.    You heard the victim say that,

17 Mr. Friendly?

18     A.    Yes.

19     Q.    Said he had seen him before?

20     A.    Yes.  He was on the porch

21 sleeping in Smiley Court.

22     Q.    Then what happened?

23     A.    Me and Boo proceeded to go back

24 on the side where we was.

25     Q.    What was the reason for that?

CR-02-2104
Part 2 of 5

**DOCUMENT NAME:** Joyce, Darryl Jevon

**CLIENT & MATTER:** 58199-001

**DESCRIPTION:**

County: Montgomery                    LWOP

CC#s: 2002-1417

Attorney: Jean Therkelsen

Circle: (TRANSCRIPT)    CASE FILE    BOTH

3 volumes

## CERTIFICATION

I hereby certify that the preceding imaged records and documents

are a true, accurate, and complete image of the original records or

documents as received by the Office of the Attorney General of

the State of Alabama.

This the 19th day of January, 2005.

Signed: _Melisa A. Martin_

Notary: _Coleen F Gibson_

Coleen F. Gibson
Notary Public
Commission expires 06/11/06