B VOL 3 of 5

COURT OF CRIMINAL APPEALS No. CR-02-2104

# APPEAL TO ALABAMA COURT OF CRIMINAL APPEALS

## FROM

### CIRCUIT COURT OF ___MONTGOMERY___ COUNTY, ALABAMA

CIRCUIT COURT NO. ___CC 2002-1417___

CIRCUIT JUDGE ___HOBBS___

Type of Conviction / Order Appealed From: ___INTENTIONAL MURDER___

Sentence Imposed: ___LIFE WITHOUT PAROLE___

Defendant Indigent: ■ YES  ☐ NO

DARRYL JEVON JOYCE
**NAME OF APPELLANT**

AIMEE C. SMITH                    (334) 264-6466
(Appellant's Attorney)                   (Telephone No.)
640 S. MCDONOUGH STREET
(Address)
MONTGOMERY          AL          36104
(City)              (State)         (Zip Code)

V.

### STATE OF ALABAMA

**NAME OF APPELLEE**

(State represented by Attorney General)
NOTE: If municipal appeal, indicate above, and enter
name and address of municipal attorney below.

_____

_____

(For Court of Criminal Appeals Use Only)

Part 5 of 5

EXHIBIT

A

1    bullet.

2         Q.    So it went from looking -- if I

3    am looking at this right, it went from left

4    to right?

5         A.    Yes, sir.

6         Q.    And the entry of that bullet

7    would have been approximately in the

8    individual's side about where I'm pointing?

9         A.    Yes, sir.

10         Q.    Now, this wound, next wound that

11    is circled, I believe you marked as wound

12    number two; is that correct?

13         A.    That's correct.

14         Q.    What is this a photograph of?

15         A.    This is a photograph of an

16    entrance wound on the left buttock and

17    there is a little ruler underneath it.   It

18    has got that rim of -- it has got that

19    round circular entrance wound

20    characteristic.

21         Q.    Doctor, I believe it is real

22    faint, but toward the top can you see wound

23    one as well?

24         A.    Toward the top, there is also,

25    yes, wound one.

1          Q.    So these are on the same side of
2     the body?
3          A.    Yes, sir.
4          Q.    That's another characteristic of
5     an entrance wound?
6          A.    Yes.
7          Q.    Now, again, another diagram has
8     come up showing the rear of the individual
9     with an arrow going across.  Did you
10    prepare that diagram as well?
11         A.    Yes, I did, sir.
12         Q.    And what does the green arrow
13    indicate?
14         A.    The direction of the bullet.
15         Q.    Now, Doctor, did -- was there an
16    exit wound that corresponded to this
17    injury?
18         A.    This bullet entered in the left
19    buttock, traveled through the pelvis and
20    then it stopped in the right hip.  The
21    bullet stopped there in the right hip and
22    that's where we recovered it from.
23         Q.    So you were able to recover this
24    projectile?
25         A.    Yes, sir.

1          Q.    Now what is that a photograph of?

2          A.    That's the projectile I

3     recovered.

4          Q.    Also we have got a larger

5     photograph admitted as State's 31.  Do you

6     recognize that?

7          A.    Yes, sir.

8          Q.    This is the actual physical

9     bullet you took out of the victim?

10         A.    Yes, sir.

11         Q.    Now, Doctor, let's talk about the

12    final wound, number three.  What is that a

13    photograph of that just appeared?

14         A.    That's a photograph of an

15    entrance gunshot wound in the left thigh.

16         Q.    And the blue circle in the

17    photograph that just appeared?

18         A.    Of an exit gunshot wound in

19    the --

20         Q.    So we have a matching entrance

21    and exit wound?

22         A.    Yes.  The bullet simply went

23    through the left thigh.

24         Q.    Again, we have a diagram of an

25    arrow.  You prepared that diagram?

1          A.    Yes, sir.

2          Q.    And what does the green arrow

3    indicate?

4          A.    The direction of the bullet.

5          Q.    Now, Doctor, the angles are a

6    little bit confusing from time to time.    So

7    is this a diagram of all three entrance

8    wounds?

9          A.    Yes, sir.

10          Q.    And what do the green arrows

11    indicate?

12          A.    They indicate the direction of

13    the path of the bullet through the body.

14          Q.    So he was all shot in the same

15    direction from the same side based on a

16    medical examination of the entrance wounds?

17          A.    Yes, sir.

18          Q.    And the photograph that just

19    appeared, what is that a photograph of?

20          A.    It shows the side of his body and

21    the three entrance gunshot wounds.

22          Q.    Now, Doctor, were you able to

23    determine a cause of death for James

24    Friendly?

25          A.    Yes, sir.

```
 1          Q.    What?

 2          A.    Multiple gunshot wounds.

 3              MR. POWELL:  I believe that's all

 4      the questions I have for the doctor,

 5      Judge.

 6              MR. HARTLEY:  No cross

 7      examination.

 8              THE COURT:  Okay.  Thank you,

 9      Doctor.

10              MR. POWELL:  Your Honor, I

11      believe the State is going to call Nicole

12      Judkins to the stand.

13                  NICOLE JUDKINS,

14      having been first duly sworn, was examined

15      and testified as follows:

16                  DIRECT EXAMINATION

17      BY MR. POWELL:

18          Q.    Could you state your name for the

19      jury?

20          A.    Nicole Judkins.

21          Q.    Nicole, I'm going to need you to

22      speak up a little bit for me.  Okay?

23          A.    Okay.

24          Q.    Back in February of 2002, about

25      the 1st, were you hosting a birthday party?
```

1          A.    Yes.

2          Q.    Over at your house?

3          A.    Yes.

4          Q.    Where were you living at the

5    time?

6          A.    Smiley Court.

7          Q.    Over in Smiley Court?  I'm going

8    to show you State's 11.  Do you recognize

9    that?

10         A.    Yes.

11         Q.    Is that your apartment over at

12   Smiley Court?

13         A.    Yes, sir.

14         Q.    And just for the Record, is

15   Smiley Court the area where you were living

16   when all this occurred?  Is that here in

17   Montgomery County?

18         A.    Yes.

19         Q.    State's 12, is this a closeup

20   photograph of the apartment where you were

21   living?

22         A.    Yes.

23         Q.    And you were having a birthday

24   party at that apartment for who?

25         A.    For my boyfriend.

1      Q.    What was his name?

2      A.    Christopher McQueen.

3      Q.    Some people call him Flip?

4      A.    Yes.

5      Q.    So it was Flip's birthday.  About

6    how many -- you don't have to know the

7    exact number.  About how many people were

8    over at your house that day -- that night

9    for the party?  Can you even say?

10      A.    I don't know.  It was so many.

11      Q.    A lot?  Like more than thirty?

12      A.    Not that much.

13      Q.    Not that much.  But a lot of

14    people?

15      A.    Yeah.

16      Q.    And a lot of coming and going?

17      A.    Yeah.

18      Q.    Did you ever see the defendant at

19    that party?

20      A.    No.

21      Q.    You never saw him over there.

22    Did you ever see an individual name Boo or

23    James Friendly at that party?

24      A.    Boo was not at the party.  He was

25    outside.

1          Q.    He was outside?

2          A.    Yeah.

3          Q.    Did you ever see an individual

4    named Darryl Foggy at the party?

5          A.    Yes.

6          Q.    Okay.  He was there.

7          A.    Yes.

8          Q.    Now, were you outside when the

9    shooting occurred?

10         A.    No.

11         Q.    You weren't.  How did you know

12   about it?

13         A.    I heard the gunshots.

14         Q.    You heard the gunshots.  Do you

15   have any idea where Darryl Foggy was when

16   the shooting occurred?

17         A.    He was in my house then.

18         Q.    You saw him in your house

19   somewhere around the time the shooting

20   occurred?

21         A.    Yes.

22         Q.    Do you know where Darryl Joyce

23   was when the shooting occurred?

24         A.    When I came out the door, he was

25   leaving.

1    Q.   He was leaving.  Describe for the
2    jury how he was leaving.
3    A.   In a blue truck or a blue
4    sidekick, something.
5    Q.   You saw him in a blue truck
6    leaving the scene?
7    A.   Yes.
8    Q.   Where was that blue truck?  Which
9    side of your apartment was it on?
10   A.   It was in the parking lot.
11   Q.   In the parking lot.  Okay.  Now
12   did you ever see James Friendly again at
13   that party?
14   A.   Yes.
15   Q.   Where was Boo?
16   A.   He was laying on the ground.
17   Q.   Was he shot?
18   A.   Yes.
19   Q.   Okay.  Now, when you saw Darryl
20   Foggy at this party, did you -- you did see
21   him with a gun, didn't you?
22   A.   I seen the gun in his pocket.
23   Q.   You seen a gun in his pocket.
24   Describe for the jurors how it was in his
25   pocket.

1          A.    In his front pocket.

2          Q.    In the front pocket.  And what

3     did that gun look like when it was in his

4     pocket?

5          A.    I didn't see the gun.  I just

6     seen the --

7          Q.    The handle?

8          A.    Yeah.

9          Q.    What did the handle look like?

10          A.    It was black.

11          Q.    So the handle of the gun was

12     black when you saw it in his front pocket?

13          A.    (Witness nodding head

14     affirmatively.)

15          Q.    Did you see who shot James

16     Friendly?

17          A.    No.

18          Q.    Do you know whether or not Darryl

19     Foggy shot James Friendly?

20          MR. HARTLEY:  Objection, Your

21     Honor.  She doesn't know who shot him.

22          A.    He was in the house during the

23     shooting.  That's what I'm saying.

24          MR. POWELL:  Nothing further,

25     Judge.

1                      CROSS-EXAMINATION

2        BY MR. HARTLEY:

3              Q.    Ms. Judkins, let's go back over

4        this again, okay.  Of course, you were

5        having a birthday party out there that

6        night, right?

7              A.    Yes.

8              Q.    Now, the events that Mr. Powell

9        was asking you about didn't happen until

10       about 11:30 or so, right?

11             A.    I guess so.  I'm not sure.

12             Q.    You don't remember what time a

13       shooting took place at your own home?

14             A.    No, I do not because it was not

15       at my home.

16             Q.    Where was it?

17             A.    It was outside my home.

18             Q.    How close would it be then?

19             A.    Well, I don't know.  I mean, it

20       was a party.  People was drinking and

21       stuff.  So I don't know.

22             Q.    Were you drinking?

23             A.    Yes.

24             Q.    Were you using any illegal drugs?

25             A.    No.

1    Q.    Okay.  Were persons -- were

2    people at your party using illegal drugs?

3    A.    I don't know.

4    Q.    Now, you gave a statement to

5    Detective Howton, didn't you, about 6:00 in

6    the morning.  Do you remember talking to a

7    Montgomery police officer and that

8    statement being recorded by a videotape or

9    a tape reporter or something?

10   A.    I believe -- yeah, I believe so.

11   It's been so long.

12   Q.    I just want to know if you have

13   given a statement.  I have a copy of it in

14   my hand.

15   A.    Yes.

16   Q.    You haven't seen your statement,

17   have you?  You haven't seen a copy of this

18   statement previously, have you?

19   A.    No.

20   Q.    I'm going to show it to you in

21   just a moment.  But let me ask you, do you

22   remember if when you were talking to

23   Detective Howton, did you tell him about

24   Darryl Foggy having a gun?

25   A.    Yes.

1      Q.    Do you know what became of that

2   gun in the minutes after this event took

3   place?  Do you know what happened to that

4   gun?

5      A.    No.

6      Q.    What did Darryl Foggy do at or

7   about the time of the -- that y'all heard

8   the gunshots go off?

9      A.    Well, we were in the kitchen then

10  but I know after the shooting he left.  I

11  don't know where he went.

12     Q.    Well, did he leave from the

13  kitchen and then go out the front door and

14  just part or did he go by where James

15  Friendly was and Rabbit were and those

16  people?

17     A.    I didn't see him out there.  I

18  don't remember seeing nobody but me and

19  Rabbit was out there.

20     Q.    You don't remember seeing Darryl

21  Foggy out there?

22     A.    No.

23     Q.    One moment, please.  Let me show

24  you on page six of your statement.  You

25  have admitted or acknowledge that you did

1    talk to a police officer.  I'm going to

2    show you what appears to be a statement

3    taken by Corporal E.E. Howton, your

4    statement on February the 2nd, and

5    beginning time is 6:24 in the morning,

6    right?

7         A.    Uh-huh (indicating yes).

8         Q.    And going over -- much further

9    over into page six, they ask you, does he

10    normally carry a gun?  And you said -- who

11    are you talking about right here when you

12    said when you came in you saw a gun on him.

13      Who were you talking about?

14         A.    That was Darryl -- I mean the

15    other, D.

16         Q.    Let's just use last names so

17    we'll be sure.  There are two Darryls.

18         A.    I don't know the last names.

19         Q.    D.  Well, you called him D.

20         A.    I don't know either one of them

21    really, you know.

22         Q.    You don't know them very well but

23    you know that he carries a gun, don't you,

24    Darryl Foggy?

25         A.    I seen him with one.

1      Q.    And they asked, how did you see

2    it, and you said you saw it, it was in his

3    back pocket.  Right?

4      A.    It was in his front pocket.

5      Q.    Well, why did they write on there

6    because it was in his back pocket?

7      A.    I don't know.  It been so long

8    since I have had to go through this.

9      Q.    But then Officer Howton asked you

10   this question:  Okay.  But right after the

11   shooting he left?  And your answer was

12   what?  Would you read that to the jury

13   please?

14     A.    Well, he'd been shot.  He had to

15   be shot because the man dead.  Yes.  He

16   disappeared.

17     Q.    You said yes, he disappeared.

18   But yes, he disappeared.  You are referring

19   to Darryl Foggy as disappearing right?

20     A.    Yes.  He left.

21     Q.    All right.  Now, did you discuss

22   this matter about Darryl Foggy leaving

23   right after this event took place with Mr.

24   Howton before the statement was taken?  Do

25   you remember if you sat down with Detective

1    Howton and talked about it and y'all went

2    through a preliminary interview?  Do you

3    remember if that happened or if it didn't

4    happen?

5        A.    I don't know.

6        Q.    Did you ever tell Officer Howton

7    that you went outside and saw Darryl Foggy

8    out there and that he fled the scene from

9    the outside?

10       A.    Yes, I remember going outside

11   after the shooting.  I mean, it been so

12   long I don't remember.  I just went out

13   there just to see was he all right.  That's

14   all.

15       Q.    If Darryl Foggy wasn't involved,

16   why do you think he ran from the scene?

17       A.    I don't know that.

18       Q.    And you don't know Darryl Joyce

19   at all, the man sitting there at the end of

20   the table?

21       A.    No.

22           MR. HARTLEY:  Thank you.  No

23   further questions.

24           MR. POWELL:  Nothing further,

25   Judge.

1          THE COURT:  Okay.  Thank you

2     ma'am.

3          MR. HARTLEY:  Judge, we are going

4     to call -- I have already told Counsel we

5     are going to want to call Mr. Howton back

6     to the stand.

7          MR. POWELL:  At this time, Your

8     Honor, the State rests.  Hang on one

9     second.  I'm sorry.  Before we rest, I

10    think -- I don't know if Mr. Hartley has

11    got an objection to it.  Again, we can call

12    Detective Howton to cure it, but I think I

13    forgot to move to admit 21.  I will move to

14    admit that at this time.

15         MR. HARTLEY:  So for the Record,

16    what is 21?

17         MR. POWELL:  The gun.

18         THE COURT:  The gun.

19         MR. POWELL:  Do you have any

20    objection to that?

21         MR. HARTLEY:  We are going to

22    call him back anyway.

23         MR. POWELL:  I will move to admit

24    State's 21 as far the State's case in

25    chief.  With that being done, the State

1        rests.

2                        (State's Exhibit Number 21

3        admitted into evidence.)

4                        THE COURT:  Folks, why don't we

5        take about a five minute break.

6                        MR. HARTLEY:  Judge, could we ask

7        for a little longer.  We have motions to

8        do.

9                        THE COURT:  Be back in the jury

10       assembly room at 11:15.

11                       (Brief Recess.)

12                       (The following was held outside

13       the presence and hearing of the jury.)

14                       MR. HARTLEY:  Judge, we would

15       make a motion for a judgment of an

16       acquittal on behalf of Mr. Darryl Joyce.

17       We submit that the State has failed to make

18       a prima facie case of murder in this matter

19       against Darryl Joyce.  We submit that the

20       State has shown no motive.  We submit that

21       they have shown no witnesses who have any

22       credibility that could tie Darryl Joyce to

23       the death of James Friendly, and we ask the

24       Court to dismiss these charges and not

25       allow this case to go to the jury.  Failure

1        to a amke prima facie case.

2                    THE COURT:  Denied.

3                    MR. HARTLEY:  No response from

4        the State, Judge?

5                    THE COURT:  I don't need one.

6                    MR. HARTLEY:  Okay.  Judge, I

7        think we can do this without the jury.  We

8        did not offer -- and I think the state

9        will.

10                   MR. POWELL:  I have no objection.

11                   MR. HARTLEY:  We'll call it

12       Defendant's Exhibit 1, but it is also

13       State's Exhibit 26 but you never offered

14       it, did you?

15                   MR. POWELL:  I never offered it.

16                   MR. HARTLEY:  It is just marked

17       State's Exhibit Number 1.

18                   MS. PERKINS:  It's State's 26.

19                   MR. HARTLEY:  26.

20                   MS. PERKINS:  Put a Defendant's 1

21       on there.

22                   (Defendant's Exhibit Number 1

23       admitted into evidence.)

24                   (The following was held in the

25       presence and hearing of the jury.)

1           E.E. HOWTON,

2      having been previously sworn, was examined

3      and testified as follows:

4                DIRECT EXAMINATION

5      BY MR. HARTLEY:

6           Q.   Thank you for coming back,

7      Officer Howton.  Let me pick up with your

8      -- this one matter I would like to ask you

9      about at this point.

10               We have heard testimony since you

11     left the stand from a Nicole Judkins.

12          A.   Yes, sir.

13          Q.   Are you familiar with who she is?

14          A.   Yes, sir.

15          Q.   And back at the time of this

16     event, more specifically on February the

17     2nd, 2002, did you take a statement from

18     her?

19          A.   Yes.

20          Q.   So information from her would be

21     included in your case file in your

22     investigation; is that right?

23          A.   Yes.

24          Q.   Now, her statement is recorded,

25     of course, and put into paper form as a

1    matter of routine, right?

2        A.   Yes, sir.

3        Q.   Now, you also prepared, because

4    we have already talked about it, incident

5    reports where you include information that

6    you compiled into this report, right?

7        A.   Yes.

8        Q.   Let me get you to refer to the

9    same one that I asked you about before, the

10    lengthy report that is dated 2/5/02.  Page

11    five.  Page five at the bottom.

12        A.   Okay.

13        Q.   And in this you are referencing

14    information that you obtained from Nicole

15    Judkins, did you not?

16        A.   Yes, sir.

17        Q.   Would you read the first six

18    lines of that down to the one where the

19    sentence ends with the word ground, and I

20    think you will see that.  What did you

21    record as to what she had told you about

22    Darryl Foggy?

23        A.   You want me to read this?

24        Q.   I would appreciate it.

25        A.   Okay.  According to Nicole

1    Judkins, she was in the kitchen when a

2    black female she identified as Kesha

3    Billups came in the kitchen area and told

4    her that someone was fighting outside. She

5    stated that she then went outside at which

6    time she observed Eric Stewart, a/k/a

7    Rabbit, and Darryl Foggy, a/k/a D,

8    disappear and the victim James Friendly on

9    the ground.

10        Q.   Did you get that information from

11   her?

12        A.   Yes.

13        Q.   And in that you said that she

14   went outside and named these following

15   people, Eric Stewart and saw Darryl Foggy,

16   right?

17        A.   Yes.

18        Q.   And then at that -- combined in

19   that sentence, she said Darryl Foggy left

20   the scene, right?

21        A.   Yes.

22        Q.   Nowhere in there did you record

23   that Darryl Foggy was inside the apartment,

24   did you?

25        A.   Not in that particular area, no.

1    Q. I don't think you did anywhere,

2 did you?  I'm talking about at the time of

3 the shooting.

4    A. I don't think so, no.

5    MR. HARTLEY:  Thank you, no

6 further questions.

7      CROSS-EXAMINATION

8 BY MR. POWELL:

9    Q. Are you trying to deny that

10 initially there were two suspects developed

11 in this case?

12    A. No.

13    Q. And who were those two suspects

14 again?

15    A. Darryl Joyce and Darryl Foggy.

16    Q. And is the information Mr.

17 Hartley keeps pointing out part of the

18 factual basis used to develop Darryl Foggy

19 as a suspect?

20    A. Yes.

21    Q. And is that the same factual

22 information that y'all followed up on?

23    A. Yes.

24    Q. Until the point you recovered

25 State's 21?

1          A.    Yes.

2          Q.    And I believe Ms. Richart

3     testified that she tested this gun, did she

4     not?

5          A.    Yes.

6          Q.    And did it match the bullets that

7     were dug out of James Friendly's body?

8          A.    No.

9          Q.    When you went looking for Darryl

10    Foggy, were you able to find him?

11         A.    Yes.

12         Q.    When you went looking for Darryl

13    Joyce, were you able to find him?

14         A.    No.

15         Q.    Where did Darryl Joyce eventually

16    end up?

17         A.    Los Angeles, California.

18         Q.    And who did you sign warrants on?

19         A.    Darryl Joyce.

20         Q.    Why?

21         A.    Because all the information I had

22    at that point directed the investigation in

23    his direction.

24              MR. POWELL:   Nothing further,

25    Judge.

1                    REDIRECT EXAMINATION

2       BY MR. HARTLEY:

3            Q.    Were the people who were hiding

4       that gun hiding the evidence from a crime

5       scene?

6            A.    Yes.

7            Q.    If somebody picked up those

8       bullets and took them away from the scene,

9       would they be hiding evidence from a crime

10      scene?

11           A.    Yes.

12           Q.    And you have a witness who

13      identified Darryl Foggy positively,

14      according to your records, as the person

15      who did this crime, right?

16           A.    Yes.

17           Q.    And who was that?

18           A.    Mr. Thomas.

19           Q.    Bryan Thomas?

20           A.    Yes.

21           Q.    And he was interviewed at what

22      date on what location?

23           A.    He was interviewed that Saturday

24      and -- what was the other part of that

25      question?

1          Q.    Where did you interview him?

2          A.    At headquarters.

3          Q.    As a result of that, that photo

4    lineup with Darryl Foggy's picture

5    identified on it was generated, right?

6          A.    Yes.

7                MR. HARTLEY:  Thank you.  No

8    further questions.

9                RECROSS-EXAMINATION

10   BY MR. POWELL:

11         Q.    Detective Howton, how many people

12   that were outside at that party -- are you

13   familiar that other people showed up after

14   the shooting occurred?

15         A.    Well, there were supposed to be

16   numerous people at the party when all this

17   was going on.

18         Q.    And after the shooting occurred,

19   waiting on the paramedics, other people

20   started coming out of Smiley Court; is that

21   right?

22         A.    Yes.

23         Q.    How many of those people said

24   they saw people looking through the grass

25   picking up shell casings?

```
 1              A.    Nobody.

 2                    MR. POWELL:  Nothing further.

 3                    REDIRECT EXAMINATION

 4       BY MR. HARTLEY:

 5              Q.    How many people were asked that

 6       question?

 7              A.    Nobody.

 8                    MR. HARTLEY:  Thank you.

 9                    MR. POWELL:  Nothing further.

10                    THE COURT:  Is that it?  Thank

11       you, sir.  Can he be released?

12                    MR. HARTLEY:  I think we are

13       through, Judge.

14                    (Off-the-Record Discussion.)

15                    MR. HARTLEY:  Judge, that's our

16       last witness so the defense rests.  We are

17       going to renew that motion that we made so

18       I want to be sure that's on the Record.

19                    THE COURT:  Ladies and gentlemen,

20       why don't we do this.  Why don't we kind of

21       take a break for an early lunch.  Would

22       anybody have a problem being back here at

23       about 12:30?  All right.  If y'all could be

24       back here at 12:30, we will go to the

25       closing arguments and I will give you the
```

1       law in the case and we'll turn the case

2       over to y'all.  So be back in the jury

3       assembly room at 12:30.

4               Remember, don't talk to anybody

5       about the case.  Don't let anybody talk to

6       you about the case.  If anybody attempts to

7       talk to you about the case, please let us

8       know.  Don't even talk to each other about

9       the case.  Okay.  Thank you.

10               (Lunch Recess.)

11               (The following proceedings were

12      held outside the presence and hearing of

13      the jury.)

14               THE COURT:  Take a look at the

15      verdict form and tell me what you think.

16               MR. POWELL:  The state is

17      satisfied with the jury form, Judge.

18               MR. HARTLEY:  Satisfied.

19               (The jury enters the courtroom.)

20               THE COURT:  Ladies and gentlemen

21      of the jury, we are now through with the

22      trial where the attorneys will make their

23      closing arguments to you.  I will remind

24      you that what the attorneys say is not

25      evidence in the case.  They will simply try

1    to persuade you that you should vote for an

2    acquittal in the case of the defense or

3    guilty in the case of the prosecution.

4    They will be telling you what they recall

5    the facts of the case to be.

6           You are not bound by the

7    attorneys' recollection of the facts but

8    you should rely on your own recollection if

9    it is different from how the attorneys

10   remember it.  Mr. Powell.

11          MR. POWELL:  May it please the

12   Court, counsel.  Members of the jury, back

13   on February the 1st of last year an

14   argument occurred outside of a birthday

15   party over who was tougher than who or

16   whose set was better than whose set, or

17   whatever the reason the argument occurred.

18   But this man, the defendant, pulled out a

19   gun and shot James Friendly dead.

20          State's 29, that's a photograph

21   of Mr. James Friendly.  That's the person

22   who wasn't able to walk away from that

23   argument.  In other words, they were

24   arguing over who was the baddest.

25          Unfortunately, it is clear that

1    Mr. Joyce won that argument that night

2    because he jerked out a pistol and shot

3    James Friendly dead over just some words

4    that they were having.  Nothing else.  This

5    was a senseless act of violence that should

6    never have occurred.

7            But it occurred on that night

8    because this defendant decided to arm

9    himself with a gun, decided to go to that

10   party, decided to keep that gun in his

11   pants where he could get to it at a

12   moment's notice, decided that those words

13   or that argument escalated to the point he

14   was going to kill someone.  Then decided to

15   reach into his waistband, pull out that

16   gun, point it at Boo and pull the trigger,

17   not once, not twice, three times.  Maybe

18   more.

19           That, members of the jury, is an

20   intentional act.  There is no question that

21   the person that pulled the trigger of that

22   gun intended to kill James Friendly.

23           The only issue that has even been

24   brought up in this trial is do we have the

25   right person.  Let me be the first one to

1       tell you, if you go back in that jury room

2       and do not believe beyond a reasonable

3       doubt that Darryl Joyce is the man who

4       pulled that trigger, by all means cut him

5       loose.  We are not trying to convict an

6       innocent person.

7              But you heard the state's

8       evidence from that witness stand.  Eric

9       Stewart was right in the middle of this

10      argument.  He was there.  The person that

11      was arguing and shooting was not this

12      Darryl Foggy the defense keeps trying to

13      inject into the case.  It was that man

14      sitting right there.

15             He was standing in the middle of

16      the two of them trying to stop the argument

17      when he pulled out the gun and shot him

18      dead.  There was an eye witness standing

19      within feet of that man as he shot him

20      dead.

21             Now, admittedly, I told you this

22      in voir dire, I told you this in opening

23      statements, he testified to it from the

24      witness stand, it was a party.  There was

25      alcohol.  There was drugs.  That's

1    something to take into consideration.   I'm

2    not asking you to convict Darryl Joyce

3    based solely on the testimony of Eric

4    Stewart.

5            Whatever questions you may have

6    in your mind about should I believe Eric

7    Stewart, there is physical evidence and

8    there are other eye witnesses, the Osborne

9    brothers.   Particularly, Brian Osborne said

10   when he heard the shot he looked back over

11   his shoulder and saw the fire coming from

12   the gun.   He was within feet -- remember,

13   he was on the witness stand and I was

14   standing about right here and he said he

15   saw that man pull the gun, pull the trigger

16   and shoot James Friendly dead.

17           Finally, there is the physical

18   evidence.   They all told the story of where

19   the shooting occurred, how it occurred.

20   The shots were on the ground.   The shots

21   went into the truck.   There are photographs

22   of the truck.   You see the shell casings.

23   All of it is consistent with the story that

24   the eye witnesses told.

25           That story is plain and it is

1    simple, that that man sitting right over

2    there got into a senseless argument at a

3    party and decided to pull a gun and shoot

4    somebody dead.  That's what happened in

5    this case.  That's what all of the evidence

6    has pointed to.  Thank you.

7            MR. HARTLEY:  Thank you, Your

8    Honor and Counsel.  Good afternoon, members

9    of the jury.  I sure want to thank you for

10   participating in our case.  The role that

11   the jury plays is so important.  I won't

12   belabor it.  It is just essential that we

13   have a system like we have.  Ultimately

14   cases are -- civil and criminal cases are

15   handed to a jury and y'all are vested with

16   a very heavy responsibility of doing a

17   compound task of deciphering the facts and

18   applying them to legal standards.

19           Judge Hobbs will give you some

20   legal standards a little later that apply

21   to this case and all criminal cases.  He

22   will give you a burden of proof type jury

23   instruction.  He will give you the elements

24   of the offense of the general charges that

25   go with you back to the jury room.  You do

1    not get written charges so you will have to
2    memorize this as it goes.
3         With all that being said, you
4    gave an oath to be the jury in this case
5    and you were summoned down here.  I hope
6    you weren't too inconvenienced.  But this
7    is so important.  This is a major important
8    case.  All of them are important but this
9    one is important because it is the one we
10   are doing today.  It involves serious
11   charges.
12        I preface that to say that you
13   are going to be applying a standard of
14   proof beyond a reasonable doubt.  The Judge
15   will give you a definition of that, but I
16   want to mention to you that that standard
17   -- it is sort of unique to criminal cases
18   in the legal system, and that standard is
19   sort of an interesting concept because
20   y'all are going to have to decide what
21   beyond a reasonable doubt is.
22        I suggest to you it is a pretty
23   high standard.  We make decisions every day
24   in our lives.  I will try to use the
25   example of people decide virtually every

1    day where they go to lunch or what they are

2    going to do for lunch.  Some days you go

3    get a good lunch and some days you may pick

4    out some place where the lunch wasn't so

5    good and you reflect back on it and you

6    say, you know, I wish I hadn't gone to that

7    place.  But you didn't really ponder on it

8    real hard before you did it.  Maybe on

9    impulse you did it.

10           You applied a standard of

11   probably just say there is a preponderance

12   of my grounds for going to restaurant A or

13   restaurant B or whatever.  That's just one

14   of the decisions we make in routine

15   everyday life and we don't apply a beyond a

16   reasonable doubt standard to such

17   decisions.

18           But when things get real, real,

19   real important, we apply a standard that is

20   more like beyond a reasonable doubt.  I

21   think an example of that might be if you or

22   somebody -- and I'm not going to make you

23   particularly, but I'm talking about you in

24   the general sense.

25           If you or a person is going to

1    face maybe some kind of major surgery and a

2    doctor told them -- told you that you could

3    take this major surgery and your problem

4    might be cured, but on the other hand, the

5    downside is you might not survive the

6    surgery.

7              That's when you start getting to

8    the situation where you put more weight

9    into the decision and you might take in

10   more factors.  You might take in a second

11   opinion.  You might go see another doctor

12   or research the topic yourself or put some

13   tremendous amount of deep thought into it.

14             That's more of the kind of

15   decision we are making now is the weight of

16   this.  The gravity of this matter is so

17   high that the standard of proof is very

18   high -- or the burden of proof is very high

19   and the standard of proof is very high

20   because the consequences are great,

21   somewhat like it would be if you were

22   facing major surgery.  So I try to make

23   that differentiation so you can see how

24   important it is.

25             But let's go to this case now.

1     He is presumed innocent.  You will hear a

2     charge on that.  I will submit to you that

3     the state hasn't proved him guilty of

4     anything because the quality of their

5     evidence is not that good.

6                I got several areas I want to go

7     into, and I apologize that I'm not the most

8     organized person but I'm going to try to go

9     to them.  One of the things I mentioned in

10    my opening was that one of the things you

11    are going to need to take into

12    consideration is the overall -- what did we

13    call it -- I think I called it the

14    circumstances or the conditions that

15    night.

16                I'm going to submit to you the

17    state got in a lot of exhibits and they got

18    in a good bit of testimony, but I really

19    like these two exhibits.  Now, I know and

20    I'm going to admit that a picture can't

21    always capture what a scene looks like, but

22    I submit to you that these are original

23    photographs because they portray a very

24    dark area, and I think these are more like

25    the scene than, for instance, this

1    picture.  I ask you to keep that in mind

2    because it happened at 11:30 or a quarter

3    to 12:00.  It happened way up close to

4    midnight.

5              The significance or the

6    importance of that is it goes to all this

7    testimony about who saw what and what they

8    were able to observe.  I think that the

9    witnesses that the state tried to use

10   overstated what could be seen and what

11   could actually be observed.

12             I'm going to try to establish

13   that by -- let's use Eric Stewart, the

14   first witness, I think, whom we'll say that

15   his testimony or his ability to recall and

16   accurately testify in this case would be

17   affected by his alcohol use, his use of

18   cocaine on that evening, and I think that

19   it is illustrated by the way he changed his

20   statement when I cross-examined him and

21   tried to pin him down on where the first

22   shots were fired.  I think Eric Stewart was

23   all over the place.  Three different

24   versions:  One time in the ground, one time

25   in the back of the truck, and another time

1    he shot the victim.

2           If he is such a spectacular or

3    stellar eye witness, as Mr. Powell wants

4    you to believe, then how could he account

5    for such inconsistencies in his statement.

6    He tried to implicate Darryl Joyce, but he

7    also told us that he was very close friends

8    with Darryl Joyce, that they had been

9    raised together or they had been friends

10   for a very, very, very long time.

11          I submit to you an overview of

12   the evidence in this case would show that

13   there could be a loyalty to Darryl Foggy --

14   I hope I didn't get the Darryls mixed up

15   -- a loyalty to Darryl Foggy that would be

16   strong enough for him to lie to him.  I

17   think that is verified by this episode of

18   this gun being at the scene and then moved

19   to the apartment.

20          Now, of course, he tried to

21   disavow that he participated in hiding that

22   gun, but I will suggest to you that raises

23   two questions.  If he didn't participate in

24   hiding the gun then why did Detective

25   Howton write in his report these exact

1    words, it's an open question as to why Eric

2    Stewart aided in hiding the gun. You heard

3    Mr. Howton say that he put that in his

4    report.

5            And the second or the same

6    related question is, if he didn't

7    participate in hiding the gun, how did he

8    no where it went and how did he know how to

9    send Detective Howton to find the gun if he

10   didn't know or have knowledge of it being

11   hidden and where it was hidden.

12           I believe that Eric Stewart's

13   testimony falls or fails for that reason to

14   make any kind of proof beyond a reasonable

15   doubt.

16           Now, let me go to two other

17   witnesses I found interesting in this

18   case. The Brian Osborne and Johnny Osborne

19   witnesses, who, if you don't really analyze

20   their testimony, seem like they really --

21   really were on the ball on the testimony.

22   But I watched this and I'm sure y'all saw

23   it, too. It was when Johnny Osborne was

24   testifying, the state -- I'm not going to

25   change it -- I'm going to use this

1    -- projected this up on there.  I guess I

2    might could do it.

3            (Off-the-Record Discussion.)

4            Well, I'm going to point because

5    I might get confused.  I will just point.

6    It won't take but a second.  The testimony

7    from Johnny Osborne was that the event took

8    place on this side, or more particularly,

9    if he didn't -- wasn't specific about the

10   other side.  I recall exactly that this is

11   where Eric Stewart said it was.  He

12   described all the events, they had come out

13   of this apartment and that he and James

14   Friendly were right over in here to use

15   drugs or to have their conversation or

16   whatever.

17           But then when we got to Brian

18   Osborne, he moved it over to this side.

19   That's real interesting because it creates

20   a question now about who could see the

21   best.  We don't know which side -- both of

22   them can't be correct.  It can't be over

23   here, it can't be over here.  I don't think

24   it can be in both places.

25           It is interesting that the shell

1      casings -- I think they said the shell

2      casings from all the other testimony were

3      found in this area, which would not resolve

4      which side of the cut or this alley they

5      were in.  But then you put in this area

6      right here where this car was, the Osborne

7      vehicle, a Jeep-type vehicle, it looked

8      like, backed into the parking place.

9           Brian Osborne starts testifying

10     -- if we just use this -- I will use this

11     if I can do it one more time right.  Let's

12     use this hypothetically as the Jeep and

13     let's consider the front or back or

14     -- let's presume this is the front of the

15     Jeep and the back would be away from it.

16          If the shooting and all this

17     activity took place over here, then the

18     driver's side of the Jeep would have the

19     better opportunity to observe because that

20     person wouldn't be able to see over here.

21     Again, and if it occurred over here, then,

22     of course, Mr. Brian Osborne who said he

23     was getting in the passenger side would

24     have been able to observe what happened

25     here but that completely contradicts Eric

1       Stewart's testimony.  So we can't have

2       Brian Osborne's testimony that it happened

3       over here and Eric Stewart's testimony that

4       it happened -- Brian Osborne and Eric

5       Stewart who said it happened over here.

6       Those things are totally inconsistent.

7               And if the state thinks that you

8       should reject Brian's testimony that it

9       occurred over here and go with the fact

10      that it took place over here, then that

11      gives Johnny Osborne the better opportunity

12      to observe.  All this clouds the issue of

13      what really happened out there because

14      Brian Osborne is positive that there were

15      three people out there.  Johnny Osborne is

16      positive that there were four or five

17      people out there.

18              So which one is it?  And I am

19      sure the state would not say that that is

20      an immaterial point.  I think it would be

21      of huge importance, who had the opportunity

22      to observe when you talk about Brian or

23      Johnny Osborne, because we have got

24      different stories about where the whole

25      thing happened.

1          It's undoubtedly dark out there,

2     undoubtedly some confusion as to who and

3     what position, et cetera, and that kind of

4     stuff.  Now, this all comes from the

5     state's evidence.  This does not -- this

6     was their witnesses.  Oh, yeah.

7          Let me go to something now.

8     Let's go to Mr. Howton.  What did Mr.

9     Howton add to this case that we suggest

10    substantiates a reasonable doubt theory in

11    this case.  He verified for us that he had

12    a witness who came in the morning after it

13    happened and was asked if he could identify

14    the person who did this -- committed this

15    crime.  This photo lineup was used, and a

16    person named Bryan Thomas identified that

17    individual right there as being the

18    shooter.  Remember the report was he

19    positively identified him.  That's Darryl

20    Foggy.  That's the person who was at the

21    scene that night.

22          I will go back to that in a few

23    minutes when I have a little theory I want

24    to give you about this case.  But also he

25    did some other things that I think I have

1    already alluded to, the fact that he noted

2    that there was -- I made a reference that

3    he -- a reference that said there was an

4    open question about why Eric Stewart had

5    gone and hidden the gun.  I think Eric did

6    in fact hide the gun or participate in

7    hiding it.

8         Another place that Mr. Howton

9    contributed to this issue of what really

10   happened or is this case against Darryl

11   Joyce that strong, he also took a little

12   bit away from Ebony Judkins' testimony.

13   She was trying to be so emphatic that she

14   was trying to place Darryl Foggy back in

15   her apartment at the time she heard the

16   shots but she didn't particularly make that

17   so clear in her statement.

18        But we asked Mr. Howton, the last

19   witness we called, the only witness we

20   called, to go back to his incident report,

21   and he said that she had told him that she

22   came out and saw Eric Stewart, a/k/a

23   Rabbit, and Darryl Foggy, a/k/a D, fleeing

24   from the scene.  That's an odd way to put

25   it if he had just been inside with her.  It

1       just sort of creates an issue as to --

2       there was a real possibility that Darryl

3       Foggy was out there when the action was

4       going on and she is just now covering for

5       him as a matter of friendship or loyalty to

6       him.

7                    There is not a single photo

8       lineup like this in this case that

9       identifies Darryl Joyce being the shooter

10      in this case.  There are some people that

11      identify him as being a person but nobody

12      picked him out of a six-person lineup like

13      that and said he did it.  The state is not

14      offering one of these with Darryl Joyce's

15      picture in it.

16                   Let me tell y'all, as I close my

17      statement to you, that I think if I -- I

18      haven't drawn this yet so I'm going to give

19      it a shot.  I'm going to characterize this

20      case as being an incomplete or sort of a

21      curtailed investigation.  Let me see if I

22      can represent this -- I should have already

23      drawn it, but I'm going to do it if I can.

24      I'm going to think of the investigation of

25      this case was sort of like a travel or

1   going down something like maybe a highway

2   from the standpoint of trying to get from

3   point A, which is the -- when the event

4   occurred, when James Friendly was killed,

5   and trying to get to -- I'm going to call

6   it an S for solution.

7            Here is what I think the state

8   did in its course.  It went along for a

9   while.  Then right after the event occurred

10  -- of course, you have the possibility of

11  where it branches like this in the course

12  of the investigation, and it might branch

13  even more times.  It might branch again and

14  it might be another branch over here, and

15  the size or the shape of the branches I'm

16  not trying to emphasize because there are

17  multiple suspects.

18           What I think happened is when

19  this case got going -- let me correct that

20  just a little bit -- the state had a -- or

21  the investigation in this case led directly

22  at one point to Darryl Foggy by an eye

23  witness who said that he positively

24  identified this person as being a suspect

25  -- being the person who perpetrated the

1      crime, who actually did it.

2           And the state had that evidence,

3      and we still have it with us today.  But

4      when these other people who had, we will

5      submit, reasons to possibly protect him

6      came along, the state went up this path

7      which they say tries to lead to Darryl

8      Joyce.  And what they did was, whatever

9      reason -- you know, they weren't satisfied

10     they had an eye witness who said they did

11     it.  They just cut this off.  This just

12     sort of goes like that, boom.

13          Then they go down this path and

14     they try to stay on this path to hope

15     Darryl Joyce did it but on what grounds or

16     what evidence?  The very weak evidence of

17     Eric Stewart who was a druggy, a convicted

18     felon, and then possibly one other witness,

19     Mr. Osborne, who has some serious

20     inconsistencies and conflicts in his

21     statement.  And that's all they have got.

22          But they never went very far down

23     this path.  In other words, once they got

24     -- they had it sort of as a possibility or

25     a probability that this man was involved in

1    the case, and it just stopped right there.

2    Boom.  And the only way it comes back up

3    again is because I bring it back into this

4    case about Darryl Foggy who had a gun.

5             Apparently, he is the kind of

6    person who would be involved in a crime

7    like this.  And how do we know that this

8    gun is not a decoy gun or a fake gun

9    against somebody to give somebody an

10   alibi.  How do we know that this wasn't a

11   plan, a false gun planted.

12            Are you sure -- Eric Stewart sure

13   volunteered it mighty quickly.  He sure

14   came up with it in a heartbeat.  We'll lead

15   you to a gun, a decoy gun.  Not the gun

16   that committed the felony but, hey, it sure

17   gave Darryl Foggy an out.  So why did he

18   even tell about it if it was zero or

19   immaterial to the case.

20            So mainly the state's case failed

21   because they didn't pursue this branch of

22   their course of conduct and focused too

23   narrowly on this branch.

24            Now I submit to you that that

25   creates reasonable doubt, serious

1    reasonable doubt that Darryl Joyce did not

2    commit that crime.  He had no motive.  I

3    know the state said it was all about an

4    argument.  Well, we don't know who was

5    arguing with who out there because of these

6    pictures, State's Exhibit Number 1 and

7    State's Exhibit Number 5.

8            And by the way, there is a --

9    some evidence in this case that somebody

10   was cleaning the gun shells off the ground

11   out there after it happened.  It wasn't my

12   client, he was gone.  You know, there is

13   more to this story that has been found or

14   has been told and it is not sufficient to

15   carry this case to the verdict that the

16   state is going to ask you for.  Too many

17   unanswered questions, too many mysterious

18   deadends that don't go anywhere and don't

19   resolve themselves.

20           And I think very importantly the

21   fact that the two Osbornes got the shooting

22   on the wrong side of the -- on opposite

23   sides of this little alley way.  And that's

24   -- in and of itself it appears to be

25   insignificant but it is not because you

1    have got to think about it, which one was

2    on which side of the vehicle.  The vehicle

3    was backed in, what perspective would the

4    driver have, what perspective the passenger

5    would have, and how much light did they

6    have to see what they said they saw.

7         A big discrepancy on how many

8    people.  Brian Osborne was essentially

9    positive there were three and his brother

10   was essentially positive there were four or

11   five people out there.  I believe you

12   probably clearly understand my argument.  I

13   submit to you that the jury -- that this

14   jury -- you should find Mr. Darryl Joyce

15   not guilty.

16        We want again to say that we

17   appreciate you being the jury.  If we have

18   done anything during the course of the

19   trial -- if we jump up and object

20   sometimes, and we have to, we are not

21   trying to be as bad as you might think we

22   are.  It is what we think the legal rules

23   require and that kind of thing.  So if we

24   did anything that looked awkward or

25   inappropriate, hold that against me, not

1    against him.  He has exercised his right

2    not to testify.

3              I think that's all I wanted to

4    say.  I might glance at my notes but that's

5    really about all I can think of in this

6    case from the evidence.  You have heard it,

7    and I will leave it with you, but I will

8    ask you to find Darryl Joyce not guilty.

9              MR. POWELL:  Mr. Hartley and I

10   certainly agree that at the initial stage

11   of this investigation there was a fork in

12   the road.  The case of the two Darryls, if

13   you will.  They interviewed one set of

14   witnesses and they were all identifying

15   Poncho or Darryl Joyce.

16             There was some indication that

17   another Darryl was at the party, and

18   another Darryl may have had a gun.  So

19   let's look at what the police did.  First

20   off, the only person -- I mean, there is no

21   dispute that Darryl Foggy was at this

22   party.  I don't think anybody is arguing

23   that.  But has a single witness in this

24   case ever said that Darryl Foggy was

25   outside or that he was in any manner

1    involved in this incident.  There has been

2    absolutely no testimony from this witness

3    stand about that at all.

4         All you know is that someone

5    named Bryant Thomas identified Darryl Foggy

6    from a photo lineup.  When you are deciding

7    and discussing this in the back, I want you

8    to ask some questions.  Where was Darryl --

9    where was Bryant Thomas when the incident

10   occurred?  Where was he standing?  Was he

11   even still at the party?

12        Eric Stewart, in some other

13   testimony, indicated that he was there but

14   he left.  Was he saying that he was the

15   shooter or was he saying that he was at the

16   party?  We know nothing about Bryant Thomas

17   other than he identified someone named

18   Darryl Foggy from a photo lineup.

19        There is no evidence about his

20   vantage point, where he was standing, what

21   he saw, nothing.  Yet the defense wants you

22   to base a reasonable doubt on unanswered

23   questions and innuendo that is not based on

24   evidence.

25        What about Nicole Judkins?  What

1    did she say?  She hosted a party.  She saw

2    Darryl Foggy there.  She saw him with the

3    gun.  She didn't think he was involved in

4    the shooting, and he elicited some

5    testimony from Detective Howton that after

6    everything was over with he saw Eric

7    Stewart and Foggy out there with the body

8    and they left.

9        Well, that is entirely possible.

10   I think all the other witnesses indicated

11   after it was over with, Eric Stewart

12   remained with the body until the paramedics

13   got there and he left.  That is not

14   evidence that Darryl Foggy shot anybody.

15   But nonetheless, Detective Howton had his

16   name.  He had the name of Darryl Joyce and

17   he had the name of Darryl Foggy.

18       So what did he do?  Did he just

19   stop the investigation as Mr. Hartley

20   indicates?  No.  He wanted to know, okay,

21   if he had a gun at the party that night,

22   where is the gun?  Where is this hidden gun

23   the defense has talked about so much?

24       It is across the street, members

25   of the jury.  It is not hidden.  It is in

1    an apartment directly across the street

2    from where the shooting happened.  Now, if

3    you were going to hide a gun, does that

4    make a whole lot of sense to leave it

5    within ten yards of where the shooting

6    occurred.

7        Detective Howton is able to get

8    this gun.  This is the gun in question,

9    State's 21.  There has been no evidence to

10    the contrary.  Mr. Hartley got up here and

11    told you some wild theory about a planted

12    gun or a gun used to mislead somebody.

13    That's what Mr. Hartley said in closing

14    argument.  Find one witness that said

15    anything to support that.  One fact, one

16    shell casing, anything to support that.

17        Judge Hobbs is going to tell you

18    what Mr. Hartley said, even what I'm saying

19    now, is not evidence.  So a wild

20    speculation by the defense attorney.  This

21    is the gun.  Why does he want you to

22    believe it is not the gun, because Kathy

23    Richart, the forensic expert, tested this

24    gun.  She tested this gun against those

25    three shell casings that were picked up at

1        the scene.

2                After the shooting occurred, they

3        went and picked up the casings that were in

4        that cut where it occurred, regardless of

5        which side it was on.  And it didn't match

6        this gun.

7                When Dr. Bristol performed the

8        autopsy, one of the bullets was still in

9        Boo's body.  They got it out.  They tested

10       it.  It didn't match this gun.  The

11       so-called hidden gun theory did not match

12       the evidence.  We still, to this day, do

13       not have the murder weapon.

14               We found Darryl Foggy's gun.  We

15       still have not found the gun that was used

16       to kill James Friendly, which makes a whole

17       lot more sense that the person that used a

18       gun to kill someone isn't going to just

19       leave it across the street where the cops

20       can find it.  They are going to ditch it

21       where nobody can find it because they don't

22       want it found.

23               Well, let's talk about what else

24       was and was not found in this case, members

25       of the jury.  First off, Darryl Foggy was

1    Smiley Court all the way to California if
2    they didn't have the lick of nothing to do
3    with who shot James Friendly.  That's
4    evidence.  That's evidence of consciousness
5    of guilt, all that running away.
6              Darryl Foggy never left.  They
7    found him right here in Montgomery.  They
8    found his gun.  They talked to him.  The
9    eye witnesses never put him involved, so
10   this fork in the road was a dead end.  He
11   didn't do it.  The forensic evidence says
12   he didn't do it.  The ballistics evidence
13   says he didn't do it.  There are no eye
14   witnesses saying he had anything to do with
15   it.  Nothing in the case points to Darryl
16   Foggy.
17             But everything in the case points
18   to Darryl Joyce.  Did the police take that
19   fork in the road?  You bet they did.  They
20   followed it for Foggy and came up with
21   nothing.  Came up with evidence that said
22   he didn't do it.
23             They followed it for Joyce and
24   the more and more and more they found.
25   Eric Stewart.  And if you don't believe

1        Eric Stewart, there is Brian Osborne.  If

2   you don't believe Brian Osborne, you got

3   two people telling the same story about an

4   argument and Darryl Joyce pulling a gun.

5   It is hard to make those stories match,

6   members of the jury, if it didn't happen.

7            Then if that's not enough for

8   you, the shell casings were found in that

9   cut where they said the shooting occurred.

10  Johnny Osborne testified that it happened

11  just the way everyone else said it

12  happened.

13            In that cut, there was an

14  argument.  Darryl Joyce was arguing with

15  Boo over who was the baddest, who was the

16  toughest, who could do this or who could do

17  that, and he was going to prove to James

18  Friendly once and for all who won that

19  argument, and he did it by pulling out a

20  gun and shooting him dead over nothing.

21  Over nothing.

22            Now, the last thing I'm going to

23  say to you is the Judge is going to read

24  you the law.  He is going to read you the

25  law on intentional murder.  That's what

1    happened in this case, members of the

2    jury.  And to meet our burden of proof

3    beyond that reasonable doubt, the same

4    standard that is used in all criminal

5    cases, we have got to prove to you that

6    James Friendly is dead.

7              I think we know that.  He was

8    shot to death.  All the evidence in the

9    case points to one person.  It doesn't

10   point to Darryl Foggy.  It points to this

11   man on trial today, Darryl Joyce.  James

12   Friendly is dead.

13             Number two, that the defendant,

14   Darryl Joyce, caused the death of James

15   Friendly by shooting him with a gun, and

16   that in committing the act which caused the

17   death of James Friendly, the defendant

18   acted with intent.  A person acts

19   intentionally when it is his purpose to

20   cause the death of another person.  That's

21   technically how the law is going to read

22   and what you are going to hear from the

23   Judge.

24             The State of Alabama has met

25   every one of those elements.  James

1   Friendly is dead. Darryl Joyce did it. We

2   proved he did it beyond a reasonable doubt,

3   and he did it with intent. Members of the

4   jury, he is guilty of intentional murder.

5   Thank you.

6        THE COURT: Ladies and gentlemen

7   of the jury, we are now at the point in the

8   trial where I tell you what the law is

9   regarding the deliberations in this case.

10  Please listen carefully as I explain it to

11  you. It is going to take a little bit of

12  time to get through it.

13       This case is brought to you by

14  way of an indictment in this case. Let me

15  read the indictment to you real quickly.

16  The State of Alabama, Circuit Court of

17  Montgomery County, November term of 2002,

18  the Grand Jury of said county charges that

19  before the finding of this indictment,

20  Darryl Joyce, whose name is otherwise not

21  known to the Grand Jury, did intentionally

22  cause the death of another person, James

23  Friendly, by shooting him with a gun in

24  violation of section 13A-6-2, Code of

25  Alabama.

1    The indictment has no bearing on
2    the guilt or innocence of any person.  Keep
3    that in mind.  That's just the way that the
4    case gets to this Court.  Now, the
5    defendant, to that charge, has pled not
6    guilty.  The plea of not guilty places the
7    burden on the State of Alabama to prove by
8    the evidence presented the guilt of Mr.
9    Joyce beyond a reasonable doubt.
10    Before a conviction can be had,
11    each of you must be satisfied beyond a
12    reasonable doubt of Mr. Joyce's guilt.
13    Otherwise, he is entitled to an acquittal.
14    We've talked about the presumption of
15    innocence.
16    The defendant is presumed to be
17    innocent of the offense of murder and that
18    presumption attends him until his guilt is
19    established from the evidence beyond a
20    reasonable doubt.  This presumption is
21    evidence in the case.  It is to be
22    considered by you along with the other
23    evidence in the case.  It is a fact which
24    is to be considered by you and goes with
25    the defendant to your verdict unless the

1    evidence convinces you beyond a reasonable
2    doubt of the proof of each and every
3    element of the charge.
4            We talk about reasonable doubt.
5    Let me try and explain that for you.  The
6    state's burden of proof in this case is a
7    stricter, heavy burden but it is not
8    necessary that the defendant's guilt be
9    proved beyond all possible doubt.  It is
10   only required that the state's proof
11   exclude any reasonable doubt concerning the
12   defendant's guilt.
13           A reasonable doubt is a real
14   doubt based upon reason and common sense
15   after careful and partial consideration of
16   all the evidence in the case.  Proof beyond
17   a reasonable doubt, therefore, is proof of
18   such a convincing character that you would
19   be willing to rely and act upon it without
20   hesitation in most important of your own
21   affairs.  If you are convinced the
22   defendant has been proved guilty beyond a
23   reasonable doubt, say so.  If you are not
24   convinced, say so.
25           As I told you at the beginning of

1   this case, y'all are the sole judges of the
2   evidence.  I am going to explain to you
3   again what is and is not evidence.  The
4   indictment that I read to you is not
5   evidence.  The arguments, statements and
6   assertions of the attorneys in this case
7   are not evidence.  Any rulings that I make
8   in this case are not evidence.  Please
9   don't get caught up in, well, I think the
10  Judge is leaning this way or he overruled
11  that side's objection, he must be favoring
12  -- hu-huh.  I'm like the referee.  I'm
13  totally neutral in this case.
14          Please don't speculate as to what
15  might have happened if I had allowed in
16  some evidence or I had not overruled --
17  overruled an objection or something like
18  that because that gets us back into
19  speculation.  We want you to decide the
20  case based on the evidence.  The evidence
21  in the case is the testimony of witnesses
22  from the witness stand.  It is what you
23  heard from the witness stand by people
24  under oath.  Okay?  It is also any exhibits
25  that we allowed into the case.  Finally, it

1    is the presumption of innocence.  We have

2    talked about that.

3              Your job -- one of your jobs in

4    this case will be to try and decide what

5    the evidence in the case is.  It is to

6    decide the credibility of the witnesses in

7    the case.  You are the sole exclusive

8    judges of the credibility of witnesses and

9    the weight that should be given to their

10   testimony.

11             In deciding to pass on the

12   credibility of a witness, you have the

13   right to consider, number one, any bias,

14   interest or prejudice that may have been

15   exhibited to you while that witness

16   testified.  Number two, the demeanor of the

17   witness on the stand, that is, how did they

18   appear to act while they testified.  Number

19   three, the witness's basis for testifying,

20   that is, how did that witness know the

21   facts that he or she testified to, whether

22   they had an opportunity to observe and

23   discern and know those facts.

24             You may accept or reject any part

25   of the testimony of a witness and you

1      should accept only that part of the

2      testimony that you consider worthy of

3      belief.  In other words, if you think a

4      witness was not being completely candid

5      with you, you can accept that part that you

6      think the witness was being candid or you

7      can reject the witness's testimony in its

8      entirety.  That's up to you to decide.

9              The defendant in this case has

10      chosen not to take the stand.  As I told

11      you earlier, he is presumed to be innocent

12      and he is not required to prove his

13      innocence and he is not required to take

14      the witness stand.  He has a constitutional

15      right not to testify in this case, and you

16      should not infer anything prejudicial

17      whatsoever because he has not testified.

18              I charge you that flight from the

19      scene can be inferred by you as a guilty

20      state of mind.  Let me talk to you a little

21      bit about the elements of intentional

22      murder.  Mr. Joyce is charged with murder.

23      A person commits the crime of murder if he

24      causes the death of another person and in

25      performing the act or acts which caused the

1    death of that person, he intends to kill

2    that person.  To convict, the state must

3    prove beyond a reasonable doubt each of the

4    following elements of murder:  Number one,

5    that Mr. Friendly is dead.  Number two,

6    that Mr. Joyce caused the death of Mr.

7    Friendly by shooting him; and number three,

8    that in committing the act which caused the

9    death of Mr. Friendly, Mr. Joyce acted with

10    intent.

11         A person acts intentionally when

12    it is his purpose to cause the death of

13    another person.  If you find from the

14    evidence that the state has proved beyond a

15    reasonable doubt each of the above elements

16    of the offense of murder as charged then

17    you shall find the defendant guilty of

18    murder.  If you find that the state has

19    failed to prove beyond a reasonable doubt

20    any one or more of the elements of the

21    offense of murder, then you cannot find the

22    defendant guilty of murder.

23         In a moment we are going to ask

24    you to go back here in this jury

25    deliberation room and begin your

1    deliberations.  When you consider the
2    evidence in reaching your verdict, you have
3    the right to use your knowledge of people
4    and their affairs.  That's what we call
5    common sense.  It is more than your right
6    to use your common sense.  We ask you to
7    please use your common sense.  That's why
8    we've got y'all here to begin with.
9           Do not let sympathy, prejudice or
10   emotion influence your verdict.  Do not
11   base your verdict upon any preconceived
12   ideas of what would be a popular or
13   unpopular verdict.  As you know, your
14   verdict must strictly be based on the
15   evidence presented and the law that applies
16   to the case.
17           Also, I want to explain to you
18   that before you can reach a verdict, all
19   twelve of you must agree on that verdict.
20   It cannot be a split verdict, it must be
21   unanimous.  In a moment when you go back to
22   the jury room, the first thing you need to
23   do is select a person to act as your
24   foreperson.  That person has no greater
25   weight in your deliberations than anyone

1    else.  That person is simply going to act

2    as your spokesperson.

3              I also notice that some of y'all

4    have taken notes, and that's fine.  I

5    encourage that.  I have no problem with

6    that.  Just because someone has something

7    written down as a note doesn't mean that

8    that's exactly the way it happened.  Rely

9    on -- each of y'all has a say on what goes

10   on back there.  If your recollection

11   differs from someone else's notes, the fact

12   that someone took a note doesn't

13   necessarily make it so.  Y'all need to talk

14   it out and arrive at the true facts of the

15   case.

16             In the course of your

17   deliberations you may have a question.  If

18   you do so, knock on this door that is

19   around on this side.  Someone from my

20   office will come answer the door.  Write

21   down your question on a piece of paper.

22   We'll do our very best to answer the

23   question.  I can promise you one thing, we

24   won't ignore your question.  However, I

25   don't think I can promise -- I may not be

1           able to answer your question.  Let me just

2           kind of give you this little test.  If it

3           is a question about the facts of the case,

4           what a witness said or something like that,

5           I probably will not be able to help you.

6           That is your job to decide the facts.  If

7           it is a question about the law, I may well

8           be able to help you.  My role is more with

9           the law.  But if you have a question, write

10          it down on a piece of paper, knock on

11          door.  We'll come and get you.

12                  When you reach a verdict, have

13          your -- knock on the door.  We'll come and

14          get you.  Have your -- you need to fill out

15          this verdict form.  The verdict form -- I

16          don't know how well you can see this, but

17          it says, we, the jury, find the defendant

18          guilty of intentional murder as charged in

19          the indictment.  Or, second part.  We the

20          jury find the defendant not guilty.  Check

21          here if you find the defendant guilty, here

22          if you find the defendant not guilty.  Have

23          your foreperson print his name.  The

24          foreperson signs it.  Dates it.  Knock on

25          this door.  Again, we'll come and get you.

1          One last thing I have got to do

2     before we let you begin your

3     deliberations.  I keep talking about it has

4     got to be unanimous.  All twelve of you

5     have to agree.  You may have noticed we

6     have thirteen people here today.

7          Mr. Carr, you are our alternate

8     juror.  I always feel badly for the

9     alternate juror.  He has to sit there and

10    hear all the evidence.  You get right up to

11    the brink of actually being able to do

12    something in the case and we pull you back

13    and we won't let you decide.  However, some

14    people are happy at that point.  They don't

15    have to make that decision.

16         The reason we put an alternate on

17    the jury is you never know when someone is

18    going to have a family emergency or become

19    ill or something.  If that were to happen,

20    we would have to start all over.  So that's

21    why we have an alternate.  I hope you

22    understand, and we do appreciate your being

23    here.  I'm going to send you back.  Let you

24    begin your deliberations.  Ms. Shelton will

25    bring the exhibits back to you in just a

1    second.

2                    (The jury begins their

3    deliberations.)

4                    THE COURT:  Just note on the

5    record the parties -- both parties are

6    satisfied with the charge.

7                    (Brief Recess.)

8                    (The following proceedings were

9    held outside the presence and hearing of

10   the jury.)

11                   THE COURT:  Let me have

12   everybody's attention while we are waiting

13   for everybody to get here.  When the jury

14   gives their verdict, I don't want there to

15   be any outbursts in this courtroom.  I

16   don't want there to be any noise.  I don't

17   want there to be any amens, hallelujahs or

18   regrets or anything else.  If you cannot

19   restrain yourself when the verdict is going

20   to be read, go ahead and leave now.

21   Otherwise, we are going to be spending some

22   extra time with you this afternoon.

23                   When the verdict is read, the

24   Friendly family and their friends are going

25   to leave the courtroom first.  Then we are

```
1        going to let the jury leave.  Then we will
2        let the Joyce family leave.  I'm not going
3        to have altercations or anything in this
4        courthouse.  If there is anybody that can't
5        handle that, leave now and get out of the
6        courthouse.  Okay?
7                    (The jury enters the courtroom.)
8                    THE BAILIFF:  Be seated.
9                    THE COURT:  Ladies and gentlemen,
10       I understand y'all have reached a verdict?
11                   THE FOREPERSON:  Yes, sir, we
12       have.
13                   THE COURT:  I will read the
14       verdict form that you just handed me.  In
15       the Circuit Court of Montgomery County,
16       Alabama, the State of Alabama versus
17       defendant Darryl Joyce.  We the jury find
18       the defendant guilty of intentional murder
19       as charged in the indictment.  Is that
20       y'all's verdict?
21                   THE FOREPERSON:  Yes, it is, Your
22       Honor.
23                   THE COURT:  Okay.  MR. HARTLEY:
24       We ask for a poll of the jurors.
25                   (At which time the Court polls
```

1    the jury.)

2              THE COURT:  The Court will enter

3    an adjudication of guilty on the charge of

4    murder in this case.  Ms. Friendly, if you

5    want to leave with your family and friends

6    right now, I would appreciate that.

7              (Parties leaving the courtroom.)

8              THE COURT:  Members of the jury,

9    I appreciate your service.  It was a

10   difficult case, I understand.  I appreciate

11   y'all hanging in there with us these two

12   days.  The only good news I can give you is

13   you are released for the rest of this day.

14   You need to call code-a-phone tonight and

15   they will let you know if you need to be

16   back in the morning or not.

17             Again, every Judge, everybody

18   that works here at the courthouse deeply

19   appreciates y'all doing your civic duty of

20   coming down here and giving us your time.

21   Thank you.  If y'all will go back this way,

22   the deputy will take y'all out of the

23   courthouse.

24             (The jurors exit the courtroom.)

25             THE COURT:  Wiley, you need to

1    apply for a presentence report, and we will

2    do the sentencing on August 18th.

3           MR. POWELL:  Judge, did you

4    accept the verdict and adjudicate Mr. Joyce

5    guilty?

6           THE COURT:  Yes, I did.

7           MR. POWELL:  At this point, just

8    for the Record, the State is putting the

9    Court on notice of three prior felony

10   convictions for the purpose of the Habitual

11   Felony Offender Act.

12          THE COURT:  Anything else here

13   today?  The Court is in recess.

14          (COURT ADJOURNED.)

15

16

17

18

19

20

21

22

23

24

25

1              IN THE FIFTEENTH JUDICIAL CIRCUIT
             IN AND FOR MONTGOMERY COUNTY
2                   MONTGOMERY, ALABAMA

3

4

5       STATE OF ALABAMA,

6              Plaintiff,

7       VS.                        CRIMINAL ACTION

8       DARRYL J. JOYCE,            NO. 02-1417

9              Defendant.

10      _____/

11      COURT REPORTER'S TRANSCRIPT OF SENTENCING

12                  AUGUST 18, 2003

13          MONTGOMERY COUNTY COURTHOUSE

14                 COURTROOM 3-A

15

16      BEFORE:  THE HON. TRUMAN M. HOBBS, JR.

17               CIRCUIT JUDGE

18

19                  APPEARANCES

20

        FOR THE STATE:
21      WILLIAM POWELL, ESQUIRE
        DEPUTY DISTRICT ATTORNEY
22      MONTGOMERY, ALABAMA

23      FOR THE DEFENDANT:
        J. WILEY HARTLEY, ESQUIRE
24      MONTGOMERY, ALABAMA

25

1              *  *  *  *  *  *  *  *  *  *  *  *  *  *  *

2                   THE COURT:  Wiley, do you want

3        a formal sentencing hearing?

4                   MR. HARTLEY:  Judge, this might

5        rise to the level of a formal sentencing

6        hearing.  We want to have an opportunity

7        for Mr. Joyce to speak if he is inclined

8        but we definitely want to have some

9        testimony from his mother -- and I'm

10       sorry, I will have to get you to

11       introduce this person to the Court, if

12       you would.

13                  MS. PATTERSON:  I'm Pat

14       Patterson.  I'm his aunt.

15                  MR. HARTLEY:  Yes, Judge.  We

16       do want to take these people.  If you

17       want to put them under oath or however

18       you want to proceed, Judge.

19                  Judge, what I would like to

20       mention on behalf of Mr. Joyce is that

21       the Court, I presume, has looked at this

22       presentence report, which reflects part

23       of Mr. Joyce's record.  We submit to the

24       Court that of interest here, Judge, is

25       that I believe he has had no convictions

1    for anything other than class C

2    felonies.  The assault seconds on this

3    record are class C's.

4            I don't know what the State

5    might say about those cases but an

6    assault second is always a class C

7    felony.  Some of those original charges

8    -- one of them was disposed of by a

9    conviction of a misdemeanor.  So it

10   wasn't a class C felony when it was done.

11   That was a 1997 case.

12           We ask that the Court take all

13   the matters into consideration.  When we

14   hear from his mother and from his aunt,

15   that the Court only consider the

16   alternative for life in this case.  I

17   think that would be -- I think that would

18   be the correct sentence for Mr. Joyce

19   under the circumstances.  I would like to

20   let her speak, Ms. Ruby Joyce.

21           MS. JOYCE:  Judge, I would just

22   like to take this time to just really put

23   my son's life in your hands, on the mercy

24   of the Court.  He is the only son I

25   have.  I was married to his father for

1    twenty-seven years.  His father is now

2    deceased.  He died while he was in jail.

3    He has been dead now six years.

4         He has two daughters, one ten

5    and one eight.  I just would like to put

6    myself and my son and the family on the

7    Court's mercy.

8         THE COURT:  Thank you, ma'am.

9         MR. HARTLEY:  Ms. Patterson,

10   you want to say anything?

11        MS. PATTERSON:  Good morning.

12   How are you doing?  I would just like to

13   appeal for a life sentence.  I am aware

14   of his past.  All things considered, I

15   would really appreciate some mercy.

16        THE COURT:  Okay.

17        MR. POWELL:  Judge, first of

18   all, the victim's family is present.

19   They just are going to choose to remain

20   seated there because of the emotion

21   involved in the case.

22        We have a victim's impact

23   statement.  Does Your Honor have one in

24   the file?  If not, I would be happy to

25   provide you my copy.

1            THE COURT:  I don't.

2            MR. POWELL:  Here, Your Honor.

3            MR. HARTLEY:  We would like to

4     get a copy.

5            MR. POWELL:  We can arrange for

6     that, Judge.  The main thing I would like

7     to address at sentencing, Judge, is --

8            (Off-the-Record Discussion.)

9            THE COURT:  Let's just take a

10    two-minute break.  Let's make sure

11    everybody has got everything.

12            (Brief Recess.)

13            THE COURT:  Okay.  I have read

14    these letters.  I appreciate that.

15            MR. POWELL:  Judge, the main

16    thing I want to address at this point is

17    the Defendant's record.  Though Mr.

18    Hartley was correct that all of the

19    charges or most of them were either class

20    C misdemeanors or felonies or a

21    misdemeanor -- class C felonies or

22    misdemeanors, they all involve offenses

23    where the defendant was shooting at

24    people, at vehicles, or actually shooting

25    people.

1          It is just the way the assault

2     statutes are written in the State of

3     Alabama, particularly until recently

4     until they changed the law on how you

5     define serious physical injury.  Back

6     then it basically had to be life

7     threatening.  And if you just shoot

8     somebody in the leg or the arm or

9     something like that, then that's just a

10    class C felony.

11         But nonetheless, the first

12    offense occurred on 10/15 of 1994.  The

13    victim is Quivan (sic) Martin.  Stand up,

14    Quivan.  This individual, they were at an

15    intersection of Bitner and Sherwood, and

16    the defendant fired a .32 revolver at the

17    victim while the victim was inside

18    his '79 Olds Cutlass.

19         I think the defendant then gave

20    a statement in that case and said that he

21    shot four times and scared the victim.

22    Hit the windshield and ran and disposed

23    of his gun by giving it to a junky.

24         The next incident in this case

25    was nol-prossed but it was part of a

1       package deal with the prior case.  On

2       11/7 of '94 he again had an altercation

3       with Mr. Martin.  The victim, Mr. Martin,

4       was leaving the Hardee's restaurant over

5       around Oak and Mill Street.  The

6       defendant and several others followed.

7       One of them was hanging out the window

8       shooting.  Five shots were fired at the

9       victim's Olds Cutlass in that case.

10               MR. HARTLEY:  Your Honor, can I

11      interject -- I mean interrupt and ask Mr.

12      Powell to distinguish these by case

13      numbers so we will know exactly where we

14      are.  The first one -- go back and cite

15      for us, please, the case number on the

16      first one.

17               MR. POWELL:  The first incident

18      where he shot at Mr. Martin's car was

19      CC 94-2506.  Here is my certified prior

20      felony conviction on that one if you want

21      to look at it.  The second incident

22      involving Mr. Martin was CC 95 -- looks

23      like 132.

24               THE COURT:  Is this the one

25      that was nol-prossed?

1      MR. POWELL: This is the one
2   that was nol-prossed.
3      THE COURT: I can't consider
4   one that has been nol-prossed. Let's
5   don't even go there. That just creates a
6   problem for everybody.
7      MR. POWELL: The next incident
8   -- and this is going to be CC 96-1980.
9   It is an assault in the second degree.
10   The victim in that case was an individual
11   named Johnny Lawson, Jr. Here is our
12   certified on that one. The facts in this
13   case are markedly similar to the facts in
14   the case you heard at trial, Judge.
15      Basically, the victim and the
16   defendant were in an argument. The
17   defendant just pulled out a gun and shot
18   the victim. The victim ran and the
19   defendant shot him again in the leg.
20   There were several witnesses, and he pled
21   guilty to that count.
22      The next incident -- looks like
23   it is going to be CC 97-1984 and 1985.
24   These were felony convictions for assault
25   in the second degree. That involved an

1    individual named Henry Green and Pleasant

2    Polanski.  There the defendant and the

3    victims were all stopped at the same red

4    light.  Apparently words were exchanged

5    between the cars, and the defendant

6    pulled a gun and shot at the car five to

7    six times hitting both of the victims in

8    the process.  He pled guilty to that and

9    received a sentence of fifteen years

10   split to serve three.

11           The final case -- these were

12   the assault seconds that were pled out to

13   misdemeanors, were CC 97-2031 and

14   97-2053.  I have got certifieds on them.

15           MR. HARTLEY:  They are just

16   misdemeanors, Judge.  They are not

17   priors.

18           MR. POWELL:  We are not

19   offering them as priors.  We have already

20   got three priors, but he can consider

21   them for sentencing purposes.  They were

22   reduced to misdemeanors.

23           In that case, the victims were

24   Tawan Brown and Steven Stewart.  They are

25   driving through the Windy Wood

1    Apartments.  The defendant was driving in

2    the opposite direction.  They passed each

3    other at a speed bump, and the defendant

4    shot at the victim's car.  He shot Mr.

5    Stewart in the face and leg and he shot

6    Mr. Brown in the shoulder.  I think those

7    were pled out in a package deal with the

8    prior two felony convictions with Mr.

9    Green and Mr. Polanski.

10            So, basically, if you look at

11    the defendant's priors, Judge, we have

12    got a progressive pattern from

13    discharging a gun into occupied vehicles,

14    to shooting at people, to actually

15    shooting people on one, two, three, four,

16    five people he has actually shot --

17    actually bullets hit them and one person

18    he shot at.

19            That's before we even get to

20    this case you heard at trial, which he

21    finally lost his temper, or whatever you

22    want to call it out there, shot and

23    killed Mr. Friendly for basically no

24    apparent reason whatsoever.  At this

25    point --

1          THE COURT:  Am I correct he was

2     on probation at the time he --

3          MR. POWELL:  That would be

4     accurate, Judge.

5          THE COURT:  How long had he

6     been out?

7          MR. POWELL:  That, I'm not

8     sure.  It hadn't been long.

9          THE COURT:  Yeah.

10          MR. POWELL:  I can't remember

11     what the witnesses told me.

12          THE COURT:  Wiley, anything

13     y'all want to say?

14          MR. HARTLEY:  Mr. Joyce wants

15     to speak, Judge.

16          THE DEFENDANT:  Yes, Your

17     Honor.  Your Honor, I did that.  I did

18     all that.  Some of the issues I was

19     trying to get Mr. Hartley to speak at

20     trial, he said he couldn't bring forth

21     because I didn't take the stand with it.

22     I didn't kill the dude and ran to

23     California.  I seen the dude.  I know who

24     killed the dude.  When he was killed, me

25     and my home boy, we left.

1                   THE COURT:  I'm sorry.  What

2        did you say?

3                   THE DEFENDANT:  When the dude

4        was killed, the dude I was with, we

5        left.  Some dudes called on my cell

6        phone, which the only dude that have my

7        cell phone, right?  That's the only dude

8        I know.  And I met D. . .

9        (unintelligible).  When D called my cell

10       phone said if you and your home boy talk

11       to the police in any kind of way, you'll

12       end up like Boo or somebody close to

13       you.  I ain't trying to make up no lies.

14       It scared me for my folks.  I thought the

15       best thing for me to do is just leave.  I

16       told them on the phone, I said, look,

17       man, y'all ain't got to worry about me

18       because I'm gone.  Plus, I just got out

19       of prison five years.  I did five years.

20       I left for the safety of my folks in case

21       their house didn't got shot up.

22                   A few years ago, I catch

23       another case or maybe somebody kill me.

24       That's the reason I left.  I ain't get in

25       no argument with no dude about who the

1    baddest.   The argument was about some

2    money.   Boo and Rabbit was arguing about

3    money.   Boo told Rabbit, man, you going

4    to take my mother fuckin' money, like

5    that.   I was trying to break them up.   I

6    thought Boo was from Smiley Court.   They

7    were still arguing.

8         I told -- I told Boo -- I told

9    Boo, I said, look, man, whatever he -- I

10   know now he had some stuff.   I said, man,

11   whatever you owe him give it back to

12   him.   He said no, fuck that.   It's the

13   principle.   He got me fucked up.   He

14   ain't going to take my shit like that.

15   Boo said, you know, I'll come back and

16   shut this bitch down.   Rabbit said, you

17   ain't gonna shut shit down in Smiley

18   Court.

19        THE COURT:   Mr. Joyce, I will

20   listen to whatever you have got to say

21   but I don't decide your guilt or

22   innocence.

23        THE DEFENDANT:   It's the facts

24   that Mr. Hartley couldn't bring up that I

25   was telling him.

1          THE COURT:  The jury found you

2     guilty.  I've got to respect that

3     verdict.  I can't substitute my judgment

4     for the jury's verdict.

5          THE DEFENDANT:  I ain't shoot

6     the man, Mr. Hobbs.

7          THE COURT:  I can't -- the jury

8     says you did.  As far as I'm concerned --

9          THE DEFENDANT:  The dude that

10    came with me -- excuse me.  The dude that

11    came with him said who shot him.  Bryant

12    Thomas told the detective who shot him.

13    The gun was in the courtroom.  That's the

14    gun Rabbit had.  I was stopping Rabbit

15    from shooting me.  He told D to shoot

16    Boo.  Boo was shooting at Bryant Thomas.

17         THE COURT:  Anything else?

18         THE DEFENDANT:  Then the girl

19    in the corner said he was in the house

20    but first she said he fled the scene.  I

21    ain't shoot the dude.  The only thing I

22    knew -- I didn't shoot the dude.  I know

23    who did it.

24         THE COURT:  I understand you

25    are saying you are innocent.

1          THE DEFENDANT:  I ain't fixing

2     to -- ain't no way in the world I am

3     going to walk up to somebody I don't know

4     and say I'm badder than you.  I didn't

5     even know the man.  I was trying to break

6     them up.  I didn't want to be around no

7     trouble.  I just got out of prison.

8          THE COURT:  Anything else?

9          MR. HARTLEY:  Judge, if Mr.

10    Joyce wants to say more, I want him to

11    have every opportunity to speak to the

12    Court.  Judge, I would say that we would

13    ask you to consider the life sentence

14    because even at his best hope he will

15    serve a very, very, very long time on a

16    life sentence.  We ask the Court not to

17    take away that twenty years from now or

18    thirty years from now he might make a

19    parole date.  That's all we are asking

20    because the finality of a life without

21    parole sentence, Judge, we believe

22    doesn't fit this case.

23          MR. POWELL:  Your Honor, I just

24    remind you of the names of Quivan Martin,

25    Johnny Lawson --

1　　　　　　　　THE DEFENDANT:  Your Honor, I

2　　did that.

3　　　　　　　　MR. POWELL:  -- Henry Green,

4　　Pleasant Polanski, Tawan Brown, Steven

5　　Stewart, and now James Friendly.  Enough

6　　is enough.

7　　　　　　　　THE DEFENDANT:  Your Honor, I

8　　did that.  I was young.  I did that, but

9　　if you know the issues behind that, it

10　　was either me or them.  I didn't kill

11　　this dude here.  Like I said, I know who

12　　killed him.  I seen who killed him.  I

13　　was right there.  B.K., he say -- he got

14　　on the stand.  He said he didn't know the

15　　dude but him and Rabbit, they grew up

16　　together.  I know D, so I know you know

17　　him.  The girl said when she came outside

18　　they fled the scene.  Then she come to

19　　court and say he was in the house when

20　　she went outside.  Rabbit said he was

21　　across the street.

22　　　　　　　　THE COURT:  The problem in this

23　　whole thing, you got two guys -- what I

24　　remember the testimony being, it is

25　　pretty clear to me, both in gangs.  I'm

1    not going to consider that for the

2    sentencing but, you know, I don't see any

3    thirty-five year old gangsters in the

4    courtroom.  They are either dead like Boo

5    or they are standing where you are.

6    That's the problem here is guns.

7    Shooting has just gotten to be a way of

8    life with some folks.

9              I'm sorry, Ms. Joyce.  I don't

10   know what got your son headed down this

11   path but that's the path he chose.

12   Sometimes I don't follow the

13   prosecution.  Sometimes I strongly

14   disagree with them.  But, you know, you

15   shot too many people, man.

16              THE DEFENDANT:  Judge, if you

17   just knowed everything.  In your

18   courtroom, the dude was lying on me.

19              THE COURT:  Mr. Joyce, let me

20   just say this.

21              THE DEFENDANT:  I was holding

22   my composure.

23              THE COURT:  I had a previous

24   case.  The jury found the guy -- a very

25   serious crime.  They found him guilty of

1     a lesser crime.  If they found him guilty

2     of the serious crimes, I would have

3     thrown the book at him but I couldn't do

4     it because I had to respect their verdict

5     when they found him guilty of relatively

6     lesser crimes.

7           But the jury has found you

8     guilty.  I can't do anything about that.

9     I have to believe -- I have to sit up

10    here and accept their jury verdict even

11    if I disagreed with it, which I don't.

12    They found you guilty.  And that's what

13    I'm looking at now.  You've shot at four

14    or five people.  Now, you killed a man.

15          THE DEFENDANT:  I didn't kill

16    that dude.

17          THE COURT:  Well, I think you

18    did.  The jury sure thought you did.

19          THE DEFENDANT:  The only reason

20    I was in California -- he never said why

21    I was in California.

22          THE COURT:  I don't think being

23    in California helped you one bit.

24          THE DEFENDANT:  The dude -- if

25    me and you go to a party and somebody

1   kill me, I know you know who killed me.

2          THE COURT:  If I go to a party,

3   I'm not going to carry a gun and I'm not

4   going to be at a party calling people

5   -- using the kind of language you've

6   just used in my courtroom.

7          THE DEFENDANT:  I'm just

8   speaking from the heart.

9          THE COURT:  Mr. Joyce, you have

10  got to learn to turn and walk away.

11         THE DEFENDANT:  I apologize,

12  Judge, for cussing.

13         THE COURT:  Don't apologize to

14  me.

15         THE DEFENDANT:  I ain't killed

16  all -- Ms. Friendly, I ain't killed your

17  son.

18         MS. FRIENDLY:  D said you did.

19  I don't --

20         THE COURT:  We are not going

21  there.  I'm going to sentence you to life

22  without parole.  I'll order you to pay

23  fifty dollars to the Crime Victims

24  Compensation Fund.

25         THE DEFENDANT:  What, Your

1      Honor?

2                  THE COURT:   Restitution in the

3      amount of?

4                  MR. POWELL:   The restitution

5      totals seven thousand six hundred and

6      seventy-five dollars and fifty-one cents.

7                  THE COURT:   All right.

8      Restitution in that amount.   Court

9      costs.   A hundred and fifty dollars

10     attorney fee.   You have a right to appeal

11     your conviction and your sentence.   We

12     will appoint an attorney for you if you

13     can't afford one.   We'll give you a

14     transcript of the proceedings free of

15     charge.

16                  MR. HARTLEY:   Judge, he does

17     give notice of appeal, both the sentence

18     and the trial -- and the conviction,

19     Judge.   We ask that the Court appoint him

20     a counsel on appeal, provide him with a

21     transcript.

22                  THE COURT:   You need to enter a

23     piece of paper withdrawing.

24                  MR. HARTLEY:   Yes.   I will make

25     a motion to withdraw.   I know you always

1    appoint.

2              MR. POWELL:  Are there any

3    fines or attorneys fees in this case?

4              THE COURT:  I said a hundred

5    fifty dollar attorney fee, I believe.

6    Fifty dollars Crime Victims Compensation

7    Fund.

8              MR. HARTLEY:  Judge, I have

9    gone over this with my client, but I

10   think we need to make a record on this.

11   We ask for an appeal bond, Judge.

12             THE COURT:  I'm not going to

13   give it.

14             MR. POWELL:  Besides that,

15   Judge, under the Rules of Criminal

16   Procedure in a sentence of twenty years

17   or more, you are ineligible for an appeal

18   bond.

19             MR. HARTLEY:  We just want that

20   on the Record.

21             THE COURT:  I understand.  It

22   is on the Record.  That's it.

23             END OF PROCEEDINGS

24

25

## CERTIFICATE

STATE OF ALABAMA        )
COUNTY OF MONTGOMERY    )


I, JUDY E. SHELTON, OFFICIAL COURT REPORTER IN AND FOR THE FIFTEENTH JUDICIAL CIRCUIT, MONTGOMERY COUNTY, ALABAMA, DO HEREBY CERTIFY THAT I REPORTED IN MACHINE SHORTHAND THE FOREGOING HEARING AS STATED IN THE CAPTION HEREOF; THAT MY SHORTHAND NOTES WERE LATER TRANSCRIBED BY ME OR UNDER MY SUPERVISION, AND THAT THE FOREGOING PAGES REPRESENT A FULL, TRUE AND CORRECT TRANSCRIPT OF SAID PROCEEDINGS; THAT I AM NEITHER KIN NOR OF COUNSEL TO ANY PARTIES IN THIS PROCEEDING NOR IN ANY WAY INTERESTED IN THE RESULTS THEREOF.

DATED THIS THE ____ DAY OF _____, 2003.


_____

JUDY E. SHELTON
OFFICIAL COURT REPORTER

1                    C E R T I F I C A T E

2

3       STATE OF ALABAMA        )
        COUNTY OF MONTGOMERY    )

4

5

6                    I, JUDY E. SHELTON, OFFICIAL

7       COURT REPORTER IN AND FOR THE FIFTEENTH

8       JUDICIAL CIRCUIT, MONTGOMERY COUNTY,

9       ALABAMA, DO HEREBY CERTIFY THAT I

10      REPORTED IN MACHINE SHORTHAND THE

11      FOREGOING HEARING AS STATED IN THE

12      CAPTION HEREOF; THAT MY SHORTHAND NOTES

13      WERE LATER TRANSCRIBED BY ME OR UNDER MY

14      SUPERVISION, AND THAT THE FOREGOING PAGES

15      REPRESENT A FULL, TRUE AND CORRECT

16      TRANSCRIPT OF SAID PROCEEDINGS; THAT I AM

17      NEITHER KIN NOR OF COUNSEL TO ANY PARTIES

18      IN THIS PROCEEDING NOR IN ANY WAY

19      INTERESTED IN THE RESULTS THEREOF.

20              DATED THIS THE 10th DAY OF Nov.,

21      2003.

22

23              _____Judy E. Shelton_____

24              JUDY E. SHELTON

25              OFFICIAL COURT REPORTER

CR-02-2104
Part 5 of 5

**DOCUMENT NAME:** Joyce, Darryl Jevon

**CLIENT & MATTER:** 58199-001

**DESCRIPTION:**

County: Montgomery                    CWOP

CC#s: 2002-1417

Attorney: Jean Therkelsen

Circle:  (TRANSCRIPT)    CASE FILE    BOTH

3 volumes

## CERTIFICATION

I hereby certify that the preceding imaged records and documents

are a true, accurate, and complete image of the original records or

documents as received by the Office of the Attorney General of

the State of Alabama.

This the 19th day of January, 2005.

Signed: Melisa C. Martin

Notary: Coleen F Gibson

Coleen F. Gibson
Notary Public
Commission expires 06/11/06